## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

COMMON CAUSE FLORIDA, et al.,

    *Plaintiffs,*

    v.                Case No. 4:22-cv-109-AW/MAF

CORD BYRD, in his official capacity as
Florida Secretary of State, et al.,

    *Defendants.*

_____/

## DEFENDANTS' MOTION TO DISMISS AND,
## IN THE ALTERNATIVE, MOTION TO STAY

Defendants, Governor Ron DeSantis and Secretary of State Cord Byrd, move to dismiss Plaintiffs' amended complaint under Federal Rule of Civil Procedure 12(b)(1) and (b)(6). In the alternative, at a minimum, the Defendants ask that this Court stay the case. Consistent with Local Rule 7.1(E), attached is a memorandum of law that explains the bases for the motion.

Respectfully submitted,

Bradley R. McVay (FBN 79034)
brad.mcvay@dos.myflorida.com
Ashley Davis (FBN 48032)
ashley.davis@dos.myflorida.com
FLORIDA DEPARTMENT OF STATE
R.A. Gray Building
500 S. Bronough St.
Tallahassee, FL 32399
(850) 245-6536

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
mjazil@holtzmanvogel.com
Gary V. Perko (FBN 855898)
gperko@holtzmanvogel.com
Michael Beato (FBN 1017715)
mbeato@holtzmanvogel.com
zbennington@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK
119 S. Monroe St. Suite 500
Tallahassee, FL 32301
(850) 270-5938

June 8, 2022

Jason Torchinsky (Va. BN 47481) (D.C.
BN 976033)
jtorchinsky@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK
15405 John Marshall Hwy Haymarket,
Prince William, VA 20169
(540) 341-8808

## CERTIFICATE OF SERVICE

I hereby certify that on June 8, 2022, I electronically filed the foregoing with the

Clerk of Court by using CM/ECF, which automatically serves all counsel of record for

the parties who have appeared.

/s/ Mohammad O. Jazil
Mohammad O. Jazil.

2

# INTRODUCTION

The Plaintiffs' amended complaint is long on rhetoric but short on facts. Plaintiffs allege that Florida's duly enacted congressional plan intentionally violates the Fourteenth and Fifteenth Amendments to the U.S. Constitution. They sue the Governor but fail to allege why he's a proper defendant under *Ex parte Young*, 209 U.S. 123 (1908). They attribute injuries to organizational Plaintiffs but fail to list any affected members or affected projects. They allege injuries to individual Plaintiffs living in specific districts but then seek relief well beyond the bounds of those districts. Even if Plaintiffs could steer clear of their Eleventh Amendment and Article III-standing problems, they still fail to state a claim for relief under the Fourteenth and Fifteenth Amendments because: (1) their district-specific allegations are speckled with flaws; (2) their novel theory that a race-neutral map must give way to a race-based map turns notions of equal protection on its head; and (3) they can't show discriminatory intent, an essential element of their constitutional claims. This Court should thus dismiss the Plaintiffs' amended complaint in its entirety.

In the alternative, and at a minimum, this Court should stay the proceedings. This is for two reasons. First, the state courts are already in the process of resolving another lawsuit challenging the State's congressional plan. Second, a stay would allow this Court and the Parties to benefit from the U.S. Supreme Court's decision in *Merrill v. Milligan*, where "the underlying question" focuses on what is and isn't "prohibited by the Equal Protection Clause." 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurral).

3

## FACTUAL BACKGROUND

After the 2020 decennial census, the State of Florida gained a congressional seat. Doc. 97 ¶ 41. To comply with the U.S. Constitution's one-person-one-vote requirement, the Florida Legislature passed a bill to equalize the State's population across 28 congressional districts, and the Governor signed that bill into law. *Id.* ¶ 74.

Plaintiffs allege that the State's newly enacted congressional plan intentionally violates the Fourteenth and Fifteenth Amendments to the U.S. Constitution, *id.* ¶¶ 75-112, to the detriment of "Black Floridians." *Id.* ¶¶ 1, 105, 110. Specifically, Plaintiffs allege that the State erred in redrawing what *had been* congressional districts 5, 10, and 13. *Id.* ¶¶ 79-90. None were majority-Black districts, and there's no claim that the Voting Rights Act mandated the prior configuration of these districts. *Id.*

Plaintiffs include organizations (Common Cause, FairDistricts, and Florida NAACP) and individuals (Inman-Johnson, Holt, Stoney, Young, and Ratzan). *Id.* ¶¶ 3-6. None of the organizational Plaintiffs identifies any member affected by the State's congressional plan, and none identifies any specific project frustrated by the plan. *Id.* ¶¶ 3-5. Only one of the individual Plaintiffs (Holt) lived in former congressional district 5, *id.* ¶ 6; one individual Plaintiff (Stoney) lived in former congressional district 10, *id.*; and none of the individual Plaintiffs lived in former congressional district 13. *Id.*

The Plaintiffs sue Governor DeSantis and the Secretary of State in their official capacities only. *Id.* ¶¶ 7-8. The Governor and Secretary move to dismiss or, at a minimum, to stay the proceedings until the resolution of other pending cases.

