## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

Common Cause Florida, FairDistricts
Now, Florida State Conference of the
National Association for the
Advancement of Colored People
Branches, Dorothy Inman-Johnson,
Brenda Holt, Leo R. Stoney, Myrna
Young, and Nancy Ratzan,

Case No.: 4:22-cv-109-AW-MAF

      *Plaintiffs,*

  v.

Ron DeSantis, in his official capacity as
Governor of Florida, and Cord Byrd, in
his official capacity as Florida Secretary
of State,

      *Defendants*.

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND, IN THE ALTERNATIVE, MOTION TO STAY

### INTRODUCTION

  Defendants launch an omnibus attack on the Amended Complaint, asserting multiple reasons to dismiss or stay this case. None of their arguments has merit. This case presents an important challenge to Florida's new congressional map based on intentional racial discrimination by the Governor and the Legislature. It should proceed.

1

## STANDARD OF REVIEW

In considering a motion to dismiss, the Court "must view the complaint in the light most favorable to the plaintiff," *Ziyadat v. Diamondrock Hospitality Co.*, 3 F.4th 1291, 1295 (11th Cir. 2021), and must "draw all reasonable inferences in the plaintiff's favor." *Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010). The complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). This standard "does not require 'detailed factual allegations.'" *Id.* (citation omitted). Indeed, "[t]he plausibility standard" is so lenient that it does not even require that allegations be "probab[ly]" true. *Bell Atl. v. Twombly*, 550 U.S. 544, 555-56 (2007). "When a federal court reviews the sufficiency of a complaint, . . . its task is necessarily a limited one. The issue is not whether [the] plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (citation omitted).

## ARGUMENT

## I.    THE GOVERNOR IS A PROPER *EX PARTE YOUNG* DEFENDANT

*Ex parte Young*, 209 U.S. 123 (1908), allows for federal jurisdiction against a state actor who is responsible for enforcing or administering a law that is alleged to be unconstitutional. *See Papasan v. Allain*, 478 U.S. 265, 276-77 (1986) (citing *Ex parte Young*, 209 U.S. 123 (1908)). "All that is required is that the official be

responsible for the challenged action," and "it is sufficient that the state officer sued must, 'by virtue of his office, ha[ve] *some connection*' with the unconstitutional act or conduct complained of." *Luckey v. Harris*, 860 F.2d 1012, 1015 (11th Cir. 1988) (emphasis added) (reversing order dismissing governor under *Ex parte Young*). "'Whether [this connection] arises out of general law, or is specially created by the [challenged] act itself, is not material so long as it exists.'" *Id.* at 1016 (quoting *Ex parte Young*, 209 U.S. at 157). These criteria make Governor DeSantis a proper defendant.

The Governor argues he is immune from suit because the mere allegation of his "general supervisory authority over the executive branch and its officials isn't enough for *Ex parte Young*," and is not "specific enough to justify Plaintiff's broad request for an injunction." (Dkt. No. 104 ("Mot.") at 7-8.) But the Amended Complaint does not allege mere "general supervisory authority" over the Department of State and the Secretary of State (who the Governor admits is a proper defendant). It alleges that he has "'*direct* supervision' over 'administration' of the Department of State," (Dkt. No. 97 ("Am. Compl.") ¶ 7 (citing Fla. Const. art. IV, § 6) (emphasis added), and asserts a unique set of facts putting the Governor himself at the center of the events underlying this case.

Governor DeSantis touts his direct authority over the Secretary of State— whom he alone has the power to appoint and remove—and highlights his personal

responsibility for the administration of Florida's election laws. Indeed, in the events leading up to this lawsuit, the Governor petitioned the Florida Supreme Court for an unprecedented advisory opinion concerning the constitutionality of a congressional redistricting bill that retained a performing district for Black Florida voters. Am. Compl. ¶¶ 55-58.[1]  The Governor said that his request was proper because *he* has "direct supervision" over the "administration" of the Department of State and Secretary of State. He added:

> The Secretary of State, *whom I direct and oversee*, is the chief election officer of the State, … and is responsible for, among many things, "[o]btain[ing] and maintain[ing] uniformity in the interpretation and implementation of the election laws," … § 97.012, Fla. Stat …. (emphasis added).[2]

Under Florida law, the Governor has *sole* authority for appointing and removing the Secretary of State. *See* Fla. Stat. § 20.10(1); *cf. Luckey*, 860 F.2d at 1016 (governor proper *Ex parte Young* defendant because he "ha[d] the final authority to direct the Attorney General to 'institute and prosecute' on behalf of the state").

---

[1] The Court may take judicial notice of the Governor's request for an advisory opinion because the Governor's petition is incorporated into the amended complaint by reference, Am. Compl. ¶ 55, and is a matter of public record.

[2] *Advisory Opinion to Governor re: Whether Article III, Section 20(a) of the Florida Constitution Requires the Retention of a District in Northern Florida*, No. SC22-139, Petition at 2 (Fla. Feb. 1, 2022), available at https://efactssc-public.flcourts.org/casedocuments/2022/139/2022-139_petition_79511_request2dadvisory20opinion2028governor29.pdf

After the Florida Supreme Court denied the Governor's request for an advisory opinion, the Governor took matters into his own hands. He coerced the Florida Legislature to pass a discriminatory map. *See, e.g.,* Am. Compl. ¶¶ 46-74, 77, 89, 95, 98-99, 102-03. The Amended Complaint alleges that the Governor controlled every aspect of the redistricting process, forcing the State Legislature to reconfigure the congressional map exactly as *he* wanted. The Governor threatened to, and did, veto the maps passed by the Legislature and insisted instead on his own maps, which destroyed the rights of Black Floridians in North Florida. *Id.* ¶¶ 47-51, 58-62, 67. As a result, for the first time in Florida's history, the congressional redistricting plan was designed by the Governor, not the Legislature. *Id.* ¶¶ 71-74. The Amended Complaint directly challenges the Governor's own personal actions and alleges that those actions were motivated, at least in part, by race.

