**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**COMMON CAUSE FLORIDA, et al.,**

     **Plaintiffs,**

**v.**                            **Case No. 4:22-cv-109-AW-MAF**

**RON DESANTIS, in his official capacity
as Governor of Florida, and CORD
BYRD, in his official capacity as Florida
Secretary of State,**

     **Defendants.**

_____/

### ORDER ON DEFENDANTS' MOTION TO DISMISS AND/OR STAY

Before Jordan, Circuit Judge, and Rodgers and Winsor, District Judges.

PER CURIAM:

      The plaintiffs in this case—five individuals and three organizations—allege in their amended complaint that Florida's recently-enacted congressional districting map was the result of intentional racial discrimination in violation of the Fourteenth and Fifteenth Amendments.   The defendants—Governor Ron DeSantis and Secretary of State Cord Byrd—have filed a motion to dismiss the complaint or stay the action.   For the reasons which follow, we agree that Governor DeSantis should be dismissed as a defendant but deny the motion to dismiss or stay in all other respects.

1

## I.     The Article III Standing of the Plaintiffs

At the motion-to-dismiss stage, a plaintiff needs to allege facts plausibly demonstrating the three elements of Article III standing (injury in fact, causation, and redressability).  *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  The defendants argue that all of the organizations and three of the individual plaintiffs lack Article III standing.

We need not address the standing of all of the plaintiffs because the parties agree (and we concur) that two of the individual plaintiffs, Brenda Holt and Leo Stoney, have standing under the district-specific injury analysis of *Gill v. Whitford*, 138 S.Ct. 1916, 1929-30 (2018) ("To the extent that the plaintiffs' alleged harm is the dilution of their votes, that injury is district specific. . . .  The boundaries of the district, and the composition of its voters, determine whether and to what extent a particular voter is packed or cracked. . . .  For similar reasons, we have held that a plaintiff who alleges that he is the subject of a racial gerrymander—a drawing of districts lines on the basis of race—has standing to assert only that his own district has been so gerrymandered.").    And where at least one plaintiff has standing to maintain the action, there is an Article III case or controversy, and it is unnecessary to address the standing of the other plaintiffs.  *See, e.g., Horne v. Flores*, 557 U.S. 433, 446-47 (2009); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 254, 264 n. 9 (1977); *Ga. Ass'n of Latino Elected*

*Officials, Inc. v. Gwinnett Cty. Bd. of Registration and Elections*, 36 F.4th 1100, 1113-14 (11th Cir. 2022).[1]

We start with Ms. Holt, who is a resident of former Congressional District 5 and a resident of the newly-created Congressional District 2.  The complaint alleges that the former Congressional District 5, which had a Black citizen voting age population (CVAP) of 45.88% was "cracked" into newly-formed Congressional Districts 2, 3, and 4 with much lower Black CVAPs.  For example, the newly-formed Congressional District 5 has a Black CVAP of just 12.45% (while increasing the White CVAP from 44.77% to 73.5%).  Under *Gill*, Ms. Holt has standing to challenge the newly-created Congressional District 2.

Turning to Mr. Stoney, he is a resident of Congressional District 10 (both before and after the new map went into effect).  According to the complaint, the newly-created Congressional District 10 "packs" additional Democrats but disadvantages Black voters by splitting the minority population of Orlando and reducing the Black CVAP to 24.84%.  The plaintiffs allege that this changes

---

[1] The caveat is that "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester v. Laroe Estates, Inc.*, 137 S.Ct. 1645, 1651 (2017).  We note that the relief requested in the complaint is the invalidation of the recently-enacted congressional districting map in its entirety and the enjoining of any elections under that map.  At this early point in the litigation, we do not address whether such relief would be available to some or all of the plaintiffs if the allegations in the complaint were proven.

Congressional District 10 from a district in which Black voters had a reasonable opportunity to elect their candidate of choice to one in which Black voters have a significantly reduced ability to reliably elect their preferred candidates.  Under *Gill*, Mr. Stoney has standing to challenge the newly-created Congressional District 10.

