# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

Common Cause Florida, FairDistricts
Now, Florida State Conference of the
National Association for the
Advancement of Colored People
Branches, Cassandra Brown, Peter
Butzin, Charlie Clark, Dorothy Inman-
Johnson, Veatrice Holifield Farrell,
Brenda Holt, Rosemary McCoy, Leo R.
Stoney, Myrna Young, and Nancy
Ratzan,

Case No. 4:22-cv-109-AW-MAF

*Plaintiffs,*

v.

Cord Byrd, in his official capacity as
Florida Secretary of State,

*Defendant.*

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTIONS TO QUASH DEPOSITION SUBPOENAS

Every day, witnesses sit for depositions to give testimony under oath about

their knowledge of the facts that are the subject of litigation. Yet two sets of

would-be deponents now ask this court to hold that this general principle does

not—and can never—apply to them because they are (or were) members of the

Florida state government.[1] This theory rests on mistaken premises and finds no

---

[1] Two motions to quash were filed: One by six legislators (the "Legislators"), Dkt.
No. 126, and one by Governor Ron DeSantis, Deputy Chief of Staff J. Alex Kelly,

1

support in any precedent binding on this court. On the contrary, courts across the country have held that public servants can be deposed when plaintiffs seek to vindicate constitutionally guaranteed public rights. The legislative privilege, which defendants seek to invoke, does not categorically bar depositions of legislators, governors, or their staff. Nor does the apex doctrine. This is especially true when, as is the case here, the legislators, governors and their staffs are not named parties in an action, but are third-party witnesses.

Movants are correct that these depositions should not be granted as a matter of course. But this case alleges that the Florida Legislature, at the behest of Governor DeSantis, enacted federal congressional maps that intentionally discriminated against Black Floridians in violation of the Fourteenth and Fifteenth Amendments of the U.S. Constitution. And in *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252, 265 (1977), the U.S. Supreme Court set forth a list of criteria through which such claims are analyzed, including (among other things) evidence of legislative intent. The information Plaintiffs seek through the depositions of the Florida Legislators, Governor DeSantis, his chief of staff and general counsel, is critical to the analysis under *Arlington Heights*. The unique relevance and the unavailability elsewhere of

---

and General Counsel to the Governor Ryan Newman (the "Executives" and, with the Legislators, collectively the "Movants"), Dkt. No. 128.

the evidence sought by these depositions mean that Plaintiffs' needs outweigh Movants' interest in not being deposed. Accordingly, the Court should deny their motions to quash, and permit the Plaintiffs to take the depositions of Chris Sprowls, Wilton Simpson, Thomas Leek, Tyler Sirois, Randy Fine, Kaylee Tuck, J. Alex Kelly, and Ryan Newman. (For reasons explained below, Plaintiffs withdraw their subpoena for Governor DeSantis without prejudice.) Additionally, the Court should grant Plaintiffs their own opportunity to depose J. Alex Kelly and allow all the depositions to be videotaped as usual.

The discovery period in this case is extremely short, ending on June 2, 2023, as Plaintiffs hope to obtain a favorable ruling in time for the 2024 election. Accordingly, Plaintiffs respectfully request the Court to expedite consideration of this motion.

## BACKGROUND

The U.S. Census Bureau reported after its decennial census in 2020 that Florida's population increased by more than 2.7 million people and, as a result, Florida was apportioned 28 congressional seats for the next Congress, a one-seat increase from the apportionment following the 2010 Census. Dkt. No. 131 ¶¶ 39-40. This increase includes 2.5 million people of color. Consistent with its constitutional obligations, Florida's legislature began the reapportionment process in the fall of 2021, and the Senate passed a Congressional map in January 2022

("Map 8060"). Dkt. No. 131 ¶ 48. In a clear departure from Florida's customary redistricting process, Governor DeSantis publicly objected to that map and others later considered and enacted by the Legislature and proposed his own Congressional map. Dkt. No. ¶ 49. Rather than *increasing* the voting power of minority Floridians, consistent with the census increase in minority population, the Governor's proposal intentionally *reduced* the voting power of Black Floridians, destroying a long functioning crossover district in north Florida, Congressional District 5 ("CD-5"), and reducing the Black citizen voting age population in a central Florida district, Congressional District 10 ("CD-10"). Dkt. No. 131 ¶¶ 50-52.

On February 1, 2022, the Governor requested an advisory opinion from the Florida Supreme Court, specifically asking whether Florida's Fair Districts Amendment required a "congressional district in northern Florida that stretches [200] miles from East to West" in order "to connect black voters in Jacksonville with black voters in Gadsden and Leon Counties . . . so that they may elect candidates of their choice, even without a majority." Dkt. No. 131 ¶ 55. The Governor acknowledged that the Florida Supreme Court had "previously suggested that the answer is 'yes.'"[2] *Id.*

---

[2] The Florida Supreme Court declined to provide the Governor an advisory opinion. *Advisory Opinion to Governor re: Whether Article III, Section 20(a) of*

On March 4, 2022, both chambers of the Florida Legislature passed a two-map solution to their redistricting conundrum; the first map, HC000C8019 ("Map 8019") reconfigured CD-5 to address the Governor's purported concerns about the length of the District, but maintained CD-5's potential status as a crossover district. Dkt. No. 131 ¶ 61. The second, H000C8015 ("Map 8015"), retained an East-West orientation for CD-5, in case the reconfigured CD-5 did not withstand judicial scrutiny. *Id*. The Governor again objected. Dkt. No. 131 ¶ 62. Throughout this period, legislators' public statements reflected an awareness of the necessity of preserving a minority access district in Northern Florida. Dkt. No. 131 ¶¶ 64-66.

While the Governor and Legislature struggled to pass a congressional map, Plaintiffs filed the first iteration of this complaint on March 11, 2022, seeking declaratory and injunctive relief from Florida's as-of-then unremedied malapportionment, pursuant to 2 U.S.C. § 2c. *See* Dkt. No. 1. On March 29, 2022, Governor DeSantis formally vetoed the Legislature's two-map solution. That same day, the Governor's General Counsel, Ryan Newman, sent a memo to the Legislature purportedly explaining the reasons the Governor believed that CD-5 was unlawful under both maps enacted by the Legislature. Dkt. No. 131 ¶ 68. Two weeks later—as time was running out and as this Court prepared to

---

*the Florida Constitution Requires the Retention of a District in Northern Florida*, 333 So. 3d 1106 (Fla. 2022).

intervene—the Governor proposed the map ultimately enacted (the "Enacted Plan"). Dkt. No. 131 ¶ 67. At a special session of the Legislature called to consider the Governor's map, on April 19, 2022, the Governor's deputy chief of staff, J. Alex Kelly, testified before the Legislature in support of the Governor's map. Dkt. No. 131 ¶ 117.

On April 21, 2022, the Legislature effectively surrendered to the Governor's will, rubber-stamping his proposed map. Dkt. No. 131 ¶ 76. The Legislature did not create a proposal of its own in the special session. Dkt. No. 131 ¶ 71.

Plaintiffs subsequently amended this complaint to pursue claims for relief for intentional discrimination under the Fourteenth and Fifteenth Amendment against Governor DeSantis and then-Secretary of State Laurel M. Lee. *See* Dkt. No. 97. Defendants moved to dismiss and this Court, sitting as a three-judge panel, dismissed the claims against Governor DeSantis but permitted the action to continue against the Secretary, who is now Cord Byrd. Dkt. No. 104; Dkt. No. 115.[3] On January 19, 2023, Plaintiffs issued deposition and document subpoenas to the Governor, certain members of his staff, and the Legislators. These third-parties now seek to quash the deposition subpoenas. *See* Dkt. Nos. 126-28.

---

[3] On February 6, 2023, Plaintiffs again amended their complaint without objection, but did not vary their claims for relief. *See* Dkt. No. 131. The facts are taken from this second amended complaint.

## ARGUMENT

## I. Legislative Privilege Does Not Bar Depositions.

Plaintiffs and Movants agree that legislative privilege "covers both governors' and legislators' action in the proposal, formulation and passage of legislation." *In re Hubbard*, 803 F.3d 1298, 1307-08 (11th Cir. 2015). But that simply poses the question raised by these motions; it does not answer it. The legislative privilege is qualified, not absolute. Federal courts nationwide have found that redistricting cases present a uniquely compelling need for overcoming the privilege. The analysis underlying these decisions is based on the fact that the motivation behind legislative actions is an essential element of the Plaintiffs' cause of action and outweighs the Legislators' interest in avoiding the distraction of being deposed.