## STANDARD OF REVIEW

To survive a motion to dismiss, a complaint must allege facts sufficient to establish the Court's subject-matter jurisdiction. *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 924-25 (11th Cir. 2020) (en banc) (citations omitted); *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). The complaint must also "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This requires "factual content" that will support a "reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Pleading facts that are "merely consistent with a defendant's liability" isn't enough because such pleadings "stop[] short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557) (quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" either. *Id.* And while Plaintiffs' well-pled factual allegations are accepted as true, allegations in the form of legal conclusions are insufficient under Rule 12(b)(6) motion. *See Ziyadat v. Diamondrock Hosp. Co.*, 3 F.4th 1291, 1295-96 (11th Cir. 2021).

## ARGUMENT

Plaintiffs' amended complaint ought to be dismissed in its entirety. The Governor isn't a proper defendant. Plaintiffs—*all* of the organizations and three of the five individuals—fail to establish Article III standing. And Plaintiffs otherwise fail to state a claim for relief. Dismissal is thus appropriate. Alternatively, at a minimum, this

Court should stay these proceedings to allow the parallel state court case to proceed and to await further guidance from the U.S. Supreme Court.

## I.   The Governor is not a proper *Ex parte Young* defendant.

*Ex parte Young* serves as an exception to the States's Eleventh Amendment sovereign immunity. Under this exception, "[a] state official is subject to suit in his official capacity when his office imbues him with the responsibility to enforce the law or laws at issue in the suit." *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011). "[A] state officer, in order to be an appropriate defendant, must, at a minimum, have some connection with the enforcement of the provision at issue," *Osterback v. Scott*, 782 F. App'x 856, 859 (11th Cir. 2019) (citations omitted), "such that an injunction prohibiting enforcement would be effectual" against that defendant. *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021). And, where the Governor is sued, his general executive authority to enforce state law and oversee the executive branch "is *insufficient* to make him the proper party." *Harris v. Bush*, 106 F. Supp. 2d 1272, 1276-77 (N.D. Fla. 2000) (collecting cases) (emphasis added); *see also Women's Emergency Network v. Bush*, 323 F.3d 937, 949 (11th Cir. 2003) ("A governor's 'general executive power' is not a basis for jurisdiction in most circumstances."); *Osterback*, 782 F. App'x at 859 ("the Governor's constitutional and statutory authority to enforce the law and oversee the executive branch do not make him a proper defendant under *Ex Parte Young*," nor does his "partial responsibility for administering a challenged statute").

In this case, Plaintiffs themselves acknowledge that the Secretary of State is generally "responsible for the administration and implementation of election laws in Florida." Doc. 97 ¶ 8. He's the State's Chief Election Officer and, as is relevant here, is responsible for qualifying candidates running in specific congressional districts, overseeing the reporting of results for any congressional election, and then certifying those results. *See, e.g.*, Fla. Stat. §§ 97.012(1), 99.061(6). The relief Plaintiffs seek in this case would enjoin the Secretary from administering *his* duties based on the current congressional map. Doc. 97 at p. 49. The Secretary is thus the appropriate defendant under *Ex parte Young. See Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1256 (11th Cir. 2020) (acknowledging that "the only issue" that *DNC v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019), addressed was "whether the Secretary is a proper defendant under *Ex parte Young*" and the *DNC* court answered that in the affirmative).

The Governor is not. Plaintiffs "named" the Governor as a defendant "in his official capacity" because "[t]he executive power is vested in [him] by the Florida Constitution, including the power of 'direct supervision' over 'administration' of the Department of State." Doc. 97 ¶ 7 (citing Fla. Const. art. IV, § 6). That general supervisory authority over the executive branch and its officials isn't enough for *Ex parte Young. See Women's Emergency Network*, 323 F.3d at 949; *Osterback*, 782 F. App'x at 859; *Harris*, 106 F. Supp. 2d at 1276-77. Nor is it specific enough to justify Plaintiffs' broad request for an injunction—a request that never identifies any specific duties of

the Governor that they seek to enjoin. *See Support Working Animals,* 8 F.4th at 1201. This Court should thus dismiss the Governor as a defendant.

## II. Every organizational Plaintiff and three of the five individual Plaintiffs fail to allege Article III standing.

In addition, neither the organizational Plaintiffs nor the individual Plaintiffs Inman-Johnson, Young, and Ratzan has established standing to sue. Standing is a burden that "rests with the party bringing the claim." *Williams v. Poarch Band of Creek Indians*, 839 F.3d 1312, 1314 (11th Cir. 2016).

**A.** First, the organizations. It's axiomatic that organizations must suffer their own injuries-in-fact: "[A]n organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art[icle] III." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976). Organizational injuries that rely on a diversion-of-resource theory require the identification of the projects or activities *from which* resources are being diverted and the projects and activities *to which* the resources are being diverted. *See Jacobson*, 974 F.3d at 1250-52. Alternatively, organizations must show standing through the standing of their members, which would require identifying members in the affected districts. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) ("identify members who have suffered the requisite harm"); *see, e.g., LULAC v. Abbott*, 2022 U.S. Dist. LEXIS 91761, at *19 (W.D. Tex. May 23, 2022) (three-judge court). It's not enough for organizations to generally allege

that the redistricting plan harms their members by preventing them from electing their candidates of choice. *Iqbal*, 556 U.S. at 678; *Summers*, 555 U.S. at 499.