Quoting the Governor again, now that litigation has commenced, "[t]he Department of State [is] responsible for defending [the] legal challenges to the new congressional redistricting map."[3] Because the allegations in the Amended Complaint go directly to the Governor's actions and good faith in creating the challenged congressional map, and because he "direct[s] and oversee[s]" his co-defendant, the Secretary of State, it is reasonable to assume that the Governor reserves, and will exercise, the ultimate decision-making authority over the defense

---

[3] *See* Advisory Opinion, Petition at 2.

of this case—including whether and how the challenged law will be enforced.  He should remain a defendant.

The cases cited by the Governor are easily distinguished.  In those cases, the respective governors were not alleged to have close personal connections to the challenged legislation, *or* the sole authority for appointing and removing the defendant executive officer, *or* direct enforcement authority over the challenged law—all of which are present here.  Instead, in those cases, the governor was sued merely because of his generic status as the head of the executive branch.  *See Osterback v. Scott*, 782 F. App'x 856, 859 (11th Cir. 2019) ("The Governor's general authority to enforce Florida's laws and his shared responsibility for appointing the director of the DAH do not make the Governor a proper party"); *Women's Emergency Network v. Bush*, 323 F.3d 937, 949-50 (11th Cir. 2003) (governor's "shared authority" with "six members of the cabinet" over the Department of Highway Safety and Motor Vehicles and Governor's "general executive power" insufficient to confer jurisdiction); *Support Working Animals, Inc. v. DeSantis*, 457 F. Supp. 3d 1193, 1209 (N.D. Fla. 2020) ("because the Governor's general executive power does not 'connect[] him with the duty of enforc[ing]' [law prohibiting commercial dog racing], he is not a proper defendant here"); *Harris v. Bush*, 106 F. Supp. 2d 1272, 1276-77 (N.D. Fla. 2000) (fact that "the Florida Constitution vests

[the governor] with executive power to faithfully execute and enforce the laws of Florida" insufficient to render governor proper party under *Ex parte Young*).

By contrast, in cases like this one, where a state's governor has a personal connection with the challenged action or exercised direct authority over the relevant enforcing officer, courts routinely hold the governor properly subject to suit under *Ex parte Young*. *See, e.g.*, *Luckey*, 860 F.2d at 1016; *Kitchen v. Herbert*, 755 F.3d 1193, 1202-04 (10th Cir. 2014) (governor proper defendant in suit challenging prohibition of same-sex marriage because his "actual exercise of supervisory power and [his] authority to compel compliance from county clerks and other officials provide[d] the requisite nexus"); *Artichoke Joe's v. Norton*, 216 F. Supp. 2d 1084, 1110 (E.D. Cal. 2002) (governor proper defendant where plaintiff alleged "a specific connection to the challenged statute," in that governor "negotiated and approved the compacts that give rise to the plaintiffs' alleged injuries"), *aff'd*, 353 F.3d 712 (9th Cir. 2003); *First Baptist Church v. Kelly*, 457 F. Supp. 3d 1072, 1079-82 (D. Kan. 2020) (governor proper defendant in churches' suit challenging COVID executive order); *League of Women Voters of Ohio v. Blackwell*, 432 F. Supp. 2d 723, 732 (2005) ("The governor, as the chief executive of the state, has sufficient connection to election law to be a proper defendant in a suit for prospective injunctive relief regarding election procedures."), *aff'd in relevant part*, 548 F.3d 463 (6th Cir. 2008).

Plaintiffs' well-pleaded allegations of the Governor's direct oversight over the Florida Secretary of State and his personal involvement in the creation and enactment of the challenged map are sufficient to keep him as a defendant in this case.

## II.   TWO INDIVIDUAL PLAINTIFFS AND THE ORGANIZATIONAL PLAINTIFFS HAVE STANDING

### A.   Individual Plaintiffs Holt and Stoney

Defendants agree that two named plaintiffs, Brenda Holt and Leo Stoney, have standing to pursue this action. Mot. at 10-12. Holt is a resident of the former Congressional District 5, and is a resident of newly-created Congressional District 2. Am. Compl. ¶ 6. Stoney is a resident of Congressional District 10 in both the former and current map. *Id.* Because Holt and Stoney's standing is sufficient to pursue this action, there is no reason for the Court to consider the standing of the remaining three individual plaintiffs—Dorothy Inman-Johnson, Myrna Young and Nancy Ratzan. *See, e.g.*, *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264 n.9 (1977) (because "at least one individual plaintiff . . . has demonstrated standing," the Court "need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit."); *Dep't of Commerce v. New York*, 139 S. Ct. at 2565 (same); *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981) (same).

### B.    The Organizational Plaintiffs

The organizational plaintiffs have standing for two independent reasons. First, Common Cause Florida, Florida NAACP, and FairDistricts Now properly alleged that Defendants' actions caused them to divert resources to counteract Defendants' illegal acts, so-called organizational standing. Second, Common Cause and Florida NAACP also have properly alleged that they have members who are individually injured by the Defendants' illegal acts, so-called representational standing.

Defendants' motion argues that the Amended Complaint contains insufficient detail to support either theory. This critique holds Plaintiffs to a heightened pleading standard that does not exist. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quoting *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 889 (1990)). Although either theory of standing alone suffices, the Amended Complaint adequately pleads both.

### 1.    Organizational Standing

"[A]n organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to

divert resources to counteract those illegal acts." *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)); *see also Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1350–51 (11th Cir. 2009) (organizational plaintiff suffered injury when forced to "divert resources from its regular activities to educate and assist [affected individuals] in complying with the [challenged] statute"); *Ga. Latino All. for Human Rights v. Governor of Ga.*, 691 F.3d 1250, 1260 (11th Cir. 2012) (same).

Here, each organizational Plaintiff has alleged the requisite "concrete and demonstrable injury to the organization's activities" and "consequent drain on the organization's resources." *Havens Realty*, 455 U.S. at 379.  Defendants' motion ignores many of these specific allegations, which must be assumed to be true:

- Common Cause alleges that its aims include "ensur[ing] Florida voters . . . can navigate through the election process to cast a ballot for the candidates of their choice, without . . . intentional discrimination or other barriers." Am. Compl. ¶ 3.  Given the intentional discrimination alleged here, Common Cause "will need to spend additional resources in Florida to counter the discriminatory effects on Black voters because of the Enacted Plan," and "Common Cause's organizational activities will be impeded." *Id*.