## II.    Governor DeSantis as a Defendant

The plaintiffs, as noted above, are challenging Florida's recently-enacted congressional districting map on federal constitutional grounds.  As relief, they seek a declaratory judgment that the map is unconstitutional, and a permanent injunction preventing Governor DeSantis and Secretary Byrd from "calling, holding, supervising, or certifying any elections" under the map.

In order to avoid Eleventh Amendment problems, plaintiffs seeking to enjoin a state's alleged ongoing violation of federal law—relief that is properly characterized as prospective—may sue state officials or agencies under the framework of *Ex Parte Young*, 209 U.S. 123, 159-60 (1908).  *See Verizon Md., Inc. v. Public Service Comm'n*, 535 U.S. 635, 645 (2002).   As the Supreme Court explained last year, *Ex Parte Young* "allows certain private parties to seek judicial orders in federal court preventing state executive officials from enforcing state laws that are contrary to federal law."  *Whole Women's Health v. Jackson*, 142 S.Ct. 522, 532 (2021).

An important requirement of *Ex Parte Young*, however, is that the state officials being sued must have some connection to the enforcement of the challenged provisions under state law.  *See, e.g., id.* at 534; *Hendrickson v. AFSCME Council 18*, 992 F.3d 950, 965 (10th Cir. 2021); *281 Care Committee v. Arneson*, 638 F.3d 621, 632-33 (8th Cir. 2011); *Summit Med. Associates, P.C. v. Pryor*, 180 F.3d 1326, 1341-42 (11th Cir. 1999).  They must, in other words, be in some way "responsible for enforcing the allegedly unconstitutional scheme."  *Osterback v. Scott*, 782 Fed. App'x 856, 858-59 (11th Cir. 2019) (citing *ACLU v. The Florida Bar*, 999 F.2d 1486, 1490 (11th Cir. 1993)).

Here, the complaint alleges that it is Florida's Secretary of State (currently Secretary Byrd) who is the "chief election officer of the state," and that is a correct statement of Florida law.  *See* Fla. Stat. § 97.012(1).  The Secretary of State, according to the plaintiffs, is "responsible for the administration and implementation of election laws in Florida."  That too is an accurate description of Florida law.  The Secretary is the head of the Department of State.  *See* Fla. Stat. § 20.10(1).  The Department, in turn, is tasked with the "general supervision of administration of election laws," and must "certify to the supervisor of elections of each county affected by a candidacy for office the names of persons nominated to such office."  *See* Fla. Stat. §§ 15.13, 99.121.

Given his duties and powers under Florida law, and those of the Department of State that he leads, Secretary Byrd is a proper defendant here.  He is the official against whom appropriate prospective injunctive relief can be ordered with respect to the congressional districting map under *Ex Parte Young*.  *See, e.g., Texas Democratic Party v. Abbott*, 978 F.3d 168, 179-80 (5th Cir. 2020); *Grizzle v. Kemp*, 634 F.3d 1314, 1318-19 (11th Cir. 2011); *Madera v. Detzner*, 325 F.Supp.3d 1269, 1277-78 (N.D. Fla. 2018).

Governor DeSantis, the plaintiffs allege, has "direct supervision" over the "administration" of the Department of State under Article IV, § 6 of the Florida Constitution.  But that allegation is insufficient.  We conclude, for the reasons which follow, that Governor DeSantis is not an appropriate defendant under *Ex Parte Young*.