Indeed, allowing depositions here is in accordance with the general principles of discovery. The Federal Rules of Civil Procedure strongly favor full discovery whenever that is possible. *Republic of Ecuador v. Hinchee*, 741 F.3d 1185, 1189 (11th Cir. 2013); *Farnsworth v. Procter & Gamble Co.*, 758 F.2d 1545, 1547 (11th Cir. 1985). And evidentiary privileges ought to be narrowly construed. "Whatever their origins, these exceptions to the demand for every man's evidence

are not lightly created nor expansively construed, for they are in derogation of the search for truth." *United States v. Nixon*, 418 U.S. 683, 710 (1974).

### A. There Is No Absolute Legislative Privilege Against Giving Evidence

Movants overstate the principles underlying legislative privilege. In tying the importance of legislative privilege to parliament's struggles with the monarchy, Sir Thomas More, and the philosophy of James Wilson, Movants conflate a legislator's absolute right to be immune from personal liability for legislative actions with its more limited evidentiary cousin. True, the two concepts are related. But the majority of case law cited by Movants expound upon a legislator's right to be free from liability for legislative actions.

To start, the Legislators rely heavily on the Supreme Court's decision in *Tenney v. Brandhove*, 341 U.S. 367 (1951). *See* Dkt. No. 126 ("Leg. Br.") at 4-6. *Tenney* assured the right of legislators to be free from civil liability for legislative acts and its pronouncements of legislative immunity must be read in that context. *Tenney*'s reference to the term "privilege" means the "privilege" of immunity from suit, not a privilege against giving evidence as a non-party. As this Court has recognized, "*Tenney* concerned only immunity from suit, not a state legislative evidentiary privilege." *Florida Ass'n of Rehab. Facilities, Inc. v. Fla. Dept. of Health and Rehab. Servs.,* 164 F.R.D. 257, 262 (N.D. Fla. 1995). Moreover, the Court expressly observed that the privilege deserves "greater respect" when the

legislator is a defendant than when the defendant is "an official acting on behalf of the legislature." That describes this case, where the defendant is not a legislator, but the Secretary of State enforcing the Legislature's map, and where any asserted legislative privilege is entitled to lesser respect. *Tenney*, 341 U.S. at 378.

The putative justifications for an expansive reading of legislative privilege simply do not apply in this context. The principle of separation of powers, for instance, while weighty for a federal court passing judgment upon the actions of a member of the U.S. Congress, is irrelevant where the separation of powers is inapplicable and where a *federal* court is evaluating a *State*'s compliance with *federal* constitutional guarantees. "[I]n those areas where the Constitution grants the Federal Government the power to act, the Supremacy Clause dictates that federal enactments will prevail over competing state exercises of power," *U.S. v. Gillock*, 445 U.S. 360, 370 (1980), and so "the separation of powers principle 'gives no support to the grant' of evidentiary use immunity," *Bethune-Hill v. Virginia State Bd. of Elections*, 114 F. Supp. 3d 323, 333 (E.D. Va. 2015) (quoting *Gillock*, 445 U.S. at 370).

The same is true of what the Legislators describe as perhaps the most important justification for the legislative privilege—principles of comity. Leg. Br. at 7. Far from supporting this justification, the Supreme Court in *Gillock* expressly *denied* that comity is a relevant consideration when important federal interests are

weighed against those of a state. "[F]ederal interference in the state legislative process is not on the same constitutional footing with the interference of one branch of the Federal Government in the affairs of a coequal branch." *Gillock*, 445 U.S. at 370.

Indeed, *Gillock* denigrated the Legislators' asserted concern that piercing the claimed evidentiary privilege will destroy the government's ability to function. (And it nowhere suggested, as the Legislators argue, that the privilege can only be overcome in criminal cases.) Rather, the Court recognized that "denial of a privilege to a state legislator may have some minimal impact on the exercise of his legislative function" but observed that similar arguments "were found wanting" in the executive-privilege context. *Gillock*, 445 U.S. at 1194. Furthermore, failing to qualify the privilege would provide "only speculative benefit to the state legislative process." *Id*. at 373.

That is not to say that legislative privilege is not important. But when the legislator is not facing personal liability, as is the case here, the interest in sustaining any legislative privilege is reduced. When a State, as opposed to an individual legislator "faces liability, the legislative [evidentiary] privilege becomes qualified when it stands as a barrier to the vindication of important federal interests and insulates against effective redress of public rights." *Bethune Hill*, 114 F. Supp. 3d at 334. In those instances, "[t]he only interest advanced by the legislative

privilege . . . is the legislator's interest in being free from the distraction of compulsory process." *Id.* at 334; *see also In re Hubbard*, 803 F.3d at 1310 (identifying the distraction interest as the reason legislative privilege extends to discovery requests). It is the risk of distracting a legislator with vexatious process, therefore, which must be weighed against the Plaintiffs' need for evidence striking the core of their claims.

### B. Courts Routinely Hold That Legislative Privilege Can Be Overridden in Redistricting Cases.

For the reasons outlined above, "[b]oth [the 5th Circuit] and the Supreme Court have confirmed that state legislative privilege is not absolute." *League of United Latin American Citizens v. Abbott*, No. 22-50407, 2022 WL 2713263, at *1 (5th Cir. May 20, 2022) (denying stay of legislators' depositions pending appeal). This Court too, in an opinion that the Legislators cite favorably, has also held that the privilege is qualified. *Florida v. United States*, 886 F. Supp. 2d 1301, 1303 (N.D. Fla. 2012) ("To be sure, a state legislator's privilege is qualified, not absolute; a state legislator's privilege is not coterminous with the privilege of a member of Congress under the Constitution's Speech and Debate Clause.").

In particular, "[t]he state legislative privilege . . . must not be used as a cudgel . . . to prevent the discovery of truth in cases where the federal interests at stake outweigh the interests protected by the privilege." *Abbott*, 2022 WL

2713263, at *2. This is especially true in redistricting cases based on federal law. "Redistricting litigation presents a particularly appropriate circumstance for qualifying the state legislative privilege because judicial inquiry into legislative intent is specifically contemplated as part of the resolution of the core issue that such cases present." *Bethune Hill,* 114 F. Supp. at 337; *see also North Carolina State Conference of the NAACP v. McCrory*, 2014 WL 12526799, at *2 (M.D.N.C. Nov. 20, 2014) (acknowledging that "judicial inquiry into legislative motive is appropriate where the very nature of the constitutional question requires an inquiry into legislative purpose") (citing *South Carolina Educ. Ass'n v. Campbell*, 883 F.2d 1251, 1259 n.6 (4th Cir. 1989)).

That is why federal courts nationwide have held that legislative privilege yields to the plaintiffs' unique evidentiary needs in a redistricting context, both for document subpoenas and depositions. *Nashville Student Organizing Comm. v. Hargett*, 123 F. Supp. 3d 967 (M.D. Tenn. 2015) (ordering deposition of legislators in case involving Constitutional claims and voting rights); *Favors v. Cuomo*, 285 F.R.D. 187, 214 (E.D.N.Y. 2012) (joining the "clear weight of authority holding that the legislative privilege is qualified and subject to a judicial balancing test."); *Baldus v. Brennan*, No. 11 Civ. 1101 (JPS) (DPW), 2011 WL 6122542 (E.D. Wis. Dec. 8, 2011) (ordering deposition of legislator's aide in redistricting case), *order clarified*, No. 11 Civ. 1011 (JPS) (DPW), 2011 WL 6385645 (E.D. Wis. Dec. 20,

2011); *Comm. For a Fair & Balanced Map v. Ill. State Bd. of Elections*, No. 11 C 5065, 2011 WL 4837508, at * 7 (N.D. Ill. Oct. 12, 2011) ("Under the federal common law, legislative privilege is qualified, not absolute, and may be overcome by a showing of need."); *Bethune-Hill*, 114 F. Supp. at 323 ("Although the Court will not lightly intrude upon the state legislative privilege, it must be a qualified privilege in such a scenario and yield in the face of an evidentiary need that lies at the core of the inquiry required by the Supreme Court in redistricting cases."); *Rodriguez v. Pataki*, 280 F. Supp. 2d 89 (S.D.N.Y. 2003) (holding legislative privilege was qualified), *aff'd*, 293 F. Supp. 2d 302 (S.D.N.Y. 2003); *Michigan State A. Philip Randolph Institute v. Johnson*, 2018 WL 1465767, at *4 (E.D. Mich. Jan. 4, 2018) (collecting cases finding that legislators enjoy only a qualified legislative privilege where plaintiffs raise constitutional challenges under the Equal Protection Clause or VRA and ordering legislative depositions); *Perez v. Perry*, No. SA-11-CV-360 (OLG), 2014 WL 106927, at *1 (W.D. Tex. Jan. 8, 2014) (recognizing that the "legislative privilege for state lawmakers is, at best, one which is qualified," endorsing *Rodriguez*'s multi-factor test, and ordering legislative depositions) (internal citations omitted); *Page v. Va. State Bd. of Elections*, 15 F. Supp. 3d 657, 666 (E.D. Va. 2014).