Applied here, the organizational Plaintiffs' allegations fall short of the standards to plausibly allege standing. Specifically, their allegations are as follows:

- Plaintiff Common Cause alleges that it "brings this action in its representative capacity on behalf of its members and in its organizational capacity." Doc. 97 ¶ 3. With respect to the former, Common Cause doesn't allege any members in the allegedly discriminatory districts. *Id.* With respect to the latter, Common Cause alleges that its "organizational activities will be impeded and it will need to spend additional resources in Florida to counter the discriminatory effects on Black voters because of the Enacted plan." *Id.* There're no facts explaining how these activities would be impeded or why additional resources must be spent. *See id.*

- Plaintiff FairDistricts Now alleges that its "organizational activities will be impeded and it will need to spend additional resources in Florida to counter the discriminatory effects on Black voters because of the Enacted Plan." *Id.* ¶ 4. There're no facts explaining how these activities would be impeded or why additional resources must be spent. *See id.*

- Plaintiff Florida NAACP alleges that it "brings this action in its representative capacity on behalf of its members and in its organizational capacity." Doc. 97 ¶ 5. With respect to the former, Florida NAACP does not allege any members in the allegedly discriminatory districts. *Id.* With respect to the latter, there're no allegations about how its organizational activities will be affected, let alone harmed. *Id.*

These conclusory allegations of harm are insufficient to establish standing. *Iqbal*, 556 U.S. at 678; *see also, e.g.*, *Jacobson*, 974 F.3d at 1250-52 ("Harm to an organization's generalized partisan preferences describes only 'a setback to its abstract social interests,' which is insufficient to establish a concrete injury in fact.") (quoting *Havens Realty Corp.*

*v. Coleman*, 455 U.S. 363, 379 (1981)); *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1342 (11th Cir. 2014) (requiring "a concrete and demonstrable injury, not an abstract social interest" for organizational standing).[1]

**B.** Second, the individual Plaintiffs. They live only in the following districts: former congressional district 2 (now in enacted district 2); former congressional district 5 (now in enacted district 2); former congressional district 10 (now in enacted district

---

[1] Today's Eleventh Circuit opinion in *GALEO v. Gwinnett County Board of Registration and Elections*, 20-14540 (11th Cir. June 8, 2022) underscores the problems with Plaintiffs' allegations. In *GALEO*, the district court granted the defendants' motion to dismiss and held that the plaintiffs, including the organizational plaintiff GALEO, lacked standing. Slip op. at 14. The Eleventh Circuit, citing *Jacobson*, reversed that determination. *Id.* at 18-25. Specifically, the court held that GALEO had standing under its diversion-of-resources theory. *Id.* Why? The *GALEO* plaintiffs pled more facts than the organizational Plaintiffs in this case. Among other things, they said:

> Because Defendants provide English-only election materials, including absentee ballot applications, to Gwinnett County's LEP Spanish-speaking voters, GALEO has diverted, and will continue to divert, time and resources that would ordinarily be directed to GALEO's other organizational goals and priorities, in an effort to help mitigate the failure of the Defendants to comply with Sections 203 and 4(e). For example, GALEO is reaching out to and educating LEP Spanish-speaking voters about how to navigate the mail voting process and how to complete the application, as well as other aspects of the electoral process. GALEO staff members such as Darrick Alvarez are assisting LEP voters who received English-only applications such as his parents and Nelson Romero with navigating the absentee voting process.

*GALEO v. Gwinnett Cnty. Bd. of Registration & Elections*, 20-cv-01587, ECF No. 36 ¶ 15 (N.D. Ga. June 8, 2020). Here, the amended complaint includes no such specificity.

10); former congressional district 19 (now in enacted district 19); and former congressional district 27 (now in enacted district 24). Doc. 97 ¶ 6.

But Plaintiffs Inman-Johnson (always having resided in district 2), Young (always having resided in district 19), and Ratzan (previously residing in district 27 and now in district 24) live in districts that're not at issue in the amended complaint. The amended complaint challenges only the former district 5 (now redrawn to cover districts 2, 3 and 4), the former district 10 (now redrawn to cover district 10), and the former district 13 (now redrawn to cover districts 13 and 14). *See id.* ¶¶ 53-91. Accordingly, Inman-Johnson, Young, and Ratzan should be dismissed as Plaintiffs; they're voters who "assert[] only a generalized grievance against governmental conduct" which they don't approve. *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018); *id.* at 1965 (Kagan, J., concurring) (collecting cases for the proposition that where cracking and packing of voters is concerned, i.e., allegations of vote dilution, "a plaintiff must prove . . . that she lives in a district that has been either packed or cracked"); *Lujan*, 504 U.S. at 560-61 (requiring an injury that's "not conjectural or hypothetical"); *LULAC*, 2022 U.S. Dist. LEXIS 91761, at *34 ("Standing appears lacking with respect to CDs 20, 34, and 35. None of the *Voto Latino* Individual Plaintiffs resides in those districts.").[2]

---

[2] Tellingly, Plaintiffs also did not provide any "remedy" map that would demonstrate specific harms that would be remedied as a result of this lawsuit from any one of the individual Plaintiffs. *See Gill*, 138 S. Ct. at 1916.