- Florida NAACP alleges "[i]ts mission is to ensure the political, social, educational, and economic equality of all persons and to eliminate race-based discrimination." *Id.* ¶ 5.  These activities are injured because "[u]nfair and discriminatory redistricting at the Congressional level frustrates and impedes the Florida NAACP core missions by diluting the votes of citizens Florida NAACP works to engage in civic participation and obstructing the ability of their members to elect candidates of choice, and these practices more broadly obstruct its other

10

core advocacy missions to bring about change in Florida through the democratic process." *Id.*

- FairDistricts Now alleges that its "organizational activities will be impeded and it will need to spend additional resources in Florida to counter the discriminatory effects on Black voters because of the Enacted Plan." *Id.* ¶ 4.

Each organization sufficiently pleads an injury in the form of diversion of resources.

The recent *GALEO* case, cited by Defendants, actually supports Plaintiffs' position. The Court held that a "broad allegation of diversion of resources is enough at the pleading stage." *Ga. Ass'n of Latino Elected Offs., Inc. (GALEO) v. Gwinnett Cnty. Bd. of Registration & Elections*, 2022 WL 2061703 at *8 (11th Cir. 2022). For support, the court cited *Havens Realty*'s holding that an allegation that an organization "has had to devote significant resources to identify and counteract the defendant's [illegal practices]" suffices to confer standing to the organization at the pleading stage. *Id.*

Defendants' reliance on *Jacobson*, Mot. at 8-9, is inapt. That opinion did not address a motion to dismiss; it was an appeal following a bench trial. *See Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1243-45, 1250 (11th Cir. 2020). There are, of course, different requirements for plaintiffs seeking to withstand a summary judgment motion or establish their standing at trial. *Lujan*, 504 U.S. at 561. At this threshold stage, the Court must accept Plaintiffs' general allegations as true.

2.   Representational Standing

As to representational standing (also called associational standing), Defendants similarly attempt to conjure requirements beyond what the law requires. Defendants assert that organizational Plaintiffs are required to identify members in the affected districts.  But Common Cause and Florida NAACP have done so.  Am. Compl. ¶ 3 (Common Cause alleges that it has "members throughout Florida, including in Florida's former Congressional Districts 5 and 10."); *Id.* ¶ 5 (Florida NAACP alleges that its "12,000 members . . . include registered voters who reside throughout the state").[4]

There is no requirement that Plaintiffs identify *by name* specific members harmed, and certainly not at this stage.  *See Doe v. Stincer*, 175 F.3d 879, 884 (11th Cir. 1999) ("[U]nder Article III's established doctrines of representational standing, [the Eleventh Circuit has] never held that a party suing as a representative must specifically name the individual on whose behalf the suit is brought.").  The case cited by Defendants, *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), does not hold otherwise.  Mot. at 8-9.  *Summers* merely held that, after fact discovery and the submission of affidavits, an organizational plaintiff must make a factual showing of perceptible harm.  555 U.S. at 500.  *Summers* does not require specific members to be identified by name at the pleading stage.  *See New York v. U.S. Dep't of*

---

[4] FairDistricts Now does not rely on this theory of organizational standing.

*Commerce*, 351 F. Supp. 3d 502, 606 n.48 (S.D.N.Y. 2019) (rejecting Defendants'

reading of *Summers* and explaining that it "overread[s]" that decision), *aff'd in part*

*and rev'd in part on other grounds*, 139 S. Ct. 2551 (2019).

Accordingly, Common Cause Florida, Florida NAACP, and FairDistricts

Now have standing, and Defendants' motion to dismiss these parties should be

denied.  Furthermore, because Common Cause Florida and the Florida NAACP

have members throughout the state, the court should reject Defendants' request to

dismiss Plaintiffs' claims regarding congressional districts 13 and 14. *See* Mot. at

12.  (In any event, those allegations will remain relevant as evidence of the

intentional discrimination that took place elsewhere in the Enacted Plan.)  Finally,

should the Court require further elaboration of the organizations' grounds for

standing, Plaintiffs request leave to file an amended complaint pursuant to Federal

Rule of Civil Procedure 15(a)(2).

## III.   PLAINTIFFS HAVE STATED A CLAIM FOR INTENTIONAL DISCRIMINATION UNDER THE FOURTEENTH AND FIFTEENTH AMENDMENTS TO THE U.S. CONSTITUTION

The Amended Complaint alleges that the Enacted Plan was motivated, at least

in part, by a desire to reduce the political power of Black voters, and provides

copious factual detail supporting that inference.  In particular, it includes allegations

satisfying each of the *Arlington Heights* factors that courts rely upon to infer

discriminatory intent.  *See Arlington Heights*, 429 U.S. at 266-68.  At this stage, the

Court must take these factual allegations as true and grant Plaintiffs the benefit of all reasonable inferences.  Accordingly, Defendants' motion to dismiss fails.

### A.    Defendants Ignore the Facts Alleged in the Complaint

Given the omissions and distortions in Defendants' characterization of the Amended Complaint, Plaintiffs begin by setting the record straight about what they have alleged.

As the Amended Complaint describes in detail, Florida has a sordid history of official racial discrimination in voting that dates back to the post-Civil War era and continues to this day.  On multiple occasions, Governor DeSantis has embraced this shameful tradition, including by selectively refusing to schedule special elections in majority-Black legislative districts and signing election legislation that intentionally discriminated against Black voters.[5]  Am. Compl. ¶¶ 12-39.

Florida's voters attempted to stop, or at least limit, these abhorrent practices by overwhelmingly approving the Fair Districts Amendment to the Florida Constitution.  Am. Compl. ¶ 44.  Among other things, it prohibits drawing state or congressional districts with "the intent or result of denying or abridging the equal opportunity of racial . . . minorities to participate in the political process or to

---

[5] Defendants posit other, supposedly non-discriminatory, reasons for these actions, but the Complaint's plausible assertion that the reason was at least in part discriminatory must be taken as true for purposes of this motion.

diminish their ability to elect representatives of their choice . . . ."  Fla. Const. art. III, §§ 20-21.