First, the provision of the Florida Constitution that the plaintiffs cite in the complaint does not read the way they suggest.  Instead, it states that the administration of the 25 executive branch departments shall be under the "direct supervision of the governor, lieutenant governor, a cabinet member, or an officer or board appointed by and serving at the pleasure of the governor," with a couple of exceptions not relevant here.  As noted, the Department of State is run by the Secretary of State.  *See* Fla. Stat. § 20.10(1).  The lower federal courts have consistently held or recognized that governors cannot be sued under *Ex Parte Young*

just because they have a general duty to enforce state law or just because they publicly endorse and defend the challenged scheme.  *See, e.g., Disability Rights S.C. v. McMaster*, 24 F.4th 893, 901 (4th Cir. 2022); *Morris v. Livingston*, 739 F.3d 740, 745-46 (5th Cir. 2014); *Summit Med. Associates,* 180 F.3d at 1341-42; *Shell Oil Co. v. Noel*, 608 F.2d 208, 211 (1st Cir. 1979).[2]

Second, the main case the plaintiffs rely on, *Luckey v. Harris*, 860 F.2d 1012 (11th Cir. 1988), is factually different and therefore distinguishable.  The case involved alleged systemic deficiencies in the provision of legal representation to indigent defendants in criminal cases, and not redistricting.  In the context of that particular challenge, the governor in *Luckey* was held to be a proper defendant under *Ex Parte Young* because state law gave him the residual authority to commence criminal prosecutions and the power to direct the attorney general to "institute and prosecute" on behalf of the state.  *See id.* at 1015-16.  This case, unlike *Luckey*, does not involve the exercise of prosecutorial discretion in criminal cases.

---

[2] Given this general consensus among the circuits, we need not address today whether Eleventh Circuit precedent binds us as a three-judge district court.  *See generally* Joshua A. Douglas & Michael E. Solimine, *Precedent, Three-Judge District Courts, and Democracy*, 107 Geo. L. J. 413, 438-55 (2019) (surveying and discussing the different views on what precedent binds three-judge district courts).  There are several election/voting cases allowing governors to be sued under *Ex Parte Young*, but they do not address the "connection" requirement of *Ex Parte Young. See, e.g.,  NAACP v. Merrill*, 939 F.3d 470, 475-78 (2d Cir. 2019); *Lawson v. Shelby County*, 211 F.3d 331, 335 (6th Cir. 2000).   We therefore do not view them as persuasive.

The Secretary of State, who is not a constitutional cabinet officer, *see* Fla. Const. art. IV, § 4(a), is appointed by the Governor and serves at his pleasure. *See* Fla. Stat. § 20.02(3). Though the Secretary "generally remains subject to oversight, direction, and supervision" by the Governor, *see id.*, the plaintiffs have not pointed to any provision of Florida law which gives the Governor authority to carry out, or direct the carrying out, of elections. And the caselaw we have located uniformly indicates that a governor's supervision of a subordinate official is not a sufficient connection under *Ex Parte Young. See, e.g., Doyle v. Hagan*, 1 F.4th 249, 255-56 (4th Cir. 2021) (governor's "supervision and direction" of state's executive branch was not enough to make him a proper defendant under *Ex Parte Young*); *Coalition to Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2012) ("[G]eneral supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit.") (internal quotation marks and citation omitted).

In closing, we recognize that the plaintiffs allege that Governor DeSantis has acted with racially discriminatory intent. But Governor DeSantis' alleged motivation for proposing the recently-enacted congressional districting map goes to the merits of the plaintiffs' Fourteenth and Fifteenth Amendment claims, and not to whether he can be sued under *Ex Parte Young* for prospective injunctive relief. And

"the inquiry into whether suit lies under *Ex Parte Young* does not include any analysis of the merits of the claim[s]." *Verizon Md.*, 535 U.S. at 646.

## III.   The Sufficiency of the Complaint

The defendants contend that the plaintiffs have failed to adequately state claims for intentional discrimination under the Fourteenth and Fifteenth Amendments.  We disagree.[3]

The Rule 12(b)(6) standard is by now well-settled.  The plaintiffs must allege sufficient facts such that their claims have "substantive plausibility."  *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014).  A complaint does not require detailed allegations, but it must have more than labels and conclusions.  It cannot just claim that the defendant harmed the plaintiff.  It must, instead permit the reasonable inference that the defendant is liable for the misconduct alleged.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2008).  That said, substantive plausibility is not a probability requirement.  *See id.*  And a well-pleaded complaint survives a motion to dismiss even if the court thinks that actual proof of the allegations is improbable