Moreover, despite the Legislators' exaggerated assertions that subjecting them to depositions would undermine the legislative process, the Florida Supreme

Court has already permitted depositions of state lawmakers when the interests asserted were similar as here—allegedly drawing a racially discriminatory map. *League of Women Voters of Florida v. Florida House of Representatives*, 132 So. 3d 135, 154 (Fla. 2013). Indeed, in the Florida state case currently underway challenging the same congressional redistricting at issue here, the Governor himself seeks to depose non-party legislators. *See* Declaration of Alvin Li ("Li Decl.") at Exhibit 1.

*In re Hubbard* does not mandate a different outcome. Movants rely heavily on that case to argue not only that this Court should weigh their interests in preventing discovery more heavily than the Plaintiffs', but also to argue that binding precedent forecloses disclosure altogether when the plaintiff seeks evidence of legislative motive. *See* Leg. Br. at 16-18; Dkt. No. 128 ("Exec. Br.") at 17-21. Both contentions are wrong.

First, *In re Hubbard* did not hold that legislative privilege is absolute. On the contrary, the court observed that the privilege is qualified, and can yield where important federal interests are at stake. *Hubbard*, 803 F.3d at 1311. The problem for the plaintiff in *Hubbard* was that its sole remaining claim, based on the First Amendment, was not legally cognizable. *Id*. at 1314-15. The court held that the First Amendment did not support a claim against a facially valid statute, even if the

legislators drafting it harbored an improper motive. *Id*. at 1312. Enforcing the subpoenas would therefore not serve *any* federal interest. *Id*. at 1314-15.

Here, on the other hand, legislative motive is a critical element of Plaintiff's underlying Fourteenth and Fifteenth Amendment claims. *Arlington Heights*, 429 U.S. at 265-66. Proof that the Legislators had or endorsed racially discriminatory motives when enacting the new map directly supports that element. Enforcing the subpoenas here would therefore vindicate an important federal interest in combatting unlawful discrimination. *Hubbard* in no way precludes enforcing subpoenas when legislative motive remains an element of the claim.

Nor does *Hubbard* draw a bright line between civil and criminal cases. The court in *Hubbard* observed, as is true, that there is an important federal interest in obtaining evidence in federal criminal investigations. 803 F.3d at 1312. But it used criminal law enforcement merely as an example to support the following much broader proposition: "[t]o be sure, a state lawmaker's legislative privilege must yield in some circumstances where necessary to vindicate important federal interests . . . ." *Id*. Indeed, the *Hubbard* Court went out of its way to make clear that it was not foreclosing piercing the privilege in an appropriate civil case. The Court emphasized that its opinion "should not be read as deciding whether, and to what extent, the legislative privilege would apply to a subpoena in a private civil

action based on a different kind of constitutional claim than the one [Plaintiffs] made here." *Id.* at 1312 n.13.

The same is true of *Gillock*. Although the Legislators suggest *Gillock* means that legislative privilege can be overcome only in federal criminal cases, as noted above, *Gillock* contains no such holding. While its facts concerned a criminal case, nothing in the opinion limits its reasoning to criminal matters. On the contrary, *Gillock* cautioned against overstating the "Court's sensitivity to interference with the functioning of state legislators." 445 U.S. at 372.

Movants' reliance on non-binding precedent is similarly unpersuasive. *Lee vs. City of Los Angeles*, for instance, also declined to categorically bar depositions of government officials on the basis of legislative privilege. 908 F. 3d 1175 (9th Cir. 2018). The Ninth Circuit rejected the plaintiffs' arguments that legislative privilege does not apply to local officials and that legislative privilege must always yield when a constitutional claim directly implicates the government's intent. *Id.* at 1187-88. Plaintiffs make no such contentions here. More important for our purposes, *Lee* rejected the need for deposition in that case after the factual record was fully developed and the district court had granted summary judgment. This allowed the Ninth Circuit to apply a fact-intensive inquiry and conclude as a factual matter that race was not the predominant factor in the redistricting process. *Id.* at 1183-85. For that reason, because "the factual record in [Lee] falls short of

justifying the 'substantial intrusion' into the legislative process" the Circuit

declined to reverse the district court's determination that the depositions should be

prohibited. *Id.* at 1188 (quoting *Arlington Heights*, 429 U.S. at 268 n. 18).

Movants do not (and could not) point to any similar factual record here.

As for the summary order in *Martinez v. Bush*, No. 1:02 Civ. 20244 (AJ)

(S.D. Fla. May 31, 2002), which the Legislators attach to their brief, that case

provides little analysis from which this court can draw guidance and it has not been

cited or relied upon by any other court. More importantly, it predates the

development of the five-factor test in *Rodriguez v. Pataki*, 280 F.Supp.2d 89, 100-

01 (S.D.N.Y. 2003), which (as set forth below) has been widely relied upon in

deciding when claims of legislative privilege have been overcome, particularly in

redistricting cases. Thus, it runs contrary to the weight of authority in recent

federal redistricting cases. *See, e.g.*, *League of United Latin Am. Citizens v.*

*Abbott*, No. 21 Civ. 259 (DCG) (JES) (JVB), 2022 U.S. Dist. LEXIS 89520 (W.D.

Tex. May 18, 2022) (ordering legislators to sit for depositions in redistricting

case); *S.C. State Conf. of the NAACP v. McMaster*, 584 F. Supp. 3d 152, 160-67

(D.S.C. Feb. 10, 2022) (same).

While the legislative motive in the redistricting lies at the heart of the case,

and Plaintiffs do seek direct testimony on that subject, the deposition testimony

sought here is wide-ranging and goes far beyond just the Legislators' and

Executives' subjective motives or states of minds. Plaintiffs' subpoenas seek

discoverable information that will help the Court discern the legislative motive

from objective facts about which the Movants have knowledge. The signposts of

discriminatory purpose are the *Arlington Heights* factors, which direct courts to

consider: (1) the impact of the official action; (2) the historical background; (3) the

specific sequence of events leading up to challenged decision, particularly in terms

of procedural departures; (4) substantive departures in the aforementioned

sequence; and (5) legislative and administrative history. *Village of Arlington

Heights*, 429 U.S. at 266-68. In this Circuit, courts also consider: (6) the

foreseeability of the disparate impact; (7) knowledge of that impact; and (8) the

availability of less discriminatory alternatives. *Greater Birmingham Ministries v.

Sec. of State for State of Ala.*, 992 F.3d 1299, 1321-22 (11th Cir. 2021). These

factors are largely objective. The Legislators and the Executive officials should

have relevant and admissible information on all of these subjects.

Nor can Plaintiffs find this information elsewhere. While the Legislators

claim Plaintiffs can simply get this information in the "ample" public record, the

vast majority of Plaintiffs' records requests have come up empty. (In contrast, the

Executive officials agree that Plaintiffs are entitled to discovery on this subject

from them, but claim Plaintiffs can get this information by deposing lower-level

officials, without having to bother the Governor.) In any event, to date, Plaintiffs

have only received a partial response to their records request from the Executives, and no response from the Legislators.[4]

As has been repeatedly recognized in the redistricting context, the legislative privilege is a qualified privilege, not an absolute bar on providing evidence. "[T]he Supreme Court, the First, the Ninth and Eleventh Circuits all recognize that the state legislative privilege is qualified." *League of United Latin Am. Citizens v. Scott*, No. 22-50407, 2022 U.S. App. LEXIS 20037, at *6 & n.2 (5th Cir. May 20, 2022).

### D. <u>The Factors Weigh in Favor of Deposing the Legislators</u>.

The multi-factor test, first developed in *Rodriguez v. Pataki*, 280 F.Supp.2d 89, 100-01 (S.D.N.Y. 2003), to resolve claims of deliberative process privilege, has been widely used by federal courts throughout the country to analyze

---

[4] Including the requests issued to the Florida House and Senate's respective public records coordinators, Plaintiffs have issued 33 public records requests to date. As of this filing, Plaintiffs have received only a partial response from the Florida Secretary of State and the Executive Office of the Governor, who agreed to produce all records produced in the state case. However, for the reasons noted below, *see infra* at pp 33-38, Plaintiffs are entitled to greater discovery here than in the state proceedings. The remainder of Plaintffs' public records requests have yielded no documents to date. Notably, Plaintiffs have received no response to date from Reps. Leek, Sirois, Fine, or Tuck. (Plaintiffs did not submit requests to the former House Speaker Chris Sprowls or former Senate President Wilton Simpson, both of whom has since departed from the Florida Legislature.)

legislative process claims in redistricting cases.[5]  While no appellate court has had

occasion to directly apply the test to redistricting cases, that is unsurprising, as

discovery is within the purview of the district court.  Plaintiffs respectfully submit

that *Rodriguez* provides the right form of analysis here.