Relatedly, the amended complaint contains allegations about the St. Petersburg-area congressional districts, congressional districts 13 and 14. *See* Doc. 97 ¶¶ 90-91. But no individual Plaintiffs have standing to pursue those allegations because none live within those districts. *Supra.* And there's no organizational Plaintiff with sufficient standing to pursue any of the allegations related to those districts (or any others). *Supra.* Accordingly, this Court should dismiss the Plaintiffs' allegations regarding districts 13 and 14. *See Gill*, 138 S. Ct. at 1930; *id.* at 1965 (Kagan, J., concurring); *LULAC*, 2022 U.S. Dist. LEXIS 91761, at *34-35 ("The *Voto Latino* Individual Plaintiffs residing in south and west Texas have not shown their standing to challenge districts where they don't live and have not plausibly alleged injury.").

## III. Plaintiffs fail to state a claim for relief under the Fourteenth and Fifteenth Amendments to the U.S. Constitution.[3]

### A. *Plaintiffs' district-specific allegations are insufficient to state an Equal Protection Clause violation.*

Plaintiffs allege that the enacted legislation violates the Equal Protection Clause because it "eliminates" two districts that were "historically Black performing districts" (former districts 5 and 10). Doc. 97 ¶ 78. Plaintiffs also include allegations regarding congressional district 13. *Id.* ¶¶ 90-91. Based on these allegations, Plaintiffs say that "the

---

[3] Courts apply the same framework when considering redistricting claims under the Fourteenth and Fifteenth Amendments. *See generally Ala. Legis. Black Caucus v. Alabama*, 989 F. Supp. 2d 1227, 1288 (M.D. Ala. 2013) (three-judge court). For the sake of brevity, this Motion doesn't repeat the arguments. The flaws in Plaintiffs' amended complaint doom both their Fourteenth and Fifteenth Amendment claims.

Governor created the Enacted Plan, at least in part for the invidious purpose of discriminating against Black Floridians by constraining their ability to vote, to elect their candidates of choice, and to participate fully in the electoral process." *Id.* ¶ 95; *see id.* ¶¶ 106, 111. But these allegations can't survive the motion-to-dismiss standard.

Here, as in all redistricting cases, "the good faith of a state legislature must be presumed." *Miller v. Johnson*, 515 U.S. 900, 915 (1995). It's the "plaintiffs' burden to overcome the presumption of legislative good faith and show that the" "Legislature acted with invidious intent." *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018). The required intent is not mere "volition" or "awareness of consequences." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). It requires plaintiffs to show that a legislature passed a law "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* Plaintiffs must also allege discriminatory effect—*i.e.*, that redistricting "bears more heavily on one race than another" with "the effect of diluting minority voting strength." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)); *Shaw v. Reno*, 509 U.S. 630, 641 (1993) (*Shaw I*); *Palmer v. Thompson*, 403 U.S. 217, 224 (1971) (explaining that an act can't violate the law "solely because of the" alleged "motivations of the men who voted for it").

With respect to the former congressional district 5, Plaintiffs admit that the Black voting-age population of the former district was 45.88%, less than a majority of the voting-age population in that district. Doc. 97 ¶ 84. The recently enacted congressional plan shifts the population from the former congressional district 5 into districts 2, 3,

and 4, so that the district no longer stretches 200 miles from Jacksonville to Tallahassee. *Id.* The Black voting-age population of the newly enacted districts 2, 3, and 4 is 23.8%, 16.7%, and 30.5% respectively, all increasing from the Black voting-age population of those former districts. *Id.* The amended complaint alleges that this "fragmentation of the Black population eliminates the ability of Black voters in North Florida to elect a candidate of their choice" because "a functional analysis confirms that the *Enacted Plan's CD-5* is no longer a Black performing district." *Id.* ¶ 85 (emphasis added). That conclusion, however, rests on an unsupported inference of discriminatory effect: Black voters who make up a sizeable portion of the population across several north Florida districts can't elect a candidate of their choice because the functional analysis for the new district—"the Enacted Plan's CD-5"—says so. *Id.* But congressional district 5 in the enacted plan was moved to Florida's east coast and generally doesn't overlap with the former district 5; it's a different district and not the appropriate benchmark. *Id.* pg. 34. Plaintiffs also ignore that States have flexibility in drawing districts; States can pursue race-neutral criteria and, as the U.S. Supreme Court held in *Bartlett v. Strickland*, aren't required to draw minority-minority or cross-over districts. 556 U.S. 1, 14-15 (2009)

With respect to congressional district 10, Plaintiffs allege that the Black voting-age population of the former district was 26.7%. *Id.* ¶ 87. They call the former district a "Black opportunity district" because the Black candidate of choice was elected in the past three elections. *Id.* Plaintiffs allege that the district is now "packed" with too many Democrats, while "disadvantaging Black voters by splitting the minority population of