In early 2022, at the start of the redistricting cycle, the Legislature passed maps redistricting the Florida House and Senate that preserved pre-existing Black opportunity districts,[6] as the Fair Districts Amendment requires.  The Florida Supreme Court approved these state legislative maps, which will be used in the 2022 election, expressly noting their compliance with the non-diminishment standard of the Florida Constitution.  Am. Compl. ¶ 46.  *See also In re: Senate Joint Resolution of Legislative Apportionment 100*, 334 So.3d 1282 (Fla. 2022).

The Legislature tried to do the same thing when it came to congressional redistricting.  The Senate approved a map (8060) that preserved pre-existing Black opportunity districts, as the law requires.  *Id*. ¶¶ 48.  But, unlike the Legislature's state-level maps, the congressional map required approval from Governor DeSantis.  *Id.* ¶ 47.

---

[6] A Black opportunity district is one considered sufficient to "afford [B]lack voters a reasonable opportunity to elect candidates of choice" and to "in fact perform for [B]lack candidates of choice." *League of Women Voters of Fla. v. Detzner*, 172 So. 3d 363, 404 ("*Apportionment VII*") (Fla. 2015) (citation omitted).  These districts are sometimes referred to as "crossover" districts when "minority voters make up less than a majority of the voting-age population," but "the minority population, at least potentially, is large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate." *Bartlett v. Strickland*, 556 U.S. 1, 13 (2009).

The Governor used this fact to interfere in the redistricting process in a manner unprecedented in Florida history—rejecting the Senate's proposed map and pushing his own alternative map "drawn with the intent to dismantle" Black opportunity districts. *Id.* ¶¶ 47-52, 55-72. Most of all, the Governor targeted CD-5, a Black opportunity district in North Florida that covered a large Black population from Jacksonville to Tallahassee in Florida's former "Slave Belt." *Id.* ¶ 53.

The Legislature initially pushed back, noting that the Governor's map would unlawfully diminish the ability of Black voters to elect their representatives of choice. In an attempt to assuage the Governor's concerns, the Legislature passed a plan that preserved an alternate, more compact Black opportunity district (8019). *Id.* ¶ 60. And in an unprecedented concession that even this plan could violate the law, the Legislature also passed a "backup" map (8015), largely preserving existing CD-5, for use in the entirely foreseeable event that its proffered compromise was struck down by a court. *Id.* ¶ 61, 63, 65.

None of this was good enough for the Governor, who vetoed the Legislature's maps and persuaded the Legislature to pass a map that would eviscerate Black voters' political power (the "Enacted Plan"), not just in Northern Florida but statewide. *Id.* ¶¶ 59-74. The Legislature did so "over the impassioned protest of the

chamber's Black representatives and members of the public," thereby becoming complicit in, and (however reluctantly) endorsing, the Governor's plan. *Id.* ¶ 74.[7]

The Enacted Plan weakens Black Floridians' political power, cutting the number of Black opportunity districts in half and splintering Black communities. *Id.* ¶ 1. Most notably, the Black population in North Florida was able to elect the candidate of its choice—with support from white crossover voters—from 1992 to 2020. *Id.* ¶¶ 80-83. The Enacted Plan chops what was previously CD-5 into pieces so that there is no longer a Black opportunity district in North Florida. Black Floridians who used to live in CD-5 now live in the redrawn CD-2, CD-3, and CD-4—all with large majority white populations—and no longer have the ability to elect their candidates of choice. *Id.* ¶¶ 84-85.

In the Orlando region, Black voters in the Democratic-leaning CD-10 lost their near-majority status in the Democratic primary. *Id.* ¶¶ 87-88. This will drastically reduce their ability to reliably elect their candidate of choice, as they have done in the past. *Id.* In the St. Petersburg area, the Enacted Plan cracks the Black population into two districts. This undermines the ability of Black voters in the

---

[7] Defendants argue that the federal Voting Rights Act ("VRA") imposed no statutory obligation to maintain the Black opportunity districts in question because they did not have Black *majorities*. Mot. at 4. But Plaintiffs' argument is not based on the VRA. Rather, Plaintiffs' claims are based on the Fourteenth and Fifteenth Amendments, which prohibit a state from intentionally destroying existing Black opportunity districts for discriminatory reasons. *See infra* at 18-22.

western half of St. Petersburg to influence the election of their candidate of choice. *Id.* ¶ 90-91.[8]

### B.   Plaintiffs Adequately Plead that the Enacted Plan was Motivated at Least in Part by Discrimination Against Black Voters

Throughout the Amended Complaint, Plaintiffs plead that this course of action was motivated by the "purpose of disadvantaging Black voters." *E.g.*, Am. Compl. ¶¶ 1, 51, 75-77.  It is fundamental that "[m]alice, intent, ... and other conditions of a person's mind may be alleged generally"; pleading with particularity is not required. Fed. R. Civ. P. 9(b).  "At this early stage," plausibly pleading intent is a "notably light burden.  After all, 'issues involving state of mind,' such as discriminatory intent, involve fact-focused questions that 'are often unsuitable for a Rule 12(b)(6) motion to dismiss.'"  *Jumbo v. Ala. State Univ.*, 229 F. Supp. 3d 1266, 1272 (M.D. Ala. 2017) (quoting *Pryor v. NCAA*, 288 F.3d 548, 565 (3d Cir. 2002)).

---

[8] In a footnote, Defendants assert that this cracking of Black voters sounds in partisan gerrymandering, rather than racial gerrymandering.  Mot. at 16 n.4.  If Defendants wish to argue partisan intent during the discovery phase, they may do so (although that would also violate the Fair Districts Amendments, which prohibit partisan gerrymandering). They may not, however, offer an alternative explanation at the pleadings stage and ask the Court to take it on faith.  *See, e.g.*, *LULAC v. Abbott*, 2022 WL 174525, at *3 (W.D. Tex. Jan. 18, 2022) (refusing to accept, at pleadings stage, government defendants' insistence that they were "driven purely by partisanship rather than race," and noting that "Defendants' alternative explanation ... is not so obvious as to render Plaintiffs' claims [of racial motivation] facially implausible").