---

[3] The defendants treat the Fourteenth and Fifteenth Amendment claims together in their motion, so we will do the same.  Like the Fourteenth Amendment, the Fifteenth Amendment prohibits racially discriminatory laws that affect voting rights.  *See generally Gomillion v. Lightfoot*, 364 U.S. 339, 346 (1960) ("When a legislature . . . singles out a readily isolated segment of a racial minority for special discriminatory treatment, it violates the Fifteenth Amendment.").

or that recovery is remote and unlikely. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

Generally speaking, an equal protection claim requires both discriminatory purpose and discriminatory effect. *See, e.g., Wayte v. United States*, 470 U.S. 598, 608 (1985). In the arena of redistricting or reapportionment, however, a plaintiff may sometimes state an equal protection claim "by alleging that the legislation, though race-neutral on its face, rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification." *Shaw v. Reno,* 509 U.S. 630, 649 (1993). In that scenario, a plaintiff need not claim that the discriminatory conduct had the effect of diluting a racial group's voting strength because a racial gerrymander causes other harms—it "reinforces racial stereotypes and undermines our system of representative democracy by signaling to elected officials that they represent a particular racial group rather than their constituency as a whole." *Id.* at 650.

"Outright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). The Supreme Court has provided a number of non-exhaustive signposts for consideration in evaluating a claim of racial discrimination. These are the "impact" of the challenged action; the "historical background;" the specific sequence

of events leading up to the challenged action, including "[d]epartures from the normal procedural sequence;" "[s]ubstantive departures . . ., particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached;" and the "legislative or administrative history." *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 266-68 (1977). Other relevant considerations are the foreseeability of the disparate impact; the knowledge of that impact; and the availability of less discriminatory alternatives. *See Greater Birmingham Ministries v. Secretary of State*, 992 F.3d 1299, 1322 (11th Cir. 2021).

Here the plaintiffs have presented non-conclusory factual allegations on all of these signposts. First, the congressional districting plan negatively impacts Black voters in Florida because it destroys or diminishes two opportunity or crossover districts. Second, Florida has a history of suppressing Black voters. Third, there were departures from procedural norms, including (a) the Legislature rejecting Governor DeSantis' proposed map and approving two maps, an initial map (incorporating some of Governor DeSantis' views while still allowing for the possibility that a Jacksonville-only district might have allowed Black voters to elect candidates of their choice), and a fallback map (in case the initial map was found legally wanting); (b) Governor DeSantis publicly rejecting those maps and vetoing those maps while making it clear that his map  was based on racial considerations

because he opposed any proposal that preserved CD-5; (c) Governor DeSantis proposing a map for the Legislature; and (d) the Legislature failing to propose any amended map in the special legislative session and simply approving—in toto—the map put forth by Governor DeSantis. This was, according to the complaint, the first time in Florida history that a congressional districting map had been created by the Governor rather than the Legislature.   Fourth, Governor DeSantis frequently complained that CD-5 was 200 miles long, but the new CD-2 (a new white-majority district) was also about the same length.   Fifth, Governor DeSantis' map violated Florida law, i.e., the Fair Districts Amendment.   Sixth, some Republican legislators stated that Legislature's two proposed maps complied with the law by continuing to protect "the minority group's ability to elect a candidate of their choice" under the Florida Constitution and urged the Legislature to put aside the external "noise" and "influences" from the outside.   Seventh, the congressional districting map was enacted over objections that it disparately impacted Black voters.

These allegations are sufficient, at the pleading stage, to make the Fourteenth and Fifteenth Amendment claims plausible. *Cf. Swierkiwciz v.  Sorema, N.A.*, 534 U.S. 506, 510-11 (2002) (holding that a Title VII plaintiff need not allege specific facts establishing a prima facie case of discrimination under the *McDonnell Douglas* framework) (cited with approval in *Twombly*, 550 U.S. at 555-56, 563, 569-70). The defendants argue that the good faith of a legislature must be presumed, and they

assert that the plaintiffs must "overcome" that presumption and "show" that the Florida Legislature "passed" the congressional districting map because of its adverse effects on Black voters. *See Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). To the extent that the defendants are arguing about proof, their argument is premature. We are not at the evidentiary stage of the case, and our only task is to evaluate the complaint for facial sufficiency (i.e., plausibility).