The *Rodriguez* factors provide a comprehensive, nuanced structure for

thinking about when the qualified legislative privilege should yield to a plaintiff's

need.  The five factors are: (1) the relevance of the evidence sought to be

protected; (2) the availability of other evidence; (3) the seriousness of the litigation

and the issues involved; (4) the role of the government in the litigation; and (5)

whether upholding the subpoena defeats the legislative privilege's purpose.[6]

*League of Women Voters of Florida, Inc. v. Lee*, 340 F.R.D. 446, 457 (N.D. Fla.

2021).

---

[5] *See, e.g.*, *Favors v. Cuomo*, 285 F.R.D 187, 214 (E.D.N.Y. 2012); *Veasey v. Perry*, No. 2:13 Civ. 193, 2014 WL 1340077 at *2 (S.D. Tx. 2014); *Puente Arizona v. Arpaio*, 314 F.R.D. 664, 672 (D. Az. 2016); *Committee for a Fair and Balanced Map v. Illinois State Bd. Of Elections*, 2011 WL 4837508 at *7 (N.D. Ill. 2011); *Bethune-Hill v. Virginia State Bd. of Elections*, 114 F.Supp.3d 323, 337-38 (E.D. Va. 2015).

[6] Some courts, including *Rodriguez* itself, refer to this final factor as weighing the possibility of future timidity by government actors.  But, as discussed above, this "chilling effect" is irrelevant in the legislative privilege context, where the correct question is slightly different—whether the discovery interferes with the legislators' ability to perform their jobs.  No matter how it is formulated, however, it is clear that this factor is meant to represent the government's interest in the privilege being maintained.

Application of those factors makes plain that Plaintiffs' needs outweigh the Movants' concerns, both with respect to the Legislators and, as set forth separately below, the Executive officials.

### 1. Relevance

The core of Plaintiff's case rests on the legislature's—and the Governor's—motives and considerations in enacting Florida's congressional map and intentionally eliminating two Black opportunity districts. *See Greater Birmingham Ministries v. Merrill*, No. 2:15 Civ. 2193 (LSC), 2017 U.S. Dist. LEXIS 233149, at *17-18 (N.D. Ala. 2017) ("the subjective decision-making process of the legislature in redistricting is the very issue and crux of the constitutional challenge"); *Favors v. Cuomo*, 285 F.R.D. 187, 219-20 (E.D.N.Y. 2012) (acknowledging, in a redistricting case, that the "motives and considerations behind the legislature's plans are, to a large degree, the case"); *Veasey v. Perry*, No. 2:13 Civ. 193, 2014 WL 1340077 at *2 (S.D. Tex. April 3, 2014) ("The motive and intent of the state legislature when it enacted [the challenged voting bill] is the crux of this…case"). Due to that centrality, "the opinions and subjective beliefs of legislators or their key advisors [are] relevant to the broader inquiry into legislative intent," and even "purely factual material can shed light on what factors and considerations were foremost in the legislature's mind while the legislation was pending." *Page*, 15 F. Supp. 3d at 666. Accordingly, the

information sought is undeniably relevant to the adjudication of Plaintiff's intentional-discrimination claim under the Fourteenth and Fifteenth Amendments.

Despite the Legislators' claim that they are simply six voices out of many without any special relevance to the redistricting process, each played a critical role in the 2022 redistricting process. As they acknowledge, the Legislators served, respectively, as Speaker of the Florida House of Representatives, President of the Florida Senate, and Chairs and Vice Chairs of the House Redistricting Committee and House Congressional Redistricting Subcommittee.

First, the motivations of *some* legislators are undeniably relevant, even if not dispositive. It is always true that particular legislators may have individual issues unique to them that may motivate their vote, but the motivations of the individual legislators are probative of the motivations Legislature as a whole. While no one legislator's intent is dispositive, *Arlington Heights* requires showing only that racial discrimination was a motivating factor in the challenged action, not the exclusive or even predominant purpose.

The motivations of the legislative leaders are particularly relevant.[7] Here, the leaders recommended passage of the two bills that the Governor vetoed and

---

[7] Tellingly, one of the Legislators' citations for their argument that individual legislators' motives are irrelevant comes from a dissent. *Edwards v. Aguillard*, 482 U.S. 578, 582 (1987).

their members followed the leaders' recommendation. And then, after the veto, the leaders determined to draw no new maps, but instead to vote on the Governor's map and their members followed suit. Dkt. No. 131 ¶¶ 61-67, 71-76. No authority says that parsing legislative intent through the *Arlington Heights* factors must be limited only to circumstantial evidence. *Arlington Heights*, 429 U.S. at 266; *Bethune-Hill*, 114 F. Supp. 3d at 340 (acknowledging that the individual motivations of particular legislators can "constitute an important part of the case presented against...[a] districting plan"). Moreover, the Eleventh Circuit has expanded on the *Arlington Heights* factors and held that additional considerations—which relate exclusively to the legislators' intent and knowledge—should be analyzed as well. *Greater Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299, 1322 (11th Cir. 2021) (identifying "foreseeability of the disparate impact" of the challenged law, and "knowledge of that impact" are relevant factors in the *Arlington Heights* analysis).

Additionally, the legislature's motivation can be revealed through other, objective, discoverable information that legislators are uniquely well-situated to provide. *Cf. LULAC v. Abbott*, 2022 U.S. Dist. LEXIS 89520 at *8 ("In any event, there are other purposes for deposing the Legislators" in a redistricting case beyond direct intent evidence). *Arlington Heights* points to a number of circumstantial factors on which plaintiffs may adduce evidence, including

procedural irregularities in the legislative process, the specific sequence of events

leading to the challenged enactment, and knowledge, foreseeability, and scope of

the disparate impact of the challenged enactment.  The Legislators are

unquestionably well-placed to provide insight into these categories of evidence, all

of which are both objective and clearly relevant to Plaintiffs' claims.

Specifically,

- Former Senate President Wilson Simpson and House Speaker Chris Sprowls are well-positioned to speak to "[d]epartures from the normal procedural sequence." *Arlington Heights*, 492 U.S. at 267.  Their joint April 11, 2022 memorandum announcing that "Legislative reapportionment staff is not drafting or producing a map for introduction during the special session," Dkt. No. 131 ¶ 79, indicates they have distinctive personal knowledge regarding the departure from ordinary redistricting procedures that resulted in the Legislature's capitulation to Governor DeSantis's plan;

- Rep. Sirois is uniquely positioned to comment upon "[s]ubstantive departures" from redistricting norms, as he expressly acknowledged that "external influences" were infringing upon the legislative process.  Dkt. No. 131 ¶ 59.

- Legislators, Rep. Leek in particular, are also well apprised of the "knowledge" and "foreseeability of the disparate impact." *Greater Birmingham Ministries,* 992 F. 3d at 1322; *see also* Dkt. No. 131 ¶ 75 (Chair Leek stated on the legislative floor that CD-5 under the Enacted Plan would not perform for Black candidates).

- Conversely, Reps. Tuck and Fine, who publicly praised the redistricting process and the enacted map, can explain the reasons they supposedly believed the process and the map to be legitimate.   Their testimony will be important to establishing "the specific sequence of events leading up to [the congressional map's passage]," and permit the Court to judge

24

whether their reasons are pretextual. *Greater Birmingham Ministries,* 992 F. 3d at 1321-22.

## 2. <u>Availability of Other Evidence</u>

Contrary to the Legislators' claims, the information sought by the subpoenas is not available through other means (as the Executives have essentially admitted by acquiescing to the deposition of Mr. Kelly). The Legislators are among the few individuals who are able to shed light on the specifics of the legislative process at issue in this case. The Enacted Plan was neither constructed nor drafted in public view, and there are both significant gaps in the legislative record with respect to the provenance, development, and consideration of the Enacted Plan, as well as significant departures in the reasoning advanced by the Legislators for supporting prior Congressional maps that would have preserved a Black ability-to-elect district in northern Florida and a Black access district in central Florida. Dkt. No. 131 ¶¶ 66-76. The Legislators are also the only individuals who can speak to the full range of factual information, including any functional analyses, considered by the Legislature during the redistricting process, much of which was never publicly produced. *See, e.g., id.* ¶¶ 66, 75. Not only are Legislators the best source of evidence to explain these gaps in the record, they may be the *only* source of evidence that can explain these gaps.