Orlando and reducing" the Black voting-age population *by less than 2%* "to 24.84%" under the newly enacted congressional plan. *Id.* ¶ 88. According to Plaintiffs, this 2% change means that "Black voters have a significantly reduced ability to reliably elect their preferred candidates," including because "Black voters no longer constitute a near majority of voters in the Democratic primary." *Id.* Here too the discriminatory effect is nothing more than a legal conclusion based on an inference. Because a 2% decrease in Black voting-age population results in Black voters going from 49.3% of the vote in Democratic primaries to some unenumerated percentage that "no longer constitute[s] a near majority of voters in the Democratic primary," Plaintiffs ask this Court to infer that Black voters "will no longer have the ability to elect their candidate of choice in the Democratic primary." *Id.* ¶¶ 87-88. That's it. Plaintiffs include no further allegations to support their "threadbare recitals" of discriminatory effect. *Iqbal*, 556 U.S. at 678. As the three-judge district court stated in *LULAC v. Abbott*, a recent redistricting case, courts "cannot credit" "naked legal conclusion[s]" that are "not support[ed] with specific factual allegations." 2022 U.S. Dist. LEXIS 91761, at *19, 21, 54.

Finally, the amended complaint alleges that the legislation "cracks" Black voters in St. Petersburg because it was previously contained within existing congressional district 13 and now is split between congressional districts 13 and 14, "rendering CD-

13 a *Republican*-leaning district." *Id.* at ¶¶ 90-91 (emphasis added). As explained above,

no Plaintiff has standing to pursue these allegations.[4]

> **B.    Plaintiffs' amended complaint seeks race-based changes to a race-neutral plan, which is irreconcilable with their Equal Protection Clause claims.**

Setting aside the district-specific flaws, Plaintiffs' novel theory of the case also

fails. Plaintiffs argue that a race-neutral redistricting plan is unconstitutional and

therefore demands a race-based redraw. *See* Doc. 97 ¶ 2 (citing *Bartlett*, 556 U.S. at 24).

That's not how the Equal Protection Clause works.

The Equal Protection Clause guarantees that "[n]o State shall … deny to any

person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV,

§ 1. "Its central purpose is to prevent the States from purposefully discriminating

between individuals on the basis of race." *Shaw I*, 509 U.S. at 642. Sorting citizens

"solely on the basis of race [is] by [its] very nature odious to a free people whose

institutions are founded upon the doctrine of equality." *Id.* (quotations omitted). That

guarantee of equality applies no less to "statutes that, although race neutral, are, on their

---

[4] This claim sounds in partisan politics and not race. The U.S. Supreme Court has cautioned that partisanship and race can't be conflated. *See Brnovich v. DNC*, 141 S. Ct. 2321, 2349 (2021). As this Court is aware, partisan gerrymandering claims aren't justiciable in federal court. *See Rucho v. Common Cause*, 139 S. Ct. 2484 (2019). And partisan gerrymandering claims under state law, such as under article III, section 20(a) of the Florida Constitution, run headlong into a *Pennhurst* problem in federal court: the remedy would be a federal court instructing state officials on conducting their duties under state law. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).

face, unexplainable on grounds other than race." *Id.* For "[a] racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification." *Feeney*, 442 U.S. at 272. Simply put, a statute that "could not be explained on grounds other than race" is invalid. *Shaw I*, 509 U.S. at 644.

Plaintiffs seek to invert the analysis. They object to the State's recently enacted congressional plan because the percentages of minority voters in certain districts have decreased. For example, plaintiffs complain that the Black voting-age populations of the former congressional districts 5, 10, and 13 decreased in the recently enacted plan, which, according to Plaintiffs, supports an Equal Protection Clause violation. Doc. 97 ¶¶ 87-88 (district 10); *see also id.* ¶ 84 (comparing BVAP percentages between former congressional district 5 and the enacted plan), ¶¶ 90-91 (district 13). Said another way, Plaintiffs theorize that the State's mere failure to maintain the same (or greater) percentage of Black voting-age population in a district is an Equal Protection Clause violation. *See infra.* That theory, if true, would require the State to do that which it constitutionally can't do: reapportion on the basis of race, even in the absence of some compelling reason and narrow tailored means for doing so. *See Cooper v. Harris*, 137 S. Ct. 1455, 1469-70 (2017); *Wis. Legis. v. Wis. Elections Comm'n*, 142 S. Ct. 1245 (2022). Plaintiffs haven't alleged any basis for sorting voters on the basis of race, let alone a compelling one that would survive strict scrutiny.

Plaintiffs' theory then comes down to their reliance on the following quote from *Bartlett*: "[I]f there were a showing that a State intentionally drew district lines in order

to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments." 556 U.S. at 24; *see also* Doc. 97 ¶¶ 2, 77. The problems with relying on this quote alone are threefold.

First, it's *dicta. Bartlett*'s "holding recognizes only that there is no support for the claim that § 2 [of the Voting Rights Act] can require the creation of crossover districts in the first instance." 566 U.S. at 24. Nothing more.

Second, it's taken out of context. The U.S. Supreme Court said that "States that wish to draw crossover districts are free to do so where no other prohibition exists." *Id.* Nothing in *Bartlett* suspends the Equal Protection Clause and gives the State of Florida carte blanche to draw districts that purposely sort voters on the basis on their race.