This is especially true with regard to *racial* discrimination. "Outright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). "Today, racism is no longer pledged from the portico of the capital or exclaimed from the floor of the constitutional convention; it hides, abashed, cloaked beneath ostensibly neutral laws and legitimate bases, steering government power toward no less invidious ends." *Lewis v. Gov. of Ala.*, 896 F.3d 1282, 1296-97 (11th. Cir. 2018), *vacated on reh'g en banc*, 944 F.3d 1287 (11th Cir. 2019).[9] "Recognizing this truth over forty years ago, the Supreme Court mandated that [courts] review both direct and circumstantial evidence to determine whether, absent an outright admission, some discriminatory purpose may yet exist; and it planted signposts to help guide this inquiry." *Id.* at 1297.

These "signposts" are the *Arlington Heights* factors, which require consideration of: (1) the impact of the official action; (2) the historical background; (3) the specific sequence of events leading up to challenged decision, particularly in terms of procedural departures; (4) substantive departures in the aforementioned sequence; and (5) legislative and administrative history. *Arlington Heights*, 429 U.S.

---

[9] Although the panel decision in *Lewis* was vacated, the *en banc* court did not reject or criticize its relevant reasoning—or even "consider the merits of [the plaintiffs'] equal protection claim." 944 F.3d at 1292. Instead, it found that the plaintiffs had failed to satisfy the traceability and redressability elements of standing, which are not at issue here.

at 266-68.  In this Circuit, courts also consider: (6) the foreseeability of the disparate impact; (7) knowledge of that impact; and (8) the availability of less discriminatory alternatives.  *Greater Birmingham Ministries v. Sec. of State for State of Ala.*, 992 F.3d 1299, 1321-22 (11th Cir. 2021).

"These factors are nonexhaustive, and no one factor is controlling." *Fla. State Conf. of NAACP v. Lee*, 566 F. Supp. 3d 1262, 1293 (N.D. Fla. 2021) (cleaned up). Plainly, "[the *Arlington Heights*] 'factors require a fact intensive examination of the record,' and therefore [an intentional discrimination] claim does not lend itself to dismissal in the pleading stages where the record is not fully developed." *Dream Defenders v. DeSantis*, 553 F. Supp. 3d 1052, 1094 (N.D. Fla. 2021) (quoting *Greater Birmingham*, 992 F.3d at 1322 n.33); *see also De La Cruz v. Tormey*, 582 F.2d 45, 59 (9th Cir. 1978) ("The 'sensitive inquiry' mandated by . . . *Arlington Heights* cannot satisfactorily be undertaken on a motion to dismiss.").

Moreover, Plaintiffs need not allege (or ultimately prove) that the Enacted Plan was motivated "*solely* [by] racially discriminatory purposes"—or even that such discrimination "was the 'dominant' or 'primary'" purpose behind the Enacted Plan.  *Arlington Heights*, 429 U.S. at 265 (emphasis added); *see also Dream Defenders*, 553 F. Supp. 3d at 1093; *Fla. State Conf.*, 566 F. Supp. 3d at 1293. "Rarely can it be said that a legislature . . . made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary'

one." *Arlington Heights*, 429 U.S. at 265.  Thus, plaintiffs need only plausibly plead that racial discrimination was "a motivating factor."  *Id.*

Here, the "[A]mended [C]omplaint presents detailed factual allegations which go to the heart of multiple *Arlington Heights* considerations."  *Lewis*, 896 F.3d at 1295.  Indeed, *all* of the factors point in one direction:

1. The Enacted Plan bears most heavily on Black Floridians, particularly with the destruction or diminishment of two opportunity or crossover districts.  Am. Compl. ¶¶ 77-89, 96.

2. Florida has a long and unbroken history of anti-Black voter suppression, including recent actions by Governor DeSantis.  *Id.* ¶¶ 12-39, 97.

3. There were extraordinary departures from procedural norms, including the Governor hijacking the redistricting process and the Legislature's approving two maps, in case one was ruled illegal.  *Id.* ¶¶ 47-52, 55-74, 98.

4. There were extraordinary departures from substantive norms, with the Governor unilaterally rejecting binding law and insisting on a map that violates the Fair Districts Amendment.  *Id.* ¶¶ 54-58, 72-74, 99.

5. The legislative history is brimming with statements from legislators identifying the discriminatory effects of the Enacted Plan and the pretextual nature of the Governor's "race-neutral" justifications.  *Id.* ¶¶ 59, 70, 73-74, 89, 100-01.

6. Both the Governor and Legislature foresaw that the Enacted Plan would harm Black voters. *Id.* ¶¶ 48, 54-66, 72-74, 89, 102.

7. The Governor and Legislature understood that the Enacted Plan in fact injured Black voters by eliminating or undermining Black opportunity districts.  *Id.* ¶¶ 48, 54-66, 72-74, 89, 102.

8. The Legislature had—and even enacted—multiple alternative maps that would have preserved greater access for Black voters.  *Id.* ¶¶ 48, 60-61, 63-66, 103.

When these factual allegations are "accept[ed] . . .as true" and "view[ed] . . . in the light most favorable to Plaintiffs," they are plainly "sufficient" to raise a plausible inference that racial discrimination was at least "a motivating factor." *Dream Defenders*, 553 F. Supp. 3d at 1093-94.  "Plaintiffs are not required to produce a 'smoking gun,' especially not in their initial complaint, to make a plausible allegation of racial intent."  *LULAC v. Abbott*, 2022 WL 174525, at *3; *see also Fla. State Conf.*, 566 F. Supp. 3d at 1296 (denying motion to dismiss where "Plaintiffs have pleaded at least some facts addressing every *Arlington Heights* factor"); *Sixth Dist. of African Methodist Episcopal Church v. Kemp*, 2021 WL 6495360, at *7-8 (N.D. Ga. Dec. 9, 2021) (denying motion to dismiss where "[the] allegations in the Amended Complaint [were] consistent with the *Arlington Heights* factors").

Citing *Abbott v. Perez*, 138 S. Ct. 2305 (2018), Defendants argue that legislative bodies are "presumed" to have acted in "good faith."  Mot. 21-22.  Read in context, however, *Perez*'s "good faith" comment means only that "[w]henever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State."  138 S. Ct. at 2324; *see also United States v. Calvillo-Diaz*, 2022 WL 1607525, at *6 (N.D. Ill. May 20, 2022) ("[*Perez*] emphasized that evidence of past discrimination must not result in courts flipping the *Arlington Heights* burden onto the legislature.").  Here, Plaintiffs acknowledge

that they bear the burden of proving discriminatory intent at trial.  The facts alleged in the Amended Complaint, when proved as true at trial, will be more than sufficient to meet that burden.