With respect to the plaintiffs' district-specific allegations, the defendants argue that they are simply threadbare claims devoid of factual allegations with respect to discriminatory effect. And they claim that the inferences about discriminatory effect with respect to CD-5 and CD-10 are "unsupported." As to these points, we disagree because we are required to view the allegations in the complaint (and the reasonable inferences to be drawn from those allegations) in the light most favorable to the plaintiffs. *See Christopher v. Harbury*, 536 U.S. 403, 406 (2002). And insofar as the defendants contend that the plaintiffs' benchmarks and voting analyses are flawed, such objections are matters for summary judgment. The question here is not whether the plaintiffs will ultimately prevail on their claims of intentional discrimination. *See Skinner v. Switzer*, 562 U.S. 521, 530 (2011).

The defendants also contend that Florida is not required to keep the same (or greater) percentage of Black voters in a given district, and that the plaintiffs are essentially demanding racial gerrymandering of their own. The problem with this

contention—at this early point in the litigation—is that the plaintiffs have sufficiently pled claims of intentional racial discrimination. *See Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) ("[I]f there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments."). Each side claims that the opponents' legal theory is "novel" and unconstitutional, but without an evidentiary record we are in no position at this time to say who is correct. *Cf. Advisory Opinion to Governor*, 333 So. 3d 1106, 1108 (Fla. 2022) (denying Governor DeSantis' request for an advisory opinion as to whether the redistricting of CD-5 was constitutional, in part because the "request might necessitate fact-intensive analysis and consideration of other congressional districts, not just [CD-5]").

## IV.    The Defendants' Request for a Stay

The defendants argue that if the complaint is not going to be dismissed, the case should be stayed pending the outcome of (1) a pending state-court case and (2) the Supreme Court's decisions in *Merrill v. Milligan*, No. 21-1086, and *Merrill v. Caster*, No. 21-1087. We reject their arguments.

First, a stay is not warranted just because a different set of plaintiffs are pursuing a state-court action challenging the recently-enacted congressional districting map. *See Black Voter Capacity Bldg. Inst., Inc. v. Byrd*, No. 2022 CA

0666 (Fla. 2d Jud. Cir. Ct.).    Although both *Black Voter Capacity* and this case involve challenges to the congressional map, the Florida action involves claims brought under the Florida Constitution (i.e., Article III, § 20), while this case involves claims brought under the Federal Constitution (i.e., the Fourteenth and Fifteenth Amendments).   Different legal principles, therefore, will govern the two cases and the resolution of one action may not have much (or any) effect on the other.   Moreover, the state trial court denied the defendants' motion to dismiss only recently.   We do not know exactly how the *Black Voter Capacity* action will proceed, and see no basis to stay this case.

Second, the Supreme Court's decision in *Growe v. Emison*, 507 U.S. 25, 35–37 (1993), does not counsel or require a stay.   *Growe* explains that state authorities— legislative or judicial—should ordinarily be given the opportunity to create a redistricting plan, but here there is already a congressional districting map enacted by the Florida Legislature.   At this time no one is currently asking a court—federal or state—to draw districts in the absence of a legislatively-created map.   Instead, the current map is being challenged on federal constitutional grounds.

Third, a stay is not appropriate due to the upcoming decisions in *Milligan* and *Caster.*   Those cases will address different legal issues concerning the nature and contours of a vote dilution claim under § 2 of the Voting Rights Act, 52 U.S.C. §

15

10301, but here there is no claim under the Act.  It is doubtful, therefore, that *Milligan* and *Castor* will have a significant impact in this case.