Plaintiffs' attempts to secure this evidence, or any evidence about the legislative process at all, by other means have been frustrated at every turn. As noted above, Plaintiffs have sought to obtain this evidence through extensive public records requests and document subpoenas, the vast majority of which have either been denied or gone unanswered.[8] And even if such evidence were available, the availability of a public legislative record does not negate the necessity of obtaining additional information from the individual Legislators and the Governor's aides. To the contrary, as numerous courts have recognized, "the practical reality [is] that officials seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority." *Bethune-Hill*, 114 F. Supp. 3d at 341 (internal quotation marks and citation omitted). Moreover, despite the Legislators' suggestions otherwise, the public record does not fully explain the mechanics of the redistricting process. The record does not reflect, for instance, informal conversations between legislators, or between legislators and third-parties enlisted

---

[8] For example, Former Chair of the Senate Reapportionment Committee Ray Rodrigues claimed that he had no responsive documents to Plaintiffs' document subpoena, notwithstanding his leadership role during the relevant time period, including as a vocal proponent for the legislature's two-map proposal retaining a minority access district in northern Florida.

to assist with the redistricting process. Both forms of evidence are highly relevant to Plaintiff's inquiry into the motivations driving the challenged redistricting.

The Legislators cite the *Arlington Heights* factors as "an illustrative list of alternative sources" of evidence. But *Arlington Heights* "did not foreclose the possibility of piercing the privilege for state legislators in discriminatory intent claims." *See Veasey*, 2014 WL 1340077, at *1. Rather, *Arlington Heights* acknowledged that, in "extraordinary instances," legislators may be compelled to testify. *Arlington Heights*, 429 U.S. at 268. This case presents such an extraordinary instance, where the Governor took unprecedented actions to take over the redistricting process, and the legislature largely acquiesced. The Legislators are thus uniquely positioned to speak to the reasons for their acquiescence, as well as the "specific sequence of events leading up [the map's] passage," including "procedural and substantive departures." *See Greater Birmingham Ministries*, 992 F.3d at 1321-22 (summarizing *Arlington Heights* factors). They likewise will have first-hand knowledge of "contemporary statements by members of the decision-making body," both on the floor of the Legislature and in the hallways, which are "highly relevant" in determining whether "invidious discriminatory action" was a motivating factor. *Arlington Heights*, 429 U.S. at 264-68.

Notably, the Legislators do not argue that, if depositions are ordered, any limits should be placed upon the subject matters suitable for inquiry. The Executives do make such an argument. For reasons substantially similar to those set forth below with respect to the Executives' argument, no limits should be imposed on questioning of the Legislators in this case. *See* pp. 37-38 *infra*.

### 3. <u>Seriousness of the Litigation</u>

As discussed above, there is no basis for the Legislators' argument that only federal criminal prosecutions are sufficiently serious to warrant overcoming the legislative privilege.[9] *See* pp. 8-11 *supra*. This factor was devised to distinguish between the vindication of public rights that are constitutionally guaranteed and those rights that are purely private. *See, e.g.*, *Bethune-Hill*, 114 F. Supp. 3d at 335, n.1 (finding that the legislative privilege should be applied differently depending on whether plaintiffs "seek private redress" or "seek to vindicate important, public rights.").

Plaintiffs raise claims not only of constitutional import but that implicate the very bedrock principles of our democracy. Where, as here, the electorate's ability

---

[9] Indeed, even if there were, this argument would be unavailing, since "[v]oting rights cases, although brought by private parties, seek to vindicate public rights. In this respect, they are akin to criminal prosecutions." *League of Women Voters of Fla., Inc. v. Lee*, 340 F.R.D. 446, 457 (N.D. Fla. 2021) (quoting *Comm. for a Fair & Balanced Map*, No. 11-C-5065, 2011 U.S. Dist. LEXIS 117656, at *6).

to elect candidates of their choice is compromised, the seriousness of the litigation is beyond dispute. *See, e.g.*, *Favors*, 285 F.R.D at 219 ("[I]t is indisputable that racial and malapportionment claims in redistricting cases raise serious charges about the fairness and impartiality of some of the central institutions of our state government and thus counsel in favor of allowing discovery") (internal citations omitted); *see also Bethune-Hill*, 114 F. Supp. 3d at 341 ("In a republican government, there is no more foundational right than meaningful representation"),

### 4. <u>Government's Involvement in the Litigation</u>

As the Legislators note, this factor is generally true where a claim of legislative privilege is made and it certainly does not support quashing the subpoenas. Moreover, as discussed above, the Legislators themselves are not parties to the case, making their testimony obtained in depositions all the more important, while making their claim of privilege entitled to lesser respect. *Tenney*, 341 U.S. at 378.

### 5. <u>Purpose of the Privilege</u>

As in every case involving legislative privilege, the lawmakers argue that depositions will distract them from their legislative work and chill their private discussions. Courts take these considerations seriously, although they are obviously less significant than the right to be immune from suit and thus less significant when the legislator is not a defendant. More important, these interests

are overcome in every case in which a court rejects a claim of privilege and orders depositions based on the factors outlined above. As recognized repeatedly in the cases cited above, in redistricting cases like this one, legislative privilege must yield "given the serious nature of the issues in this case and the government's role in crafting the challenged redistricting plans[.]" *Baldus*, 2011 WL 6122542, at *8.

Nor do Plaintiffs ask that the Legislators or Executive officials demonstrate "uncommon courage." Leg. Br. at 25 (quoting *Tenny*, 341 U.S. at 377). As one court has noted, there is no evidence that taking discovery from state legislators in redistricting litigation has "rendered [state] officials 'timid.'" *LULAC v. Abbott*, 2022 U.S. Dist. LEXIS 131217 at *19 n.5 (W.D. Tex. July 25, 2022). Indeed, two of the six subpoenaed Legislators are no longer even members of the Legislature. Plaintiffs submit that when considering all the relevant factors under *Rodriguez*, the balance tips in favor of disclosure here.

It is also worth noting that, in the state case challenging this same congressional map, counsel for the Executives has noticed depositions of at least 33 sitting legislators. Li Decl. at Ex. 1. Thus, while the Legislators may claim that the prospect of sitting for a deposition will totally stifle Florida's government; the Governor and his staff appear to think otherwise.

Finally, the Legislators' argument that application of the *Rodriguez* test introduces uncertainty and unpredictability is unpersuasive. In fact, the opposite is

true.  The use of a guiding rubric yields consistency and predictability to the determination whether the legislative privilege should yield in any given case, rather that leaving the issue to the deciding court's wholly unfettered discretion. Nor need this Court fear that a ruling in the Plaintiffs' favor will open the floodgates to a flurry of depositions.  Plaintiffs foresee few, if any, more subpoenas on Legislators in this case.  Nor should there be any concern about what will happen in future cases.  In the future, as here, the application of the *Rodriguez* test will be fact-intensive and the legislative privilege is unlikely to be overcome except in uniquely compelling circumstances such as those presented here.  A determination that the legislative privilege should yield here will therefore not threaten legislative deliberations in the future, notwithstanding the Legislators' hyperbolic claims otherwise.

### E. <u>The factors likewise weigh in favor of deposing the Executives</u>.

### 1. <u>The Governor</u>

The most important witness in this case is Governor Ron DeSantis.  It is Governor DeSantis and no one else who decided that CD-5 should be dismantled because its drawing considered race and elected a Black candidate of choice to Congress, in compliance with the Florida Constitution, and he decided—or so he said—that such racial line-drawing violated the United State Constitution.  The Legislature disagreed.  No court has ever agreed with Governor DeSantis, or held

anything to that effect. Nonetheless, he forced this point of view on the Legislature and had the maps redrawn—at his direction—to destroy CD 5. This assertion came from him, not the Legislature, and he went to extraordinary lengths to achieve his goal.

The Governor's real motivation is at the heart of this case. Of course, he claims the highest of motives—he was just applying the U.S. Constitution as he understood it to ban the use of race in drawing district lines. But those accused of intentional racial discrimination always advance some facially neutral argument.[10]

---

[10]*See, e.g.*, *Hunt v. Cromartie*, 526 U.S. 541, 546, 553 (1999) (recognizing that "[o]utright admissions of impermissible racial motivation are infrequent" and that "[t]he task of assessing a jurisdiction's motivation…is not a simple matter; on the contrary, it is an inherently complex endeavor, one requiring the trial court to perform a sensitive inquiry into such circumstantial and direct evidence of intent as may be available") (internal citations and quotations omitted); *Lewis v. Gov. of Ala.*, 896 F.3d 1282, 1296-97 (11th. Cir. 2018), *vacated on reh'g en banc*, 944 F.3d 1287 (11th Cir. 2019) ("Today, racism is no longer pledged from the portico of the capitol or exclaimed from the floor of the constitutional convention; it hides, abashed, cloaked beneath ostensibly neutral laws and legitimate bases…Recognizing this truth over forty years ago, the Supreme Court mandated that we review both direct and circumstantial evidence to determine whether, absent an outright admission, some discriminatory purpose may yet exist."); *Hall v. Holder*, 117 F.3d 1222, 1225 (11th Cir. 1997) ("[I]t is rarely the case that those with intent to discriminate will announce their purpose. Consequently, the Supreme Court repeatedly has stressed that intentional discrimination can be inferred from the circumstances surrounding the challenged governmental action, where the facts are sufficiently compelling.")