Third, intent still matters. As discussed below, Plaintiffs fail to show how a race-neutral map can be said to intentionally discriminate against Black voters.

### C.   *Plaintiffs have not sufficiently pled discriminatory intent.*

Plaintiffs' *sole* allegations of invidious race-based purpose specific to the districts challenged here (the former districts 5, 10, and 13) are limited to a single paragraph of their amended complaint. First, contradicting the allegation of race-based purpose, Plaintiffs acknowledge the Governor's "concern with race-based line drawing." Doc. 97 ¶ 101. What comes next is a series of conclusory assertions, insufficient to overcome the Plaintiffs' burden at the motion-to-dismiss stage. *See Iqbal*, 556 U.S. at 678. Plaintiffs assert without supporting factual allegations that the Governor "plainly knew that existing CD-5 and CD-10 were Black opportunity districts and he intentionally

destroyed or limited them for that reason." Doc. 97 ¶ 101. Likewise, they assert without supporting factual allegations that "racial considerations *permeated* the Governor's effort." *Id.* (emphasis added). The only allegations accompanying these assertions are that: (1) the Governor's counsel admitted that he considered whether Section 2 of the Voting Rights Act mandated the retention of Black-performing congressional districts 20 and 24, which plaintiffs allege would have required "consideration of race," and (2) the Governor's deputy chief of staff testified that "he did not consider race *at all* in drawing the Governor's map" but then "conceded that he did account for the Hispanic voting age population when reconfiguring CD-26." *Id.* Those threadbare allegations are insufficient to cross *Iqbal*'s plausibility line. *Iqbal*, 556 U.S. at 678-79.

Plaintiffs fail to establish that redistricting legislation was enacted *because of* its racial effects, not in spite of such efforts. *Feeney*, 442 U.S. at 279. For example, it's not enough for Plaintiffs to point to the testimony of others for the proposition that congressional districts that replace the former district 5 would "not perform" for Black voters; this testimony says nothing about whether the new districts were drawn *because of* and not *in spite of* the consequences to their racial makeup. Doc. 97 ¶ 73; *Feeney*, 442 U.S. at 272. Indeed, there's an "obvious alternative explanation" for the redraw. *Bell Atlantic Corp.*, 550 U.S. at 567. As Plaintiffs must concede, the new legislation replaced the former congressional district 5 (sprawling across a 200-mile stretch) with three more compact districts in its place. Doc. 97 ¶¶ 53, 79, 83-84. In this way, the enacted congressional plan merely champions the well-respected, well-established, race-neutral

redistricting criteria of compactness. *Compare LULAC v. Perry*, 548 U.S. 399, 427-29 (2006) (finding fault with Texas's newly drawn and sprawling majority-minority district); *Miller*, 515 U.S. at 916 (finding that race predominated where "the legislature subordinated traditional race-neutral districting principles" "to racial considerations").

### D.   The alleged "history of discrimination" is insufficient to salvage Plaintiffs' amended complaint.

Plaintiffs' remaining allegations rely on the alleged history of discrimination in Florida. Plaintiffs begin their factual allegations with the assertion that, "[a]s courts are well aware, 'Florida has a horrendous history of racial discrimination in voting,'" and that "[f]or over a century, both government officials and bigoted white citizens have engaged in discriminatory measures to suppress and dilute the voting power of Black Floridians." Doc. 97 ¶ 12 (quoting *League of Women Voters of Fla., Inc. v. Lee*, 2022 LEXIS 60368, at *105 (N.D. Fla. 2022)). The amended complaint invokes Florida's first proposed post-Civil war constitution and other Reconstruction- and twentieth-century era history—all well pre-dating the current Governor and current members of Florida Legislature. *Id.* ¶¶ 13-25. "But it cannot be that" a State's "history bans its legislature from ever enacting otherwise constitutional laws about voting." *GBM v. Sec'y of Ala.*, 992 F.3d 1299, 1325 (11th Cir. 2021).

Of more recent vintage, the amended complaint discusses recent litigation regarding the State's post-2020 election reform package. *Id.* ¶ 27. Plaintiffs quote extensively from the district court opinion, *id.* ¶¶ 28-32, but omit that the case is

currently on appeal and that the Eleventh Circuit stayed the district court's order, in part, because "the district court's determination regarding the legislature's intentional discrimination suffers from at least two flaws." *League of Women Voters of Fla. v. Fla. Sec'y of State*, 32 F.4th 1363, 1372 (11th Cir. 2022) ("The first of the two flaws come from the district court's determination that SB90 is the product of intentional race discrimination," and the second comes from the district court's determination that SB90's "Solicitation Provision was unconstitutionally overbroad and vague.").

Plaintiffs' additional allegations fare no better. The amended complaint surmises that the Governor intentionally delayed scheduling special elections to fill recent legislative vacancies in majority-Black legislative districts, suggesting the delays were on the basis of race rather than some other reason such as the local supervisor of election's decision to suggest a schedule and then change his mind about that schedule. *Id.* ¶¶ 33-39. And Plaintiffs ultimately conclude that "[t]he Legislature adopted the Enacted Plan" challenged here "against the backdrop of a well-documented and egregious history of discrimination against Black Floridians in voting rights and election law." *Id.* ¶ 97.