*Perez* did not overturn or modify *Arlington Heights*.  *See Perez*, 138 S. Ct. at 2325-30 (recognizing and applying the *Arlington Heights* framework).  *A fortiori*, it did not establish a new, heightened pleading standard for claims of intentional discrimination.  *Perez* was decided years into a lengthy litigation, on review of a decision to enjoin the challenged map.  *See LULAC*, 2022 WL 174525, at *4 (noting that *Perez* "reach[ed] [its] conclusion by weighing evidence produced at trial").  Its relevance at the motion-to-dismiss stage is minimal at best.  *See United States v. Georgia*, 2021 WL 5833000, at *4 n.4 (N.D. Ga. Dec. 9, 2021) (*Perez*'s "presumption of good faith" is "not a shield that requires automatic dismissal of discrimination claims at the pleading stage"); *LULAC v. Abbott*, 2022 WL 1631301, at *26 (W.D. Tex. May 23, 2022) (denying motion to dismiss that "stress[ed] the presumption of legislative good faith"; noting that, at the pleading stage, "[i]t is not yet necessary for Plaintiffs to demonstrate that the Texas legislature more likely than not acted with discriminatory intent").

## C.    Defendants' Proffered Race-Neutral Explanation Fails

Defendants argue that the Enacted Plan was motivated solely by something different: the intent to remediate *prior* "discrimination" that purportedly took place

23

when Black opportunity districts like CD-5 were created. This alternative explanation fails for two separate reasons. First, it has no basis in law; no court has ever upheld the Governor's theory. Second, Plaintiffs allege that it has no basis in fact; racial discrimination was at least a part of the reason for the Enacted Plan. At best, Defendants' alternative explanation raises a factual dispute for discovery and trial.

### 1. There is no Legal Support for Defendants' Position that the Creation of Opportunity Districts is Discriminatory

Defendants argue that Governor DeSantis legitimately targeted Florida's Black opportunity (or "crossover") districts for destruction because the creation of such districts *is itself* discriminatory. In other words, Defendants argue that remediating past "discrimination" (apparently against white voters) was the legitimate, non-discriminatory motive behind the Enacted Plan. It is ironic that Defendants accuse Plaintiffs of advancing a "novel theory of the case," Mot. at 16-18, because it is *Defendants* whose legal position is unprecedented. *See, e.g.*, Am. Compl. ¶ 64 (House Redistricting Chair Tom Leek referring to the "novel legal theory put forth by the Governor").

As the Supreme Court explained in *Bartlett v. Strickland*, 556 U.S. 1 (2009), a "crossover district is one in which minority voters make up less than a majority of the voting-age population," but where "the minority population . . . is large enough to elect the candidate of its choice with help from voters who are members of the

24

majority." *Id.* at 13.  The question in *Bartlett* was whether Section 2 of the federal Voting Rights Act ("VRA") *compels* the creation of crossover districts.  The Court held that the VRA does not "mandate" the creation of such districts, *id.* at 43, but seven Justices recognized that it is plainly permissible for a State to choose to create such districts.

The three Justices in the plurality observed that "crossover districts may serve to diminish the significance and influence of race by encouraging minority and majority voters to work together toward a common goal," and noted that "[t]he option to draw such districts gives legislatures a choice that can lead to less racial isolation, not more." *Id.* at 23 (plurality op.); see also *id.* at 24 ("in the exercise of lawful discretion States could draw crossover districts as they deemed appropriate"). As particularly relevant here, the plurality observed that "if there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, ***that would raise serious questions under both the Fourteenth and Fifteenth Amendments***." *Id.* at 24 (citing *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 481-82 (1997)) (emphasis added).  The four dissenting Justices, meanwhile, would have found the creation of crossover districts not only permissible, but required under the VRA. *See, e.g.*, *id.* at 34 (Souter, J., dissenting) ("Recognizing crossover districts has the value of giving States greater flexibility to draw districting plans with a fair number of minority-opportunity districts. . . .").

Defendants cite not a single case from the U.S. Supreme Court or any other court stating otherwise.

Defendants also fail to mention that the Florida Supreme Court has found that the specific Black opportunity districts involved in this litigation—in particular CD-5—were required by the Fair Districts Amendment and complied with federal law. Am. Compl. ¶¶ 54-58.[10]   Governor DeSantis understood that these decisions were binding on him when he pushed for the Enacted Plan, which is why he first asked the Florida Supreme Court—unsuccessfully—to issue an advisory opinion reversing its position.   *See id.* Without judicial approval, he then proceeded to destroy the district specifically found lawful by the Florida Supreme Court.

Thereafter, the only court specifically to consider the Governor's theory on the merits rejected it, holding that the application of the Fair Districts Amendment's non-diminishment provision to draw a Black opportunity district in Northern Florida did not violate the Equal Protection Clause, because, *inter alia*, compliance with the Amendment is a compelling state interest.   *See Black Voters Matter Capacity Bldg. Inst., Inc. v. Lee*, 2022 WL 1684950 (Fla. 2d Cir. Ct. 2022).[11]   Notably, in that state

---

[10] *See Apportionment VII*, 172 So.3d 363 (Fla. 2015); *League of Women Voters of Fla. v. Detzner*, 179 So.3d 258, 261 (Fla. 2015) ("*Apportionment VIII*").

[11]That decision was vacated on appeal for reasons unrelated to the merits. *Byrd v. Black Voters Matter Capacity Bldg. Inst., Inc.*, 2022 WL 2187144 (Fla. 1st DCA 2022).

court proceeding, it was *only the Governor* (acting through his Secretary of State) who claimed that the Fair Districts Amendment violates the Equal Protection Clause. The Florida Senate and House, who are also parties to that case, *did not* endorse that claim; they defended the Enacted Plan for other reasons.  *Compare* Sec. of State's Answer and Affirm. Defenses, *Black Voters Matter Capacity Bldg. Inst., Inc. v. Byrd*, No. 2022 CA 000666, Filing No. 150958256 (Fla. 2d Cir. Ct. 2022), *with* Answer and Affirm. Defenses of Florida Senate, Filing No. 150960578; Florida House of Rep. Answer and Affirm. Defenses, Filing No. 150959495.