Fourth, a stay is not called for just because the defendants take the position that the Voting Rights Act analog in the Florida Constitution cannot be applied in a way that is (in their view) reconcilable with the Fourteenth Amendment's Equal Protection Clause.  Without taking any position on the defendants' perspective, this case does not involve any claims under Florida law.  So the defendants' position on Florida law will not affect how the Fourteenth and Fifteenth Amendment claims are ultimately resolved here.

## IV.    Conclusion

In sum, the defendants' motion to dismiss is granted in part and denied in part. Governor DeSantis is dismissed as a defendant in this case.  In all other respects, the motion to dismiss is denied.

Winsor, J., concurring in part and dissenting in part:

I agree with my colleagues in large part: I agree that Plaintiffs have alleged sufficient facts to show standing, that the Eleventh Amendment bars claims against the Governor, and that Defendants have shown no basis for a stay. On each of these points, I join the court's opinion in full.

16

I respectfully disagree, however, as to Part III. In my view, Plaintiffs have not alleged sufficient facts to plausibly allege a claim for racial discrimination. I would therefore grant the motion to dismiss and allow Plaintiffs to replead with additional facts.

Plaintiffs contend the newly drawn congressional districts violate their Fourteenth and Fifteenth Amendment rights. To succeed, they ultimately must prove that the Legislature acted with a racially discriminatory purpose. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."); *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021) (recognizing that discriminatory intent is an essential element of Fourteenth and Fifteenth Amendment claims). At this early stage, though, the question is whether Plaintiffs have alleged sufficient facts to state a plausible claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Thus, the question is whether Plaintiffs have pleaded facts that support a reasonable inference that the Legislature's purpose in enacting the map was to discriminate based on race. It is not enough to allege facts that would be

"merely consistent with" a discriminatory purpose; Plaintiffs must allege enough to "nudge [their] claims of invidious discrimination across the line from conceivable to plausible." *Id.* at 680 (cleaned up). Determining whether they have is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

Because direct evidence of discriminatory intent can be rare, courts often look for circumstantial indicators of discrimination, including (1) disproportionate impact, (2) historical background, (3) departures from usual procedure, (4) substantive departures, and (5) legislative history. *Arlington Heights*, 429 U.S. at 266-68 ; *see also Greater Birmingham Ministries*, 992 F.3d at 1322  (citing *Jean v. Nelson*, 711 F.2d 1455, 1486 (11th Cir. 1983)) (listing foreseeability of impact, knowledge of impact, and availability of less discriminatory alternatives as additional factors). Plaintiffs rely heavily on these factors in arguing they have alleged sufficient facts. But even accepting Plaintiffs' well-pleaded allegations as true, and even drawing all reasonable inferences in their favor, I see nothing "more than the mere possibility of misconduct"—not any showing that Plaintiffs are entitled to relief. *Iqbal*, 556 U.S. at 679.

To be sure, Plaintiffs do allege facts supporting the impact-related markers. First and foremost, Plaintiffs allege that the new plan performs worse for black voters than did the old plan. *See* ECF No. 97 (FAC) ¶ 84. And they allege the Florida

Legislature knew that it would. *See id.* ¶ 73. Indeed, these disproportionate-impact allegations are the centerpiece of Plaintiffs' complaint. Impact, though, "is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution." *Washington v. Davis*, 426 U.S. 229, 242 (1976). That is particularly true in redistricting, where "legislatures will . . . almost always be aware of racial demographics." *Miller v. Johnson*, 515 U.S. 900, 916 (1995); *cf. also Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) ("'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences." (citation omitted)). Impact is a factor, of course, and coupled with non-conclusory allegations about purpose, there could be enough to push Plaintiffs' claims from conceivable to plausible. But Plaintiffs' other factual allegations do not bridge the gap.