Plaintiffs' seek to develop evidence that probes the true motivation for the passage of the Enacted Plan, guided by the *Arlington Heights* factors.

The courts have permitted inquiry into the Governor's motivations on facts like this. For example, in *Brooks v. Miller*, 158 F.3d 1230 (11th Cir. 1998), Governor Sanders testified and the court paid special attention to the Governor's influence over the legislative process in evaluating intent: "Plaintiffs argue that the district court placed too much emphasis on the motivations of Governor Sanders and his administration, in light of the fact that the entire Georgia legislature enacted the [majority vote requirement]. However, the Defendant's evidence persuaded the district court that [the Governor] wielded enough power in the legislature…to effectuate the passage of the [law]." *Id*. at 1242.

It is for these reasons that Plaintiffs served a subpoena on Governor DeSantis. Movants argue, implausibly in our view, that the information we seek from the Governor can be obtained from others through less burdensome means. Leg. Br. at 15. Plaintiffs intend to seek such alternative discovery vigorously. Plaintiffs have reason to doubt that such discovery will truly prove sufficient, but recognize that the Court will be reluctant to order the Governor's deposition until the attempt has been made. Therefore, Plaintiffs withdraw the subpoena for now, without prejudice to re-serving it in the event the alleged alternatives prove illusory.

## 2.  **J. Alex Kelly, Deputy Chief of Staff**

J. Alex Kelly is the Governor's Deputy Chief of Staff.  Mr. Kelly played key roles in redistricting.  Most crucially, Mr. Kelly says he drew the Governor's map, and conceded that he considered race in doing so.  Dkt. No. 131 ¶ 117.   He also testified in support of the Enacted Plan before the Legislature.  The parties agree that as to Mr. Kelly the legislative privilege is qualified and has been overcome: he should be deposed.  The only disagreement is to the scope and terms of the deposition.  The Executives suggest that Plaintiffs should attend the deposition in the state case and depose Mr. Kelly pursuant to state rules and a state court order on state law privilege.  Plaintiffs contend, to the contrary, that they are entitled to their own deposition pursuant to federal law and federal rules.

There are multiple problems with deposing Mr. Kelly as part of the state case.  The issues in the state case are different and the rules of law governing the applicable privileges are different.  First, and most important, the relevant legal issues are very different.  As this Court noted in denying a stay of this case because of its alleged overlap with the state case, the only similarity is that both cases involve challenges to the congressional map.  "[T]he Florida action involves claims bought under the Florida Constitution … while this case involves claims brought under the Federal Constitution ….   Different legal principles, therefore,

will govern the two cases and resolution of one case may not have much (or any) effect on the other." Dkt. No. 115.

In fact, the issues are very different. The state case involves claims raised under the Florida Fair Districts Amendments, concerning impermissible partisan motivation and the abridgment of minority voters' rights under the Enacted Plan. There is no partisan gerrymandering claim in Plaintiffs' case, yet one might reasonably expect half of Mr. Kelly's state court deposition to be devoted to that utterly unrelated subject. And the seeming similarity of the racial discrimination claims does not bear scrutiny. In the state case, the principal race-based claim is whether the Enacted Plan abridges or diminishes Black voters' ability to participate in the political process, under the Fair Districts Amendment. While that can be proven by proof of discriminatory intent, all that is necessary to prove is that the effect of the map is to diminish Black voters' ability to elect representatives of their choice. *See* Am. Compl. at 33 *Black Voters Matter Capacity Building Inst. Inc. v. Byrd*, 2022-CA-000666 (Fla. 2d Cir. Ct. Feb. 8, 2023), Dkt. No. 225. In the federal case, the discrimination claim requires meeting the higher burden of showing intentional discrimination. Because the legal standards greatly differ, it is reasonable to expect the questioning to differ as well. As a result, the state plaintiffs and Plaintiffs here could not reasonably be expected to structure a deposition that is of full value to each.

35

The state court deposition is no substitute for a federal deposition on the different subjects raised by the federal complaint. The Federal Rules give the Plaintiffs the right to a seven-hour deposition of Mr. Kelly, Fed. R. Civ. P. 30(d)(2), and sharing Mr. Kelly with the state plaintiffs would effectively cut that time at least in half with no offsetting benefit to the Plaintiffs.

Meanwhile, the rules of privilege governing the deposition also differ. In this Court, Plaintiffs are subject to the federal common law of legislative privilege, not the more limited state privilege law. In the state court, the parameters of legislative privilege are as interpreted in *League of Women Voters of Fla. v. Fla. House of Representatives,* 132 So.3d 135, 138 (Fla. 2013) ("*Apportionment IV*"). Accordingly, the state court determined that Mr. Kelly might be questioned regarding any matter already in the public record and/or information received from any third party, but not with respect to information internal to the Governor's office and not in the public record. But *Apportionment IV* is not binding on this court, and Plaintiffs should not be constricted by its holdings or the state court's orders.

The Governor and his staff acknowledge that the state legislative privilege is different from the federal legislative privilege. *See* Exec. Br. at 5-6 n.3. In so doing, they implicitly acknowledge that confining the deposition of Mr. Kelly in this case to the topics permitted under only state law would forfeit Plaintiffs' right

to information that would be discoverable under federal law. Nonetheless, they attempt to bootstrap the state court's ruling on state law into a limitation on Plaintiffs' rights under the Federal Rules here. This Court should not endorse that attempt. *Cf. LULAC v. Abbott*, 2022 U.S. Dist. LEXIS 89520, at *6-7 ("Suffice it to say, the [federal legislative] privilege [in redistricting cases] is not so broad as to compel the Court to quash the deposition subpoenas, modify them, or enter a protective order prohibiting questions about topics that are not strictly within the public record.").

Rather, weighing the *Rodriguez* factors discussed above leads to the conclusion that Plaintiffs may depose Mr. Kelly in the ordinary course in a deposition separate from the one in the state action. For the reasons noted above, the seriousness of the litigation, the role of the government in the legislation, and the purpose of the privilege weigh in favor of broad disclosure in this case. Moreover, Mr. Kelly's deposition is highly relevant. As the map's alleged drafter, Mr. Kelly is uniquely positioned to comment about what was and was not considered when creating the Enacted Map and the basis for his testimony to the Legislature. And the issues in this case are quite different from those in the state action.

Mr. Kelly argues that limits should be imposed on his deposition, as in the state case. (The Legislators ask for no limits to be placed on their depositions).

We recognize that courts sometimes take that approach and impose limits on the scope of depositions of government officials. *See e.g., League of Women Voters of Fla., Inc. v. Lee*, 340 F.R.D. 446, 458 (N.D. Fla. 2021) (limiting discovery to the materials and information available to [the Legislature] at the time a decision was made); *Comm. for a Fair & Balanced Map v. Illinois State Bd. of Elections*, No. 11 C 5065, 2011 WL 4837508, at *10 (N.D. Ill. Oct. 12, 2011) (limiting discovery to communications between legislators and third-parties).

We respectfully submit, however, that there should be no limitations imposed here. To the contrary, since the Governor argues that Mr. Kelly can provide all the information that Plaintiffs might obtain from deposing the Governor himself, and since the Governor's motivations lie at the heart of this case, Plaintiffs should be permitted widespread latitude in questioning Mr. Kelly. It is particularly important that Plaintiffs be able to ask Mr. Kelly not only about his conversations with third parties, but also about the internal discussions at the Governor's office that resulted in the challenged maps. Courts have taken this approach in redistricting cases where intent is at issue. *See Baldus*, 2011 WL 6122542, at *2 (legislative privilege did not apply to documents and depositions sought in redistricting action "given the serious nature of the issues in this case and the government's role in crafting the challenged redistricting plans"); *Benisek* v. *Lamone*, 263 F. Supp. 3d 551, 555 (D. Md. 2017) (finding legislative privilege

yielded to federal interest in redistricting case and allowing discovery of documents and depositions without topic limitations), *aff'd*, 241 F. Supp. 3d 566 (D. Md. 2017); *see also LULAC v. Abbott*, 2022 U.S. Dist. LEXIS 89520, at *6-7 (declining to enter "a protective order prohibiting questions about topics that are not strictly within the public record").