Taken as a whole, these allegations are insufficient to salvage claims of intentional discrimination. Legislatures are entitled the presumption of good faith. Redistricting is no exception. As the U.S. Supreme Court explained in *Miller v. Johnson*, "the presumption of good faith that must be accorded legislative enactments," among other evidentiary factors, "requires courts to exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." 515 U.S. at 915-16. Any

alleged history of discrimination doesn't change that presumption. *See Abbott*, 138 S. Ct. at 2324-25; *see also Shelby Cnty. v. Holder*, 570 U.S. 529, 532 (2013) (explaining that for the federal Voting Rights Act to be constitutional, it "must identify those jurisdictions to be singled out on a basis that makes sense in light of current conditions" and "cannot rely simply on the past").

The burden remains with Plaintiffs to establish—here by plausible allegations— that the Florida Legislature failed to act in good faith *this time*, irrespective of a time long since passed. Plaintiffs fail to do so here, and their claims should be dismissed.

## IV. Short of dismissal, this federal litigation should be held in abeyance.

If Plaintiffs' amended complaint survives in any form, then the remaining claims should be held in abeyance pending the outcome of the ongoing state-court action and the U.S. Supreme Court's decisions in the consolidated cases of *Merrill v. Milligan*, U.S.S.C. No. 21-1086, and *Merrill v. Caster*, U.S.S.C. No. 21-1087.

### A. *Federal litigation should be stayed while the state-court case proceeds.*

Nearly 30 years ago, the U.S. Supreme Court said in no uncertain terms that the power to redistrict lies with the States, not the federal courts. *See Growe v. Emison*, 507 U.S. 25, 35 (1993). In *Growe*, two groups of Minnesota plaintiffs filed federal lawsuits challenging ongoing reapportionment efforts while litigation was ongoing in the state supreme court. *Id.* at 28-29. The federal litigation tied the State's hands, repeatedly. *Id.* at 30-31. Once the parallel disputes reached the U.S. Supreme Court, it said plainly, "[i]n

the reapportionment context, the Court has required federal judges to defer consideration of disputes involving redistricting where the State, through its legislative *or judicial branch*, has begun to address that highly political task itself." *Id*. at 33 (emphasis added). The only exception to *Growe*'s rule is when there is "evidence" making it "apparent" that the State (including the state courts) will fail to "develop a redistricting plan in time for the primaries." *Id*. at 34, 36. "Absent evidence that these state branches will fail timely to perform that duty, a federal court must neither affirmatively obstruct state reapportionment nor permit federal litigation to be used to impede it." *Id*. at 34.

Particularly salient here, *Growe* rejected the "mistaken view that federal judges need defer only to the Minnesota Legislature and not at all to the State's courts." *Id*. at 34. Per *Growe*, any federal suit involving the "reapportionment of election districts" must also wait for any state litigation. *Id*. at 35. That includes the litigation pending in the Florida state courts—substantially overlapping with the claims here. After all, the State "can have only one set of legislative districts, and the primacy of the State in designing those districts compels a federal court to defer." *Id*. That's consistent with the reality that reapportionment is primarily a matter for the State, be it its legislative or judicial branches. *See id*. at 33-34 (Case law "prefers *both* state branches to federal courts as agents of apportionment."); *see also Reynolds v. Sims*, 377 U.S. 533, 586 (1964) ("[R]eapportionment is primarily a matter for legislative consideration and determination, and that judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after

23

having had an adequate opportunity to do so."); *Voinovich v. Quilter*, 507 U.S. 146, 156 (1993) ("Federal courts are barred from intervening in state apportionment in the absence of a violation of federal law precisely because it is the domain of the States, and not the federal courts, to conduct apportionment in the first place."); *White v. Weiser*, 412 U.S. 783, 795 (1973) (collecting cases for rule that "state legislatures have 'primary jurisdiction' over legislative reapportionment").

Applied here, Plaintiffs challenge districts to be used two years from now. There's no basis for pressing ahead with this litigation while state-court litigation is underway in *Black Voters Matter Capacity Building Institute, Inc. v. Byrd*, Case No. 2022 CA 0666 (Fla. 2d Cir. Ct.).[5] There's thus every reason for this Court to "sta[y] its hand" while the state-court litigation runs its course. *Scott v. Germano*, 381 U.S. 407, 409 (1965) (per curiam); *see also Growe*, 507 U.S. at 37 ("What occurred here was not a last-minute federal-court rescue of the Minnesota electoral process, but a race to beat the Minnesota Special Redistricting Panel to the finish line. That would have been wrong, even if the Panel had not been tripped earlier in the course.").

Plaintiffs' amended complaint contains no allegations to justify ongoing federal oversight in this case while Florida state courts adjudicate a similar case. *Growe* directs

---

[5] The last entry in this case was the Secretary, the Florida House of Representatives, and the Florida Senate filing their answers to the state Plaintiffs' complaint on June 6, 2022. An appeal of the temporary injunction the state trial court previously granted also remains pending before Florida's First District Court of Appeal.

this Court to stay its hand. Proceeding, while the State is engaged in the ongoing state litigation and where the state litigation could very well resolve the claims here, creates unwarranted federal interference with the State's process. This, in turn, denies the State the dignity to allow redistricting to play out as *Growe* requires.