In sum, Defendants offer no support for their novel theory that the creation of crossover districts like CD-5 was *itself* racial discrimination that must be remedied.

> 2. <u>In Any Event, Whether Defendants' Alternative Explanation is Truthful is a Fact Question Inappropriate for Resolution on a Motion to Dismiss</u>

To be clear, this lawsuit is not about whether the Fair Districts Amendment or its non-diminishment requirement is unconstitutional, and such an unprecedented finding would not excuse Defendants from liability here.  Among other reasons, Plaintiffs' well-pleaded Amended Complaint alleges that the Governor's alternative, "remedial" justification for the Enacted Plan is pretextual—a fig leaf to cover up the true, racially discriminatory motivation that, at least in part, prompted his actions and ultimately those of the Legislature.  *See* Am. Compl. ¶¶ 51, 58, 62, 68-70.

At the pleadings stage, Plaintiffs' plausible allegations must be taken as true. Alternative explanations, even if "themselves plausible, do not on their own render Plaintiffs' allegations [of discriminatory intent] implausible." *LULAC*, 2022 WL 174525, at *4. Indeed, potential alternative explanations are immaterial at this stage. *See Bala v. Comm. of Va. Dep't of Conservation & Recreation*, 532 F. App'x 332, 335 (4th Cir. 2013) ("Because the district court considered [Defendant's] proffered legitimate nondiscriminatory reasons at a procedurally improper time, within the context of a Rule 12(b)(6) motion, we conclude that the court erred."); *Alonso v. Alonso*, 2019 WL 5268554, at *4 (S.D. Fla. Oct. 17, 2019) ("Defendant's allegations . . . that her decisions . . . [were] not motivated by [Plaintiff's] disability . . . cannot be examined at the motion to dismiss stage.").

After discovery, "[D]efendants will have their turn to prove that 'the same decision would have been made for a legitimate reason'"—*e.g.*, a purportedly benign intent to draw district lines that just happened to dismantle CD-5 and diminish Black electoral power across the state. *Lewis*, 896 F.3d at 1296. "Once discriminatory intent and effect are established, . . . the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this racial discrimination factor." *Greater Birmingham*, 992 F.3d at 1321 (cleaned up). That analysis will be straightforward here and fatal to Defendants. The record makes clear *exactly* what

the Legislature would have enacted without the Governor's racially-motivated interference—a map such as 8060 that preserved Black opportunity districts.

Defendants cannot short-circuit this process by asking the Court to "just take their word for it" that their purportedly benign explanation is actually the reason for the Enacted Plan, and that intentional discrimination because of race was not even a "motivating factor." *Arlington Heights*, 429 U.S. at 265.

## IV.   THIS COURT SHOULD NOT STAY THIS PROCEEDING

### A.   The State-Court Matter does not Provide a Basis for a Stay

This is the second time that Defendants have moved to stay in deference to a state-court proceeding. Their motion should be denied for substantially the same reasons as before.

When Defendants previously moved to stay, they argued that *Growe v. Emison*, 507 U.S. 25 (1993), required this Court to defer to a state-court proceeding involving overlapping redistricting issues. Dkt. No. 62. This Court rejected that argument and denied Defendants' motion. Dkt. No. 76. Now, Defendants recycle their argument that *Growe* "directs this Court to stay its hand" pending a state-court proceeding involving a challenge to Florida's congressional district plan. *Compare* Dkt. No. 62 at 4, *with* Mot. at 24-25. But *Growe* directs no such thing, and Defendants' argument is, if anything, less persuasive the second time around. As this Court previously held, "setting a schedule for the parties to follow" is

29

appropriate when it will not "affirmatively obstruct state apportionment nor permit federal litigation to be used to impede it."  Dkt. No. 76 at 2 (quoting *Growe*, 507 U.S. at 34).  Proceeding here will do neither.

Concurrent state-court proceedings involving challenges to redistricting plans "do not detract" from a federal court's "obligation" to hear and decide a case. *Covington v. North Carolina*, 2015 WL 13806587 at *1 (M.D.N.C. Nov. 25, 2015) (quoting *Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 590-91 (2013)).  Although Defendants argue that this Court should defer to the action captioned *Black Voters Matter Capacity Bldg. Inst., Inc. v. Byrd*, that action involves different parties and different claims.[12]  Plaintiffs here are not parties to the state-court action.  The complaint in the state-court action only alleges violations of Article III, Section 20 of the Florida Constitution,[13] whereas the claims in this case are for intentional discrimination in violation of the Fourteenth and Fifteenth Amendment of the United States Constitution.  While Defendants speculate that the state-court action "could very well resolve the claims here," Mot. at 25, the state court will not have occasion

---

[12] Case No. 2022 CA 000666 (Fla. 2d Cir. Ct. 2022).

[13] The state-court complaint alleges the following violations of the Florida Constitution: (i) "diminishment of minority ability to elect," (ii) "intent to abridge and diminish minority voting strength," (iii) intent to favor or disfavor a political party," (iv) "non-compactness," and (v) political and geographic boundary splits." Complaint at 32-36, *Black Voters Matter Capacity Bldg. Inst. v. Byrd*, Case No. 2022 CA 000666, Filing No. 148201925 (Fla. 2d Cir. Ct. 2022).

to adjudicate whether the Enacted Plan violates either the Fourteenth or Fifteenth Amendment of the federal Constitution.

A stay is also inappropriate because there is no guarantee that the state-court action will be adjudicated on the merits or in advance of the next election cycle.  As this Court recognized in denying Defendants' first motion to stay, "litigation is often unpredictable, and there is no way to anticipate what twists and turns [the state-court action] may take."  Dkt. No. 76 at 2.  The state-court action has been moving slowly. Just last month, the Florida Court of Appeal lamented its "procedural dilatoriness." *Byrd v. Black Voters Matter Capacity Bldg. Inst*., 2022 WL 1698353, at *1 (Fla. 1st DCA 2022)).  And as of today, no case schedule has been set.