As to history, Plaintiffs allege that "[f]or over a century," the State has "engaged in discriminatory measures to suppress and dilute the voting power of Black Floridians." FAC ¶ 12; *see also id.* ¶¶ 13-39 (outlining events dating back to the post-Civil War era). But these allegations go far beyond "the specific sequence of events leading up to [the plan's] passage" itself, *Greater Birmingham Ministries*, 992 F.3d at 1322 (citing *Arlington Heights*), and "old, outdated intentions of previous generations should not taint a state's legislative action forevermore on certain topics," *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th

1363, 1373 (11th Cir. 2022) (cleaned up) (quoting *Greater Birmingham Ministries*, 992 F.3d at 1325); *accord Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018) (explaining that a state's discriminatory past "cannot, in the manner of original sin, condemn governmental action that is not itself unlawful" (quoting *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality opinion))).

Plaintiffs also allege "extraordinary departures" from usual procedures—primarily relating to the Governor's proposing a plan and vetoing earlier maps, as well as the Legislature's ultimately adopting the Governor's proposal. ECF No. 109 at 21 (citing, *e.g.*, FAC ¶ 98). But Plaintiffs do not allege anything extraordinary. Florida enacts congressional maps through its usual lawmaking function: the Legislature passes a bill, and the Governor signs or vetoes it. *See* Fla. Const. art. III, §§ 7, 8. It is unremarkable that the Governor vetoed proposed legislation, and it would be quite something to infer racial discrimination from his doing so. It is likewise unremarkable that the Governor would propose a map (or any other piece of legislation). *See id.* art. IV, § 1(e) (vesting authority in the Governor to "recommend measures in the public interest" to the Legislature). Plaintiffs have not alleged any procedural deficiency; they challenge an enactment that "progressed according to the usual procedures" for ordinary lawmaking. *Arlington Heights*, 429 U.S. at 269; *see also Hall v. Holder*, 117 F.3d 1222, 1230 (11th Cir. 1997) ("Appellants also point to no procedural departures from the ordinary policy-making

process in the decision to maintain the system; that is, they do not argue that the referendum was somehow deficient.").[1]

More importantly, even if I accepted Plaintiffs' characterization of the legislative process as unusual, Plaintiffs still lack allegations connecting the process to discriminatory intent. "[P]rocedural violations do not demonstrate invidious intent of their own accord." *Rollerson v. Brazos River Harbor Navigation Dist.*, 6 F.4th 633, 640 (5th Cir. 2021). Context is key. *See id.* at 640-41. And Plaintiffs offer no facts comparable to cases where challenged procedures were chosen specifically *because of* discriminatory intent. *Cf. City of Pleasant Grove v. United States*, 479 U.S. 462, 470, 472 (1987) (affirming discriminatory-intent finding where defendant city deviated from normal procedure to justify not annexing minority neighborhood); *Major v. Treen*, 574 F. Supp. 325, 352 (E.D. La. 1983) (three-judge court) (finding governor's veto of original districting plan *combined with* minority legislators' exclusion from private meeting regarding later-enacted plan was procedural departure); *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 724 (S.D. Tex. 2017)

---

[1] Plaintiffs allege that past congressional redistricting cycles were different. More specifically, they allege that no Florida governor had ever before proposed or vetoed a map. At this stage, I must (and do) accept these facts as true. But the proper inquiry is not how a narrow subset of legislative action (decennial congressional redistricting) has worked. It is how the Florida lawmaking process works. Plaintiffs have not alleged that a Florida governor has never proposed or vetoed *any* legislation before.

(finding procedural departure where defendant city's employee directed others "to 'pull out Hispanic names' from the mailing lists" used to promote districting proposition). Instead, in pointing to the Legislature's "facially neutral" procedures without more, *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188 195 (2003), Plaintiffs' allegations do not plausibly show that discriminatory intent— and not race-neutral factors like political forces inherent in ordinary lawmaking— motivated the Legislature.

Plaintiffs also point to the Governor's comments about CD-5's 200-mile length, noting that he himself proposed a "non-Black district of similar length." FAC ¶ 58 ("[The Governor] continued to insist that there was a problem with a district that 'stretches over 200 miles from East to West . . . . (quoting Petition at 1, *Advisory Opinion to the Governor re: Whether Article III, Section 20(a) of the Florida Constitution Requires the Retention of a District in Northern Florida*, 333 So. 3d 1106 (Fla. 2022) (No. SC22-139))). Their implication here is that the Governor's asserted objection to the old district was pretextual.