### 3. **Ryan Newman, General Counsel**

Ryan Newman is Governor DeSantis's general counsel and he played a significant role in the redistricting plan. He wrote the Governor's brief asking the Florida Supreme Court for an advisory opinion on the constitutionality of CD-5 and he wrote a memo to the Legislature explaining why the Governor believed that the Legislature's proposed maps were unconstitutional. He served as the point person for hiring Robert Popper, a testifying expert flown in by the Governor to attempt to persuade legislators that CD-5 was unconstitutional. *See* Li. Decl. at Exs. 2&3. He seemingly directed his deputy to respond to press inquiries about the Governor's plan. *See id.* at Ex. 4. His deposition should not be precluded by either the legislative privilege or the attorney-client privilege.

First, Mr. Newman plainly has non-privileged information to provide about the circumstances of all of the above. This would bear, *inter alia*, on *Arlington Heights* factors such as the sequence of events leading to the 2022 congressional map and the substantive departures from ordinary redistricting procedures,

including the outsized influence of external parties. Indeed, Mr. Newman's deposition, like Mr. Kelly's, is only more relevant in light of Plaintiffs' agreement to depose Governor DeSantis's staff initially in lieu of the Governor.

Second, while there may be information in Mr. Newman's possession that is legitimately subject to a claim of attorney-client privilege, that is not a reason to bar a deposition altogether. "A lawyer's profession is not a talisman of privilege, automatically granting attorneys immunity from discovery under the federal rules." *Gamache v. Hogue*, 595 F. Supp. 3d 1344, 1350 (N.D. Ga. 2022). The Executives conflate the so-called *Shelton* test and the *Friedman* test in a bid to bar any deposition at all. Exec. Br. at 28 n.8. But *Shelton* only bars efforts to depose an adversary's trial counsel and then only when the deposition will reveal trial strategy.[11] Nothing of the kind is implicated by a deposition of the Governor's in-house counsel. Rather, applying the *Friedman* test, because "the standards set forth in Rule 26 require a flexible approach to lawyer depositions," and the facts

---

[11] In *Shelton*, the Eight Circuit established a 3-part test a party must establish before it deposed opposing counsel. *Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1986). But the Eighth Circuit subsequently clarified when the *Shelton* test governed, and cautioned against its misapplication. *Pamida, Inc. v. E.S., Originals, Inc.*, 281 F.3d 726, 729-30 (8th Cir. 2002). *Shelton* is applicable, then, in "only two instances: (1) when trial and/or litigation counsel are being deposed, and (2) when such questioning would expose litigation strategy in the pending case." *United States v. Philip Morris Inc.*, 209 F.R.D. 13, 17 (D.D.C. 2002).

and circumstances of this case weigh in favor of a deposition of Mr. Newman, this Court should order the deposition to go forward and allow any legitimate claims of attorney-client privilege to be addressed during the deposition. *See In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 71-72 (2d Cir. 2003); *United States v. Philip Morris Inc.*, 209 F.R.D. 13, 17 (D.D.C. 2002).

Plaintiffs have demonstrated a "need to depose" Mr. Newman. *In re Friedman*, 350 F.3d at 72. As set forth above, his "role in connection" to this redistricting matter is central, *id.,* and, as the Governor's counsel, he is likely to produce evidence related to the good-faith defense advanced by the Secretary. *See, e.g.*, *Salazar v. Driver Provider Phoenix LLC*, No. CV-19-05760-PHX-SMB, 2022 WL 1747811 at *4 (D. Ariz. May 31, 2022) (plaintiffs demonstrated need for deposition of party's attorney when defendant relied on advice of counsel defense).

As to the risk of "encountering privilege and work-product issues," *In re Friedman*, 350 F.3d at 72, the Executives overstate the problems of separating privileged from non-privileged material in Mr. Newman's mind. *See* Exec. Br. at 27-31. Every single day, attorneys routinely separate such information in their minds in conducting their daily business. At the very least, for instance, Mr. Newman may testify about the events and circumstances leading to the hire of Robert Popper, an expert retained to testify before the Legislature in support of the

Governor's maps, how Mr. Popper was prepared for his testimony, and the mechanics of drawing the map proposed by the Governor and ultimately enacted.

Like the Governor, Mr. Newman insists that this information is equally available from Mr. Kelly. *See* Exec. Br. at 29-30. But Mr. Kelly cannot be the only employee of the executive branch subject to deposition in this case. And he doesn't know everything. For instance, from publicly available documents, it does not appear that Mr. Kelly was involved in any way in the hiring or preparation of Mr. Popper, or in the communication of the Governor's plan to the press. Li Decl. at Ex. 4.

For the moment, Plaintiffs will not inquire at deposition about the legal advice that Mr. Newman provided to the Governor, but reserve the right to do so (upon application to the Court), if the record demonstrates waiver. A claim of attorney client privilege will yield to a defense of good faith reliance on counsel by the Governor. *See* Dkt. No. 104 at 12-20, No. 112 at 8-10; *see also Handguards, Inc. v. Johnson & Johnson*, 413 F. Supp. 926, 929 (N.D. Cal. 1976) (putting good faith at issue waived attorney client privilege) (citing 8 Wigmore, Evidence § 2327).

## II.    The Apex Doctrine Does Not Bar These Depositions

The so-called apex doctrine does not bar the depositions of the Legislators or the Executive officials in this case. "In the Eleventh Circuit, there is no *per se* rule

forbidding the deposition of high-ranking government officials." *Fair Fight*

*Action, Inc. v. Raffensperger,* 333 F.R.D. 689, 692 (N.D. Ga. 2019) (permitting

deposition of Governor Kemp as to certain topics regarding his actions as

Secretary of State).   Instead, if an individual has established that they are a high-

ranking official, courts consider factors including whether:

> (1) deposing the official is necessary to obtain relevant, "first-hand" information;
>
> (2) the information possessed by the official is important to the case;
>
> (3) the deposition would not significantly interfere with the ability of the official to perform his government duties or reasonable accommodations could ameliorate such interference; and
>
> (4) the evidence sought is not reasonably available through less-burdensome means or alternative sources.

*Odom v. Roberts*, 337 F.R.D. 359, 365 (N.D. Fla. 2020).   The inquiry, sometimes

called a showing of "exceptional circumstances," is largely duplicative of the

legislative privilege inquiry.  It is satisfied "when high-ranking officials have direct

personal factual information pertaining to material issues in an action and the

information to be gained is not available from any other sources." *Raffensperger,*

333 F.RD. at 693 (citations and quotation marks omitted); *see also Odom* 337

F.R.D. at 364 (same).   However, "[t]he apex doctrine rarely, if ever, shields a lead

official from discovery when the official is directly involved in the event at issue

and has *personal knowledge* about it." *Kimberly Regenesis, LLC v. Lee County*, No. 2:10 Civ. 538 (SPC) (NPM), 2021 WL 5285093, at *6 (M.D. Fla. Sept. 29, 2021) (emphasis in original), *modified*, No. 2:19 Civ. 538 (SPC) (NPM), 2021 WL 5028204 (M.D. Fla. Oct. 29, 2021); *see also Florida v. United States*, No. 3:21 Civ. 1066 (TKW) (ZCB), 2022 WL 4021934, at *1 (N.D. Fla. Sept. 2, 2022) (denying motion to quash deposition pursuant to the apex doctrine and finding that "Given the language of [Fed. R. Civ. P. 30], it is unsurprising that a party seeking to prevent a deposition has a steep hill to climb. Such relief should only be granted in extraordinary circumstances.") (citations omitted).

If any person sits at the apex of Florida's government for purposes of this case, it is Governor DeSantis. According to Plaintiffs' Second Amended Complaint, the Enacted Plan is his doing and he forced it upon a compliant Legislature by aggressive use of his veto power. *See* Dkt. 131 ¶¶ 49, 55, 58, 62, 67. The Governor argues that he should not be deposed because of the apex doctrine, and Plaintiffs have agreed to forego his deposition for the time being. The idea that the members, even the leaders, of the Florida legislature are, in reality, the "apex" of Florida's government is an overstatement. But even if the doctrine applies to the six Legislators subject to subpoena, the doctrine does not bar their depositions. Under the doctrine, their depositions are still necessary

because they have first-hand personal knowledge of important information to this case, which is not available through alternative means.

The Legislators cite no binding Eleventh Circuit precedent for the proposition that state legislators are even covered by the apex doctrine. The Legislators bear the burden of demonstrating that they are "high-ranking officials." *Odom*, 337 F.R.D. at 364. For purposes of the apex doctrine, "[t]here is no hard and fast rule for determining who is a high-ranking official; the determination must be made on a case-by-case basis." *League of Women Voters of Fla., Inc. v. Lee*, No. 4:21 Civ. 186 (MW) (MAF), 2021 WL 4962109, at *1 (N.D. Fla. Oct. 19, 2021) (citations omitted). But while it is "unclear" when the doctrine applies, "[m]ost courts have applied the doctrine narrowly . . . ." *Florida v. United States*, 2022 WL 4021934, at *2 (footnote omitted).