### B.     Federal litigation should be stayed pending the U.S. Supreme Court's decision in pending redistricting cases.

This Court may also stay litigation pending the U.S. Supreme Court's decisions in the Alabama consolidated redistricting suits before it. The pending suits will decide what Section 2 of the Voting Rights Act requires of States in redistricting and, necessarily, what the Equal Protection Clause prohibits. *See Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurral). In those cases, Alabama's overarching argument is that a three-judge district court interpreted the federal Voting Rights Act in a way that is irreconcilable with the Equal Protection Clause. Likewise here, Florida's overarching argument has been that Florida's Voting Rights Act analog in the State Constitution can't be applied in a way that's reconcilable with the U.S. Constitution's Equal Protection Clause. Plaintiffs disagree—seeking a race-based remedy that echoes the arguments currently pending in state court that redistricting can't diminish Black voting-age population in Florida's congressional districts. *Supra.*

Rather than press ahead with federal litigation here, principles of judicial economy and efficiency favor awaiting the decision in *Merrill*. The U.S. Supreme Court's decision in *Merrill* will necessarily consider what limits the Equal Protection Clause

places on redistricting—in particular, whether the federal Voting Rights Act can operate as an exception to the Equal Protection Clause's general rule that "[c]lassifications of citizens solely on the basis of race are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Shaw I*, 509 U.S. at 643 (quotation marks omitted). In particular, Alabama has asked whether the federal Voting Rights Act can require race-based districts that wouldn't have been drawn but for the consideration of race. *See* Merrill Merits Br. 22-24, 54-56, *Merrill v. Milligan*, U.S.S.C. No. 21-1086, available at https://bit.ly/3wNQNjK (explaining that majority-minority districts proposed by plaintiffs were outliers among more than two million simulations).

Those same questions predominate here. For example, can Florida's Voting Rights Act analog require the former congressional district 5's sprawling shape at less than a majority-minority district,[6] explainable only because it links together Black voters more than 200 miles apart? In circumstances such as these, awaiting "a federal appellate decision that is likely to have a substantial or controlling effect on the claims and issues in the stayed case" is "at least a good [reason], if not an excellent one" for staying proceedings. *Miccosukee Tribe of Indians v. S. Fla. Water Mgmt. Dist.*, 559 F.3d 1191, 1198 (11th Cir. 2009).

---

[6] Not in this amended complaint, the original complaint, nor in any state court complaint has any plaintiff alleged it is even possible to draw a majority-minority district in North Florida. No map containing a majority-minority district in North Florida was ever presented to the Florida Legislature by any legislator, citizen, or other submitter.

There's ample time to hold this case in abeyance pending *Merrill*. The U.S. Supreme Court noted probable jurisdiction in *Merrill v. Milligan*, U.S.S.C. No. 21-1086, in February 2022, and granted certiorari before judgment in *Merrill v. Caster*, U.S.S.C. No. 21-1087, at the same time. Parties are currently filing their merits briefs, and the cases will be argued this fall. Meanwhile here, Plaintiffs seek relief for the 2024 elections. There should thus be ample time between *Merrill* and the start of the 2024 election season to adjudicate plaintiffs' claims with the benefit of the U.S. Supreme Court's clarification in *Merrill* to guide discovery, briefing of dispositive motions, and (if necessary) a trial on the merits.

## CONCLUSION

For the foregoing reasons, this Court should (1) dismiss the Governor as a defendant; (2) dismiss the organizational Plaintiffs and Plaintiffs Inman-Johnson, Young, and Ratzan for failure to establish Article III standing; (3) dismiss the amended complaint in its entirety because it fails to state a claim under the Fourteenth and Fifteenth Amendments to the U.S. Constitution; and (4) in the alternative, at a bare minimum, stay these proceedings until the resolution of the parallel state-court proceedings and related U.S. Supreme Court cases.

Respectfully submitted,

Bradley R. McVay (FBN 79034)
brad.mcvay@dos.myflorida.com
Ashley Davis (FBN 48032)
ashley.davis@dos.myflorida.com
FLORIDA DEPARTMENT OF STATE
R.A. Gray Building
500 S. Bronough St.
Tallahassee, FL 32399
(850) 245-6536

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
mjazil@holtzmanvogel.com
Gary V. Perko (FBN 855898)
gperko@holtzmanvogel.com
Michael Beato (FBN 1017715)
mbeato@holtzmanvogel.com
zbennington@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK
119 S. Monroe St. Suite 500
Tallahassee, FL 32301
(850) 270-5938

June 8, 2022

Jason Torchinsky (Va. BN 47481) (D.C.
BN 976033)
jtorchinsky@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK
15405 John Marshall Hwy Haymarket,
Prince William, VA 20169
(540) 341-8808

## **LOCAL RULE 7.1(F) CERTIFICATION**

The undersigned certifies that this memorandum contains 6,716 words, excluding the case style and certifications; and it complies with the size and font requirements in the local rules.

/s/ Mohammad O. Jazil
Mohammad O. Jazil

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 8, 2022, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

/s/ Mohammad O. Jazil
Mohammad O. Jazil.