Defendants wrongly suggest that this case should languish because "Plaintiffs challenge districts to be used two years from now."  Mot. at 24.  In reality, there is no time to waste.  This case raises issues of both liability and remedy, so that a favorable ruling on liability after discovery and trial would likely necessitate another round of discovery and trial on the remedy.  If the current congressional district plan is invalidated, a new map would need to be in place by early May 2024 at the latest to allow election officials time to meet the relevant election deadlines.  *See* Dkt. No. 67 at 8.  And it is likely that there will be an appeal.  It is already optimistic to expect all of this activity to occur in less than two years.  A stay of this action would jeopardize state officials' ability to meet those deadlines.  This Court is therefore

justified, as before, in setting a schedule to enable it to "adopt a constitutional plan 'within ample time . . . to be utilized in the upcoming [2024] election.'" *Growe*, 507 U.S. at 35 (citation omitted).

Courts repeatedly deny motions to stay federal cases in deference to state-court proceedings where, as here, it is uncertain that a challenge to a congressional district plan will be resolved in time to ensure constitutional congressional districts are set before an election. *See Hunter v. Bostelmann*, 2021 WL 4206654, at *4 (W.D. Wis. Sept. 16, 2021) (denying motion to stay redistricting case, explaining need to "set a schedule that will allow for the timely resolution of the case should the state process languish or fail"); *Covington v. North Carolina*, 2015 WL 13806587, at *3 (denying motion to stay action challenging constitutionality of redistricting plan despite "parallel" state-court actions); *Brown v. Kentucky*, 2013 WL 3280003, at *2 (E.D. Ky. June 27, 2013) (Supreme Court precedent "clearly permits the simultaneous operation of these two procedures to ensure constitutional legislative districts are in place in time for an election"). This case is no different.

**B.    The Unrelated Voting Rights Act Cases Before the U.S. Supreme Court do not Provide a Basis for a Stay**

There is likewise no basis for staying these proceedings pending the U.S. Supreme Court's decision in *Merrill v. Milligan*, which concerns the "nature and contours of a vote dilution claim" under Section 2 of the federal Voting Rights Act. *Merrill v. Milligan*, 142 S. Ct. 879, 883 (2022). Defendants seek a stay because they

32

wish to argue that "Florida's Voting Rights Act analog in the State Constitution can't be applied in a way that's reconcilable with the U.S. Constitution's Equal Protection Clause."   Mot. at 25.   But *Merrill* will not assist this argument.   Defendants' arguments are about the non-diminishment standard of the Florida Constitution, the Florida analog to Section 5 of the VRA; they have nothing to do with Section 2, at issue in *Merrill*.   There is no reason to expect the *Merrill* Court to say anything about diminishment under Section 5 of the VRA, let alone the Florida Constitution.

Waiting for *Merrill* is particularly inappropriate because this case will turn on the facts, not the law.   Plaintiffs do not raise a claim under the Voting Rights Act or its Florida analogs.   The Governor's Equal Protection argument (baseless though it is) is at best just a pretextual excuse for the Defendants' actions.   There is no reason for it necessarily to be resolved in this case because it is not a defense to Plaintiffs' claims, which are that the Defendants *intentionally discriminated* against Black Floridians, at least in part because they are Black.   If as a matter of fact the Defendants' actions in eliminating or diminishing functioning Black crossover districts, thereby depriving thousands of Black Floridians of representation in the U.S. Congress, were motivated, at least in part, by race, they violated the Fourteenth and Fifteenth Amendments under established law.   *See Vill. of Arlington Heights v. Met. Housing Dev. Corp.*, 429 U.S. 252, 266-68 (1977).

33

*Merrill* will have nothing to say about that question and thus provides no reason for a stay.  A ruling in *Merrill* would have no effect, let alone a "substantial or controlling one," on the "claims and issues in [this] case."  *Miccousukee Tribe of Indians v. S. Fla. Water Mgmt. Dist.*, 559 F.3d 1191, 1198 (11th Cir. 2009).

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss or stay should be denied.

Respectfully submitted,

PATTERSON BELKNAP WEBB & TYLER LLP

By: */s/ Gregory L. Diskant*
Gregory L. Diskant *(pro hac vice)*
H. Gregory Baker *(pro hac vice)*
Jonah M. Knobler *(pro hac vice* forthcoming)
Peter Shakro *(pro hac vice* forthcoming)
Catherine J. Djang *(pro hac vice)*
Alvin Li (*pro hac vice*)
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000
gldiskant@pbwt.com
hbaker@pbwt.com
jknobler@pbwt.com
pshakro@pbwt.com
cdjang@pbwt.com
ali@pbwt.com

Katelin Kaiser *(pro hac vice)*
Christopher Shenton (*pro hac vice* forthcoming)
Alexandra Wolfson (*pro hac vice* forthcoming)
SOUTHERN COALITION FOR SOCIAL JUSTICE

34

1415 West Highway 54, Suite 101
Durham, NC 27707
(919) 323-3380
katelin@scsj.org
chrisshenton@scsj.org
alexandra@scsj.org

Janette Louard (*pro hac vice* forthcoming)
Anthony P. Ashton (*pro hac vice* forthcoming)
Anna Kathryn Barnes (*pro hac vice* forthcoming)
NAACP
OFFFICE OF THE GENERAL COUNSEL
4805 Mount Hope Drive
Baltimore, MD 21215
Telephone: (410) 580-5777
jlouard@naacpnet.org
aashton@naacpnet.org
abarnes@naacpnet.org

Henry M. Coxe III (FBN 0155193)
Michael E. Lockamy (FBN 69626)
BEDELL, DITTMAR, DeVAULT, PILLANS &
 COXE
The Bedell Building
101 East Adams Street
Jacksonville, Florida 32202
(904) 353-0211
hmc@bedellfirm.com
mel@bedellfirm.com

*Attorneys for Plaintiffs*

## <u>LOCAL RULE 7.1(F) CERTIFICATION</u>

The undersigned certifies that this memorandum contains 7,998 words, excluding the case style, signature block, and certifications; and it complies with the size and font requirements in the local rules.

Date: June 29, 2022

*/s/ Gregory L. Diskant*
Gregory L. Diskant

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 29, 2022, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

/s/ *Gregory L. Diskant*
Gregory L. Diskant