But this does not support a reasonable inference the Governor's proposal was motivated by racial discrimination. For one, the complaint's truncated quotation omits the Petition's full statement, which is this:

> The district stretches over 200 miles from East to West across eight counties without conforming to usual political or geographic boundaries, solely to connect a minority population center in Jacksonville with a separate and distinct minority population center in

> Leon and Gadsden Counties so that, together, these minority
> populations may elect a candidate of their choice. It is a narrow district
> that compresses to only three miles wide, North to South, when
> traversing a string of the northernmost precincts in Leon County so the
> district can connect with the minority population in western Leon
> County without including the non-minority population in eastern Leon
> County. Similarly, in Duval County, the district narrows to about a mile
> and a half in width. As of the 2020 Census, two counties, Duval to the
> East and Leon to the West, alone contribute 82.77% of the district's
> population. These counties are in two completely different regions of
> the State.

Petition at 1, *supra*.[2] Plaintiffs offer no facts suggesting that the Governor's proposed 200-mile district shared similar characteristics. They rely solely on the fact of a similar length. There is no fair inference of discriminatory motive simply because the Governor objected to the old CD-5 and proposed an entirely different district (albeit of similar length).

Finally, the legislative history. While "contemporary statements" of decisionmakers are relevant, *Arlington Heights*, 429 U.S. at 268, Plaintiffs do not allege any that would allow an inference that racial discrimination motivated the

---

[2] Although a Rule 12(b)(6) analysis is generally limited to the complaint's four corners, we must "consider the complaint in its entirety, as well as . . . , in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007); *see also Lozman v. City of Riviera Beach*, 713 F.3d 1066, 1075 n.9 (11th Cir. 2013) (taking notice of state court documents in § 1983 suit challenging official action). Here, because Plaintiffs cite and rely on the Petition to allege discrimination, it is appropriate for the court to consider other, uncited, portions of the filing.

enacted plan. Besides largely pointing to statements by the plan's opponents,[3] Plaintiffs point to statements from the Governor and his representative suggesting that race was considered in the redistricting process. *See* FAC ¶¶ 67, 101. But "redistricting differs from other kinds of state decisionmaking in that the legislature" (and here, the Governor) "always is *aware* of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors." *Shaw v. Reno*, 509 U.S. 630, 646 (1993).

At the end of the day, Plaintiffs have not alleged sufficient facts to state a plausible claim. We should give them another opportunity to do so, but we should insist on more before throwing open the door to burdensome discovery. *Cf. Simpson v. Hutchinson*, 4:22-CV-213, 2022 WL 14068633, at *4 (E.D. Ark. Oct. 24, 2022) (three-judge court) (dismissing racial discrimination claim against Arkansas congressional map for lack of sufficient factual allegations but granting leave to amend); *see also Twombly*, 550 U.S. at 559 (district courts should "retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed" (quoting *Associated Gen. Contractors of Cal., Inc.*

---

[3] *See, e.g.*, *Butts v. City of New York*, 779 F.2d 141, 147 (2d Cir. 1985) ("The Supreme Court has, however, repeatedly cautioned—in the analogous context of statutory construction—against placing too much emphasis on the contemporaneous views of a bill's opponents. . . . [S]peculations and accusations of the . . . law's few opponents simply do not support an inference of the kind of racial animus discussed in, for example, *Arlington Heights* . . . ." (citations omitted)).

*v. Carpenters*, 459 U.S. 519, 528 n. 17 (1983)); *Miller*, 515 U.S. at 916-17 ("[C]ourts must also recognize . . . the intrusive potential of judicial intervention into the legislative realm[] when assessing under the Federal Rules of Civil Procedure the adequacy of a plaintiff's showing at the various stages of litigation and determining whether to permit discovery." (citing Fed. R. Civ. P. 12(b)). I would therefore grant the motion to dismiss but with leave to amend.