The court in the parallel state action, considering Florida's apex doctrine, specifically permitted the depositions of Speaker Sprowls and Representatives Leek and Sirois.[12] In fact, Judge Marsh found that the apex doctrine did not apply to the Florida legislature at all, saying, "[w]hereas this Court respects the role of

---

[12] The Court found that "[b]ecause it was constrained by the holding in *Apportionment IV* [a Florida state court decision]" the doctrine shielded legislators from questions regarding the process by which the specific bill moved through each respective chamber. As noted, the Legislators ask for no such limits to be imposed in this case and, and, for the reasons articulated *supra*, this Court should not do so.

each constitutionally elected legislator, it cannot find all 160 legislators to be an apex officer not subject to deposition as to legislation they introduce or vote on." *Black Voters Matter Capacity Building Inst. Inc. v. Byrd*, 2022-CA-000666, at 5 (Fla. 2d Cir. Ct. Oct. 27, 2022).

Further, the Legislators cite no authority within the Eleventh Circuit whatsoever for the proposition that the doctrine extends to former state legislators. Outside of the Eleventh Circuit, contrary to the State Legislators' single citation, courts are divided on whether former officials are entitled to the protection. *See Sec. & Exch. Comm'n v. Comm. on Ways & Means of the U.S. House of Representatives*, 161 F. Supp. 3d 199, 252 (S.D.N.Y. 2015) (denying motion to quash where the movant was a former official who "no longer has government duties with which a deposition might interfere"); *but see Thomas v. Cate*, 715 F. Supp. 2d. 1012, 1049 (E.D. Cal. 2010) (applying apex doctrine to former governor, although "one important rationale for the rule is absent"). The apex doctrine should not apply to former legislators, Senator Simpson and Representative Sprowls.

In any event, however broad it may be, the apex doctrine is not a bar to the depositions in this case. As set forth in detail above in connection with the claim of legislative privilege, *see* pp. 19-25, *supra*, these "high-ranking officials have direct personal factual information pertaining to material issues in an action and

the information to be gained is not available from any other sources."

*Raffensperger,* 333 F.RD. at 693 (citations and quotation marks omitted). That is

all that is needed to overcome the apex doctrine. Indeed, the Legislators cite no

cases in which a state legislator was protected from testifying in a deposition in a

redistricting case due to the apex doctrine.[13]  In fact, the doctrine appears to be

rarely asserted in this context. Depositions of state legislators and state legislative

personnel in redistricting cases are routine. *See, e.g., Benisek v. Lamone*, 263 F.

Supp. 3d 551, 555 (D. Md. 2017) (denying state legislators motion to quash

deposition subpoenas in redistricting case) *aff'd*, 241 F. Supp. 3d 566 (D. Md.

2017); *League of United Latin Am. Citizens v. Abbott*, No. 21 Civ. 259 (DCG)

(JES) (JVB), 2022 WL 2866673, at *5 (W.D. Tex. July 6, 2022) (finding apex

doctrine did not shield parliamentarian of Texas House from deposition); *Fund

Texas Choice v. Paxton*, No. 1:22 Civ. 859 (RP), 2022 WL 6851755, at *5 (W.D.

Tex. Oct. 4, 2022) ("Courts have repeatedly found that even the highest-ranking

officials should testify when they have personal knowledge of relevant facts" and

collecting cases).

---

[13] The one case the Legislators cite involved not burdening a state senator
unnecessarily to travel to trial to authenticate a record. *Link v. Diaz*, No. 4:21 Civ.
00271 (MW) (MAF) (N.D. Fla. Jan. 4, 2023) (ECF No. 229). That is a far cry
from asking a legislator to sit for a deposition at a mutually convenient time and
place to testify about substantive issues about which the official has personal
knowledge.

Plaintiffs are committed to reducing any burden on the Legislators and have communicated to counsel that they are willing to work with the Legislators to schedule their depositions at a convenient time and place to reduce the burden on them. Plaintiffs are also willing to travel to depose the Legislators. As such, any disruption to their official duties would be minimal.

## III.    The Depositions Should Be Videotaped

The Legislators, but not the Executive officials, object to video-taping their depositions. The Legislators claim to be concerned that video depositions could be used by political opponents. Leg. Br. at 30. That concern can be entirely assuaged by entering into a protective order, which would limit the use of the video depositions to this case. In a footnote the Legislators claim a protective order would be insufficient, *see id.* at 31 n.11, but they completely fail to explain their reasoning. Protective orders are routine in federal litigation and they work well. A protective order is vastly more sensible than prohibiting video depositions in their entirety. The testimony should be preserved in video form because there is no guarantee that any deponent will be available for trial.

Courts have expressed a strong preference for video depositions at trial. As one court commented:

> It is not surprising to find . . . the legion of cases which have extolled the advantages of video depositions and preference for their use in a trial, noting that a witness'

demeanor reflected in his motions, expressions, voice inflections, etc., give the fact-finder a unique advantage in evaluating evidence, resulting in appellate courts granting greater deference to such findings. Video depositions can markedly increase accuracy and trustworthiness. In addition, to the extent that a video deposition reduces tedium, the fact-finder's concentration and attention will be enhanced, again to the benefit of the decision process. One court, faced with an entire trial presented through video depositions, agreeably anticipated the greater convenience and freedom in scheduling the trial which it would permit.

*Rice's Toyota World, Inc. v. Se. Toyota Distributors, Inc.*, 114 F.R.D. 647, 649

(M.D.N.C. 1987) (internal citations and quotation marks omitted).

Finally, the cases that the Legislators cite add nothing. In *Willis v. CLECO Corp.*, the court properly refused to issue a protective order *after* video depositions had been released to the general public. Such an order would have been barred by the First Amendment. No. 09 Civ. 2103, 2011 WL 13253345, at *2 (W.D. La. Mar. 3, 2011). In *Mendez v. City of Chicago*, the court barred the public pretrial release of certain video depositions—exactly what Plaintiffs are proposing here. *See Mendez v. City of Chicago*, No. 18 Civ. 5560, 2019 WL 6210949, at *4 (N.D. Ill. Nov. 21, 2019).

## CONCLUSION

For the foregoing reasons, the Court should deny the Motions in their entirety and allow the depositions of the Legislators, J. Alex Kelly, and Ryan

Newman to proceed. As noted at the outset, in light of the extremely short discovery period in this case, Plaintiffs respectfully ask the Court to expedite the resolution of this motion.

Respectfully submitted,

*/s/ Gregory L. Diskant*

Gregory L. Diskant *(pro hac vice)*
H. Gregory Baker *(pro hac vice)*
Jonah M. Knobler *(pro hac vice* forthcoming)
Catherine J. Djang *(pro hac vice)*
Alvin Li *(pro hac vice* forthcoming)
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000
gldiskant@pbwt.com
hbaker@pbwt.com
jknobler@pbwt.com
cdjang@pbwt.com
ali@pbwt.com

Katelin Kaiser *(pro hac vice)*
Christopher Shenton (*pro hac vice* forthcoming)
SOUTHERN COALITION FOR SOCIAL JUSTICE
1415 West Highway 54, Suite 101
Durham, NC 27707
(919) 323-3380
katelin@scsj.org
chrisshenton@scsj.org

Janette Louard (*pro hac vice* forthcoming)
Anthony P. Ashton (*pro hac vice* forthcoming)
Anna Kathryn Barnes (*pro hac vice* forthcoming)
NAACP OFFICE OF THE GENERAL COUNSEL
4805 Mount Hope Drive
Baltimore, MD 21215
Telephone: (410) 580-5777
jlouard@naacpnet.org
aashton@naacpnet.org
abarnes@naacpnet.org

Henry M. Coxe III (FBN 0155193)
Michael E. Lockamy (FBN 69626)
BEDELL, DITTMAR, DeVAULT, PILLANS &
 COXE
The Bedell Building
101 East Adams Street
Jacksonville, Florida 32202
(904) 353-0211
hmc@bedellfirm.com
mel@bedellfirm.com

*Attorneys for Plaintiffs*

Date: February 16, 2023

## LOCAL RULE 7.1(F) CERTIFICATION

The undersigned certified that this memorandum contains 11,599 words, excluding the case style and certifications.

/s/ Gregory L. Diskant
Gregory L. Diskant

## CERTIFICATE OF SERVICE

I hereby certify that on February 16, 2023, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

/s/ Gregory L. Diskant
Gregory L. Diskant