Page 1

Common Cause, et al.          )

                              )

v.                            )  4:22-cv-109

                              )

Cord Byrd                     )

                              )


TRANSCRIPTION OF VIDEO FILE

HOUSE REDISTRICTING COMMITTEE

FEBRUARY 25, 2022


DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646


Common Cause v. Cord Byrd
4:22-CV-109-AW-MAF (N.D.Fla.)
Joint Exhibit
JX 0038

HT_0005198

JX 0038-0001

FEBRUARY 25, 2022

CHAIRMAN LEEK:  The Redistricting Committee will come to order.  DJ, please call the roll.

THE SECRETARY:  Chair Leek.

CHAIRMAN LEEK:  Here.

THE SECRETARY:  Vice Chair Fine.

VICE-CHAIR FINE:  Here.

THE SECRETARY:  Ranking Member Geller.

REPRESENTATIVE GELLER:  Here.

THE SECRETARY:  Representative Andrade.

REPRESENTATIVE ANDRADE:  Here.

THE SECRETARY:  Bush.

REPRESENTATIVE BUSH:  Here.

THE SECRETARY:  Byrd

REPRESENTATIVE BYRD:  Here.

THE SECRETARY:  Clemons.

REPRESENTATIVE CLEMONS:  Here.

THE SECRETARY:  Drake.

REPRESENTATIVE DRAKE:  Here.

THE SECRETARY:  Driskell.

REPRESENTATIVE DRISKELL:  Here.

THE SECRETARY:  Goff-Marcil.

REPRESENTATIVE GOFF-MARCIL:  Here.

THE SECRETARY:  Grall.

HT_0005199

Page 3

REPRESENTATIVE GRALL:   Here.

THE SECRETARY:  Grant.

REPRESENTATIVE GRANT:   Here.

THE SECRETARY:  Jenne has been excused.

Latvala.

REPRESENTATIVE LATVALA:   Here.

THE SECRETARY:  Mariano.

REPRESENTATIVE MARIANO:   Here.

THE SECRETARY:  McClain.

REPRESENTATIVE MCCLAIN:   Here.

THE SECRETARY:  Omphroy.

Omphroy.

REPRESENTATIVE OMPHROY:   (No audible

response).

THE SECRETARY:  Payne.

REPRESENTATIVE PAYNE:   Here.

THE SECRETARY:  Robinson.

REPRESENTATIVE ROBINSON:   Here.

THE SECRETARY:  Rommel.

REPRESENTATIVE ROMMEL:   Here.

THE SECRETARY:  Sirois.

REPRESENTATIVE SIROIS:   Here.

THE SECRETARY:  Slosber-King.

REPRESENTATIVE SLOSBER-KING:   Here.

THE SECRETARY:  Thompson.

HT_0005200

JX 0038-0003

Page 4

REPRESENTATIVE THOMPSON:  Here.

THE SECRETARY:  Tuck.

REPRESENTATIVE TUCK:  Here.

THE SECRETARY:  Ex Officio Skidmore.

REPRESENTATIVE SKIDMORE:  Here.

THE SECRETARY:  Quorum is present, Mr. Chair.

CHAIRMAN LEEK:  Thank you, DJ.

Members, a few reminders before we begin.  Please silence all electronic devices. And if you're here today to give public testimony, please take time now to fill out an appearance form and turn it into the sergeant staff.

Also, as a reminder, for our members and speakers, please ensure that you turn your microphone on when you are speaking and off when you are finished.

Members, I'm going to kick off today's meeting a little differently than I had planned at the beginning of the week, such has been this week.  We had a pause in our congressional redistricting process.  We paused our process when the governor voiced an opinion over the legal standards of our maps and requested an

HT_0005201

JX 0038-0004

Page 5

advisory opinion from the Supreme Court regarding CD5, in which we joined.

Once the Court chose not to opine on that request, we immediately resumed our process. We have a lot of work ahead of us today; and before regular session concludes, I want to make sure we are focused.

We received a letter from Ranking Member Geller. I think another letter. One of several. All along, I have encouraged the members to provide feedback and ask questions as we move maps throughout this process. Myself, Chair Sirois, and staff have met with dozens of members from both sides of the aisles, who have brought forth legitimate feedback and questions.

Despite all the fluidity that this process has encountered, I was feeling optimistic and like we had partners who wanted to work collaboratively with us in this process for a landing. This letter shakes my confidence in that.

On Monday, I received a letter from the Ranking Member requesting items that have been discussed ad nauseam on the record. This letter didn't espouse the same genuine concerns that

HT_0005202

JX 0038-0005

Page 6

many of you have provided to us, rather it reiterated questions that have already been before us many, many times, with many, many answers.

I want to stop here, and I want to thank those of you who have engaged in the process. Those of you who have come to us, those of you who have brought your suggestions forth, many of which we have been able to accommodate.

Specifically, I'd like to thank Representative Brown. I would like to thank Representative Woodson. And actually, I'd like to thank the entire black caucus who took the time to meet with us the other day. We have been able to accommodate many, many of your requests, and I appreciate you bringing those genuine concerns to us.

So here's the deal. We're going to knock this out right now. I'm going to directly address this letter because we have a significant amount of work ahead of us today, and I don't want to spend any more time on things that don't bring us closer to the finish line.

Point one of the Geller letter. Your first point asked for functional analysis data.

HT_0005203

JX 0038-0006

Page 7

That's the same data that has been before you, available to you the entire time. You already have it. Check your meeting packet. It's on the desk in front of you, posted to our website, emailed to you last night, and it's also available in our software.

You also asked for us to run a functional analysis on every single district in the map. This question at this point has been raised from the very first Committee meeting. I will tell you again that the partisan analysis of these maps that are not protected districts will lead us down a road to disaster. Stop injecting the partisan nature into this process. Let us do our work.

Let me be clear, the Committee will absolutely not run a functional analysis on every single district in the map. What you're asking us to do sets this Committee and this process up for failure. This has never been done by the House for any map drawn under the Fair District amendments. It would compromise our process, and I repeat, this Committee will not do it.

The second point of the letter. We have hired outside counsel to advise us in this

HT_0005204

JX 0038-0007

Page 8

process because we want the House to be successful, because we want our maps to be upheld, just like it looks like the House map is going to be because we do not want to spend years in litigation.  But the reality is we all know the chances of litigation are real.

The House is committed to a legal process, but there are entities that want to see us fail for their own selfish partisan benefit. Our counsel advises us on the legalities of our maps, period.  The items you're seeking are not public records retained by the House.

And I want to step back for a second because, as I go through this and I see this come up again, there's something called a consulting expert, something called a testifying expert that many of us lawyers would know.  I was standing in my office when I got a call from a reporter.  I think it was August.

And the reporter was asking me to comment on the fact that the Fair Districts Coalition had announced that they had planned to file suit on redistricting.  We didn't have numbers.  We didn't have census data yet.  We hadn't drawn the first line, and someone is

JX 0038-0008

HT_0005205

Page 9

declaring that they're going to sue us over maps that have yet to be drawn.

I want to go back to one of the things that Ranking Member Geller has said in this Committee. We all know where we're headed. We all know that this will end up in litigation. That is why it's necessary for the House to retain its work product privilege. So you may not like my answer, but that is the answer. The House has conducted and analyzed the congressional map exactly the same way as the House map, which has gone unchallenged after receiving heavy criticism.

Finally, as it relates to your request for all alternate configurations of the maps, again, a question that I've addressed countless number of times, we have provided to the Committee, the districts that we believe are the best. All members have the exact same ability to draw districts and produce maps. All members have the same ability to come to staff with alternate ideas. And many of you have. Thank you for engaging.

This is not the same as changing a "shall" to "may" in a bill text. Every single

HT_0005206

JX 0038-0009

Page 10

time you move a line means a ripple effect across multiple districts. Besides my amendment today, there has not been a single alternative district configuration produced for consideration during the Committee process, House or congressional, for the last five months.

I want to commend the members that have spent time to understand the maps and to ask questions. That is what this process is all about. So let's stop the political theater. Let's stop focusing on moving pieces across the litigation chessboard, and let's just do our work. With that, I'm moving on to the important business that we have before us today.

I'm not done. I'll call you. I'll call on you at the appropriate time.

You may have noticed the lengthy bill and amendment text for the congressional map and was once again not included in the meeting materials for today's meeting. The bill text reflects the technical census block, block group, and track numbers that comprise each district. These are the exact same districts that are depicted in the printed maps before you. DJ has the printed copy of the bill text, about 300

HT_0005207

JX 0038-0010

Page 11

pages for the Committee's viewing right here at the desk.

To kick things off, I'm going to hand the gavel over to Vice Chair Fine in a second.

Ranking Member Geller, we'll get to you in just a minute in the appropriate order. You'll have all the time that you need to ask questions or debate and respond in any way you'd like. But we're going to make sure we get the work that we actually have to get done today over with first.

So now I'm going to hand the gavel over to Vice Chair Fine.

VICE-CHAIR FINE:  Thank you, Mr. Chairman.

Members, up for consideration today we have one bill, it is HB 7503, Establishing the Congressional Districts of the State. And I would again remind everyone, we have a fair amount of time to do this. So everyone should have adequate time to have their questions, answers, and have whatever debate.

I think we did this well the last time when we did state redistricting. Hopefully, we can do this again here.

HT_0005208

JX 0038-0011

Page 12

And with that said, Representative Sirois, you are recognized to present the bill.

REPRESENTATIVE SIROIS:  Thank you, Mr. Chairman.

House Bill 7503 contains the congressional map that passed out of Congressional Redistricting Subcommittee last Friday.  Chair Leek has offered an amendment to this bill, and I request that we take up the amendment to ensure we're discussing the most updated congressional map, as there have been updates made to it.

VICE-CHAIR FINE:  Okay. Representative Sirois has addressed the Committee, are there questions on the bill? Members, we are in questions, and I'm sure you have a lot of questions.  I would prefer, although you have the right, I'd prefer that we take up the strike-all amendment so we can get into the proper posture on the correct map.  But I will recognize folks if they have questions for Rep. Sirois on the map that we're hoping to amend in a strike-all.

Ranking Member Geller, you are

HT_0005209

JX 0038-0012

Page 13

recognized for a question on the existing map that we're planning to amend.

REPRESENTATIVE GELLER:  Has the counsel retained by the House performed any analysis on that map or on the maps that are being offered as an amendment?

VICE-CHAIR FINE:  You can ask questions relating to the other maps.  I would note that it is my understanding that the amendment, which has two maps effectively, the second map is very similar to Representative Sirois's existing bill. But if you want to ask about the existing bill, I'll allow him to answer that question but not about the amendment until we get to the amendment.

Representative Sirois, would you like to answer that question?

REPRESENTATIVE SIROIS:  Mr. Chairman, could you repeat the question, please?

VICE-CHAIR FINE:  I'm not going to try that.  I'm going to let Ranking Member Geller do that, within the confines of the map that is before us, which again, I think Representative Sirois and Chair Leek intend to amend away anyway.

HT_0005210

JX 0038-0013

Page 14

You're recognized.

REPRESENTATIVE GELLER:  My question is whether or not counsel retained by the House has performed any analysis or retained an expert to look at that particular version of the map.

VICE-CHAIR FINE:  Chair Leek, I'm going to recognize you to answer that question.

CHAIRMAN LEEK:  Yeah.  That same question was asked and answered in the prior Committee stop.  And because we're now wasting time on a map that's going to be amended out of this bill, I would recommend that we move on. But that question has certainly been asked and answered, and I know you know the answer to it.

REPRESENTATIVE GELLER:  Well --

VICE-CHAIR FINE:  Would you like a follow-up, Ranking Member Geller?

REPRESENTATIVE GELLER:  If can respond to that, since I was addressed directly.  With all deference, I was not in the prior Committee, the congressional subcommittee.  I'm not a member of that committee.  I didn't attend it, so saying that some other committee talked about it does not really go to my question.

But my question does go to the

HT_0005211

JX 0038-0014

Page 15

statements that you made earlier. And I guess what I'm really trying to find out, first of all, was did counsel analyze it? I'll ask the same question about the amended maps when they're in front of us. But as to the existing one, did counsel analyze it? Did they retain an expert? Did the expert provide an opinion?

VICE-CHAIR FINE: Rep. Geller, I'm going to let you ask one question at a time. So if you want to ask --

REPRESENTATIVE GELLER: We'll stop with that on. That's fine.

VICE-CHAIR FINE: That was three. I'm relatively good at math.

REPRESENTATIVE GELLER: Okay. Then let me --

VICE-CHAIR FINE: So you can ask one question.

REPRESENTATIVE GELLER: I'll be happy to rephase it.

VICE-CHAIR FINE: And then you can ask a follow-up. You're recognized.

REPRESENTATIVE GELLER: The question is: Did counsel analyze it --

VICE-CHAIR FINE: Okay. You've asked a

HT_0005212

JX 0038-0015

Common Cause, et al. v. Cord Byrd

question.

REPRESENTATIVE GELLER:  No.  I'm not done with that question, sir.

VICE-CHAIR FINE:  Nope.  There was a question mark after that.

REPRESENTATIVE GELLER:  Did counsel analyze it --

VICE-CHAIR FINE:  I'm going to move.

REPRESENTATIVE GELLER:  -- retain an expert --

VICE-CHAIR FINE:  Okay.  I'm going to move on.  We're going to be done with this.  You can ask one question that ends with a question mark.  I will recognize someone to answer it.  If you're going to ask three or four again, we're going to be done and we're just going to move on to the amendment.

Would you like to ask one question? I'll ask more, but we're not going to do a three-minute soliloquy with 47 questions for Chair Leek.  If you have a question, you can ask it.  You're recognized to ask a question.  Last chance --

REPRESENTATIVE GELLER:  I promise it will not be a three-minute soliloquy --

HT_0005213

JX 0038-0016

Page 17

VICE-CHAIR FINE:  All right.

REPRESENTATIVE GELLER:  -- with 47 questions.  My question is:  Did counsel analyze it or --

VICE-CHAIR FINE:  That's a --

REPRESENTATIVE GELLER:  -- or retain an expert who performed an analysis?

VICE-CHAIR FINE:  Okay.  Chair Leek, you're recognized to answer the question.

CHAIRMAN LEEK:  The question is moot, Vice Chair, as this map's about to be amended away.

REPRESENTATIVE GELLER:  I'm sorry, sir, but this map is still -- my understanding is --

VICE-CHAIR FINE:  Ranking Member Geller, you don't have --

REPRESENTATIVE GELLER:  No.  Excuse me, sir, point of order.

VICE-CHAIR FINE:  Yep.

REPRESENTATIVE GELLER:  Point of order.

VICE-CHAIR FINE:  What's your point?

REPRESENTATIVE GELLER:  I cannot be told that I can't ask about the maps that are about to be introduced because they're not in front of us yet and simultaneously be told I can't ask about

HT_0005214

JX 0038-0017

Page 18

the map that is in front of us because the amendment hasn't occurred yet.  One or the other, sir.

VICE-CHAIR FINE:  Rep. Geller, what I would say is you've asked a question about the map.  Chair Leek has answered the question.  I don't think you find his answer satisfactory, and that is your right.  But he has asked a question about the map in front of you.  And to --

REPRESENTATIVE GELLER:  No, sir.  The question --

VICE-CHAIR FINE:  No.  You don't like his answer.  I'll recognize you for another follow-up on the map that is before us now.  I would again note, it's Friday afternoon, many of us want to go home, and we're asking questions about -- I'm missing my son's first track meet.  To lighten the mood, I can't understand why my son wants to be in a track meet, since he's my son.  But you know, despite that, if you want to ask questions about a map that I believe the sponsor is hoping is amended, you can do that.  So I'm going to recognize you for a question on this exact map.

REPRESENTATIVE GELLER:  Thank you,

HT_0005215

JX 0038-0018

Page 19

Mr. Chair.

And let me say that since we were to meet yesterday and it was postponed not because of me or anyone else, that to say, oh, now it's Friday, is not really appropriate.  Now is when the Committee has decided to call the meeting.

My question is:  Did counsel perform an analysis of the map that is before us or retain an expert to perform such an analysis?

VICE-CHAIR FINE:  Okay.  That question has been asked and answered.  You don't like Chair Leek's answer.  I understand that, but he's asked that question.  So since you're asking the same question again and again, you all will remember, I had a three-word answer to this question before on the floor last year, I don't want to say it again in this room.  We're going to move on.

REPRESENTATIVE GELLER:  Sir, if I might?

VICE-CHAIR FINE:  Yes.

REPRESENTATIVE GELLER:  Being told my question is moot and will not receive an answer is not asked an answer.

VICE-CHAIR FINE:  I did not say it -- well, okay.  That wasn't what I said.

HT_0005216

JX 0038-0019

Page 20

REPRESENTATIVE GELLER:  No.  So you said I got an asked and answered.  "The question is moot" is not an answer.

VICE-CHAIR FINE:  I think --

REPRESENTATIVE GELLER:  It's a punch line from a TV show.

VICE-CHAIR FINE:  Chair Leek is entitled to answer the question however he sees fit and that's how he chose to answer the question.  Okay.  We're going to move on.

All right.  We are going to take up our first amendment.  It's amendment barcode 258203 by Chair Leek.  This is going to take a little bit of time.

As a reminder, we are holding questions until the end of the amendment presentation to ensure we have time to get through an explanation of the entire state and no one region is rushed.

So Chair Leek, you are recognized to explain the amendment.

CHAIRMAN LEEK:  Thank you, members.  We're going to focus on the substantive work in front of us now.  And I'm going to go through some high-level items first, and we'll then explain the structure of the amendment and the

HT_0005217

JX 0038-0020

Page 21

changes that were filed last night.  Again, this is a strike-all, so this will replace everything that was before you initially.

Representative Sirois will also be helping me to explain those changes throughout the map.  The Florida Legislature is directed to redistrict every ten years following the decennial census to account for growing and shifting population across Florida.  A decade ago, the Florida House's process and methodology for drawing maps was allotted by the Florida Supreme Court.  And I'd like to read a quote from the 2012 ruling.

"A review of the House plan in the record reveals that the House engaged in a consistent and reasoned approach, balancing the two-tier standards by endeavoring to make districts compact and as nearly equal in population as possible and utilizing political and geographical boundaries were feasible by endeavoring to keep counties and cities together where possible.  In addition, the House approached the minority voting protection provision by properly undertaking a functional analysis of voting strength in minority

HT_0005218

JX 0038-0021

Page 22

districts."

As I mentioned earlier, this Committee has undertaken several months of education in order to understand the redistricting process and uphold the high bar that was set for this chamber last decade.  Last week, the Congressional Redistricting Subcommittee passed map H000C8011, what is now HB 7503, which proposes congressional districts that will be used on election cycle starting in 2022.  Today, we will walk through an amendment to HB 7503 that has two maps.  And I'll explain that further here in a few minutes.

As I mentioned earlier, this map has been drafted exclusively by Committee staff with the advice of legal counsel based on the data from the 2020 census and to be in alignment with the Florida Constitution, state and federal law, as well as court precedent.

Members, I want to make sure each of you has a map packet in front of you.  This contains a printout of the proposed map itself, the statewide snapshot of statistics, the functional analysis data for our six protected minority districts, a list of county shares of population, a list of city splits, and finally, the boundary

HT_0005219

JX 0038-0022

analysis report. These items will be referenced throughout the presentation today, so please feel free to refer to your packet as needed. This packet is also available on our subcommittees webpage on myfloridahouse.gov.

Now, let's talk about the structure of the amendment before we segue into its specific contents. This is new, and I want to take time to explain. This amendment contains a primary map, H000C8017, that addresses concerns about the shape of Congressional District 5 by creating a more compact North Florida district that will enable minority voters to elect the candidates of their choice. We believe this solution creates a singular exception to the diminishment standard.

The amendment also contains a secondary map, H000C8015. The legislature knows it's legally compliant under the current law and keeps the previously proposed configuration of District 5. Outside of the districts impacted by the change to District 5, the structure of both maps is exactly the same throughout the rest of the state.

The amendment also includes other adjustments that have been made, the same in both

HT_0005220

JX 0038-0023

Page 24

maps, to bring us more in alignment with our Senate partner so we can bring this process in for landing prior to the conclusion of the regular session.  I want to emphasize that. Prior to the conclusion of the regular session.

So why two maps and one amendment, you may be asking.  The primary map was put forward as a way to address the novel legal theory raised by the governor, while still protecting a black minority seat in North Florida.  If this configuration of CD5 and the primary map is struck down by a court, the secondary map is postured to take immediate effect and contains a district configuration similar to the benchmark district.

I know this has a lot to take in.  I acknowledge these maps look visually different, even having two maps is a unique setup.  However, we are faced with a unique situation, and this is the House attempt at continuing to protect the minority group's ability to elect a candidate of their choice, addressing compactness concerns, and working to make sure we bring this process in for a landing during the regular session.

And perhaps most importantly, we want to

HT_0005221

JX 0038-0024

Page 25

make sure all Floridians have clarity and finality, going into our upcoming election cycle with where our map stands.  Now let's dive into the details of the primary map, and we'll walk through the secondary map after that.

Here's an overview of the primary map. Let's first look at the map as a whole.  When compared to the benchmark congressional map, the new map of new proposed congressional districts has several points of improvement throughout tier 2 standards.  When looking at a statewide average of each district's compactness scores, we have been able to recreate compact districts that improve on our benchmark metrics even after the addition of the new congressional district.

The proposed map statewide average compactness scores are a Reock score of 0.48, a Convex-hull score of 0.82, an Polsby-Popper score of 0.42.  Where feasible, we also worked to improve visual compactness of districts or the eyeball test, such as being able to keep Polk County wholly within a single congressional district.  When looking at the number of counties splits, we've kept similar to the benchmark map with 18 counties split last decade and only 18

HT_0005222

JX 0038-0025

Page 26

counties split this decade.

The ideal population for this decade's congressional districts after adding the 28th district is 769,211 people.  The overall deviation range is the same as it was last decade, with 27 districts being the exact ideal population and one district having a single person less than the ideal population.  We also are proudly able to improve the number of cities split in our proposed map.  In the benchmark map there were 39 cities split.  In the PCB that passed last week, there were 27 cities split.

In today's amendment we've been able to decrease that to just 17 cities split.  This proposed congressional map also allows a district to be placed wholly within each of Florida's top six largest counties, Miami-Dade, Broward, Palm Beach, Hillsborough, Orange, and Duval respectively.  The proposed map is inclusive of three protected black districts and three protected Hispanic districts.  This is the same number of protected districts as found in the benchmark map.

All six of these protected minority districts have had an individual functional

HT_0005223

JX 0038-0026

Page 27

analysis conducted. And in performing this analysis, we can confirm each district will be a solidly performing district as under the benchmark map. And we will continue to provide minority voters with the ability to elect candidates of their choice and the equal opportunity to participate in the political process.

These districts are also drawn in a consistent manner, with respect to the Florida Supreme Court precedent, to maintain existing majority-minority districts. As we move throughout the map, I will highlight these districts as well. All of our districts consist of contiguous territory. And as I'm sure you're aware, the Committee has also implemented safeguards in order to ensure that we do not draw districts with the intent to favor or disfavor a political party or an incumbent.

Now that we've looked at the statewide overview, let's begin to review each region of the state. I'm going to hand it over to Representative Sirois to walk through each region.

VICE-CHAIR FINE: Representative Sirois,

HT_0005224

JX 0038-0027

Page 28

you're recognized.

REPRESENTATIVE SIROIS: Thank you very much, Mr. Chairman. Thank you, Chair Leek. Good afternoon, members. Let's start with Congressional Districts 1 through 5.

Starting in the Panhandle, Congressional District 1 has the entirety of Escambia, Santa Rosa, and Okaloosa County. Walton County is then split as Congressional District 1 achieves the equal population threshold here.

Again, members, for congressional maps equal population for each district is plus or minus one person. And for the purpose of the boundary between District 1 and 2 primarily uses State Road 83 for the majority of its length, except where it deviates to ensure that the municipalities of Freeport and DeFuniak Springs are kept whole, with Freeport within Congressional District 1 and DeFuniak Springs in Congressional District 2.

Congressional District 2 and three 3 two of the districts that are affected by the changes we've made to Congressional District 5. Both Congressional District 2 and Congressional District 3 are compact districts that are made up

HT_0005225

JX 0038-0028

almost entirely whole counties, except where both districts need to add the necessary population to achieve equal population. Those districts that are split for this purpose are Lafayette and Marion Counties. However, Congressional District 3 contains the entire city of Ocala in Marion County.

These two districts alone contain 25 whole counties throughout the Panhandle and the Big Bend regions. Congressional District 4 contains all of Nassau and Clay County, along with the remaining part of Duval County that is not included in Congressional District 5, which I'll talk about more shortly. This leaves the district approximately 234,000 people short of the population needed for a congressional district.

So the district includes part of St. Johns County for population equality and to create a more compact district shape in the region. The part of the district in St. Johns County keeps all of St. Augustine and St. Augustine Beach within the district, and all the other municipalities in St. Johns County remain whole. The most striking visual

HT_0005226

difference in this new configuration of the map is Congressional District 5, which is now wholly within Duval County.

Duval County itself is too large for a single congressional district and, therefore, has to be split.  This district faithfully adheres to all tier 2 principles.  This new district configuration creates a very compact district that utilizes the Duval County line for much of its boundary as well as I-295 and many other major roadways, while keeping this district within Duval County.

It also has compactness scores above the statewide averages for compactness, a Reock score of 0.51, a Convex-hull score of 0.91, and a Polsby-Popper score of 0.49.

The configuration of this district, although very visually different than the benchmark district, is still a protected black-performing district.  There is a reduction in voting-age population; however, our functional analysis concludes that this is a reliable performing district.

We believe this configuration balances the feedback we've been perceived dealing with

HT_0005227

JX 0038-0030

Page 31

the compactness of current Congressional District 5 and still protects the minority voting group of this district and helps to ensure the citizens of Florida have an enforceable congressional map before the fast approaching 2022 election cycle.

Congressional District 6 through 11 and 16. Moving south, Congressional District 6 is created in a circular compact shape that is tied for the highest Reock score of any district in the map at 0.71. It does this by keeping Flagler and Putnam County wholly within it, while including the southern part of St. Johns County, as well as parts of Volusia, Lake, and Marion Counties.

The oddly shaped flags of Lake and Volusia Counties are absorbed by this compact district, while also keeping every municipality and these counties whole, with the exception of Port Orange and Volusia County, which is split between District 6 and 7 to achieve equal population.

Because Congressional District 6 was created with such a compact shape, it left about 212,000 people in Volusia County without a district. So that population is included in

HT_0005228

Page 32

Congressional District 7, which also includes the entirety of Seminole County.  Within Volusia County, Congressional District 7 primarily uses municipal lines keeping Debary, Deltona, Orange City, and Lake Helen whole.

District 7 is then left approximately 85,000 short of the ideal district population, and it continues south into Orange County to get this remaining population.  Congressional District 8 includes all of Brevard and Indian River Counties, which leaves the district about 2,800 people short of the population needed for a district.  In order to achieve the population equality required for congressional districts, the remaining population is added to Congressional District 8 by going north into Volusia County along I-95 and then including the entire municipality of Oak Hill and it's 1,986 people keeping it whole.

Congressional District 9 contains the entirety of Osceola County, which was the fastest-growing county in the state this past decade.  The district includes part of Orange County following almost entirely primary roadways such as State Road 50, known as Colonial Drive;

HT_0005229

JX 0038-0032

Page 33

State Route 436, known as                Boulevard; and U.S. 441, known as Orange Blossom Trail; as well as others before using the Orange County line as well.

This compact tier 2 compliant district also happens to be a new majority-minority Hispanic district reflective of the Hispanic growth in this region.

Congressional District 10 is kept wholly within Orange County, similar to the benchmark map where a district is kept wholly within the county.  After receiving feedback on this district, adjustments were made to align it closer to the district that exists in the benchmark map, as well as to -- excuse me.  Let me go back, members, to clarify.  I want to restate that.

After receiving feedback on this district, adjustments were made to align it closer to the district that exists in the benchmark map as well as to the proposal by our Senate partners.  We accomplished this by bringing its western border all the way to the Orange County line, which enabled us to keep the municipalities of Edgewood, Belle Isle,

HT_0005230

JX 0038-0033

Eatonville, Maitland, Winter Park, Ocoee, Winter Garden, and Oakland whole within the district, while at the same time improving to have three mathematical compactness measures for the district bringing the Reock score to 0.50, up from 0.35 in the previous version of the district; and the Polsby-Popper score to 0.39, up from 0.35.

Congressional District 11 has the remaining population in Orange County, which is about 194,000 people, and goes west to include the majority of Lake County, all of Sumter County, and part of Marion and Citrus County where it achieves equal population.

Congressional District 16 keeps Polk County hole in this map. This is an improvement from the benchmark map where Polk County was divided in between three districts. Population growth this decade made this possible and is approximately 44,000 people shy of the ideal population of a congressional district. Pairing Polk County with a small part of Eastern Hillsborough County achieves the necessary population needed for the population of a congressional district while creating a very

HT_0005231

JX 0038-0034

Page 35

compactly shaped district.

Moving on to Congressional Districts 12 through 15.  Now looking at Congressional District 13 in the Tampa Bay area, which is kept wholly within Pinellas County.  Its northern boundary follows the municipal lines of the cities of Dunedin, Clearwater, and Safety Harbor to enable every city within Pinellas County to remain whole.  Because Pinellas County has more people than can fit into a single congressional district, this configuration of Congressional District 13 enables connecting the remaining portion of the county overlay into another county rather than over water.

Congressional District 12 is the entirety of Hernando County, the remainder of Citrus County, part of Pasco County, which is divided primarily along U.S. Highway 41, State Road 54, and the Suncoast Parkway, as well as the portion of Northern Pinellas County, not already included in Congressional District 13.

Congressional District 14 is located wholly within Hillsborough County.  Its boundary follows primary roads Hillsborough Avenue, Busch Boulevard and I-4 for its northern border, State

HT_0005232

JX 0038-0035

Page 36

and County Road 39 on the east side, and County Road 672, Balm Road and Big Bend Road on the southern side.

Finishing out the Tampa Bay area, Congressional District 15 then connects the remaining part of Pasco County with the appropriate amount of population from Hillsborough County to complete the district's population.

Moving on to Congressional Districts 17 through 19. Congressional District 17 is the last of the four districts that have part of Hillsboro County. This district actually has the exact amount of people in Hillsborough County, 112,723 people, so that exactly 12 districts make up all the remaining population in the counties to the south of the Polk, Osceola, and Indian River County line. This ensures that no other district has to cross these county lines and keeps the counties to the east whole.

Congressional District 17 then incorporates all of Manatee County and approximately 250,000 people in Sarasota County to complete its population. Every city in Sarasota County is kept whole with Congressional

HT_0005233

JX 0038-0036

Page 37

District 17 utilizing the Venice municipal line for part of its southern border.

The remaining part of Sarasota County, along with six entire counties, Hardee, DeSoto, Charlotte, Highlands, Okeechobee, and Glades County, make up the majority of Congressional District 18. This leaves the district about 192,000 short of the ideal population, allowing it to cross into Lee County to acquire this remaining population using primarily the Caloosahatchee River, State Road 82, the Fort Myers municipal line, and other roadways.

Congressional District 19 connects the rest of Lee County with Collier County using primarily I-75, U.S. 41, and Collier Boulevard, creating a very recognizable boundary with the county, except where it deviates to achieve equal population.

Moving on to Congressional Districts 20 through 23 and 25. Congressional District 20 is a performing majority-minority black district that was recreated similar to the benchmark district that connects population in Palm Beach County to population in Broward County. As noted before, the functional analysis on this district

HT_0005234

JX 0038-0037

conducted by staff ensures the minorities' ability to elect does not diminish.

This decade, we were able to create this district in such a way that respects more major roadways in the area, such as U.S. 441, I-95, and the Florida Turnpike, and keeps more cities whole, keeping the cities of Lake Park, Margate, Tamarac, and others wholly within it, which were split a decade ago.

Congressional District 21 includes all of St. Lucie and Martin counties and includes just over 280,000 people in Palm Beach County in order to achieve equal population for this district. The district boundary follows a railway in the northern Palm Beach County to Okeechobee Boulevard, where it borders Congressional District 20 before going out to the coast, using the Palm Beach inlet to complete its southern border.

Congressional District 22 is kept wholly within Palm Beach County. Its boundary extends north through the Palm Beach inlet to meet Congressional District 21, before heading west to include the entire city of Wellington, creating the rounded point of the western side of the

HT_0005235

JX 0038-0038

Page 39

districts.

It then uses the Loxahatchee National Wildlife Refuge to continue south until it gets the population necessary for a district without splitting any other city in Palm Beach County. It uses the Boca Raton and Highland Beach City municipal line for much of its boundary in this area.

This leaves approximately 200,000 people in southeast Palm Beach County that is then included in Congressional District 23.  This district then connects this population with Broward County utilizing many municipal lines in this area for the boundary line, keeping the city of Coral Springs, Coconut Creek, and many others whole within Broward County.

Congressional District 25 is kept wholly in Broward County, giving Broward County a congressional district wholly within the county for the first time since the 1980 redistricting cycle.  The district utilizes as many major roadways as possible, such as I-75, the Sawgrass Expressway, the Florida Turnpike, I-95, Davie Boulevard, Sunrise Boulevard, among others.

It also uses municipal lines of Weston,

HT_0005236

JX 0038-0039

Southwest Ranches, Pembroke Pines, Miramar, and Hallandale Beach, as well as the Broward/Miami-Dade County line on the southern side of the district.

Within these five districts, several adjustments were made to improve visual compactness, improve the boundary analysis scores, as well as keep more municipalities whole. One specific example of those changes is shown here. In the previous version of the map, the city of Royal Palm Beach was split between three districts. In this new map, an adjustment was made so that is now wholly within Congressional District 20.

Members, Congressional District 24 is a performing black district. As noted earlier, the functional analysis on this district conducted by staff ensures the minority group's ability to elect is not diminished. This is the only district that crosses the Miami-Dade/Broward County Line, which is an improvement over the benchmark map that had two such districts.

This district also includes many whole cities within Miami-Dade County, including Aventura, North Miami, Biscayne Park, Miami

Page 41

Shores, Miami Gardens, Opa-locka, and others, and uses many other major recognizable roadways in the area as possible. This is another district that we heard some great feedback on by members regarding Miami Gardens and Opa-locka. Similar to our Senate partners, we have now been able to keep these two municipalities whole within Congressional District 24.

Moving on to Congressional Districts 26 through 28. Congressional Districts 26, 27, and 28, are all performing majority-minority Hispanic districts where the functional analysis on each district individually was conducted by staff, ensures the minority group's ability to elect is not diminished.

Congressional District 26, similar in shape to the benchmark map, connects part of Collier County, not including in Congressional District 19, with population in Hendry County, as well as Miami-Dade County using the Collier, Broward, and Miami-Dade County lines, as well as I-75, U.S. 41, the Tamiami Trail, and the Dolphin Expressway. It additionally shares a boundary line with the Congressional District 24 line in the eastern side of the district.

HT_0005238

JX 0038-0041

Page 42

This district includes the municipalities of Hialeah, Hialeah Gardens, Medley, Doral, and Miami Lakes in their entirety.

Representative Latvala, did I pronounce that correctly?

REPRESENTATIVE LATVALA:  (No audible response).

REPRESENTATIVE SIROIS:  Our adjustments to Congressional Districts 27 and 28 mirror those of the districts that were in the map approved off the Senate floor.  We were able to include these districts in this way as we try to bring this process in for a landing as soon as possible.

Congressional District 27 uses the Dolphin Expressway and the Florida Turnpike for the vast majority of its boundary line on its northern and western sides, while using the Cutler Bay municipal boundary along its southern border, creating a very compact district wholly within Miami-Dade County with a very high Reock score of 0.71.

Congressional District 28 includes all of Monroe County and then connects with the remaining population in southern Miami-Dade

HT_0005239

JX 0038-0042

Page 43

County using U.S. 41 and the Florida Turnpike as its primary boundary lines in Miami-Dade County. The municipalities of Sweetwater, Florida City, and Homestead are whole within the district.

And I'd like to highlight a couple of technical changes. Along with the changes we've already highlighted, staff made other technical changes in the map by adjusting lines to improve the visual shape of the districts, clean up roadblocks, or make small adjustments to improve the mathematical compactness of districts.

Two examples are included here. Now using I-75 as the major roadway between Districts 17 and 18, on the left and following the cleaner railway as a boundary line between Districts 12 and 15 on the right.

VICE-CHAIR FINE: Chair Leek, you're recognized.

CHAIRMAN LEEK: Thank you.

Members, I want to pause for a second and refocus before we move on to our secondary map. What we just heard described by Representative Sirois, was a description of the primary map that is part of this amendment. As I mentioned before, the secondary map that we are

HT_0005240

JX 0038-0043

Page 44

about to segue into would only take effect should CD5 and the primary map be struck down by a court.

The secondary map is labeled H000C8015. The structure of this map is exactly the same as the primary map except for six districts that are impacted by the changes to CD5.  The other 22 congressional districts are identical to the districts in the primary map.  For everyone's sanity, in this next presentation, we are only going to walk through those districts that are different than the primary map.

All right.  Let's begin.  Overall, this map splits 20 counties, which is the same as the map that passed our subcommittee last week.  It now only splits 18 cities, an improvement of nine cities when compared to the previous version of this map.  There were also improvements made in the overall mathematical compactness score and in the boundary analysis.  The mathematical compactness scores are now Reock, 0.45; Convex-hull, 0.80; and Polsby-Popper at 0.40.

So even though this is our secondary map, it is still an improvement over the map that passed through the subcommittee with the same

HT_0005241

JX 0038-0044

methodology being applied for the improvements. And similarly, this map still maintains three protected black districts and three protected Hispanic districts.

I'd now like to hand it back over to Representative Sirois to take us through the differences in the secondary map from the primary map.

VICE-CHAIR FINE:  Rep. Sirois, you're recognized to explain the secondary map.

REPRESENTATIVE SIROIS:  Thank you. Thank you, Chair Leek.

The changes to Congressional District 5 impact an additional five districts, Districts 2, 3, 4, 6, and 11.  Let's start with Congressional District 5.  The configuration of this district is very similar to the map passed out of the subcommittee and has had slight changes made to bring it more in alignment with our Senate partners and improve our boundary analysis metrics.

It still of course remains a protected black district as well.  Additionally, we have been able to equalize our population in Leon County, which prevents Congressional District two

Page 46

from having to split Marion County to find the remainder of its population.  This is a combination of both the House and Senate configurations of this district with the additional benefit of not splitting Lake City in Columbia County.

Segueing back to Congressional District 2.  This district is made up mostly whole of whole counties.  It contains 15 whole counties along with the remaining portion of Walton County not contained within Congressional District 1 and the parts of Leon, Jefferson, and Columbia County that are not in Congressional District 3.  Its eastern boundary is the county lines of Levy, Gilchrist, and Columbia Counties.

Congressional District 3 is made up of five whole counties: Alachua, Bradford, Union, Clay, and Putnam Counties.  It then splits Marion County for its remaining population, while keeping the city of Ocala wholly within it, creating a very compactly shaped district, similar to the current Congressional District 3.

Congressional District 4 has all of Nassau County along with the remaining part of Duval County that is not included in

HT_0005243

JX 0038-0046

Congressional District 3.  This leaves the district approximately 213,000 people short of the population needed for a congressional district.  So the district must continue south into St. Johns County for population equality.

In doing so, it is able to keep all of St. Augustine within the district, and all of the other municipalities in St. Johns County remain whole.  This district configuration is similar to the current district.

In an effort to impact as few districts as possible with regard to the primary map, Congressional District 6 uses the same boundary line with Congressional District 7 in Volusia County, while including all of Flagler County and a part of St. Johns, Lake, and finally, Marion County.  This district helps absorb the uniquely shaped parts of Lake and Volusia Counties to create a compact district for this area.

Congressional District 11 is very similar to the district in the primary map as it adds the remaining population in Orange County, which is about 194,000 people, and goes west to include the majority of Lake County, all of Sumter County, and part of Marion and Citrus

HT_0005244

JX 0038-0047

Page 48

County, where it achieves equal population.

The final slide shows all the remaining districts throughout the state that are unchanged between the two maps. The gray area represents the area of the six districts impacted by the changes to Congressional District 5, where the changes occurred.

And that, Mr. Chair, are both maps in the amendment.

VICE-CHAIR FINE: Thank you for the presentation of the amendment.

Members, are there any questions on the amendment? Are there any questions?

Mr. Representative Driskell, you're recognized for a question.

REPRESENTATIVE DRISKELL: Thank you, Mr. Chair. I have a lot of questions, actually.

VICE-CHAIR FINE: Well, you're welcome to ask them, but one at a time.

REPRESENTATIVE DRISKELL: Okay. Thank you. So I know, as we've been going through this process, we talk a lot about the methodology that we've used and that we have to make sure that they're compliant with tier 1 and tier 2 criteria in the Constitution. So looking at the primary

HT_0005245

JX 0038-0048

map, could you identify the districts where those criteria were in tension with one another?

VICE-CHAIR FINE:  I'm sorry, can you identify those criteria where what?  I just didn't hear the end of the question.

REPRESENTATIVE DRISKELL:  Yep.  Sure. So we've got methodology that we have to follow, tier 1 and tier 2.  We have to look at those criteria.  And when they're in tension with one another, you have to --

VICE-CHAIR FINE:  Oh, "in tension." Okay.

REPRESENTATIVE DRISKELL:  Yes.

VICE-CHAIR FINE:  Or in conflict, I understand.

REPRESENTATIVE DRISKELL:  Sorry. Probably did not articulate that, enunciate it clearly enough.  And when they're in tension with one another, you have to reconcile or harmonize or prioritize them.  And so, in trying to make sure that we did that, I just want to identify like were there any districts --

VICE-CHAIR FINE:  I understand.

REPRESENTATIVE DRISKELL:  -- where those criteria were in tension, and if so, can we

Page 50

identify them?

VICE-CHAIR FINE:  Two words, in tension as opposed to an intention.  So I understand.

REPRESENTATIVE DRISKELL:  In tension. Yes.

VICE-CHAIR FINE:  Chair Leek, you're recognized to answer the question.

CHAIRMAN LEEK:  Thank you.  I'll do the best I can with it.

And Representative Driskell, I want to thank you again for all of your work on this and engaging in the process.

So as I think we know, there's tier 1 and tier 2.  Each of the pieces of tier 1 are in tension with the other pieces of tier 1, so one doesn't get priority over the other.

REPRESENTATIVE DRISKELL:  Right.

CHAIRMAN LEEK:  Same thing with tier 2. So there is no tension between tier 1 and tier 2. There is tension between each of the categories within each tier, and that tension happens in every district.

VICE-CHAIR FINE:  Okay.  You're recognized.

REPRESENTATIVE DRISKELL:  Thank you, Mr.

HT_0005247

JX 0038-0050

Page 51

Chair.

So then how did the Committee staff -- I'm presuming Committee staff -- resolve the times where they had tension?  What policy decisions were made to resolve the tension in the districts set out in the primary map?

VICE-CHAIR FINE:  Chair Leek, you're recognized.

CHAIRMAN LEEK:  Thank you.

I don't think there's any way to answer that question as asked.  If you look at the maps in front of you, you can see where a railway was chosen over a road, or you can see where a waterway was chosen over a county line.  That's the best I'm going to be able to do with that question as it's asked.

REPRESENTATIVE DRISKELL:  Okay.

VICE-CHAIR FINE:  You're recognized.

REPRESENTATIVE DRISKELL:  And was the same methodology used throughout both maps, both the primary and the secondary map?

VICE-CHAIR FINE:  Chair Leek, you're recognized.

CHAIRMAN LEEK:  Yes.

REPRESENTATIVE DRISKELL:  Okay.

HT_0005248

JX 0038-0051

Page 52

VICE-CHAIR FINE:  And by the way, I'll do this the same way I did the state redistricting map.  So if people want to ask a few questions, take another bite at the apple, it won't get held against you if you want to round robin.  And so you don't have to know all your questions right now.  So feel free to keep going, but this isn't your only shot.  So you're recognized for another question.

REPRESENTATIVE DRISKELL:  Thank you, Mr. Chair.

So I know in dealing with the state House maps, it seemed like we relied primarily on census data.  But for purposes of the congressional maps, did we use more than census data?

VICE-CHAIR FINE:  You're recognized.

CHAIRMAN LEEK:  We relied primarily on census data again.

REPRESENTATIVE DRISKELL:  Okay.

VICE-CHAIR FINE:  You're recognized.

REPRESENTATIVE DRISKELL:  So no secondary data was used?

VICE-CHAIR FINE:  Chair Leek, you're recognized.

HT_0005249

JX 0038-0052

CHAIRMAN LEEK:  The process that we use in the congressional maps is the exact same process that we used in the state maps.

REPRESENTATIVE DRISKELL:  So to be very clear --

VICE-CHAIR FINE:  You're recognized.

REPRESENTATIVE DRISKELL:  I probably didn't ask that clear enough.  So was only census data used in preparing the primary and secondary congressional maps?

VICE-CHAIR FINE:  Chair Leek, you're recognized.

CHAIRMAN LEEK:  There's a lot more that goes into that.  So what I'm having trouble with is confining it to "only census data," because we used a lot of member input as well.  There's also elections data and performing a functional analysis.  So to state that it's "only census data," I think would be inaccurate.

REPRESENTATIVE DRISKELL:  Okay.

VICE-CHAIR FINE:  Rep. Driskell, you're recognized if you want to couple more, or do you want to take a break?

REPRESENTATIVE DRISKELL:  No.  I want to I want to follow up on that thread to just make

HT_0005250

JX 0038-0053

Page 54

sure that we get absolute clarity.

Was there anything other than census data, member input, I think you said political data, that was used?

VICE-CHAIR FINE:  You recognized.

CHAIRMAN LEEK:  I said elections data.

REPRESENTATIVE DRISKELL:  Oh, elections data.  I apologize.

CHAIRMAN LEEK:  You know, the only data used was the data that we are permitted to use. Now, I don't want to get in a situation where we're quibbling whether this was member input or communities of interest or those types of things because sometimes member input crosses over into arguments about communities of interest or, you know, whether tier 2 standards are being met.  Is it appropriate to use this road, is it appropriate to use this highway, et cetera.

So I'm having trouble confining it to a single set of lists, which I know we, as lawyers, like to get a single set of list.  I can't do that for you.  But the only information that was used was information that is appropriate in drawing maps.

REPRESENTATIVE DRISKELL:  Okay.

HT_0005251

JX 0038-0054

Page 55

VICE-CHAIR FINE:  You're recognized.

REPRESENTATIVE DRISKELL:  Yes.  So let's talk about those six districts where we receive the performance data for.  And I know we've gone through this with the House maps too.  Could you talk about the process for the congressional maps for how we selected those six districts that were identified as protected districts?

VICE-CHAIR FINE:  You're recognized, Chair Leek.

CHAIRMAN LEEK:  It was the exact same process that we use for the state maps.

VICE-CHAIR FINE:  Follow up?

REPRESENTATIVE DRISKELL:  Yes.

So just to get clarity because it's been a couple of weeks since we had that meeting.  So that means that we looked at the BVAP scores, and I believe that was the primary metric that we use for purposes of the House maps?  Oh, and HVAP.  Sorry.  Yes.

CHAIRMAN LEEK:  Yeah, thank you.  No.  That would be inaccurate.  So you have to look at the process as a whole.  You take the benchmark maps.  You layer on top of it the 2020 census data.  You'd look at the benchmark.  Then you

HT_0005252

JX 0038-0055

Page 56

perform a functional analysis, and it could be BVAP, HVAP. Could also be election data. It could be a number of different things that go into a functional analysis.

VICE-CHAIR FINE: You're recognized.

REPRESENTATIVE DRISKELL: I had another question about Tampa Bay, in the area where I represent. So the old Congressional District 15, actually, the way that is in the benchmark map actually is designed to be -- I know we don't identify it as protected, but it is thought of, at least back home, as like a black district or a district where there are a lot of black voters who could elect the candidate of their choice, even though their candidate of their choice happens to be non-black.

I guess my question is: Did the Committee staff take a look at that district and make a decision about it, that, no, it doesn't look like it could be a black district, and is it possible to take another look at that one?

VICE-CHAIR FINE: Representative Sirois, you're recognized to answer that question.

REPRESENTATIVE SIROIS: Thank you, Mr. Chairman.

HT_0005253

JX 0038-0056

Page 57

Congressional District 15 in the benchmark map is not presently a protected district.

REPRESENTATIVE DRISKELL:  To follow up, my question was:  Can we take another look at that one?

VICE-CHAIR FINE:  Representative Sirois, you're recognized.

REPRESENTATIVE SIROIS:  Thank you, Mr. Chairman.

No.  The functional analysis process that occurs on the benchmark map is to make sure that protected districts have been properly identified in the benchmark map.

VICE-CHAIR FINE:  I'm going to recognize our staff director, Ms. Kelly --

REPRESENTATIVE DRISKELL:  Okay.

VICE-CHAIR FINE:  -- to add a little more color on that.

STAFF DIRECTOR KELLY:  Thank you, Mr. Chair.

And I'll just piggyback off what Rep. Sirois had said.  So if you'd like to stop by, you know, we can take a look at that.  And I will piggyback off of what Chair Leek had said

HT_0005254

JX 0038-0057

Page 58

originally as well.

Going into additional functional analysis on districts that aren't protected may lead us down a path of having information that would potentially lead to improper intent behind the decisions we're making. So we would not analyze that district normally because it was not a performing district in the benchmark map. So again, I know that was kind of a combination of what they said, but just to help clarify. Thank you.

VICE-CHAIR FINE: You're recognized.

REPRESENTATIVE DRISKELL: Thank you, Leda. So that actually is really helpful. So it sounds like, on the benchmark map -- by the end of this, we're all going to be redistricting experts, I hope. On the benchmark map, the functional analysis was performed on all districts to identify which might be protected and CD15 did not rise to that threshold.

VICE-CHAIR FINE: I know the answer to that's no. But Chair Leek, you're recognized to answer the question.

CHAIRMAN LEEK: No. Functional analysis is only performed on the protected districts.

HT_0005255

JX 0038-0058

Page 59

REPRESENTATIVE DRISKELL:  Okay.

VICE-CHAIR FINE:  Yeah.  I'll come back.

REPRESENTATIVE DRISKELL:  Okay.

VICE-CHAIR FINE:  So Ranking Member Geller, you're recognized.

REPRESENTATIVE GELLER:  Thank you, Mr. Chair.

If I'm not mistaken, I believe, Chair Leek, that you used the phrase "singular exception" when you were discussing, I think it's the primary map, and I think it was the proposed District 5.  Would you explain what you mean by "singular exception" and why there is this singular exception?  What does that mean?

VICE-CHAIR FINE:  Chair Leek, you're recognized.

CHAIRMAN LEEK:  Thank you.  CD5 in the primary map has a reduction in the BVAP, and that's the only place that that reduction has been more than immaterial.  That is the singular exception of it.  CD5, however, still is a performing district.

VICE-CHAIR FINE:  Follow up?

REPRESENTATIVE GELLER:  What is the reduction in BVAP in that particular map, that

HT_0005256

JX 0038-0059

Page 60

district?

VICE-CHAIR FINE:  Chair Leek, you're recognized.

CHAIRMAN LEEK:  It goes from about 43 to about 35 and a half percent BVAP.

REPRESENTATIVE GELLER:  Follow up.

VICE-CHAIR FINE:  Yep.  You're recognized.

REPRESENTATIVE GELLER:  What is the effect of that reduction in the functional analysis of the ability of the minority voter population to elect representatives of their choice?

VICE-CHAIR FINE:  Chair Leek, you're recognized.

CHAIRMAN LEEK:  Well, the district still performs, so the answer is none.

VICE-CHAIR FINE:  Yep.  Follow up.

REPRESENTATIVE GELLER:  Okay.  Thank you, Mr. Chair.  My ears play tricks on me.  Did you say the districts still perform so the answer is there is no effect of that reduction?

VICE-CHAIR FINE:  Chair Leek, you're recognized.

CHAIRMAN LEEK:  Yeah.  The question that

HT_0005257

JX 0038-0060

Page 61

you asked was:  What affect would it have on the functional analysis?  Functional analysis is a combination of several factors to determine whether something performs.  This district, CD5, as drawn even in the primary map, still performs. So there was no effect on the functional analysis for CD5.

VICE-CHAIR FINE:  You're recognized.

REPRESENTATIVE GELLER:  Thank you, Mr. Chair.

Under the non-dilution standards that apply to drawing constitutionally compliant maps, isn't weakening of the performance of historically performing districts considered dilution?

VICE-CHAIR FINE:  You're recognized.

CHAIRMAN LEEK:  No.  Remember we're talking about overall performance, right.  So a change, a variation, in any of the factors that go into that performance analysis, that doesn't impact performance.  It's not a weakening, and you know, ultimately, a court is going to have to decide what diminishment means, which is, I think, what you're getting after.  Ultimately, a court's going to have to decide that, but this

HT_0005258

JX 0038-0061

Page 62

district drawn in the primary map still performs.

VICE-CHAIR FINE:  You're recognized.

REPRESENTATIVE GELLER:  Thank you, Mr. Chair.

The House filed a brief for the Florida Supreme Court in the state legislative reapportionment case, apparently with the assistance of Andy Bardos of GrayRobinson.  And I think it said that, in a prior case called Apportionment I, new districts may not weaken historically performing districts and that that constituted diminishment.  And then further said, reducing a safe district to a competitive district is a downward shift and that differences are at the margins where many elections are decided.  And I'm quoting from the position that the House itself just took in court.

VICE-CHAIR FINE:  Is there a question?

REPRESENTATIVE GELLER:  I'm getting there, Chair Fine.  Called a predicate.

Doesn't that contradict this statement that moving from 43 to 35, which is considered to be in that questionable margin, does not constitute dilution or weakening?

VICE-CHAIR FINE:  Chair Leek, you're

HT_0005259

JX 0038-0062

Page 63

recognized.

CHAIRMAN LEEK:  You know, again, the ultimate question of diminishment is going to have to be one determined by a court.  But I can tell you looking at all of the factors, this district still performs.  So what we know is we don't have to stay strictly where it was before, right.  The courts have been out saying you can move, in this case, BVAP up and down, right, as long as the district still performs.

Ultimately, I think a court is going to decide whether that constitutes diminishment or not.  But in our analysis, the functional analysis, that district still performs.

VICE-CHAIR FINE:  You're recognized.

REPRESENTATIVE GELLER:  Thank you, Mr. Chair.

Isn't it so that, in the analysis that's actually released to us, that very limited analysis that we've gotten to look at, that instead of performing in 14 out of 14 test elections under the old configuration, under the new configuration, approximately one-third of those same test elections, it does not perform to allow minorities to elect the candidate of their

HT_0005260

JX 0038-0063

Page 64

choice?

VICE-CHAIR FINE:  I'm going to recognize Staff Director Kelly to answer that question.

STAFF DIRECTOR KELLY:  Thank you, Mr. Chair.

And thank you, Representative, for that question.  I think this is a really good point to drive home why a full functional analysis is needed, right.

So we have primary and general elections for every statewide election throughout the entire decade.  So what you're referencing, the portions where that district would not perform for a candidate of choice, we're in the earlier parts of the decade.  So as we look at the trends of how that portion of the state performs and how it's moved over the decade, the portions that you said where it does perform are actually the more recent elections, which again, is why wholistically, not only election results, but looking at voter registration turnout is also important.

I think it's also important to acknowledge, you know, the primary maps configuration of CD5 does have a slightly

HT_0005261

JX 0038-0064

Page 65

different electorate than the secondary map or the maps that we've previously put before the Committee as well.

So again, with having a different electorate, that could change voting patterns as well. Hopefully that provides some context. Thank you.

VICE-CHAIR FINE: Ranking Member Geller, you're recognized.

REPRESENTATIVE GELLER: Thank you.

Thank you for that answer. Does that answer mean that it doesn't perform as well based on the analysis but there is some suppositions that are being made about possible trends and how much weakening still allows it to, as the Chair calls it, "perform"?

VICE-CHAIR FINE: Chair Leek, you're recognized.

CHAIRMAN LEEK: Okay. You know, first of all, performance is not an air quote thing. It's an actual part of the law. So the district itself --

REPRESENTATIVE GELLER: It's all air quote stuff, Chair. It's all air quotes in here.

CHAIRMAN LEEK: The district still

HT_0005262

JX 0038-0065

performs.  You know, when you redraw districts necessarily, they're going to change.  I mean, that happens with every redistricting, so necessarily going to change.  They're not suppositions.  The trends are what the trends are.  This district that we have that is now in this primary map, CD5, would still perform.

VICE-CHAIR FINE:  You're recognized.

REPRESENTATIVE GELLER:  Thank you, Chair.

Chairman, I hear you.  I think I understand the word.  When you say "perform," you don't mean -- and go ahead and correct me, I'm sure you will -- you don't mean it will have the same result; you mean that based on assumptions about things like trends, you think it's likely that it would get to the same place when you say "perform" but statistically, it is less likely to get there.  But you think it'll get there anyway.  Is that basically what you're saying?

VICE-CHAIR FINE:  Chair Leek, you're recognized?

CHAIRMAN LEEK:  Thank you.

The ultimate measure is performance.  And every time you move a line and you put this

HT_0005263

JX 0038-0066

Page 67

neighborhood in that district now, the performance of that district may change. But the ultimate measure is whether the district that is drawn before you performs. This district under a functional analysis still performs.

VICE-CHAIR FINE: Ranking Member Geller, you're recognized,

REPRESENTATIVE GELLER: Thank you, Mr. Chair.

And I hear you, Chair. But every time you move a line, it changes, but you can move those lines in a way that makes it more likely that it will perform or less likely that it will perform. And we're moving those lines in a way that makes it less likely that it will perform, right?

VICE-CHAIR FINE: You're recognized.

CHAIRMAN LEEK: Thank you.

That happens in every map drawing every, changes in every map drawing. And what I can tell you is after the functional analysis of CD5, is still performs. Is it less likely to perform? Honestly, I don't know. Is it more likely to perform? But what I want you to understand is you can't take and pull BVAP out alone and draw

HT_0005264

JX 0038-0067

Page 68

the conclusion that it's less likely to perform. So it's important that you look at all of the factors and then come up with the performance scale. This one performs.

VICE-CHAIR FINE: I'm going to ask a question real quick, if that's okay. Just to maybe help move this long.

Chair Leek, would it be fair to say, just since we can talk about performance, it's not a guess, it's not a trend, it's an actual data thing, would it be fair to say, looking at the 2020 performance in this district, that the district outperformed by 13 points? So it wasn't close in 2020 in terms of the performance of the district based on how we do the functional analysis, a 13-point overperformance?

REPRESENTATIVE GELLER: Can I object to the leading question?

VICE-CHAIR FINE: No. You can and you're denied. So I'm asking a question.

Chair Leek.

CHAIRMAN LEEK: Thank you. And you raise an excellent point. So it's relative performance, right. And so that's the trends, right. When you look at the trends, that

HT_0005265

JX 0038-0068

Page 69

district performs stronger and stronger in each election cycle. So it's relative. The district still performs. It is not a diminishment unless the district does not perform.

VICE-CHAIR FINE: But one follow-up by me, but 13 percent's not close, right?

CHAIRMAN LEEK: I would agree with you.

VICE-CHAIR FINE: Okay. Great. Ranking Member Geller, we'll come back to you now.

REPRESENTATIVE GELLER: Thank you, Mr. Chair.

Was outside counsel retained to analyze that congressional district or to hire an expert to analyze that congressional district?

VICE-CHAIR FINE: Chair Leek, you're recognized.

CHAIRMAN LEEK: Okay. I'm going to answer this one more time again, right, because I know you know the answer to this question. Outside counsel has been retained. They've spoken to you. Outside counsel has performed all of the required analyses for each protected district.

VICE-CHAIR FINE: Ranking Member Geller, you're recognized.

HT_0005266

JX 0038-0069

Page 70

REPRESENTATIVE GELLER:  Thank you, Mr. Chair.

Who is their client?

VICE-CHAIR FINE:  Chair Leek, you're recognized.

CHAIRMAN LEEK:  Ultimately, the House is by and through the Speaker.  And I want to correct something I just said.  Remember staff performs functional analysis.  So I said outside counsel, but staff performs the functional analysis.

VICE-CHAIR FINE:  Ranking Member Geller, you're recognized.

REPRESENTATIVE GELLER:  Well, thank you, Mr. Chair.

Let's clarify that.  Was an expert retained by counsel to review and opine on the functional analysis or performance of that district?  Let's get that clear.

VICE-CHAIR FINE:  Chair Leek, you're recognized.

CHAIRMAN LEEK:  Staff performs the functional analysis, and our counsel advises the staff and Committee through the staff.

REPRESENTATIVE GELLER:  And the expert?

HT_0005267

JX 0038-0070

Page 71

VICE-CHAIR FINE:  I'm sorry.  You're recognized, Ranking Member Geller.  Is there an expert, I guess, was the question.

Chair Leek, you're recognized.

CHAIRMAN LEEK:  Thank you.

Our expert is not retained for functional analysis, but experts advise staff.

VICE-CHAIR FINE:  I'm going to -- sort of go into round robin, so if you --

REPRESENTATIVE GELLER:  Let me just --

VICE-CHAIR FINE:  If you want to bring this kind of question in for a landing --

REPRESENTATIVE GELLER:  Just this one point.  Let me --

VICE-CHAIR FINE:  -- you'll get a second bite at the apple to collect your thoughts.

REPRESENTATIVE GELLER:  Let me just close this one point, Mr. Chairman.

VICE-CHAIR FINE:  Yep.  Ranking Member Geller, you're recognized.

REPRESENTATIVE GELLER:  Is my understanding of your other answer that the client is the House?  Is that correct?

VICE-CHAIR FINE:  He answered that, but yes, so --

HT_0005268

JX 0038-0071

Page 72

REPRESENTATIVE GELLER:  Okay.  So if the client is the House, and last time I looked, I'm still a member of it, why is it not available to every member of the House to see what the outside counsel's opinions were and what the expert they retained included, recommended, studied, advised, or whatever it is that the expert did?

VICE-CHAIR FINE:  Chair Leek, you're recognized.

CHAIRMAN LEEK:  Thank you.

It seems we're going to go down the path here of consulting expert versus testifying expert.  But the short answer, and probably the one that you want to hear, is you, along with many folks out there, have gone on record saying you're going to sue the House.  So if you take your analogy to its end, you would be suing yourself under that analogy and not accepting the decision as of the whole.

So because we are in anticipation of litigation, as previously announced by you, and because the House moves through the Speaker, we are retaining the consulting expert work product privilege.

VICE-CHAIR FINE:  Still on this?

HT_0005269

JX 0038-0072

Page 73

REPRESENTATIVE GELLER:  Oh, yeah.

VICE-CHAIR FINE:  Okay.  Ranking Member Geller.

REPRESENTATIVE GELLER:  Mr. Chair, and I say this with the greatest respect for you personally, but with all deference, you totally have misstated what I said.  And since I said it, I think I have a pretty good idea of what I've said.  I assure you I never said I was going to sue the House, possibly for some of the reasons you just mentioned but others as well.

When I said, undoubtedly, there will be litigation, it was a comment on the process and results that we have followed.  But I never said I was going to sue the House.  And by the way, I don't think any of my colleagues on my side of the aisle have ever said they were going to sue the House.  Predicting that there will be litigation is not the same as saying that we would, or I would, be the author of it.

If that's the only reason why some decision apparently has been made, that I, as a member of the House, are not entitled to see what our counsel has done or the experts --

VICE-CHAIR FINE:  If you'd bring it in

Page 74

for a question.

REPRESENTATIVE GELLER:  -- to that counsel, I would say, respectfully, that I'd like that information today because I at present --

VICE-CHAIR FINE:  I'm going to ask you for a question.

REPRESENTATIVE GELLER:  -- have no intention --

VICE-CHAIR FINE:  What's your question?

REPRESENTATIVE GELLER:  -- of suing the House.

VICE-CHAIR FINE: Okay.  So all right. I let you talk there for a while.  Is there a question?  I'm not recognizing Chair Leek.  You didn't ask a question.

REPRESENTATIVE GELLER:  Yes.  There is ask a question.

There is a question.

VICE-CHAIR FINE:  Let's ask a question quickly.

REPRESENTATIVE GELLER:  Okay.  Thank you.

The question that I would follow that with is:  Will that information be released to any House member who verifies they have no

HT_0005271

JX 0038-0074

Page 75

present intention of suing the House?

VICE-CHAIR FINE:  Chair Leek, you're recognized.

CHAIRMAN LEEK:  No.

VICE-CHAIR FINE:  All right.

REPRESENTATIVE GELLER:  Why?  I'd just like to ask why that is.

VICE-CHAIR FINE:  You're recognized, Chair Leek.

CHAIRMAN LEEK:  Work product doctrine privilege.

VICE-CHAIR FINE:  Okay.  We're going to move on.  And again, you'll get another bite at the apple.  I know Representative Skidmore has been waiting to ask a --

You had questions, correct?  Yeah.

So you're the only other hand I've seen. So if other people -- okay.  All right.  I'll come to you guys.

So your next, Rep. Skidmore.  Go ahead, you're recognized for a question.

REPRESENTATIVE SKIDMORE:  Thank you, Mr. Chair.

And I think we kind of were touching on this, but I'm still a little confused about a

HT_0005272

JX 0038-0075

Page 76

CD5.  And this may be a question for either Chair Leek or staff or Chair Sirois.

But when I'm looking at the primary map and we are talking about performance, in more than one-third of the time that districts did not elect the candidate of its choice.  But in the secondary map, 100 percent of the time they did.  So can you explain, again, for me how that's not diminishment under the definition, as I understand it?

VICE-CHAIR FINE:  Chair Leek, you're recognized.

REPRESENTATIVE SKIDMORE:  And I hope I asked that the right way.

CHAIRMAN LEEK:  You did.  I appreciate the question.  The answer is going to be the same.  Ultimately a court is going to have to determine what diminishment means.  Diminishment is a legal conclusion.  We have determined that that district still performs.

VICE-CHAIR FINE:  Follow up?

REPRESENTATIVE SKIDMORE:  Thank you, Mr. Chair.

And when you say that "it still performs," the rest of that sentence is for the

HT_0005273

JX 0038-0076

Page 77

candidate of choice for that district?

VICE-CHAIR FINE:  You're recognized.

CHAIRMAN LEEK:  Correct.  Yeah.  Under the legal standards.  I'm sorry.  I'm trying to move the meeting along.  When I say "performs," I mean the functional analysis still demonstrates to the candidate that they're able to choose or elect a candidate of their choice.

REPRESENTATIVE SKIDMORE:  Okay.  Follow up, Mr. Chair?

VICE-CHAIR FINE:  Yes, you're recognized.

REPRESENTATIVE SKIDMORE:  Thank you.  I'm sorry I have so many papers.  I lost one of my questions.  But it ultimately has to do with the 30-day statute of limitations for filing against the maps.  And is there any precedent for that?  Have we done that before in this type of a situation, and does federal law not supersede that at some level?

VICE-CHAIR FINE:  You're recognized, Chair Leek.

CHAIRMAN LEEK:  Thank you.

And listen, I think that is a very, very fair question.  Of course, throughout law, there

HT_0005274

JX 0038-0077

Page 78

are statute of limitations.  In this particular instance, we have qualifying in what, four months?  I think we have an election, let's call it nine months.  So the statute of limitation is designed to move the process along and get to an end so people know what districts they're running in.

VICE-CHAIR FINE:  Follow up?

REPRESENTATIVE SKIDMORE:  Thank you, Mr. Chair.

Thank you for that answer.  That filing of the lawsuit, however, doesn't end, necessarily, the lawsuit in time for that.  So how does that really jive with us being able to know what districts we're going to run in or any candidate know what districts they're going to run in?

VICE-CHAIR FINE:  Chair Leek, you're recognized.

CHAIRMAN LEEK:  The filing of the lawsuit is the initial step that gets us to that answer.  And the Court can then accelerate the process such that you can get an answer prior to June, but this is the part of it that we can control is when the lawsuit, when it must be

HT_0005275

JX 0038-0078

Page 79

initiated.

VICE-CHAIR FINE:  You're recognized.

REPRESENTATIVE SKIDMORE:  Thank you, Mr. Chair.

And the second part of that is does federal law, VRA, you know, I think there's a six-year statute of limitations on that level, does that now in conflict with the 30 days?

VICE-CHAIR FINE:  Chair Leek, you're recognized.

CHAIRMAN LEEK:  Potentially it could conflict if it has a longer statute of limitations and if the person -- but potentially it may not.  So if the challenge is solely within federal court on federal law, then I would say the federal statute of limitations would likely prevail.  Ultimately, a court's going to have to decide this.  I'm just giving you my opinion as I sit here today.  But if it's going to be filed in state courts, it's a 30-day statute of limitations.

VICE-CHAIR FINE:  Rep. Skidmore, do you have another question?

REPRESENTATIVE SKIDMORE:  I'm good for now.  Thank you, Mr. Chair.

HT_0005276

JX 0038-0079

Page 80

VICE-CHAIR FINE: Okay. Again, everyone can have a second.

REPRESENTATIVE SKIDMORE: I may reorganize.

VICE-CHAIR FINE: Yep, that's fine. I think it keeps us moving a little more smoothly.

Representative Thompson, I think I saw your hand. Did you have a question?

REPRESENTATIVE THOMPSON: Yes. Thank you, Mr. Chairman.

VICE-CHAIR FINE: You're recognized.

REPRESENTATIVE THOMPSON: I have a question regarding the increase in the minority population across the state of Florida. And I'd like to know, given the proportional increase of minorities in Florida, was there the possibility of creating additional minority districts that are not in either the primary or the secondary plans that we've seen?

VICE-CHAIR FINE: I'm actually going to answer that question myself since I spoke to it on the floor. The proportion of black voters in Florida has not materially changed in the last ten years.

REPRESENTATIVE THOMPSON: Thank you,

HT_0005277

JX 0038-0080

Page 81

Representative Fine.  And yes.  I did raise this same issue on the floor, and I guess I just don't understand, given 1.5 million individuals who, when they responded to the census, identified themselves as Hispanic and 500,000, who identified, additional individuals, as black, why there's no change, you indicated that there's no change?

VICE-CHAIR FINE:  I'll take this, again, particularly as it relates to black voters.  Let me give a mathematical example.

If ten years ago, there was there were ten people who lived in Florida and one of them were black and ten years later, there are two people in Florida that are black, that would be a 100 percent increase.  But if the population of Florida has gone from 10 to 20, even though the black population has doubled, their proportion remains the same at 10 percent.  That is the situation in the state of Florida as it relates to the black population.

Yes.  There are more.  But there are more of everybody, so the black percentage has not materially changed.

REPRESENTATIVE THOMPSON:  Thank you.  So

HT_0005278

JX 0038-0081

Page 82

I should understand, then, from your response that there was not an opportunity to create additional minority districts. Is that correct?

VICE-CHAIR FINE: That'd be a question for Chair Leek.

CHAIRMAN LEEK: Yep. We've maintained the benchmark. They're not entirely in the same places, but we've maintained the benchmark.

VICE-CHAIR FINE: Do you have a follow-up?

Okay. You're good for now.

Representative Slosber-King, I see you.

And then Rep. Omphroy, you'll be up next.

REPRESENTATIVE SLOSBER-KING: Thank you, Chair. My question centers around the statute of limitations. So what is the current statute of limitations that somebody can bring to challenge the maps?

VICE-CHAIR FINE: Chair Leek, you're recognized.

CHAIRMAN LEEK: Yeah. So remember that each one of these redistricting bills lives its own life, and that life necessarily ends at the end of the decade. So there's not a current one,

HT_0005279

JX 0038-0082

Page 83

period.  There was not, to my knowledge, a statute of limitations on the prior set of maps. Right.

But because of where we are, because we know this is headed to litigation, and because we want finality for people out there to know what district they live in, to know what district they want to run in, a 30-day statute of limitations works.

Listen, people are going to have to make that decision and qualify in four months, right. You know, people are going to have to make that decision and win or lose an election in nine months.  So forcing the initiation of a lawsuit early is the best course of action to have some finality of what district you live in and what district you're going to run in.

VICE-CHAIR FINE:  Follow up.

REPRESENTATIVE SLOSBER-KING:  Thank you.

Is there any other laws that you're aware of that has a 30-day statute of limitations?

VICE-CHAIR FINE:  Chair Leek, you're recognized.

CHAIRMAN LEEK:  Not that I'm aware of,

HT_0005280

JX 0038-0083

Page 84

but again, this is its own beast.

VICE-CHAIR FINE:  Okay.  All right. Again, there'll be more bites of the apple.

Rep. Omphroy, you're recognized for a question.

REPRESENTATIVE OMPHROY:  Thank you so very much, Chair.

So I'm looking at the protected districts.  And when I look at the protected districts, all six of them, my concern happens to be -- well, I know the House and the Senate worked on this map.  Unfortunately, the senator for my part of Broward County is not in seat.  So I'm looking at this map, and I'm noticing that Congressional District 20, there's eight city splits.  And I only compared it to the other protected districts.

There are eight city splits in Congressional District 20.  There are two city splits and Congressional District 24.  There is one in 5.  There is one in 26.  There is one in 27 and zero in 28.  So my question is:  Why is it that CD20 has been split eight times?

I'm going to recognize our Chief Map Drawer, Mr. Poreda, to answer that question.

HT_0005281

JX 0038-0084

Page 85

CHIEF MAP DESIGNER POREDA:  Thank you, Mr. Chair.

That's a good question.  That revolves heavily around there being so many municipalities all right up against each other in Broward County, where that district -- and really, into Palm Beach County too.  And the other areas, where a lot of the other minority districts that you're referring to, they're either not cities or their cities that can be incorporated differently into the district.

So it's simply that there are just so many municipalities in Broward County that are all right up against each other.

VICE-CHAIR FINE:  Follow up.

You're recognized.

REPRESENTATIVE OMPHROY:  How many municipalities are in Miami-Dade County?

VICE-CHAIR FINE:  I don't know that that's the subject of the bill.

REPRESENTATIVE OMPHROY:  My reason for asking the question, Chair, is that we're talking about Broward County having all these cities all configured all together.  I'm almost certain that Miami-Dade has a similar amount of cities, and

HT_0005282

JX 0038-0085

Page 86

yet Miami-Dade does not have a similar amount of splits.

VICE-CHAIR FINE:  Do you want to take a shot at that?

CHIEF MAP DESIGNER POREDA:  I don't have that exact number in front of me, Representative. But I'd be happy to get the total number of municipalities for both Broward and Miami-Dade County.  You are correct that Miami-Dade County does have a great number of municipalities just like Broward County, but it's where those minority populations are distributed throughout those cities and how the districts can be constructed where it might lend itself to splitting fewer in Dade County than in Broward County because, if you remember, the keeping of municipalities being closed at tier 2 concern and all of these districts are tier 1 protected districts.

So splitting them sometimes is a requirement to make sure those districts can perform rather than trying to keep the municipalities whole.  So it's just a function of where their geography is, but I'll be happy to get you the total number of municipalities in

HT_0005283

JX 0038-0086

Page 87

both those particular counties.

VICE-CHAIR FINE:  Follow up?

REPRESENTATIVE OMPHROY:  Yes.  Is there any way for us to -- because, you know, when we look at these maps, we can't necessarily see all the cities that are in the particular protected districts.  And is there any way for me to get all the cities within 20, all the cities within 24, all the cities within -- I know 5 only has one city, all the cities within 27, all the cities within 28.

I just want to be able to look at actual cities within the protected districts.  And I thank you very much for allowing me to ask questions.

VICE-CHAIR FINE:  of course.  And I'm going to let Chair Leek answer this in a minute. But I would note that in the software, you can zoom in.  I've done it.  You can zoom in and you can see cities and you can do that.  It's hard to see on the maps, but it is available on the software that we all have access to and we've been trained on.

I don't know if you have anything you want to add to that, Chair Leek.

HT_0005284

JX 0038-0087

Page 88

CHAIRMAN LEEK: That was precisely what I was going to say. I would also invite you, if you would like, to sit down with any of the staff, and we can walk you through all of that.

VICE-CHAIR FINE: You're recognized, Representative Omphroy.

REPRESENTATIVE OMPHROY: Thank you so very much, Chair.

I have zoomed in, zoomed around, sat with staff. It is extremely difficult for me to see because some of my cities are very, very tiny, and that's why my area had to be zoomed in the way it is where it has a southeast section. It is extremely difficult, and so that's why I'm asking for a printout of the actual cities within each of the protected districts because I have zoomed. I have swum through these maps. So I please ask for that consideration. I thank you.

VICE-CHAIR FINE: Sounds like we need to ask the Speaker for bigger computer monitors, but staff has said they're happy to sit down and provide that to you.

Okay. Is there any member who has not yet asked a question who would like to before we move on to round two?

HT_0005285

JX 0038-0088

Page 89

Okay. I see Ranking Member Geller. You're recognized. Okay.

And you'll be next, Rep. Driskell.

REPRESENTATIVE GELLER: Thank you very much, Mr. Chair.

The obligation we have is to produce a map that is constitutionally compliant. Is it the belief of -- I'll direct it to whoever wants to answer whether that's the Chair or the staff -- that the so-called primary map is constitutionally compliant?

VICE-CHAIR FINE: Chair Leek, you're recognized.

CHAIRMAN LEEK: Thank you.

You know, so you've hit on the crux of the question, right. It is a novel legal question that is being put forth, and if that question is answered in the affirmative, it will be constitutional. But that's also why we have a secondary map in case that that question is not answered in the affirmative.

VICE-CHAIR FINE: Ranking Member Geller, you're recognized.

REPRESENTATIVE GELLER: Thank you.

Appreciate that answer. Is it therefore

HT_0005286

JX 0038-0089

Page 90

fair to say -- and watch for what follows that --
is it therefore fair to say that there is a
serious legal question in the mind of the
proponents of the so-called primary map as to
whether it will be found constitutionally
compliant and that's why a secondary map is being
proposed?

VICE-CHAIR FINE:  Chair Leek, you're
recognized.

CHAIRMAN LEEK:  You know, I think all
questions that go to the Supreme Court are
serious legal questions.  So it is a serious
legal question, and what we've done is we put
forth a primary map.  But we don't know the
answer to the question, right.  So we put forth a
primary map, and if that primary map is found to
be unconstitutional, then the secondary map kicks
in.

VICE-CHAIR FINE:  You're recognized.

REPRESENTATIVE GELLER:  Thank you,
Mr. Chair.

Is it a fair paraphrase of what you've
just said that there is -- watch again, be
careful here -- is it a fair paraphrase of what
you just said to say that there is a serious

HT_0005287

JX 0038-0090

Page 91

doubt or question as to the constitutional compliance of the so-called primary map?

VICE-CHAIR FINE:  Chair Leek, you can answer that question.

CHAIRMAN LEEK:  No.  I mean, the nature of a novel question is that it's unknown.  It's unanswered.  And so, you know, what you see is the effort to make sure that we're covered if the novel question is if the answer is not as expected.

REPRESENTATIVE GELLER:  Follow-up question.

VICE-CHAIR FINE:  You're recognized.

REPRESENTATIVE GELLER:  Has the Chair, a noted attorney, or any of the staff or our -- I use the word "our" in a colloquial sense -- outside legal expert opined as to whether or not proposing two different maps violates the single-subject rule because we're being asked to vote on two completely distinct legal propositions as part of a single bill?

VICE-CHAIR FINE:  Chair Leek, you're recognized.

CHAIRMAN LEEK:  No.

REPRESENTATIVE GELLER:  Follow up?

HT_0005288

JX 0038-0091

Page 92

VICE-CHAIR FINE:  You're recognized.

REPRESENTATIVE GELLER:  Has there been consideration given to whether or not voting on two alternative propositions in a single bill violates the single-subject rule?

VICE-CHAIR FINE:  And before Chair Leek answers that, I would note that -- I don't remember what the vote was, but the House passed HJR.  And that did have two maps in it, a House map and a Senate map, even though it was a single --

REPRESENTATIVE GELLER:  Not the same, but --

VICE-CHAIR FINE:  Maybe not, but there were two -- one bill, two maps, and by the way, completely different.  One was the House, and one was the Senate.

But with that, Chair Leek, you're recognized to answer the question.

CHAIRMAN LEEK:  And this doesn't violate the single subject.  The subject is redistricting, and this has two maps, one secondary and one primary.  Doesn't violate the single subject.

VICE-CHAIR FINE:  Yes, you're

HT_0005289

JX 0038-0092

Page 93

recognized.

REPRESENTATIVE GELLER:  My next set of questions is intended to focus on how this primary/secondary approach, which is apparently novel, would work.  Is it intended that if the reviewing court makes any change whatsoever in the so-called primary map, if it does not strike it in its entirety, if it says there's a problem here or a problem there, we have to adjust this district or the boundaries of this district, which of course affects at least the contiguous ones, or if it says this precinct is in the wrong place, is it the intent of this -- because I can't tell from the way the bill was worded -- that any change whatsoever automatically disqualifies the entire primary map and automatically moves us to the secondary or is the secondary only intended if the whole map gets struck?

VICE-CHAIR FINE:  Chair Leek, you're recognized?

CHAIRMAN LEEK:  Yeah.  I addressed that upfront, and it's also in the bill language.  If the Court strikes down CD5, then the secondary map goes into place.

HT_0005290

JX 0038-0093

Page 94

VICE-CHAIR FINE:  Yep, you're recognized.

REPRESENTATIVE GELLER:  Thank you, Mr. Chair.

If there is any other change made anywhere else in the map by the Court, am I to understand that the secondary still doesn't kick in?

VICE-CHAIR FINE:  Before he asks that, I mean, isn't the map the same, the primary and the secondary, other than the CD, so they're the same map other than that.  So I'm not sure it would matter.

But Chair Leek, you're recognized to answer the question.

CHAIRMAN LEEK:  Yeah.  The secondary only kicks in if the court finds a problem with CD5.

REPRESENTATIVE GELLER:  I'm good for now.

VICE-CHAIR FINE:  All right. Rep. Driskell, you're recognized, and then Rep. Omphroy will be after you.

REPRESENTATIVE DRISKELL:  Thank you, Mr. Chair.

HT_0005291

JX 0038-0094

Page 95

So it sounds like, I just want to go back to CD10, that the Senate views CD10 as a protected black performing minority access district but that the House maintains that it's not. Could you talk to us about why it's not now that we have the Senate data to understand why they believe it is?

VICE-CHAIR FINE: Chair Leek, you're recognized.

CHAIRMAN LEEK: Yeah. The underlying data is roughly the same, but the conclusion is different. And if you look at the performance trends of CD10, we've come to the conclusion that it's no longer a protected district. The Senate came to the opposite conclusion.

VICE-CHAIR FINE: Rep. Driskell, you're recognized. Or do you want to wait and come back?

There could be --

REPRESENTATIVE DRISKELL: Just I guess --

VICE-CHAIR FINE: -- a third bite of the apple even. So if you don't know your question, you can take a few minutes.

REPRESENTATIVE DRISKELL: Thank you. I

HT_0005292

JX 0038-0095

Page 96

guess the question is, you know, it's why.  I
mean, why are we drawing that opposite
conclusion?

VICE-CHAIR FINE:  Chair Leek, you're
recognized.

CHAIRMAN LEEK:  I'll kick part of this
over to staff, but we're drawing that opposite
conclusion based on the trends and the
performance data.

But if somebody wants to go through
those trends, I'm happy to do it.

VICE-CHAIR FINE:  Staff Director Kelly,
you're recognized.

STAFF DIRECTOR KELLY:  I'll piggyback
off of -- thank you, Chair.  I appreciate it.

And thank you, other Chair, for that
answer.  I'll piggyback off of what you were
saying.

So I can't speak to the Senate's
process.  I want to be real clear about that.
The House, whether it's going through the state
House map, the state Senate map, or any other
congressional proposals that have come before us,
we've run independent processes.  So I want to be
clear that we're not opining on what the Senate

HT_0005293

JX 0038-0096

has done or the conclusions that we've reached.

Whenever we analyze this district, as we know, going through the subcommittee and the other maps we put out, we don't feel that it's performing. I think one thing that's good to focus on with, you know, the primary, and again, it's the same district in the secondary map for this proposal as well, we've been able to bring it more in alignment with where we know the Senate is. I think that's important because it shows that we're working towards an in-process and it's also as a direct result of several members' feedback actually, some that was given in committee and some that have come to talk with staff as well. Thank you.

VICE-CHAIR FINE: All right. It's going to be Rep. Omphroy, and then I will come back to Rep. Skidmore.

Rep. Omphroy, you're recognized.

REPRESENTATIVE OMPHROY: Thank you so very much, Chair.

Okay. So my question this time around is in regards to CD24. And I'm looking at the 2012 information for the black voting-age population, and then I'm looking at the proposed.

HT_0005294

JX 0038-0097

And I'm trying to figure out why there's a 6 percent difference between what it was before compared to what it is currently being proposed.

VICE-CHAIR FINE:  Rep. Omphroy, could you point us exactly --

REPRESENTATIVE OMPHROY:  Sure.  I'm on page 3 on -- and I'm looking at --

VICE-CHAIR FINE:  "The total registered voters percentage" at the top?

REPRESENTATIVE OMPHROY:  Yes.

VICE-CHAIR FINE:  Okay.  So what exactly?  Which line are you looking at and which column are you looking at?

REPRESENTATIVE OMPHROY:  So I'm looking at column 2012, and it's 48.21.  And then I'm looking at the proposed BVAP, and it's 42.7, which I'm trying to figure out why we have gone down 6 percent in eight years.

VICE-CHAIR FINE:  Okay.  So thank you. We see the data.

And Mr. Poreda, you're recognized to answer that.

CHIEF MAP DESIGNER POREDA:  Thank you.

Just to make sure I'm looking at the right column, you're on the packet for 8017, and

HT_0005295

Page 99

you're on page 4.  And you're looking at the --

REPRESENTATIVE OMPHROY:  No, sorry.

Page 3.

CHIEF MAP DESIGNER POREDA:  Oh, I'm sorry, page 3.  So page 3, and you're looking at District 24, and you're looking at the black column from 2012 to 2012 and wondering why there was -- and here, it looks like in 2012, it was 48.21 percent black total registered voters, and in 2020, it was 44.01 percent registered voters. Am I looking at the right data points?

REPRESENTATIVE OMPHROY:  Correct.

CHIEF MAP DESIGNER POREDA:  Okay.  So that just indicates that over the course, from 2012 to 2020, and you look at the other data points in between, there's been a steady decline of the share that black total registered voters are of the total electorate in that particular district.  So over the course of the decade, with the five election cycles that we have, that black population has decreased from 48 percent to 44 percent just naturally throughout the decade.

VICE-CHAIR FINE:  You're recognized.

REPRESENTATIVE OMPHROY:  Thank you for the follow-up, Chair.

HT_0005296

JX 0038-0099

Page 100

So my question is:  When I look at, let's say, 26 or 27 and 28, I see that we have tried to intensify the Hispanic voting-age population in those districts, is there a reason why we didn't intensify the black voting-age population in 24?

VICE-CHAIR FINE:  You're recognized, Mr. Poreda.

CHIEF MAP DESIGNER POREDA:  I mean, you're dealing with different types of population, and you're just dealing with the different geographies for the different districts.  And 24, that black population has just naturally decreased over the decade, and in Districts 26, 27, and 28, it's just a different segment of population that you're looking at.

That's also why the functional analysis is individual for each individual district in looking at its individual functional analysis to determine that.  And looking here, I would say looking at the Hispanic total registered voters over the course of the decade in all three of those districts, they, all three of them are less in 2020 that they were in 2012.

VICE-CHAIR FINE:  You're recognized.

HT_0005297

JX 0038-0100

Page 101

REPRESENTATIVE OMPHROY:  Thank you, Chair.

I just want to say thank you.

VICE-CHAIR FINE:  Okay.  Thank you.

Okay.  Rep. Skidmore, you are recognized for your second round.

REPRESENTATIVE SKIDMORE:  Thank you, Mr. Chair.

And this is a question that has probably been asked, and I apologize.  During the period of time that the maps could be under litigation, do we adopt what has been proposed in the primary map or secondary map in terms of what candidates would be able to prepare for?

VICE-CHAIR FINE:  Chair Leek, you're recognized.

CHAIRMAN LEEK:  I think I'm answering your question, but once it's adopted, the primary map becomes the map.

REPRESENTATIVE SKIDMORE:  I'm sorry. Say it again.

CHAIRMAN LEEK:  So the primary map becomes a map upon adoption.  And if it's challenged, it is the map that is being challenged, but it is in place.

HT_0005298

JX 0038-0101

Page 102

VICE-CHAIR FINE:  And the secondary map's like that backup plan if the primary map gets thrown out for whatever reason.

REPRESENTATIVE SKIDMORE:  Okay.

VICE-CHAIR FINE:  I'm going to do a third round in a minute.  Let's let Rep. Skidmore go ahead.

REPRESENTATIVE SKIDMORE:  So I'm just trying to sort of play out the scenario in my head knowing we don't have crystal balls.  I don't mean to suggest that.  So because we have an additional congressional seat, we wouldn't be able to stick with our current map while that litigation is taking place.  We'd have to adopt either the primary or secondary.

VICE-CHAIR FINE:  Chair Leek, you're recognized.

CHAIRMAN LEEK:  Yeah.  Let me see if I can explain it.  So when this comes out of the legislature as a bill, it will either be signed or vetoed or become law without being signed, that is then the adoption time that map is in place unless it's overturned or replaced.

VICE-CHAIR FINE:  And Chair Leek, wouldn't it be fair to say that if we only passed

HT_0005299

JX 0038-0102

Page 103

one map and it was litigated, same thing?  It would still be in place.  The only difference being that, if it got tossed for whatever reason, there's a plan B, and the other instance, it's back to the drawing board, correct?

Okay.

CHAIRMAN LEEK:  Right.

VICE-CHAIR FINE:  All right.  I'll let us have a third bite at the apple in a minute, but I do want folks to be aware that we do have two amendments to the amendment that we're going to be considering.  There won't be questions back on it afterwards, but I just want people to know from a sense of timing here that I want everybody to know what's coming up.  I'm happy to allow more questions on the amendment if there are questions.

Rep. Omphroy, are you ready for round three?

All right.  You're recognized.

REPRESENTATIVE OMPHROY:  You might have answered this already, Chair, but very hypothetical, maps are passed out of the House, they're passed out of the Senate, governor says no, and he vetoes it, how does that work?  And

HT_0005300

JX 0038-0103

Page 104

has that ever happened in the history -- and this

is just me being completely curious.

VICE-CHAIR FINE:  It's a process

question.

REPRESENTATIVE OMPHROY:  Yeah.  I'm just

wondering what that looks like for us as a

committee.

VICE-CHAIR FINE:  Okay.  So even though

this isn't a question relating to the bill, I

mean, I think it's a question relating to the

process.  People have the right to know.

Staff Director Kelly, would you like to

talk about the process?

STAFF DIRECTOR KELLY:  Absolutely.  And

I don't know about the entire history of

Florida's redistricting, so I don't want to

misspeak on that.  I'd say in recent history that

hasn't happened.

And so, you know, as you described, you

know, we'll have a congressional map that goes

out of the House.  It'll eventually pass out of

the Senate.  And since the congressional map is

formed just like any other bill or piece of

litigation, as opposed to the House and Senate

maps, it doesn't go to the Supreme Court for

HT_0005301

JX 0038-0104

Page 105

review.

It will go straight through to the governor, and he has three options.  He has the ability to veto it, the ability to sign it, or the ability to allow it to pass into law.  So depending on what happens at that stage in the game, would indicate what comes next.

VICE-CHAIR FINE:  Did that answer your question?

Okay.  So anyone else wishing to ask any more questions before we move on?

Yes.  Representative Thompson, you're recognized.

REPRESENTATIVE THOMPSON:  Thank you, Representative Fine.

Is the primary map that you're proposing essentially the same as what the governor is proposing in terms of the congressional maps?

VICE-CHAIR FINE:  Chair Leek, even though it's not a question relating to the bill, you're welcome to answer that.

CHAIRMAN LEEK:  No, it's not.

REPRESENTATIVE THOMPSON:  Thank you.

VICE-CHAIR FINE:  Any additional questions?

HT_0005302

JX 0038-0105

Page 106

Representative Driskell, you're recognized.

REPRESENTATIVE DRISKELL:  Thank you.

With this novel process that we're proposing with having a primary and a secondary map, there's nothing in the legislation that would preclude the Court -- not saying that the Court would, but if the Court decided that it didn't like either map, from just tossing both of them out?

VICE-CHAIR FINE:  Chair Leek, you're recognized.

CHAIRMAN LEEK:  Yeah.  This doesn't restrict the authority of the Court.  Right.

REPRESENTATIVE DRISKELL:  Okay.

VICE-CHAIR FINE:  All right.  Yep. Ranking Member Geller, round three.

CHAIRMAN LEEK:  Four?  No, five.

VICE-CHAIR FINE:  I don't know.  I'm losing track.

All right.  Ranking Member Geller, whatever round it is, you're recognized.

REPRESENTATIVE GELLER:  Thank you.  I think it's round and round to be technical.

But Chair, are you concerned and have

HT_0005303

JX 0038-0106

Page 107

you considered whether the adoption of a 30-day statute of limitations is not authorized in the Florida Constitution Fair District Amendment?

VICE-CHAIR FINE:  Chair Leek, you're recognized.

CHAIRMAN LEEK:  No.

REPRESENTATIVE GELLER:  Follow-up, please.

VICE-CHAIR FINE:  You're recognized.

REPRESENTATIVE GELLER:  Given the -- let's just say, does that mean that you're not concerned about it or you haven't considered it, which?

VICE-CHAIR FINE:  Chair Leek, you're recognized.

CHAIRMAN LEEK:  Yeah.  There's nothing set forth in the Constitution that would require it or disallow it.

REPRESENTATIVE GELLER:  Follow-up, please.

VICE-CHAIR FINE:  You're recognized.

REPRESENTATIVE GELLER:  You don't think there is anything in the abruptness of that 30-day statute that would interfere with the constitutional right of access to courts?

HT_0005304

JX 0038-0107

Page 108

VICE-CHAIR FINE:  I think that's a different question than what you asked before.

But Chair Leek, you're recognized.

REPRESENTATIVE GELLER:  It is a different -- yes, sir.  That's correct.

CHAIRMAN LEEK:  Yeah.  You're asking my legal opinion, and no.  I don't think it would interrupt or disrupt access to court.

REPRESENTATIVE GELLER:  Okay.

VICE-CHAIR FINE:  You're recognized.

REPRESENTATIVE GELLER:  Thank you.

Am I correct that we have been unable to determine anytime in the history of this state in any previous separate beasts, as you call them, these individual redistricting or reapportion laws, where a statute of limitations has been imposed?

VICE-CHAIR FINE:  One second.  When you're ready, Chair Leek, you're going to be recognized.

Just a minute.

CHAIRMAN LEEK:  I'm sorry.  I needed a little refresher.  But this is very much akin to the 30-day challenge to ballot language.  So your specific question is whether it's ever happened

HT_0005305

JX 0038-0108

Common Cause, et al. v. Cord Byrd

in reapportionment or redistricting.  And I actually don't know the answer to that question, but the 30-day challenge actually goes on each time you've tried to put something on the ballot.

VICE-CHAIR FINE:  Chair Leek, just a follow-up, isn't the reason for that is the timeliness because there's an election coming up?

CHAIRMAN LEEK:  That's exactly right. So the reasoning would be consistent with what we have here.

VICE-CHAIR FINE:  Ranking Member Geller, you're recognized.

REPRESENTATIVE GELLER:  Thank you, Mr. Chair.

Given that the previous redistricting and reapportionment plan adopted after the 2010 census and the plan that was voted in 2012, including the congressional plan which was struck down, did not occur until 2015, affecting elections in 2016, what's the policy reason behind the rush to try to compel this litigation to be filed when it's manifest that if it takes longer to resolve, if it's filed later, heard later, tried later, ordered later, it simply doesn't kick into effect until it kicks into

HT_0005306

JX 0038-0109

Page 110

effect?

VICE-CHAIR FINE:  Chair Leek, you can answer that.

But my understanding is when that happened, that lawsuit, by the way, was filed almost immediately.  They didn't even need 30 days.  It sounds like they needed like 30 minutes.

You're recognized, Chair Leek.

CHAIRMAN LEEK:  Thank you.  Yeah.  You know, we're trying to give the Court every opportunity to expedite resolution of any litigation that happens.

VICE-CHAIR FINE:  Okay.  Any other questions before we move on to the amendment to the amendment?

Okay.  Seeing none, we're going to move on.  You should each have yellow papers on your desk.  These were not distributed in advance.  So I am going to take up -- and they don't have barcode on them, so I'm going to explain which one we're going to do by basically reading the amendment so you know.

They're both by Rep. Driskell.  The one we're going to do is the one that says, "Remove

HT_0005307

JX 0038-0110

Page 111

lines 7129 to 7136 of the amendment."  It's Draft Request 84152.  So we're going to take that amendment to the amendment up.

Representative Driskell, you're recognized to explain the amendment.

REPRESENTATIVE DRISKELL:  Thank you, Mr. Chair.

This amendment removes the portion -- the amendment to the amendment removes a portion of the amendment that is imposing the 30-day statute of limitations.  Presently, the statute of limitations for challenge to districts will be four years under statute 95.11(3)(p).  Moving this statute of limitations from four years to 30 days, I believe, would be highly problematic, and actually, it does nothing to help the Court expedite litigation.

It expedites the timeframe to file litigation.  But in terms of the judicial economy or judicial efficiency, it's not an apples-to-apples comparison.  So what we're trying to do is make sure that we remove that to give potential litigants the time that they need to review the information and to file a lawsuit.

And while it may not be the intention, I

HT_0005308

JX 0038-0111

Page 112

sincerely doubt it is the intention of this Committee or the legislature when we vote on this map to appear as though we're using procedure as a weapon to stave off substantive challenges, I'm concerned about the appearance of that. And I'm trying to save us from that and just remove that language in the amendment so that we can leave things with the status quo as they've always been.

And that is the amendment, Mr. Chair.

VICE-CHAIR FINE: Okay. Thank you.

Representative Driskell having explained her amendment, members, are there questions on the amendment to the amendment?

Representative Mariano, you're recognized for a question.

REPRESENTATIVE MARIANO: Thank you, Chair. Thank you, Representative.

Can you please explain why a potential litigate would not be able to meet the requirements within 30 days?

VICE-CHAIR FINE: Representative Driskell, you're recognized.

REPRESENTATIVE DRISKELL: Absolutely. And there may be a number of reasons why they

HT_0005309

JX 0038-0112

Page 113

couldn't.  For example, look at how thick this packet is and thick this packet is.  I mean, it's a lot of data that we're considering.  It takes a lot of time to analyze it.  It may take time to develop legal theories and to make sure that the lawsuit is in the posture that they want.  It may take time for them to do pre-suit discovery and talk to people who were involved, if they can get that.  It may take time to go through legislative records, for example.

So with these hearings that we've been having, sometimes these committee meetings have gone on hours long.  And the meeting that we're in right now, we've already been here for an hour and 52 minutes.  It takes a lot to review that material.  It can take a lot of time to do legal research, take a lot of time to read briefs.  It could take a lot of time to do comparative analyses under the law.

In other words, in sum, it could take a lot of time.  And I keep saying "a lot of time," and maybe I shouldn't use that descriptive.  What I'm just saying is that it could take more than 30 days.  Thirty days sounds like a lot, but I can tell you, as a business litigator, it's not a

HT_0005310

JX 0038-0113

lot of time to review an entire record and the evidence that you may want to rely on in bringing a case.

VICE-CHAIR FINE:  Representative Mariano, follow up.

REPRESENTATIVE MARIANO:  Thank you.

And are you aware of any previous challengers not filing within this deadline?  How quickly do they normally file?

VICE-CHAIR FINE:  Representative Driskell.

REPRESENTATIVE DRISKELL:  You know, I can't answer that for you.  And to be very honest with, you know, this being filed overnight and it only coming to my attention this morning, on the same day that we had session, I've done the best that I could to try to make sure that we're not wading into a situation where we could appear that we want to use procedure as a way to stave off litigation.

Listen, if we believe that our maps are good and they're constitutional, we should give people every right that they're afforded under the law to challenge those because, hopefully, and I do believe we'll come up with congressional

HT_0005311

JX 0038-0114

maps, this is not the way to stave off litigation.

VICE-CHAIR FINE: Representative Mariano. Good?

All right. Any other members wishing to ask a question on this amendment to the amendment?

Okay. Seeing none, we don't have any public testimony, I don't think, on the amendment to the amendment?

No? Okay. Seeing no public testimony, members, is there anyone wishing to debate on the amendment?

Ranking Member, you're recognized.

REPRESENTATIVE GELLER: Thank you, Mr. Chair.

I support this amendment. I urge the members to support it. We've only heard about this idea, for one thing, since pretty late last night, and 13 and a half hours in advance of our meeting today. I did try to use a couple of those to get a little bit of sleep.

I actually also think not only that it's not harmful to have people file a little bit later and take a little more time to be able to

HT_0005312

JX 0038-0115

Page 116

investigate so things can go more quickly, even if that means that the maps we vote might turn out to be the ones that govern the elections at the end of this year.

In fact, there was recently a decision that was made in regard to Alabama, that the Supreme Court, by a narrow vote, decided to leave the map that had been put forth in place for the moment.  They said that that can be reviewed and decided in the fullness of time.  And perhaps that's what will happen here in this state and maybe it'll take more time and maybe it won't get done before 2022 since I don't personally plan to be that litigant.  I have no idea how long they might need.

But I'll point out one other unintended consequence.  If you require people to file within 30 days, you're likely to force some litigation that perhaps, in the fullness of time, might not occur.

If you simply gave people enough time to study all the issues, gather all the data, perhaps they would find that the plan that's ultimately adopted is satisfactory, that they don't need to challenge it, and forcing them to

HT_0005313

JX 0038-0116

Page 117

run down and get to the courthouse and get something in before the 30 days is up might actually result in unnecessary litigation, which I know we would all not like to see happen.

So I strongly support the amendment to delete the 30 days, and I urge you to vote in support of it.

VICE-CHAIR FINE:  Representative Rommel, were you wishing to debate?

REPRESENTATIVE ROMMEL:  Thank you, Chair.

And Rep. Driskell, I understand your concern in making sure possible litigants have proper time to prepare for a possible lawsuit, but I truly don't think it's necessary.  And I urge our members to vote down on this.

Before we even started session this year, multiple groups on the outside already indicated there were prepared to file lawsuits before we even filed a bill.  So I think 30 days is more than ample time since they've already threatened to file lawsuits.  So please vote down.

VICE-CHAIR FINE:  Any of the members wish to debate?

HT_0005314

JX 0038-0117

Page 118

Representative Skidmore, you're recognized.

REPRESENTATIVE SKIDMORE:  Thank you, Mr. Chair.

Because the 30 days doesn't really indicate how long litigation is going to take, it just really just a number picked out of the air. Just filing doesn't do anything about restricting how long it's going to take.  So it doesn't help in terms of, oh, we need to know what we're doing, candidates need to know where they're running, because the litigation could take, you know, two, three years before it's completed.  So I'm not sure I really understand the purpose for that.

And I also think one year is certainly a compromise between what we understand four years is what we have at the moment in terms of other types of statutes of limitation.  So I certainly think one year is an appropriate compromise from 30 days giving the folks who want to be able to understand all of this process.

And Rep. Driskell, you know, she motioned to some of the things on our desks that we're going through, not to mention the bill

HT_0005315

JX 0038-0118

Page 119

itself that is sitting on the counter that has

repeatedly been, we've been reminded is, you

know, in excess of 300 pages.

So I certainly think one year is a

significant compromise, and we should definitely

vote up on this amendment.

VICE-CHAIR FINE:  Representative

Goff-Marcil, you are recognized.

REPRESENTATIVE GOFF-MARCIL:  Thank you,

Chair.

I need to reiterate as well, because

going from four years to 30 days, that's enough

of a red flag to have people file a lawsuit just

from that.  So I definitely think that this is a

great amendment, and we should vote up on it.

VICE-CHAIR FINE:  Yes.  Representative

Thompson, you are recognized.

REPRESENTATIVE THOMPSON:  Thank you,

Representative Fine.

I just want to point out that in 2012,

there was a challenge to the State Senate maps,

not to the House but to the Senate that certainly

took considerably more than 30 days.  So I wanted

to point that out and ask for your support of

Representative Driskell's very good amendment.

HT_0005316

JX 0038-0119

Page 120

VICE-CHAIR FINE:  And not to -- just that challenge, while it took a long time, it was filed within 30 days.  It was filed, my understanding is within 30 minutes.  So just so folks understand.

Any other members wishing to speak in in debate?  Anyone else?

Representative Leek, you are recognized. Chair Leek.

CHAIRMAN LEEK:  Thank you.  I appreciate it.  And listen, the first lawsuit, 2012, was filed within the first hour of the maps.  We need to disabuse ourselves of the fantasy that these lawsuits aren't already prepared and weren't started before we got census data.

Any serious challenge to the maps can easily be achieved within the first 30 days, and we can start the clock running to get the Court to expedite the case and give some finality to our voters.  That's the purpose of the 30 days. I urge you to vote this amendment down.

VICE-CHAIR FINE:  Before I recognize Representative Driskell to close on her amendment, look, I would add to what Chair Leek said.  There's a compelling public policy

HT_0005317

JX 0038-0120

Page 121

interest for this to be done quickly.  And
anyone, frankly, who has concerns with the maps
and who wishes to sue, if they don't sue fast,
they're not all that concerned because we have an
election very soon.

Let's just hypothetically play this out.
If the governor were to sign this, we get this
done over the next couple of weeks, governor
signs that by the end of March, you know,
qualifying is two months later.  The primary is
four months later.

So voters have a right, we have an
obligation to help our voters have some funding
to vote on.  And frankly, if people think those
districts are wrong, then they owe it to those
voters to do it fast to try to change it before
the election.

If they're going to drag it out, then
they're actually hurting the same people that
they claim to want to help.

With that, Representative Driskell,
you're recognized to close on your amendment.

REPRESENTATIVE DRISKELL:  Thank you, Mr.
Chair, and thank you, members, for the robust
conversation around this.

HT_0005318

JX 0038-0121

Page 122

I suppose what I would say is a few points.  The first is that the measure of concern that a member of the public or group may have about the constitutionality of the maps is not a perfect measure for how quickly that lawsuit should be filed.

I think that the rules of civil procedure are enacted to provide guardrails and make sure that litigation has a cognizable basis and that a lawsuit is reasonable when it is brought.  It doesn't track or comport to say I really don't like this map, I really want to bring this lawsuit, and slap something together within 30 days.  No.  You want to take your time and make sure that you get it right.

Second, there was a lot of comment about groups that have made statements in the public. I don't know what all groups have done that, but it sounds like there's been some conversation today that there are groups that have made comments around wanting to sue.  Well, that's great.  And it sounds to me -- I mean, I don't want to say that's great.  I'm just like, well, you know, whatever, that they did that.  But my suspicion is that any group that would say that

HT_0005319

JX 0038-0122

Page 123

might have more resources than just say like an average citizen who wanted to bring a lawsuit. We keep talking a lot about groups.

But this is a statute of limitations that would govern everybody. And so you think about the members of the public who have been doing their best to track the process, to use the website to submit their maps, and you think about what resources they may have. They may not have the resources to retain counsel or, you know, to mount a large challenge, but they certainly would have standing to bring a challenge if they wanted to. And 30 days is far too short a time for something that this important.

And the third thing that I would mention. I really don't understand the arguments that are being made. To me, it's just a red herring around wanting to have the Court resolve these issues as quickly as possible.

I've yet to see in any of the jurisprudence that I've read around redistricting, the Court saying that it hasn't had sufficient time, or if only these lawsuits had been brought sooner, they could have done their job better. This has nothing to do with

HT_0005320

JX 0038-0123

Page 124

the Court's ability to do its job. What we're talking about is on the front end, giving litigants the time, potential litigants the time that they would need to bring an effective lawsuit.

And if we think that these maps are constitutional, if we believe in our work, and I believe that through this process, we will be able to get to a place where we can all stand behind our work, then we should stand behind our work and not use a procedural and, frankly, arbitrary deadline that is removing it from four years, 48 months. If my math is right, Randy's probably better, Chair Fine's better at math tonight than I am. He always says. Forty-eight months down to one month to do it.

We're using procedure as a weapon and it's wrong. We're using procedure as a weapon to stave off substantive challenges and that is wrong. That's why I brought the amendment. You know, I regret that there was not enough time to talk to the Chair about it. It all kind of came together pretty fast this morning. But that's the intention of the amendment because I do not believe that it would be the intention of this

HT_0005321

JX 0038-0124

Page 125

Committee or the legislative body to not stand behind its work product. So please vote up on the amendment.

VICE-CHAIR FINE: Having closed on the amendment, members will vote on the amendment now. All in favor say yea.

MULTIPLE SPEAKERS: Yea.

VICE-CHAIR FINE: All opposed, nay.

MULTIPLE SPEAKERS: Nay.

VICE-CHAIR FINE: Show the amendment failed.

Okay. We're now going to move on to our second amendment. Again, you should have the yellow piece of paper in front of you. At the bottom, it says Draft Request 84153. And just so you know, we're talking about the amendment having three lines in it. They're on line 7, 8, and 9. So that's the amendment.

Representative Driskell, you are recognized to explain the amendment.

REPRESENTATIVE DRISKELL: Thank you, Mr. Chair.

So this amendment, rather than maintain the status quo, which would be four years under statutes, would bring it to one year. Although

HT_0005322

Page 126

one year is only 25 percent of the current statute of limitations, at least it's longer than 30 days, and I think it would be a reasonable compromise to require litigants to bring a lawsuit within one year.  And that is the amendment to the amendment.

VICE-CHAIR FINE:  Okay.  Thank you.  And that math is correct.

Members, are there any questions on the amendment?

All right.  Seeing no questions.  We don't have any public comment on this amendment to the amendment.  Members, is there anyone wishing to debate on the amendment?

Yes.  Representative Goff-Marcil, you are recognized.

REPRESENTATIVE GOFF-MARCIL:  Thank you, Mr. Chair.  And thank you for this really good amendment.  I think the other amendment was better than this amendment that this amendment, but this seems like a compromise.

I feel when we go from 48 months to 30 days, that just seems -- we're starting to go into violating notice and due process of law, which is very concerning.  And again, there will

HT_0005323

JX 0038-0126

Page 127

be a lot of red flags going up on that.

But going from 48 months to 12 months, is a very good compromise. And as Representative Driskell said, if these maps are fine, this is all a moot point because it doesn't matter how many lawsuits are out there or are brought up, they would have to be successful to overturn the map. And these are congressional maps, and they're constitutional maps, then there's not a problem. So please accept this, vote up on this amendment.

VICE-CHAIR FINE: Any other members wishing to debate on this amendment to the amendment? Okay.

Oh, yes. Representative Leek you're recognized.

CHAIRMAN LEEK: Thank you. Members, I urge you to vote down on this. And if you think about what you're asking, right, you're asking for someone to initiate a challenge. Not the conclusion. This 30-day statute of limitations doesn't require the Court to rush, doesn't require the Court to conclude it within 30 days. But you're telling the world that you can file a lawsuit three months after we've elected a member

HT_0005324

JX 0038-0127

Page 128

into one of the districts.

I mean, that just does not make any sense.  All this requires is that you initiate the lawsuit within the 30 days.  I urge you to vote down on this.

VICE-CHAIR FINE:  Seeing no additional debate, Representative Driskell, you are recognized to close.

REPRESENTATIVE DRISKELL:  Thank you, Mr. Chair.

I'm having a hard time with this one because we already have process and procedure in place for if the maps get challenged.  We just move forward with the maps that we passed.  Why do we do that?  Because we believe in the maps that we passed.  And that's the process that's allowed.

The process is the process.  I know we've wanted this process to be very collaborative.  This is a change that I was surprised to see.  Maybe with some further conversation, we can talk about a compromised position as these head to the floor, because moving it from four years to 30 days, it's quite drastic.  And I don't think that this is an

HT_0005325

JX 0038-0128

Page 129

invitation to litigation in any way.  It's not an invitation.  We're not asking people to sue us.

I'm sure the Committee would prefer that they didn't and that they, you know, like our work product.  But that's not what statute of limitations are for.  Statute of limitations are to recognize, with a sense of equity and fairness and justice under the law, that you cannot restrict people's access to the Court.  And part of access to the Court is providing a reasonable amount of time for people to bring a lawsuit.

We have statutes of limitations for like everything under the law, whether it's a wrongful death suit, you know, whether it's an action in tort, an action in contract, if it's not clear what it is, you've got latches, you got all sorts of things to make sure that people have the access that they need.

And I'm here to tell you that this looks like we're weaponizing procedure to cut off substantive challenges to the map.  And I don't think that's right.  And so this is a compromise position to try and do this within one year, which frankly, probably also is still too short, but at least we're trying to work with what's

HT_0005326

JX 0038-0129

Page 130

been proposed by the Committee staff and by the Chair and try to reach a compromise position.

And if the amendment is voted down today, I do hope that maybe we can continue conversations and see what a compromise position might be.  With that, I asked you to vote up on this amendment to the amendment.  Thanks.

VICE-CHAIR FINE:  Representative Driskell having closed on her amendment, all in favor say yea.

MULTIPLE SPEAKERS:  Yea.

VICE-CHAIR FINE:  All opposed, nay.

MULTIPLE SPEAKERS:  Nay.

VICE-CHAIR FINE:  Show the amendment failed.

Okay.  That concludes both of our amendments to the amendment.  So we will now return to the original amendment that has been unchanged.  We're now at the point in the process where we would do public testimony.

We do have one public testimony card on this amendment.  It is Cecile Scoon, with the League of Women Voters of Florida who wishes to speak for information only.

MS. SCOON:  Thank you for this

HT_0005327

JX 0038-0130

Page 131

opportunity.  Cecile Scoon, president of the League of Women Voters of Florida.  And I've been listening.  It's been a very interesting debate and a lot of information without a whole lot of time to absorb it.  The league would say that we would like this body to exercise caution with regards to the primary map that has been presented with the change in the voting-age population of the black population.

As Chair Leek indicated, it is not a de minimis change.  He indicated it was substantial and when asked, readily admitted, he didn't know for sure if a court or anybody would say it was constitutional or not because it's kind of a new concept to present two maps in this way.

And the concern that we have is, when you all were presenting your prior map, I believe on Friday, there was only one real force against your map at that time, a strong force, and that was the governor's office and his representative, Mr. Popper, came and spoke before you.  And of course, we know that the governor had presented a map that diminished the voting strength of African Americans by two districts.

HT_0005328

JX 0038-0131

Page 132

And so to have this map here now before us, that is the only entity that we know that was pushing in that direction was the governor who has indicated that his desire was to limit access, it is concerning that anything would change that may be possibly go in that direction.

So I think that -- just ask everyone to be very cautious about this move.  Your analysis from Friday, I think was interesting and strong. And you asked a lot of really good questions of Mr. Popper.  He had no case law to support what he was advising you to do.

So I would just ask you to be cautious in adhering in any way to the guidance from that direction from Mr. Popper and his efforts, when he could not cite any case law to support his position and actions.  So we'll just leave it there.

There's not a lot of time to do the deep analysis that we would normally like to, you know, work on, and we know that everybody's working as hard as they can.  But we just asked you to be very cautious in this move.  Thank you.

VICE-CHAIR FINE:  Thank you for your testimony.  I would note, however --

HT_0005329

JX 0038-0132

Page 133

We're good.  You're welcome.

I would note, however, most of us aren't on the committee last Friday.  And while we said there was one, you said there's only one strong force against what was presented Friday, it was my understanding that every single democratic member of the Committee voted against it.  So I don't know that it's very respectful of them to say they're not a strong force because it didn't pass unanimously.

Ranking Member Geller.

REPRESENTATIVE GELLER:  I had a question if Ms. Scoon would entertain one.

VICE-CHAIR FINE:  That's fine.  You're welcome to come back up.

MS. SCOON:  Absolutely.  And Representative Fine, I was referring to District 5 with regards to that part of the map. Just to clarify for you.  Thank you.

Yes, sir.

REPRESENTATIVE GELLER:  Thank you, Mr. Chair.

Ms. Scoon, I understand they haven't been out very long and we're all in the same boat.  But so far, has your organization been

HT_0005330

JX 0038-0133

Page 134

able to develop any analysis as to whether or not the proposed primary map with an all in Duval County purported minority district to elect representatives of the Community's own choice is constitutionally compliant or whether conversely, it constitutes diminishment, dilution, or backsliding?

MS. SKOON:  No, we have not had that opportunity.

VICE-CHAIR FINE:  Thank you.  Okay.

Seeing that, we're going to move on to debate on the amendment.  We will obviously still have debate on the bill as amended, assuming it is amended.

Members, is there anyone wishing to debate on Chair Leek's amendment?

Okay.  Well, seeing none, Chair Leek -- oh.  Okay.

Ranking Member Geller, you are recognized to debate on the amendment.

REPRESENTATIVE GELLER:  Thank you.

I don't believe that the change in the proposed minority district contained wholly within Duval County is constitutionally compliant in that I think that it represents a substantial

HT_0005331

JX 0038-0134

Page 135

dilution or diminishment of the minorities' ability to elect representatives of that community's own choice.  In that sense, I believe that proposed map is constitutionally deficient.

I understand there have been concerns raised about compactness.  Compactness is a tier 2 standard. Tier-two standards are not supposed to imperil tier 1 standards.

This is a protected district or ought to be a benchmark district.  The proposed dilution of having that district entirely within Duval County, which is a substantial numerical dilution, is not, in my opinion, satisfied by reliance on trends, especially where we've not been able to see that analysis, the work of outside counsel, or any of what the consulting expert may have determined.

The notion that that map is constitutionally compliant is belied by the very fact that there is a so-called secondary map in an effort to assure constitutional compliance. If there was confidence that the proposed district in Duval County was constitutionally compliant, we would not have a secondary map or a need for a secondary map.  And it is therefore

HT_0005332

JX 0038-0135

Page 136

apparent that even the proponents of that map have no confidence in it as being constitutionally compliant.

It may, in fact, be a novel legal theory, or it may be simply a blatantly unconstitutional violation of all the jurisprudence we have seen under Voting Rights Act cases and the precedent set when this map was, in fact, drawn only a few years ago by the same courts that we're now saying, well, who knows what they'll do.

If it was as unconstitutional as we've been led to believe, why did the Court draw it? At the conclusion of that, I also think the process of a primary and secondary is improper. I think it violates the single-subject rule, and I think it is a terrible precedent for us to set.

Can you imagine applying that precedent to every law, that this body votes? We're going to have a new law. We don't know if it's legal, but we're going to have a new law. And in case it turns out it's not legal, we'll have a different law.

What if we did that on everything? I don't think it's the right approach. I have

HT_0005333

JX 0038-0136

serious questions as to whether it's authorized by law, and it is, in fact, the culmination of a process that has left minority members of this Committee seriously in the dark.

It is the culmination of a process that has seen our lawyers and our experts working for our House produce information and analyses and opinions which are not shared with us, though they are paid for by the taxpayers of Florida, whom the minority members of this Committee represent, as well as the majority members of the Committee.

This primary secondary approach is flawed. Perhaps the secondary map, if adopted, with some tweaks that have been put on it, would be something there that an agreement could be reached with the Senate. I can't say that that map would be constitutionally compliant based on the fact that I haven't seen all of the data I would need to look at, apparently based on some incorrect assumption that I said I personally was going to sue the House, which I have no intention of doing it this time.

But regardless of whether I have the information to determine if that secondary map is

HT_0005334

JX 0038-0137

Page 138

or is not constitutionally compliant, I think it is abundantly clear that that so-called primary map is not constitutionally compliant.

And again, if the people voting it in thought it was, we would not have a secondary map. So I oppose this amendment. And I would ask, respectfully, that the Chair and the majority party members of the Committee make a choice. Pick a map that you think will survive constitutional review and pass that map because this primary/secondary approach unprecedented in the history of our state is wrongheaded, bad precedent, and in my opinion, unconstitutional.

Vote down on this proposed amendment and make a choice as to what you think is constitutional. Thank you.

VICE-CHAIR FINE: Any other members wishing to speak in debate?

Yes, Representative Sirois, you are recognized.

REPRESENTATIVE SIROIS: Thank you very much, Mr. Chairman.

And you know, as I'm sitting here listening to these comments and I hear that, you know, the amendment before us is improper, I look

HT_0005335

JX 0038-0138

Page 139

at it and find it to be prudent and reasonable given the circumstances ahead of us.

This amendment, I think, is making the best decision that we can with the information that we have in front of us in our awareness of the timetable moving forward.  We also have an election cycle ahead of us.  And I think that Floridians deserve some clarity in terms of district boundaries.

I think candidates deserve some clarity in terms of qualifying.  You know, so I think that this is a good step for us to take to kind of lay the groundwork but also recognize the time constraints that exist as we approach the end of session.

You know, we also have a Senate that we have to work with, and obviously, take into consideration their views on these matters.  The governor has proposed a novel legal theory that, you know, remains somewhat of an open question for us moving forward.  So I think that the amendment, you know, takes all of that wholistically into account and puts us in a good position to proceed.

The other thing that I feel compelled to

HT_0005336

JX 0038-0139

Page 140

talk a little bit about, because with all due respect, Ranking Member, you know, I think this suggests that this hasn't been an effort where there's been collaboration and communication among members.  That's not been my experience.

And I think as Chair Leek indicated in his comments at the start of our Committee meeting, both of us have been open and receptive to feedback from members, perspectives, experiences that members have in their own communities and neighborhoods that they're bringing to the table.  And I think that there's a lot in this map, in the amendment that we can all be very proud of in terms of member input and a collaborative effort towards, you know, a final product.

And I've been a participant in those meetings around the Capitol with many of you and members not on this Committee, and I think those conversations have been very productive and helpful and have resulted in the amendment, the maps that are before us today.

So I encourage members to be proud of this work product to vote up on this amendment, and I appreciate the continued conversation.

HT_0005337

JX 0038-0140

Page 141

VICE-CHAIR FINE:  Any other members wishing to speak in debate?

Before I give it to Chair Leek to close, a couple of comments of my own.  I want to reject a couple of the comments that were made, because I don't think they're accurate, relating to the process.

The notion of the secondary map, frankly, is probably a good idea that might have been done before, because I would note that, even if what we're proposing is a secondary map or the primary map, there are folks who have said they would litigate against it.  And so the notion that was put forth as though like the second map is like the safety school, if you think about college admissions, that you know you're going to get into if you don't get into your stretch school, I think is a false analysis.

I mean, frankly, there's no guarantee because there are folks who take issue with that map as well.  So the notion is it's a guaranteed backup.  And so if we were so confident about it, why wouldn't we put that out as the only map I think is false equivalence.

Again, there are folks who have

HT_0005338

JX 0038-0141

Page 142

legitimate concerns about that map. And I think the notion, you know, that the governor's argument is going to be so easily dismissed, I think there's a lot of reason to support that.

The other thing I would note is this notion of "what if's." I'd like to remind folks that a number of months ago, we did something exactly like this in what is one of our other most significant things we will work on the legislature because of the time horizon. When we passed the Seminole Compact, which had a 30-year time horizon, this is a 10-year time horizon, we all knew that there was a risk in the compact. And so we put in that compact, distinct severability that said, if X is found illegal by the courts, the rest of it can still exist.

Now, unfortunately, the Biden administration did not share that information with the courts, and so we are in a different place than we expected to be. But all of us who voted for that compact explicitly voted for something that included severability and a backup plan if there was an issue with the Court. So something we actually all thought was a good idea just a few months ago, and I think this builds on

HT_0005339

JX 0038-0142

Page 143

that here as well.

With that, Representative Leek, you are recognized to close.

CHAIRMAN LEEK:  Thank you.  Very well said.  And in fact, good enough I don't think I need to add any more of the substantive arguments here.

But what I do want to tell you is where we are procedurally.  This, much like a budget, even though we pass a budget out of a committee, then it goes on to the floor, we pass it on the Committee then goes to conference, and the budget that you end up eventually may not resemble entirely the budget that you passed out of the committee.  That's where we are today.

So what we're doing is we're putting this in a posture to move on to the next step.  The next step for us will be the floor, and then potentially it's in conference and then potentially, to the governor's office.  So that's what we're doing today.  I urge you to vote up on this amendment.  Let's keep us moving.  Our timeline is getting shorter, so we need to get this thing moving and out of Committee now.  And with that I close.

HT_0005340

JX 0038-0143

Page 144

VICE-CHAIR FINE:  Having closed on the amendment, all in favor of this amendment say yea.

MULTIPLE SPEAKERS:  Yea.

VICE-CHAIR FINE:  Opposed nay?

MULTIPLE SPEAKERS:  Nay.

VICE-CHAIR FINE:  Show the amendment adopted.

All right.  Members, we are on the bill as amended.  Are there any questions on the bill as amended?  There shouldn't be because it's the same thing we just talked about.

All right.  Seeing none, we're going to move on to public testimony on the bill as amended.  We do have two appearance forms.

The first is Jerry Nolan, who's representing himself as an individual citizen and voter.  Multiple titles.  Are you here, Mr. Nolan?

He is not here, but he is a proponent.

And our second speaker is Lashonda Holloway, who is representing, I think herself. Is she here?

Okay.  And she is also a proponent of the bill.  All right.

HT_0005341

JX 0038-0144

Page 145

Unless there's anybody else, public testimony?  All right.  Seeing none, members, are there any members wishing to debate?

Yes.  Representative Skidmore, you're recognized in debate.

REPRESENTATIVE SKIDMORE:  Thank you, Mr. Chair.

And as a member of the Congressional Redistricting Subcommittee, I was encouraged by our meeting last week and encouraged by the individual meetings that Chair Sirois has acknowledged.  So this big change overnight has me, you know, a little caught off guard a little bit.  And I do have some major concerns with a couple of things.  Not as many as maybe Ranking Member Geller, but a couple of things.

I am very concerned about the primary map District 5 because it does seem to me, based on language that the House actually used, that it does reflect diminishment.  And I recognize that the secondary map is there in case the Court does rule that way.  But to me, I feel like we should have just gone forward with the secondary map. And I really reject the governor's interference in our legislative process.  I think it's wrong.

HT_0005342

JX 0038-0145

Page 146

He gets to, you know, to veto or approve the maps that we create. He has no authority here. And I'm kind of disappointed that our House acquiesced based on testimony that was given that really did not have a lot of substance behind it.

I also think 30 days is an inappropriate maneuver, and it's a false narrative that that 30 days would somehow compel the Court to rule more quickly or sooner rather than later, in any litigation that was brought forward. And I also believe that the work product that's created by the general counsel and Mr. Alford, the expert consultant, is mine. I am the client. We are all the client. And I truly believe that.

And I don't see any reason why that information has been withheld from us, so that we can understand this map better and be more collaborative partners so that we understand some of the analysis, some of the things threshold data that we don't have and we don't know how to analyze.

So I think there are some flaws here, and I won't be able to vote for it. I still have high hopes at the end of the day, with our Senate

HT_0005343

JX 0038-0146

Page 147

partners, we're going to get somewhere that we all agree on. And I think we all want to do that. And so that is the direction I will continue to move in.

But for today, I will not be able to support the bill as amended. Thank you.

VICE-CHAIR FINE: Representative Robinson, you're recognized in debate.

REPRESENTATIVE ROBINSON: Thank you, Mr. Chair.

Look, our Committee has met six or seven times this session. We've done a lot of different things, whether it's education or our workshop maps, and I'm very proud of what we've done over the past several weeks. But frankly, we only have one charge, and that's to produce a legally compliant map to the full vote by the House.

And to me what we're doing today, while being unique, I frankly, don't think it's terribly unique. As Chair Fine mentioned, we do severability stuff all the time here, and so I have no problem changing our goal from a legally compliant map to a legally compliant product, which is exactly what we're doing here.

HT_0005344

JX 0038-0147

Page 148

And to me, we accomplished our primary goal, which is to produce a legally compliant product to the full House for consideration. And look, this product is closer to our Senate colleagues. So that's very good. And frankly, to me, the voters and the candidates in these congressional districts deserve some certainty and deserve us to do this work to move it forward, to give them all certainty.

So I'm very pleased with what we've done, and I look forward to voting on this product. Thank you.

VICE-CHAIR FINE: Ranking Member Geller, you are recognized.

REPRESENTATIVE GELLER: I won't waste my colleagues' time with a repetition of what I've already said. I just ask that for the record my comments against the amendment be considered against the bill as amended. Thank you.

VICE-CHAIR FINE: Representative Tuck, you are recognized.

REPRESENTATIVE TUCK: Thank you, Mr. Chair.

And members, I think we need to keep in mind here that every redistricting cycle was very

HT_0005345

JX 0038-0148

Page 149

different, very unique. I had the privilege to sit on both the congressional and this Committee as well. And it's been incredible to see the input from members from the public, from everybody to get it in a posture to what we see today. And I want to commend staff and everybody involved for that.

I think the changes that we see here are a great effort to make sure that members, all members have the opportunity to participate in the entire process in a meaningful way while still bringing a constitutionally compliant product in for a landing during our regular session. So with that, I would encourage everyone to vote up on this great change to this map. Thank you.

VICE-CHAIR FINE: Okay. Representative Driskell, you are recognized.

Yep, Representative Driskell.

REPRESENTATIVE DRISKELL: Thank you, Chair.

So just a few things I'm not sure had been raised and just wanted to make sure that they were covered. When it comes to CD10, I don't think we're there yet. The Senate

HT_0005346

JX 0038-0149

Page 150

recognizes that as a protected district, the House does not. I have concerns around that. As Rep. Skidmore pointed out, and as I attempted to correct in my amendments to the amendments, 30 days is not a lot of time. It's not sufficient time for litigation to be brought. I'm concerned about us shortening that statute of limitations.

And then the third point that I wanted to make was around CD5. I have real concerns about how it's drawn in the primary map. And while it's capable of -- it appears under this analysis of being drawn wholly within Duval County, you know, I think about those voters in Tallahassee and Gadsden and other places who would be perhaps losing their ability to elect the candidate of their choice.

And so, for those reasons, I'll have to be down. You know, I would echo that I appreciate the staff for taking time to meet and try to help answer some of my questions about this process. And I think that's a good thing. I think we're headed on the right track in terms of having this be a collaborative process. And I remain optimistic that we can get there.

But we have some work to do. We have

Page 151

some real work to do around CD5, around CD10. And you know, just to echo Rep. Skidmore and Rep. Geller's comments, you know, I hope we can continue this conversation around legal counsel because I was personally not satisfied with the rationale that I heard today for why, as members of the House, we aren't all able to have access to that counsel.

And if it's the situation where, you know, we can't have access to that counsel, then could resources be made available to provide counsel for those who of us who would appreciate the opportunity to talk to counsel in this process? So thank you. And for those reasons, I'll be down today.

VICE-CHAIR FINE: Additional debate?

Representative Byrd, you are recognized in debate.

REPRESENTATIVE BYRD: Thank you, Chairman Fine.

A decade ago when litigation arose over redistricting, Congresswoman Corrine Brown said redistricting makes strange bedfellows, and it certainly does because, while I'm going to join Representative Geller in opposing the bill under

HT_0005348

JX 0038-0151

Page 152

constitutional grounds, I'm going to do so for very different reasons.

And I'm sure it's no surprise to any of you that I'm going to focus my comments on the concept of the constitutionality of what we're about to do.

So I think it's a necessary to understand the legal landscape, which includes the Federal Constitution, the Federal Voting Rights Act, and the rules contained in Article III, Section 20 of the Florida Constitution.

Since 1993, the Supreme Court has held, under the equal protection clause and the 15th Amendment to the Constitution, that states are prohibited from using race as a predominant factor in drawing district lines unless the state can show a compelling state interest and that its reason for doing so are narrowly tailored to pursue that compelling state interest. This is the strict scrutiny test, and outside of redistricting litigation, states are almost never able to meet it.

There's been some discussion about what the Supreme Court of Florida did back in 2015.

HT_0005349

JX 0038-0152

Page 153

But redistricting cases continue to evolve. And I want to look at three cases that have come out from the United States Supreme Court. Cooper v. Harris in 2017, Bethune-Hill v. Virginia State Board of Education in 2017, and Abbott v. Perez in 2018.

Cooper struck down racial gerrymanders designed to create majority-minority House districts in North Carolina. So I want to read from the Cooper case, and once again, this is 2017. Supreme Court of Florida case in the last redistricting round was 2015.

And this opinion was delivered by Justice Kagan she wrote the majority opinion for the Court. She says, "The Constitution trusts states with the job of designing congressional districts, but it also imposes an important constraint. A state may not use race as the predominant factor in drawing district lines unless it has a compelling reason. The Equal Protection Clause of the 14th Amendment limits racial gerrymanders and legislative redistricting plans. It prevents a state in the absence of 'sufficient justification' from separating its citizens into different voting districts based on

HT_0005350

JX 0038-0153

Page 154

race.

"First, the plaintiff must prove that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.  That entails demonstrating that the legislature subordinated other factors. Compactness, respect for political subdivisions, partisan advantage, as have you, to racial considerations.  The plaintiff may make the required showing through direct evidence of legislative intent, circumstantial evidence of a district shape and demographics, or a mix of both.

"Second, if racial considerations predominated over others, the design of the district must withstand strict scrutiny.  The burden now shifts to the state to prove that its race-based sorting of voters serves a 'compelling interest' and is narrowly tailored to that end.  This Court has long assumed" -- again assumed not required -- "that one compelling interest is complying with operative provisions of the Voting Rights Act of 1965.

"So how do racial gerrymanders survive

HT_0005351

JX 0038-0154

Page 155

such strict scrutiny?  Supreme Court has assumed the Voting Rights Act sometimes requires drawing racial gerrymanders and, therefore, states have a compelling interest in complying with federal law that is itself an exercise of Congress's power to enforce the 14th and 15th amendments.

"A state doesn't have to prove that its racial gerrymander was literally required by the VRA, only that the state had good reasons or a strong basis to believe that it needed to discriminate on the basis of race and drawing district lines in order to create a VRA district.

"The state then must meet the narrow tailoring requirement, it must show that the actual district doesn't go too far in packing disparate voters into a district just because they are black.  States are more commonly faulted for excessive packing than for the creation of such districts in the first place."

So now, I want to focus a little bit on the secondary map, which was the primary map before the amendment.  And I think that's where some of the disagreement begins because we assume, and I understand why there's the illegal assumption that that map is the benchmark map,

HT_0005352

JX 0038-0155

Page 156

because it is the one that the Supreme Court of Florida approved last redistricting cycle.

But I want to read from Justice Polston's dissenting opinion.  And in the 2015, Florida Supreme Court case, he said -- and this is under our current map, which is the same or essentially the same as the secondary map.  And this is so this is concerning the district that runs from Jacksonville, west of Tallahassee.

This is what Justice Polson said.  "This is a court adopted map, not a legislative-drawn map.  The map the trial court recommended and the majority adopts was drawn by a democratic consulting firm, a firm that has performed mapping and data analysis for numerous democratic candidates and causes.

"It traditionally adopts a remedial plan drawn entirely by Democrat operatives. Plaintiffs even stated in oral argument, and the majority opinion agrees, that if the remedial plan had been drawn by the Democratic National Committee itself, the outcome would be the same. Not only is this ironic, it is an unconstitutional violation of the Fair District's amendments in the separation of powers."

HT_0005353

JX 0038-0156

Page 157

And Justice Polston, therefore, dissented. I think it's important to put that in the proper context.

It's also important to note that we've talked a little bit when we were going through the historical analysis, the Shelby County opinion, which struck down the pre-clearance requirements under the Voting Rights Act. Fair District amendments were passed prior to the United States Supreme Court's opinion in Shelby, and that's important for this reason.

So in addition to the federal law, there is the Florida rule that districts shall not be drawn with the intended result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice and district shall consist of contiguous territory.

The requirements of compactness and following existing boundaries are flagrantly violated by the secondary map, in my opinion and the opinion of others. It's really not in dispute, and I think that's why we've gone to the primary map.

HT_0005354

JX 0038-0157

Page 158

But the Florida rule incorporates language similar to Sections 2 and 5 of the Voting Rights Act and gives those rules preference over compactness, and this is where things get tricky.

The prohibitions on districts that diminish racial minorities' ability to elect a representative of their choice is a state analog to Section 5 of the VRA.  Section 5 was written to apply only to states that were required to pre-clear changes in their voting rules or districts before implementing them.  Covered jurisdictions had to show that they were not retrogressive a rule that the Court read to mean, among other things, that states could not reduce the number of majority-minority districts.

Proponents have argued that once a VRA district exists, a VRA territory exists forever. Here's what's important to note, the state of Florida was never one of the pre-clearance districts.  Five counties in Florida were pre-clearance districts.  None of those five counties are in the district in question.

So if we call Florida's little Section 5, it prompts the question of complying

HT_0005355

JX 0038-0158

Page 159

with Section 5 of the VRA is a compelling state interest that justifies racial discrimination, is complying with the state version of Section 5 also enough to justify racial discrimination?

I would submit that it does not because, last week when Mr. Popper testified, and I watched the entirety of the committee, and he was asked the question, you know, do you have any case law to support your proposition?  He said, no.  The flip side is true as well.  There's no case law addressing whether or not the State Fair Districts amendments are or constitute a compelling state interest for the State of Florida to draw racially gerrymandered districts, or use race as the predominating factor in opposition to the 14th and 15th amendments.

So now we come to the primary map, which I think during the presentation of the amendment, it was conceded that, you know, while it addresses the compactness issue, it's still a racially gerrymander or a district drawn upon a racial basis that violates the 14th amendment.

It has been suggested that the governor has a novel legal theory.  I don't think it's a novel at all.  I think it's well grounded in the

HT_0005356

JX 0038-0159

Page 160

United States Constitution, the 14th and 15th amendments which, let's remember, the 14th and 15th Amendments were specifically written to prevent states from using race in voting and in redistricting. We have to remember that.

So the State Fair Districts, I do not believe can constitute the compelling state interest to draw maps based on racial lines. And so therefore, just because the Court approved the districts in 2015 and they were court-approved, does not mean today that they are constitutionally valid when looked in light of the 14th and 15th amendments and the subsequent case law and cases that are continuing, you know, currently and before the Supreme Court, such as the Alabama opinion.

So for that reason, because I believe that both the primary and secondary maps violate the United States constitutional provisions of the 14th and 15th Amendment, I regretfully must be down today. Thank you.

VICE-CHAIR FINE: Additional members wishing to speak in debate?

Okay. Seeing none, just a couple of points. I did want to address the comment that I

HT_0005357

JX 0038-0160

Page 161

thought was inappropriate here about the governor's involvement. Neither map that we are voting on today is the governor's map. The governor has a separate map that we have not considered here.

And I also want to belie the notion that his interest and his opinions are not appropriate. He's a citizen of the state of Florida. And he submitted a map the same way any other citizen did. In addition, he does have the right to veto whatever we pass.

And frankly, if you don't talk to the governor's office when you're running any bill in the process to make sure you're getting their opinion as you move through the process, then you're not doing a good job of being a bill sponsor because he does have that right. We sometimes assume if you get a bill through the House and Senate, he's just automatically going to sign it. I think some of you have experienced that that is not necessarily the case.

I certainly respect his view. And I certainly respect the opinion that Chair Byrd has put forth. I think that it's an interesting concept, and it's one that certainly does need to

HT_0005358

JX 0038-0161

Page 162

be explored.  But I also recognize we're 14 days from the end of session, and we do have an obligation to keep a product moving forward.

I think you've seen, this Committee listens at every step of the process, and you see changes.  There have been changes, I think, on every map and every committee at every stage, and I'm assuming that there will continue to be as all of the stakeholders are involved in all of the opinions are weighed as it moves through the process.

So I'm optimistic that at the end of these next 14 days, we've got something that everyone can be excited about, hopefully, whether it is my good friend and, I think, future law professor Cord Byrd or Rep. Driskell and our Ranking Member.  Hopefully that is where we will end up over the next two weeks, but we will see.

And with that, I'm going to let Rep. Sirois close on his bill.

REPRESENTATIVE SIROIS:  I appreciate the time, members, this afternoon.  I won't spend too much of your time revisiting subjects that we have already talked about.  But I do want to mention I'm proud of the significant member input

HT_0005359

JX 0038-0162

Page 163

that we have had, and I also appreciate all of the comments that my colleagues have made in supportive Chair Leek's amendment.

I'm not much of a legal scholar, far from it. But I believe that the bill that we have in front of us today is the best outcome that we could have given the information and the realities in front of us.

When I embarked on this process over the summer, a lot to learn, especially from you, Chair Leek, and I appreciate that and the time that we have spent together.

But part of my understanding is that this process of redistricting is not as much about what the law could be, as it is as much about what it is. And I feel compelled to revisit what the law is related to this process that I have touched on time and time again in this Committee and in my subcommittee, and I just want to take a moment to read from our constitutional standards because we haven't had an opportunity to do that today. And I think we should before we have an opportunity to vote on the work product that is in front of us.

So our tier 1 standards. "No

HT_0005360

JX 0038-0163

Page 164

apportionment of planned or individual districts shall be drawn with the intent to favor or disfavor a political party or an incumbent. Districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish the ability to elect a representative their choice. Districts shall consist of contiguous territory."

Our tier 2 standards. "Districts shall be nearly equal in population as practical. We know with our congressional districts, they must be drawn to the person. Districts shall be compact. Districts, where feasible, shall utilize existing political and geographical boundaries."

Members, the work product that is in front of you today is legally compliant. I am proud to have my name attached to it. I am proud to have spent the last six months working with members and receiving their input and perspective on it. I think is the best product that we could have given the information and the reality that is in front of us. And I ask for you to join me

HT_0005361

JX 0038-0164

Page 165

in voting yes today.

VICE-CHAIR FINE:  Thank you.  Having closed on his bill, members, please remember to turn on your microphones when you vote.

DJ, please call the roll.

MS DJ:  Chair Leek.

CHAIRMAN LEEK:  Yes.

THE SECRETARY:  Representative Andrade.

REPRESENTATIVE ANDRADE:  Yes.

THE SECRETARY:  Bush.

REPRESENTATIVE BUSH:  No.

THE SECRETARY:  Byrd.

REPRESENTATIVE BYRD:  No.

THE SECRETARY:  Clemons.

REPRESENTATIVE CLEMONS:  Yes.

THE SECRETARY:  Drake.

REPRESENTATIVE DRAKE:  No.

THE SECRETARY:  Driskell.

REPRESENTATIVE DRISKELL:  No.

THE SECRETARY:  Fine.

VICE-CHAIR FINE:  Yes.

THE SECRETARY:  Geller:

REPRESENTATIVE GELLER:  No.

THE SECRETARY:  Goff-Marcil.

REPRESENTATIVE GOFF-MARCIL:  No.

2/25/2022                Common Cause, et al. v. Cord Byrd                Audio Transcription

Page 166

THE SECRETARY:  Grall.

REPRESENTATIVE GRALL:  Yes.

THE SECRETARY:  Grant.

REPRESENTATIVE GRANT:  Yes.

THE SECRETARY:  Jenne has been excused.

Latvala.

REPRESENTATIVE LATVALA:  Yes.

THE SECRETARY:  Mariano.

REPRESENTATIVE MARIANO:  Yes.

THE SECRETARY:  McClain.

REPRESENTATIVE MCCLAIN:  Yes.

THE SECRETARY:  Omphroy.

REPRESENTATIVE OMPHROY:  Yes.

THE SECRETARY:  Payne.

REPRESENTATIVE PAYNE:  Yes.

THE SECRETARY:  Robinson.

REPRESENTATIVE ROBINSON:  Yes.

THE SECRETARY:  Rommel.

REPRESENTATIVE ROMMEL:  Yes.

THE SECRETARY:  Sirois.

REPRESENTATIVE SIROIS:  Yes.

THE SECRETARY:  Slosber-King.

REPRESENTATIVE SLOSBER-KING:  No.

THE SECRETARY:  Thompson.

REPRESENTATIVE THOMPSON:  No.

HT_0005363

JX 0038-0166

Page 167

THE SECRETARY:  Tuck.

REPRESENTATIVE TUCK:  Yes.

THE SECRETARY:  Ex Officio Skidmore.

REPRESENTATIVE SKIDMORE:  No.

THE SECRETARY:  Fifteen yeas, nine nays, Mr. Chair.

VICE-CHAIR FINE:  Show the bill reported favorably.

Members, I will now give the gavel back to Chair Leek.

CHAIRMAN LEEK:  Thank you, all.  Boy, this is a technical, tedious process.  And I want to thank, you know, the few members of the public who showed up at the committee meetings and all the members in this Committee for your thorough and thoughtful questions.

I also want to thank our staff.  When I say this is a tedious process, I mean that it requires hours upon hours upon hours of work to achieve the first piece of work product.  So I want to thank our staff:  Leda, Jason, Sam, DJ, Karen.  Am I missing anybody?  Don't get me in trouble.  Kyle.

I want to thank all of you because I know how much work that you've put in coming up

HT_0005364

JX 0038-0167

with any work product. I also want to thank you for sitting down with every member who engaged in the process in a substantive way and walking them through the same thing that I'm sure you had walked us all through at some point or another so that they had an understanding of how to participate and how to engage in the process.

This concludes our committee meeting for this Committee. I want to thank you all for stepping up, engaging in the process, and I want to encourage you all to know that this is not the end. We'll keep going. You'll see this on the floor, probably see this on conference, and the work product, much like the budget, the work product that we end up with may look different than what we're doing here today. But thank you for keeping the process moving.

And with that, Vice Chair Fine moves, we rise.

(END OF VIDEO RECORDING)

HT_0005365

JX 0038-0168

Page 169

CERTIFICATE OF TRANSCRIPTIONIST

I certify that the foregoing is a true and accurate transcript of the digital recording provided to me in this matter.

I do further certify that I am neither a relative, nor employee, nor attorney of any of the parties to this action, and that I am not financially interested in the action.

_____

Julie Thompson, CET-1036

HT_0005366

JX 0038-0169

2/25/2022                    Common Cause, et al. v. Cord Byrd                    Audio Transcription

**A**

Abbott 153:5
ability 9:19,21
  24:21 27:5 38:2
  40:18 41:14
  60:11 105:4,4,5
  124:1 135:2
  150:15 157:17
  158:7 164:8
able 6:9,15 25:13
  25:21 26:9,13
  38:3 41:6 42:11
  45:24 47:6
  51:15 77:7
  78:14 87:12
  97:8 101:14
  102:13 112:20
  115:25 118:21
  124:9 134:1
  135:15 146:24
  147:5 151:7
  152:23
abridging 157:15
  164:5
abruptness
  107:23
absence 153:23
absolute 54:1
absolutely 7:17
  104:14 112:24
  133:16
absorb 47:17
  131:5
absorbed 31:16
abundantly
  138:2
accelerate 78:22
accept 127:10
accepting 72:18
access 87:22 95:3
  107:25 108:8
  129:9,10,18
  132:5 151:7,10
accommodate
  6:9,15
accomplished
  33:22 148:1

account 21:8
  139:23
accurate 141:6
  169:3
achieve 29:3
  31:20 32:13
  37:17 38:13
  167:20
achieved 120:17
achieves 28:9
  34:14,23 48:1
acknowledge
  24:17 64:24
acknowledged
  145:12
acquiesced 146:4
acquire 37:9
Act 136:8 152:10
  154:24 155:2
  157:8 158:3
action 83:15
  129:14,15
  169:7,8
actions 132:17
actual 65:21
  68:10 87:12
  88:15 155:15
ad 5:24
add 29:2 57:18
  87:25 120:24
  143:6
added 32:15
adding 26:3
addition 21:22
  25:15 157:12
  161:10
additional 45:14
  46:5 58:2 80:17
  81:6 82:3
  102:12 105:24
  128:6 151:16
  160:22
additionally
  41:23 45:23
address 6:20
  24:8 160:25
addressed 9:16

12:15 14:19
  93:22
addresses 23:10
  159:20
addressing 24:22
  159:11
adds 47:22
adequate 11:21
adheres 30:6
adhering 132:14
adjust 93:9
adjusting 43:8
adjustment
  40:12
adjustments
  23:25 33:13,19
  40:6 42:8 43:10
administration
  142:18
admissions
  141:16
admitted 131:12
adopt 101:12
  102:14
adopted 101:18
  109:16 116:24
  137:14 144:8
  156:11
adoption 101:23
  102:22 107:1
adopts 156:13,17
advance 110:19
  115:20
advantage 154:9
advice 22:15
advise 7:25 71:7
advised 72:6
advises 8:10
  70:23
advising 132:12
advisory 5:1
affect 61:1
affirmative 89:18
  89:21
afforded 114:23
African 131:25
afternoon 18:15

28:4 162:22
ago 21:10 38:9
  81:12 136:9
  142:7,25
  151:21
agree 69:7 147:2
agreement
  137:16
agrees 156:20
ahead 5:5 6:21
  66:13 75:20
  102:7 139:2,7
air 65:20,23,24
  118:7
aisle 73:17
aisles 5:14
akin 108:23
al 1:2
Alabama 116:6
  160:16
Alachua 46:17
Alford 146:13
align 33:13,19
alignment 22:16
  24:1 45:19 97:9
allotted 21:11
allow 13:13 63:25
  103:15 105:5
allowed 128:17
allowing 37:8
  87:14
allows 26:15
  65:15
alternate 9:15,22
alternative 10:3
  92:4
amend 12:23
  13:2,25
amended 14:11
  15:4 17:11
  18:22 134:13
  134:14 144:10
  144:11,15
  147:6 148:19
amendment 10:2
  10:18 12:9,11
  12:20 13:6,9,14

13:15 16:17
  18:2 20:12,12
  20:16,20,25
  22:11 23:7,9,16
  23:24 24:6
  26:13 43:24
  48:9,11,13
  103:11,16
  107:3 110:15
  110:16,23
  111:1,3,3,5,8,9
  111:9,10 112:7
  112:10,13,14
  112:14 115:6,7
  115:9,10,13,17
  117:5 119:6,15
  119:25 120:21
  120:24 121:22
  124:20,24
  125:3,5,5,10,13
  125:16,18,20
  125:23 126:6,6
  126:10,12,13
  126:14,19,19
  126:20,20
  127:11,13,14
  130:3,7,7,9,14
  130:17,18,22
  134:12,16,20
  138:6,14,25
  139:3,22
  140:13,21,24
  143:22 144:2,2
  144:7 148:18
  152:15 153:21
  155:22 159:18
  159:22 160:20
  163:3
amendments
  7:22 103:11
  130:17 150:4,4
  155:6 156:25
  157:9 159:12
  159:16 160:2,3
  160:13
Americans
  131:25

HT_0005367

2/25/2022                    Common Cause, et al. v. Cord Byrd                    Audio Transcription

**amount** 6:21
  11:20 36:7,14
  85:25 86:1
  129:11
**ample** 117:21
**analog** 158:8
**analogy** 72:17,18
**analyses** 69:22
  113:19 137:7
**analysis** 6:25 7:8
  7:11,17 13:4
  14:4 17:7 19:8
  19:9 21:25
  22:23 23:1 27:1
  27:2 30:22
  37:25 40:7,17
  41:12 44:20
  45:20 53:18
  56:1,4 57:11
  58:3,18,24
  60:11 61:2,2,6
  61:20 63:13,14
  63:18,20 64:8
  65:13 67:5,21
  68:16 70:9,11
  70:18,23 71:7
  77:6 100:17,19
  132:8,20 134:1
  135:15 141:18
  146:20 150:12
  156:15 157:6
**analyze** 15:3,6,24
  16:7 17:3 58:7
  69:12,14 97:2
  113:4 146:22
**analyzed** 9:10
**Andrade** 2:11,12
  165:8,9
**Andy** 62:8
**announced** 8:22
  72:21
**answer** 9:9,9
  13:13,17 14:7
  14:14 16:14
  17:9 18:7,13
  19:12,15,22,23
  20:3,8,9 50:7

51:10 56:23
58:21,23 60:17
60:21 64:3
65:11,12 69:18
69:19 71:22
72:13 76:16
78:11,22,23
80:21 84:25
87:17 89:9,25
90:15 91:4,9
92:19 94:15
96:17 98:22
105:8,21 109:2
110:3 114:13
150:20
**answered** 14:9,14
  18:6 19:11 20:2
  71:24 89:18,21
  103:22
**answering**
  101:17
**answers** 6:4
  11:22 92:7
**anticipation**
  72:20
**anybody** 131:13
  145:1 167:22
**anytime** 108:13
**anyway** 13:25
  66:19
**apologize** 54:8
  101:10
**apparent** 136:1
**apparently** 62:7
  73:22 93:4
  137:20
**appear** 112:3
  114:18
**appearance** 4:13
  112:5 144:15
**appears** 150:11
**apple** 52:4 71:16
  75:14 84:3
  95:23 103:9
**apples** 111:21
**apples-to-** 111:20
**applied** 45:1

**apply** 61:12
  158:10
**applying** 136:18
**apportionment**
  62:10 164:1
**appreciate** 6:16
  76:15 89:25
  96:15 120:10
  140:25 150:19
  151:12 162:21
  163:1,11
**approach** 21:16
  93:4 136:25
  137:13 138:11
  139:14
**approached**
  21:23
**approaching**
  31:5
**appropriate**
  10:16 11:6 19:5
  36:7 54:17,18
  54:23 118:20
  161:8
**approve** 146:1
**approved** 42:10
  156:2 160:9
**approximately**
  29:15 32:6
  34:20 36:23
  39:9 47:2 63:23
**arbitrary** 124:12
**area** 35:4 36:4
  38:5 39:8,14
  41:3 47:19 48:4
  48:5 56:7 88:12
**areas** 85:7
**argued** 158:17
**argument** 142:3
  156:19
**arguments** 54:15
  123:16 143:6
**arose** 151:21
**Article** 152:11
**articulate** 49:17
**asked** 6:25 7:7
  14:9,13 15:25

18:5,8 19:11,13
19:23 20:2
51:11,16 61:1
76:14 88:24
91:20 101:10
108:2 130:6
131:12 132:10
132:22 159:8
**asking** 7:18 8:20
  18:16 19:13
  24:7 68:20
  85:22 88:15
  108:6 127:19
  127:19 129:2
**asks** 94:9
**assistance** 62:8
**assume** 155:24
  161:18
**assumed** 154:21
  154:22 155:1
**assuming** 134:13
  162:8
**assumption**
  137:21 155:25
**assumptions**
  66:15
**assure** 73:9
  135:21
**attached** 164:20
**attempt** 24:20
**attempted** 150:3
**attend** 14:22
**attention** 114:15
**attorney** 91:15
  169:6
**audible** 3:13 42:6
**August** 8:19
**Augustine** 29:22
  29:23 47:7
**author** 73:20
**authority** 106:14
  146:2
**authorized** 107:2
  137:1
**automatically**
  93:15,17
  161:19

**available** 7:2,6
  23:4 72:3 87:21
  151:11
**Aventura** 40:25
**Avenue** 35:24
**average** 25:11,16
  123:2
**averages** 30:14
**aware** 27:16
  83:21,25
  103:10 114:7
**awareness** 139:5

**B**

**B** 103:4
**back** 8:13 9:3
  33:16 45:5 46:7
  56:12 59:2 69:9
  95:2,18 97:17
  103:5,12
  133:15 152:25
  167:9
**backsliding**
  134:7
**backup** 102:2
  141:22 142:22
**bad** 138:12
**balances** 30:24
**balancing** 21:16
**ballot** 108:24
  109:4
**balls** 102:10
**Balm** 36:2
**bar** 22:5
**barcode** 20:12
  110:21
**Bardos** 62:8
**based** 22:15
  65:12 66:15
  68:15 96:8
  137:18,20
  145:18 146:4
  153:25 160:8
**basically** 66:20
  110:22
**basis** 122:9
  155:10,11

HT_0005368

JX 0038-0171

2/25/2022                    Common Cause, et al. v. Cord Byrd                    Audio Transcription

Page 3

159:22
Bay 35:4 36:4
    42:19 56:7
Beach 26:18
    29:23 37:23
    38:12,15,18,21
    38:22 39:5,6,10
    40:2,11 85:7
beast 84:1
beasts 108:14
bedfellows
    151:23
beginning 4:21
begins 155:23
belie 161:6
belied 135:19
belief 89:8
believe 9:18
    18:21 23:14
    30:24 55:18
    59:8 95:7
    111:15 114:21
    114:25 124:7,8
    124:25 128:15
    131:18 134:22
    135:3 136:13
    146:12,15
    155:10 160:7
    160:17 163:5
Belle 33:25
benchmark
    24:14 25:8,14
    25:24 26:10,23
    27:4 30:19
    33:10,15,21
    34:17 37:22
    40:22 41:17
    55:23,25 56:9
    57:2,12,14 58:8
    58:15,17 82:7,8
    135:10 155:25
Bend 29:10 36:2
benefit 8:9 46:5
best 9:19 50:9
    51:15 83:15
    114:16 123:7
    139:4 163:6

164:23
Bethune-Hill
    153:4
better 123:25
    124:14,14
    126:20 146:18
Biden 142:17
big 29:10 36:2
    145:12
bigger 88:20
bill 9:25 10:17,20
    10:25 11:17
    12:3,6,10,16
    13:11,12 14:12
    85:20 91:21
    92:4,15 93:14
    93:23 102:20
    104:9,23
    105:20 117:20
    118:25 134:13
    144:9,10,14,25
    147:6 148:19
    151:25 161:13
    161:16,18
    162:20 163:5
    165:3 167:7
bills 82:23
Biscayne 40:25
bit 20:14 115:22
    115:24 140:1
    145:14 155:20
    157:5
bite 52:4 71:16
    75:13 95:22
    103:9
bites 84:3
black 6:13 24:9
    26:20 37:21
    40:16 45:3,23
    56:12,13,20
    80:22 81:6,10
    81:14,15,18,21
    81:23 95:3
    97:24 99:6,9,17
    99:20 100:5,13
    131:9 155:17
black-performi...

30:20
blatantly 136:5
block 10:21,21
Blossom 33:2
board 103:5
    153:5
boat 133:25
Boca 39:6
body 125:1 131:6
    136:19
border 33:23
    35:25 37:2
    38:19 42:20
borders 38:16
bottom 125:15
Boulevard 33:1
    35:25 37:15
    38:16 39:24,24
boundaries 21:20
    93:10 139:9
    157:21 164:17
boundary 22:25
    28:14 30:10
    35:6,23 37:16
    38:14,21 39:7
    39:14 40:7
    41:23 42:17,19
    43:2,15 44:20
    45:20 46:14
    47:13
Boy 167:11
Bradford 46:17
break 53:23
Brevard 32:10
brief 62:5
briefs 113:17
bring 6:23 24:1,2
    24:23 42:12
    45:19 71:11
    73:25 82:18
    97:8 122:13
    123:2,12 124:4
    125:25 126:4
    129:11
bringing 6:16
    33:23 34:5
    114:2 140:12

149:12
brought 5:14 6:8
    122:11 123:24
    124:20 127:6
    146:11 150:6
Broward 26:17
    37:24 39:13,16
    39:18,18 41:21
    84:13 85:5,13
    85:23 86:8,11
    86:15
Broward/Mia...
    40:3
Brown 6:11
    151:22
budget 143:9,10
    143:12,14
    168:14
builds 142:25
burden 154:18
Busch 35:24
Bush 2:13,14
    165:10,11
business 10:14
    113:25
BVAP 55:17 56:2
    59:18,25 60:5
    63:9 67:25
    98:16
Byrd 1:6 2:15,16
    151:17,19
    161:23 162:16
    165:12,13

————————————
            C
————————————
call 2:3 8:18
    10:15,15 19:6
    78:3 108:14
    158:24 165:5
called 8:15,16
    62:9,20
calls 65:16
Caloosahatchee
    37:11
candidate 24:21
    56:14,15 63:25
    64:14 76:6 77:1

77:7,8 78:16
    150:16
candidates 23:13
    27:6 101:13
    118:11 139:10
    148:6 156:16
capable 150:11
Capitol 140:18
card 130:21
careful 90:24
Carolina 153:9
case 62:7,9 63:9
    89:20 114:3
    120:19 132:11
    132:16 136:21
    145:21 153:10
    153:11 156:5
    159:9,11
    160:14 161:21
cases 136:8 153:1
    153:2 160:14
categories 50:20
caucus 6:13
caught 145:13
Cause 1:2
causes 156:16
caution 131:6
cautious 132:8
    132:13,23
CD 94:11
CD10 95:2,2,13
    149:24 151:1
CD15 58:20
CD20 84:23
CD24 97:23
CD5 5:2 24:11
    44:2,7 59:17,21
    61:4,7 64:25
    66:7 67:21 76:1
    93:24 94:18
    150:9 151:1
Cecile 130:22
    131:1
census 8:24
    10:21 21:8
    22:16 52:14,15
    52:19 53:8,15

HT_0005369

JX 0038-0172

53:18 54:2
55:24 81:4
109:17 120:15
centers 82:16
certain 85:24
certainly 14:13
  118:16,19
  119:4,22
  123:11 151:24
  161:22,23,25
certainty 148:7,9
CERTIFICATE
  169:1
certify 169:2,5
CET-1036
  169:13
cetera 54:18
Chair 2:5,7 4:7
  5:12 11:4,13
  12:9 13:24 14:6
  16:21 17:8,11
  18:6 19:1,12
  20:7,13,19 28:3
  43:17 45:12
  48:8,17 50:6
  51:1,7,22 52:11
  52:24 53:11
  55:10 57:21,25
  58:22 59:7,9,15
  60:2,14,20,23
  61:10 62:4,20
  62:25 63:17
  64:5 65:15,17
  65:24 66:10,21
  67:9,10 68:8,21
  69:11,15 70:2,4
  70:15,20 71:4
  72:8 73:4 74:14
  75:2,9,23 76:1
  76:2,11,23
  77:10,22 78:10
  78:18 79:4,9,25
  82:5,16,20
  83:23 84:7 85:2
  85:22 87:17,25
  88:8 89:5,9,12
  90:8,21 91:3,14

91:22 92:6,18
93:20 94:4,14
94:25 95:8 96:4
96:15,16 97:21
99:25 101:2,8
101:15 102:16
102:24 103:22
105:19 106:11
106:25 107:4
107:14 108:3
108:19 109:5
109:14 110:2,9
111:7 112:10
112:18 115:16
117:11 118:4
119:10 120:9
120:24 121:24
124:14,22
125:22 126:18
128:10 130:2
131:10 133:22
134:16,17
138:7 140:6
141:3 145:7,11
147:10,21
148:23 149:21
161:23 163:3
163:11 165:6
167:6,10
168:18
Chairman 2:2,6
  4:8 11:15 12:5
  13:18 14:8
  17:10 20:21
  28:3 43:19 50:8
  50:18 51:9,24
  52:18 53:1,13
  54:6,9 55:11,21
  56:25 57:10
  58:24 59:17
  60:4,16,25
  61:17 63:2
  65:19,25 66:11
  66:23 67:18
  68:22 69:7,17
  70:6,22 71:5,18
  72:10 75:4,10

76:15 77:3,23
78:20 79:11
80:10 82:6,22
83:25 88:1
89:14 90:10
91:5,24 92:20
93:22 94:16
95:10 96:6
101:17,22
102:18 103:7
105:22 106:13
106:18 107:6
107:16 108:6
108:22 109:8
110:10 120:10
127:17 138:22
143:4 151:20
165:7 167:11
challenge 79:14
  82:18 108:24
  109:3 111:12
  114:24 116:25
  119:21 120:2
  120:16 123:11
  123:12 127:20
challenged
  101:24,25
  128:13
challengers
  114:8
challenges 112:4
  124:19 129:21
chamber 22:5
chance 16:23
chances 8:6
change 23:21
  61:19 65:5 66:2
  66:4 67:2 81:7
  81:8 93:6,15
  94:5 121:16
  128:20 131:8
  131:11 132:6
  134:22 145:12
  149:15
changed 80:23
  81:24
changes 21:1,5

28:22 40:9 43:6
43:6,8 44:7
45:13,18 48:6,7
67:11,20 149:8
158:11 162:6,6
changing 9:24
  147:23
charge 147:16
Charlotte 37:5
Check 7:3
chessboard 10:12
Chief 84:24 85:1
  86:5 98:23 99:4
  99:13 100:9
choice 23:14
  24:22 27:6
  56:14,15 60:13
  64:1,14 76:6
  77:1,8 134:4
  135:3 138:9,15
  150:16 157:18
  158:8 164:9
choose 77:7
chose 5:3 20:9
chosen 51:13,14
circular 31:8
circumstances
  139:2
circumstantial
  154:12
cite 132:16
cities 21:21 26:9
  26:11,12,14
  35:7 38:6,7
  40:24 44:16,17
  85:9,10,23,25
  86:13 87:6,8,8
  87:9,10,11,13
  87:20 88:11,15
citizen 123:2
  144:17 161:8
  161:10
citizens 31:3
  153:25
Citrus 34:13
  35:17 47:25
city 22:25 29:6

32:5 35:8 36:24
38:24 39:5,6,14
40:11 43:3 46:5
46:20 84:15,18
84:19 87:10
civil 122:7
claim 121:20
clarify 33:16
  58:10 70:16
  133:19
clarity 25:1 54:1
  55:15 139:8,10
clause 152:14
  153:21
Clay 29:11 46:18
clean 43:9
cleaner 43:14
clear 7:16 53:5,8
  70:19 96:20,25
  129:15 138:2
clearly 49:18
Clearwater 35:7
Clemons 2:17,18
  165:14,15
client 70:3 71:23
  72:2 146:14,15
clock 120:18
close 68:14 69:6
  71:18 120:23
  121:22 128:8
  141:3 143:3,25
  162:20
closed 86:17
  125:4 130:9
  144:1 165:3
closer 6:23 33:14
  33:20 148:4
Coalition 8:22
coast 38:18
Coconut 39:15
cognizable 122:9
collaboration
  140:4
collaborative
  128:20 140:15
  146:19 150:23
collaboratively

5:19
colleagues 73:16
  148:5 163:2
colleagues'
  148:16
collect 71:16
college 141:16
Collier 37:14,15
  41:18,20
colloquial 91:16
Colonial 32:25
color 57:19
Columbia 46:6
  46:12,15
column 98:13,15
  98:25 99:7
combination
  46:3 58:9 61:3
come 2:3 6:7 8:14
  9:21 59:2 68:3
  69:9 75:19
  95:13,17 96:23
  97:14,17
  114:25 133:15
  153:2 159:17
comes 102:19
  105:7 149:24
coming 103:15
  109:7 114:15
  167:25
commend 10:7
  149:6
comment 8:21
  73:13 122:16
  126:12 160:25
comments
  122:21 138:24
  140:7 141:4,5
  148:18 151:3
  152:4 163:2
committed 8:7
committee 1:11
  2:3 7:10,16,19
  7:23 9:5,18
  10:5 12:16
  14:10,20,22,23
  19:6 22:2,14

27:16 51:2,3
  56:18 65:3
  70:24 97:14
  104:7 112:2
  113:12 125:1
  129:3 130:1
  133:3,7 137:4
  137:10,12
  138:8 140:7,19
  143:10,12,15
  143:24 147:11
  149:2 156:22
  159:7 162:4,7
  163:19 167:14
  167:15 168:8,9
Committee's
  11:1
Common 1:2
commonly
  155:17
communication
  140:4
communities
  54:13,15
  140:11
community's
  134:4 135:3
compact 21:18
  23:12 25:13
  28:25 29:20
  30:8 31:8,16,23
  33:5 42:20
  47:19 142:11
  142:13,14,21
  164:15
compactly 35:1
  46:21
compactness
  24:22 25:12,17
  25:20 30:13,14
  31:1 34:4 40:7
  43:11 44:19,21
  135:6,6 154:8
  157:20 158:4
  159:20
comparative
  113:18

compared 25:8
  44:17 84:16
  98:3
comparison
  111:21
compel 109:21
  146:9
compelled
  139:25 163:16
compelling
  120:25 152:18
  152:20 153:20
  154:20,22
  155:4 159:1,13
  160:7
competitive
  62:13
complete 36:8,24
  38:18
completed
  118:13
completely 91:20
  92:16 104:2
compliance 91:2
  135:21
compliant 23:18
  33:5 48:24
  61:12 89:7,11
  90:6 134:5,24
  135:19,24
  136:3 137:18
  138:1,3 147:17
  147:24,24
  148:2 149:12
  164:19
complying
  154:23 155:4
  158:25 159:3
comport 122:11
comprise 10:22
compromise 7:22
  118:17,20
  119:5 126:4,21
  127:3 129:22
  130:2,5
compromised
  128:22

computer 88:20
conceded 159:19
concept 131:15
  152:5 161:25
concern 84:10
  86:17 117:13
  122:2 131:17
concerned
  106:25 107:12
  112:5 121:4
  145:17 150:6
concerning
  126:25 132:5
  156:8
concerns 5:25
  6:17 23:10
  24:22 121:2
  135:5 142:1
  145:14 150:2,9
conclude 127:23
concludes 5:6
  30:22 130:16
  168:8
conclusion 24:3,5
  68:1 76:19
  95:11,13,15
  96:3,8 127:21
  136:14
conclusions 97:1
conducted 9:10
  27:1 38:1 40:17
  41:13
conference
  143:12,19
  168:13
confidence 5:20
  135:22 136:2
confident 141:22
configuration
  10:4 23:19
  24:11,14 30:1,8
  30:17,24 35:11
  45:16 47:9
  63:22,23 64:25
configurations
  9:15 46:4
configured 85:24

confines 13:22
confining 53:15
  54:19
confirm 27:2
conflict 49:14
  79:8,12
confused 75:25
Congress's 155:5
congressional
  4:22 9:10 10:5
  10:18 11:18
  12:7,8,12 14:21
  22:6,8 23:11
  25:8,9,15,22
  26:3,15 28:5,6
  28:9,11,19,20
  28:21,23,24,24
  29:5,10,13,16
  30:2,5 31:1,4,6
  31:7,22 32:1,3
  32:9,14,16,20
  33:9 34:9,15,21
  34:25 35:2,3,10
  35:11,15,21,22
  36:5,10,11,21
  36:25 37:6,13
  37:19,20 38:10
  38:17,20,23
  39:11,17,19
  40:14,15 41:8,9
  41:10,16,18,24
  42:9,15,23 44:8
  45:13,15,25
  46:7,11,13,16
  46:22,23 47:1,3
  47:13,14,20
  48:6 52:15 53:2
  53:10 55:6 56:8
  57:1 69:13,14
  84:15,19,20
  96:23 102:12
  104:20,22
  105:18 109:18
  114:25 127:8
  145:8 148:7
  149:2 153:16
  164:13

HT_0005371

JX 0038-0174

2/25/2022                Common Cause, et al. v. Cord Byrd                Audio Transcription

Page 6

Congresswoman 151:22
connecting 35:12
connects 36:5
  37:13,23 39:12
  41:17 42:24
consequence 116:17
considerably 119:23
consideration
  10:4 11:16
  88:18 92:3
  139:18 148:3
considerations 154:10,15
considered 61:14
  62:22 107:1,12
  148:18 161:5
considering
  103:12 113:3
consist 27:14
  157:19 164:9
consistent 21:16
  27:10 109:9
constitute 62:24
  159:12 160:7
constituted 62:12
constitutes 63:12
  134:6
Constitution
  22:17 48:25
  107:3,17 152:9
  152:12,15
  153:15 160:1
constitutional
  89:19 91:1
  107:25 114:22
  124:7 127:9
  131:14 135:21
  138:10,16
  152:1 160:19
  163:21
constitutionality
  122:4 152:5
constitutionally
  61:12 89:7,11

90:5 134:5,24
135:4,19,23
136:3 137:18
138:1,3 149:12
160:12
constraint 153:18
constraints 139:14
constructed 86:14
consultant 146:14
consulting 8:15
  72:12,23
  135:16 156:14
contain 29:8
contained 46:11
  134:23 152:10
contains 12:6
  22:20 23:9,16
  24:13 29:6,11
  32:20 46:9
contents 23:8
context 65:6
  157:3
contiguous 27:15
  93:11 157:19
  164:10
continue 27:4
  39:3 47:4 130:4
  147:4 151:4
  153:1 162:8
continued 140:25
continues 32:8
continuing 24:20
  160:14
contract 129:15
contradict 62:21
control 78:25
conversation
  121:25 122:19
  128:22 140:25
  151:4
conversations
  130:5 140:20
conversely 134:5

Convex- 44:21
Convex-hull
  25:18 30:15
Cooper 153:3,7
  153:10
copy 10:25
Coral 39:15
Cord 1:6 162:16
correct 12:21
  66:13 70:8
  71:23 75:16
  77:3 82:3 86:9
  99:12 103:5
  108:5,12 126:8
  150:4
correctly 42:5
Corrine 151:22
counsel 7:25 8:10
  13:3 14:3 15:3
  15:6,24 16:6
  17:3 19:7 22:15
  69:12,20,21
  70:10,17,23
  73:24 74:3
  123:10 135:16
  146:13 151:4,8
  151:10,12,13
counsel's 72:5
counter 119:1
counties 21:21
  25:23,25 26:1
  26:17 29:1,5,9
  31:14,16,18
  32:11 36:16,20
  37:4 38:11
  44:14 46:9,9,15
  46:17,18 47:18
  87:1 158:21,23
countless 9:16
county 22:24
  25:22 28:8,8
  29:7,11,12,19
  29:22,24 30:3,4
  30:9,12 31:11
  31:12,19,24
  32:2,3,8,17,21
  32:22,24 33:3

33:10,12,24
34:10,12,13,13
34:16,17,22,23
35:5,8,9,13,13
35:16,17,17,20
35:23 36:1,1,6
36:8,13,14,18
36:19,22,23,25
37:3,6,9,14,14
37:17,24,24
38:12,15,21
39:5,10,13,16
39:18,18,19
40:3,21,24
41:18,19,20,21
42:21,24 43:1,2
45:25 46:1,6,10
46:12,14,19,24
46:25 47:5,8,15
47:15,17,22,24
47:25 48:1
51:14 84:13
85:6,7,13,18,23
86:9,9,11,15,16
134:3,24
135:12,23
150:13 157:6
couple 43:5
  53:22 55:16
  115:21 121:8
  141:4,5 145:15
  145:16 160:24
course 45:22
  77:25 83:15
  87:16 93:11
  99:14,19
  100:22 131:23
court 5:1,3 21:12
  22:18 24:12
  27:11 44:3
  61:22 62:6,17
  63:4,11 76:17
  78:22 79:15
  90:11 93:6,24
  94:6,17 104:25
  106:7,8,8,14
  108:8 110:11

111:16 116:7
120:18 123:18
123:22 127:22
127:23 129:9
129:10 131:13
136:13 142:23
145:21 146:9
152:13,25
153:3,11,15
154:21 155:1
156:1,5,11,12
158:14 160:9
160:15
court's 61:25
  79:17 124:1
  157:10
court-approved
  160:10
courthouse 117:1
courts 63:8 79:20
  107:25 136:10
  142:16,19
covered 91:8
  149:24 158:12
create 29:20 38:3
  47:19 82:2
  146:2 153:8
  155:12
created 31:8,23
  146:12
creates 23:14
  30:8
creating 23:11
  34:25 37:16
  38:24 42:20
  46:21 80:17
creation 155:18
Creek 39:15
criteria 48:24
  49:2,4,9,25
criticism 9:13
cross 36:19 37:9
crosses 40:20
  54:14
crux 89:15
crystal 102:10
culmination

HT_0005372

JX 0038-0175

2/25/2022    Common Cause, et al. v. Cord Byrd    Audio Transcription

137:2,5
curious 104:2
current 23:18
  31:1 46:22
  47:10 82:17,25
  102:13 126:1
  156:6
currently 98:3
  160:15
cut 129:20
Cutler 42:19
cycle 22:9 25:2
  31:5 39:21 69:2
  139:7 148:25
  156:2
cycles 99:20

**D**

D.C 1:24
Dade 86:15
dark 137:4
data 6:25 7:1
  8:24 22:15,23
  52:14,16,19,23
  53:9,15,17,19
  54:3,4,6,8,9,10
  55:4,25 56:2
  68:11 95:6,11
  96:9 98:20
  99:11,15 113:3
  116:22 120:15
  137:19 146:21
  156:15
Davie 39:23
day 6:14 114:16
  146:25
days 79:8 110:7
  111:15 112:21
  113:24,24
  116:18 117:2,6
  117:20 118:5
  118:21 119:12
  119:23 120:3
  120:17,20
  122:14 123:13
  126:3,23
  127:23 128:4

128:24 146:7,9
  150:5 162:1,13
de 131:11
deadline 114:8
  124:12
deal 6:18
dealing 30:25
  52:12 100:10
  100:11
death 129:14
Debary 32:4
debate 11:8,22
  115:12 117:9
  117:25 120:7
  126:14 127:13
  128:7 131:3
  134:12,13,16
  134:20 138:18
  141:2 145:3,5
  147:8 151:16
  151:18 160:23
decade 21:9 22:6
  25:25 26:1,6
  32:23 34:19
  38:3,9 64:12,15
  64:17 82:25
  99:19,22
  100:14,22
  151:21
decade's 26:2
decennial 21:8
decide 61:23,25
  63:12 79:18
decided 19:6
  62:16 106:8
  116:7,10
decision 56:19
  72:19 73:22
  83:11,13 116:5
  139:4 154:4
decisions 51:5
  58:6
declaring 9:1
decline 99:16
decrease 26:14
decreased 99:21
  100:14

deep 132:19
deference 14:20
  73:6
deficient 135:4
definitely 119:5
  119:14
definition 76:9
DeFuniak 28:17
  28:19
delete 117:6
delivered 153:13
Deltona 32:4
Democrat 156:18
democratic 133:6
  156:13,15,21
demographics
  154:13
demonstrates
  77:6
demonstrating
  154:6
denied 68:20
denying 157:14
  164:5
depending 105:6
depicted 10:24
described 43:22
  104:19
description 43:23
descriptive
  113:22
deserve 139:8,10
  148:7,8
design 154:16
designed 56:10
  78:5 153:8
DESIGNER 85:1
  86:5 98:23 99:4
  99:13 100:9
designing 153:16
desire 132:4
desk 7:4 11:2
  110:19
desks 118:24
DeSoto 37:4
despite 5:16
  18:20

details 25:4
determine 61:3
  76:18 100:20
  108:13 137:25
determined 63:4
  76:19 135:17
develop 113:5
  134:1
deviates 28:16
  37:17
deviation 26:5
devices 4:10
difference 30:1
  98:2 103:2
differences 45:7
  62:14
different 24:17
  30:18 44:12
  56:3 65:1,4
  91:18 92:16
  95:12 100:10
  100:12,12,15
  108:2,5 136:23
  142:19 147:13
  149:1 152:2
  153:25 168:15
differently 4:20
  85:10
difficult 88:10,14
digital 1:23 169:3
dilution 61:15
  62:24 134:6
  135:1,10,13
diminish 38:2
  157:17 158:7
  164:8
diminished 40:19
  41:15 131:24
diminishment
  23:15 61:23
  62:12 63:3,12
  69:3 76:9,18,18
  134:6 135:1
  145:20
direct 89:8 97:12
  154:11
directed 21:6

direction 132:3,6
  132:15 147:3
directly 6:19
  14:19
director 57:16,20
  64:3,4 96:12,14
  104:12,14
disabuse 120:13
disagreement
  155:23
disallow 107:18
disappointed
  146:3
disaster 7:13
discovery 113:7
discriminate
  155:11
discrimination
  159:2,4
discussed 5:24
discussing 12:11
  59:10
discussion
  152:24
disfavor 27:18
  164:3
dismissed 142:3
disparate 155:16
dispute 157:24
disqualifies
  93:16
disrupt 108:8
dissented 157:2
dissenting 156:4
distinct 91:20
  142:14
distributed 86:12
  110:19
district 7:8,18,21
  10:3,22 23:11
  23:12,19,21
  24:14,15 25:15
  25:23 26:4,7,15
  27:2,3 28:7,9
  28:12,14,19,20
  28:21,23,24,25
  29:5,10,13,15

HT_0005373

JX 0038-0176

| | | | | |
|---|---|---|---|---|
| 29:17,18,20,21 | 84:15,19,20 | 86:13,18,19,21 | 103:5 152:17 | 22:13 40:16 |
| 29:23 30:2,5,6 | 85:6,11 93:10 | 87:7,13 88:16 | 153:19 155:2 | 64:14 |
| 30:7,8,11,17,19 | 93:10 95:4,14 | 100:4,13,15,23 | 155:11 | **early** 83:15 |
| 30:20,23 31:1,3 | 97:2,7 99:6,19 | 111:12 121:15 | **drawn** 7:21 8:25 | **ears** 60:20 |
| 31:6,7,9,17,20 | 100:18 107:3 | 128:1 131:25 | 9:2 27:9 61:5 | **easily** 120:17 |
| 31:22,25 32:1,3 | 133:18 134:3 | 148:7 153:9,17 | 62:1 67:4 136:9 | 142:3 |
| 32:6,7,10,11,13 | 134:23 135:9 | 153:25 155:19 | 150:10,12 | **east** 36:1,20 |
| 32:16,20,23 | 135:10,11,23 | 157:13 158:6 | 156:13,18,21 | **eastern** 34:22 |
| 33:5,7,9,11,13 | 139:9 145:18 | 158:12,16,21 | 157:14 159:21 | 41:25 46:14 |
| 33:14,19,20 | 150:1 152:17 | 158:22 159:12 | 164:2,4,14 | **Eatonville** 34:1 |
| 34:2,5,7,9,15 | 153:19 154:6 | 159:14 160:6 | **Driskell** 2:21,22 | **echo** 150:18 |
| 34:21,25 35:1,4 | 154:13,17 | 160:10 164:1,4 | 48:14,16,20 | 151:2 |
| 35:11,12,15,21 | 155:12,12,15 | 164:9,11,13,14 | 49:6,13,16,24 | **economy** 111:19 |
| 35:22 36:5,11 | 155:16 156:8 | 164:15 | 50:4,10,17,25 | **Edgewood** 33:25 |
| 36:13,19,21 | 157:9,19 | **dive** 25:3 | 51:17,19,25 | **education** 22:3 |
| 37:1,7,7,13,20 | 158:18,23 | **divided** 34:18 | 52:10,20,22 | 147:13 153:5 |
| 37:21,23,25 | 159:21 | 35:18 | 53:4,7,20,21,24 | **effect** 10:1 24:13 |
| 38:4,10,14,14 | **district's** 25:12 | **DJ** 2:3 4:8 10:24 | 54:7,25 55:2,14 | 44:1 60:10,22 |
| 38:17,20,23 | 36:8 156:24 | 165:5,6 167:21 | 56:6 57:4,17 | 61:6 109:25 |
| 39:4,11,12,17 | **districts** 7:12 | **doctrine** 75:10 | 58:13 59:1,3 | 110:1 |
| 39:19,21 40:4 | 8:21 9:18,20 | **doing** 47:6 | 89:3 94:22,24 | **effective** 124:4 |
| 40:14,15,16,17 | 10:2,23 11:18 | 118:11 123:7 | 95:16,20,25 | **effectively** 13:10 |
| 40:20,23 41:3,8 | 21:18 22:1,9,24 | 137:23 143:16 | 106:1,3,15 | **efficiency** 111:20 |
| 41:13,16,19,24 | 23:20 25:9,13 | 143:21 147:19 | 110:24 111:4,6 | **effort** 47:11 91:8 |
| 41:25 42:1,15 | 25:20 26:3,6,20 | 147:25 152:19 | 112:12,23,24 | 135:21 140:3 |
| 42:20,23 43:4 | 26:21,22,25 | 161:16 168:16 | 114:11,12 | 140:15 149:9 |
| 45:13,16,16,23 | 27:9,12,14,14 | **Dolphin** 41:22 | 117:12 118:23 | **efforts** 132:15 |
| 45:25 46:4,7,8 | 27:18 28:5,22 | 42:16 | 120:23 121:21 | **eight** 84:15,18,23 |
| 46:11,13,16,21 | 28:25 29:2,3,8 | **Doral** 42:3 | 121:23 125:19 | 98:18 |
| 46:22,23 47:1,2 | 32:14 34:18 | **doubled** 81:18 | 125:21 127:4 | **either** 76:1 80:18 |
| 47:4,4,7,9,10 | 35:2 36:10,12 | **doubt** 91:1 112:1 | 128:7,9 130:9 | 85:9 102:15,20 |
| 47:13,14,17,19 | 36:15 37:19 | **downward** 62:14 | 149:18,19,20 | 106:9 |
| 47:20,21 48:6 | 39:1 40:5,12,22 | **dozens** 5:13 | 162:16 165:18 | **elect** 23:13 24:21 |
| 50:22 56:8,12 | 41:9,10,12 42:9 | **Draft** 111:1 | 165:19 | 27:5 38:2 40:19 |
| 56:13,18,20 | 42:10,12 43:9 | 125:15 | **Driskell's** 119:25 | 41:14 56:14 |
| 57:1,3 58:7,8 | 43:11,13,15 | **drafted** 22:14 | **drive** 32:25 64:8 | 60:12 63:25 |
| 59:12,22 60:1 | 44:6,8,9,11 | **drag** 121:18 | **due** 126:24 140:1 | 76:6 77:8 134:3 |
| 60:16 61:4 62:1 | 45:3,4,14,14 | **Drake** 2:19,20 | **Dunedin** 35:7 | 135:2 150:15 |
| 62:13,14 63:6 | 47:11 48:3,5 | 165:16,17 | **Duval** 26:18 | 157:18 158:7 |
| 63:10,14 64:13 | 49:1,22 51:6 | **drastic** 128:25 | 29:12 30:3,4,9 | 164:8 |
| 65:21,25 66:6 | 55:3,7,8 57:13 | **draw** 9:20 27:17 | 30:12 46:25 | **elected** 127:25 |
| 67:1,2,3,4 | 58:3,19,25 | 67:25 136:13 | 134:2,24 | **election** 22:9 |
| 68:12,13,15 | 60:21 61:14 | 159:14 160:8 | 135:11,23 | 25:2 31:5 56:2 |
| 69:1,2,4,13,14 | 62:10,11 66:1 | **Drawer** 84:25 | 150:12 | 64:11,20 69:2 |
| 69:23 70:19 | 76:5 78:6,15,16 | **drawing** 21:11 | | 78:3 83:13 |
| 76:20 77:1 83:7 | 80:17 82:3 84:9 | 54:24 61:12 | **E** | 99:20 109:7 |
| 83:7,16,17 | 84:10,17 85:8 | 67:19,20 96:2,7 | **earlier** 15:1 22:2 | 121:5,17 139:7 |

HT_0005374

JX 0038-0177

elections 53:17
   54:6,7 62:15
   63:22,24 64:10
   64:19 109:20
   116:3
electorate 65:1,5
   99:18
electronic 4:10
emailed 7:5
embarked 163:9
emphasize 24:4
employee 169:6
enable 23:13
   35:8
enabled 33:24
enables 35:12
enacted 122:8
encountered 5:17
encourage
   140:23 149:14
   168:11
encouraged 5:10
   145:9,10
endeavoring
   21:17,21
ends 16:13 82:24
enforce 155:6
enforceable 31:4
engage 168:7
engaged 6:6
   21:15 168:2
engaging 9:23
   50:12 168:10
ensure 4:16
   12:11 20:17
   27:17 28:16
   31:3
ensures 36:18
   38:1 40:18
   41:14
entails 154:6
entertain 133:13
entire 6:13 7:2
   20:18 29:6
   32:18 37:4
   38:24 64:12
   93:16 104:15

114:1 149:11
entirely 29:1
   32:24 82:7
   135:11 143:14
   156:18
entirety 28:7
   32:2,21 35:16
   42:3 93:8 159:7
entities 8:8
entitled 20:7
   73:23
entity 132:2
enunciate 49:17
equal 21:18 27:6
   28:10,12 29:3
   31:20 34:14
   37:17 38:13
   48:1 152:14
   153:20 157:15
   164:5,12
equality 29:19
   32:14 47:5
equalize 45:24
equity 129:7
equivalence
   141:24
Escambia 28:7
especially 135:14
   163:10
espouse 5:25
essentially
   105:17 156:7
Establishing
   11:17
et 1:2 54:18
eventually
   104:21 143:13
everybody 81:23
   103:14 123:5
   149:5,6
everybody's
   132:21
everyone's 44:9
evidence 1:23
   114:2 154:11
   154:12
evolve 153:1

Ex 4:4 167:3
exact 9:19 10:23
   18:24 26:6
   36:14 53:2
   55:11 86:6
exactly 9:11
   23:22 36:15
   44:5 98:5,12
   109:8 142:8
   147:25
example 40:9
   81:11 113:1,10
examples 43:12
excellent 68:23
exception 23:15
   31:18 59:10,13
   59:14,21
excess 119:3
excessive 155:18
excited 162:14
exclusively 22:14
excuse 17:17
   33:15
excused 3:4
   166:5
exercise 131:6
   155:5
exist 139:14
   142:16
existing 13:1,11
   13:12 15:5
   27:11 157:21
   164:16
exists 33:14,20
   158:18,18
expected 91:10
   142:20
expedite 110:12
   111:17 120:19
expedites 111:18
experience 140:5
experienced
   161:20
experiences
   140:10
expert 8:16,16
   14:4 15:6,7

16:10 17:7 19:9
   69:13 70:16,25
   71:3,6 72:5,7
   72:12,13,23
   91:17 135:17
   146:13
experts 58:17
   71:7 73:24
   137:6
explain 20:20,25
   21:5 22:12 23:9
   45:10 59:12
   76:8 102:19
   110:21 111:5
   112:19 125:20
explained 112:12
explanation
   20:17
explicitly 142:21
explored 162:1
Expressway
   39:23 41:23
   42:16
extends 38:21
extremely 88:10
   88:14
eyeball 25:21

———————
**F**
———————
faced 24:19
fact 8:21 116:5
   135:20 136:4,9
   137:2,19 143:5
factor 152:17
   153:19 154:3
   159:15
factors 61:3,19
   63:5 68:3 154:7
fail 8:9
failed 125:11
   130:15
failure 7:20
fair 7:21 8:21
   11:19 68:8,11
   77:25 90:1,2,22
   90:24 102:25
   107:3 156:24

157:8 159:11
   160:6
fairness 129:7
faithfully 30:6
false 141:18,24
   146:8
fantasy 120:13
far 123:13
   133:25 155:15
   163:4
fast 31:5 121:3
   121:16 124:23
fastest-growing
   32:22
faulted 155:17
favor 27:18
   125:6 130:10
   144:2 164:2
favorably 167:8
feasible 21:20
   25:19 164:15
FEBRUARY
   1:12 2:1
federal 22:17
   77:19 79:6,15
   79:15,16 152:9
   152:9 155:4
   157:12
feedback 5:11,15
   30:25 33:12,18
   41:4 97:13
   140:9
feel 23:2 52:7
   97:4 126:22
   139:25 145:22
   163:16
feeling 5:17
fewer 86:15
Fifteen 167:5
figure 98:1,17
file 1:10 8:23
   111:18,24
   114:9 115:24
   116:17 117:19
   117:22 119:13
   127:24
filed 21:1 62:5

79:19 109:22
109:23 110:5
114:14 117:20
120:3,3,12
122:6
filing 77:16 78:11
78:20 114:8
118:8
fill 4:12
final 48:2 140:15
finality 25:2 83:6
83:16 120:19
finally 9:14 22:25
47:16
financially 169:8
find 15:2 18:7
46:1 116:23
139:1
finds 94:17
fine 2:7,8 11:4,13
11:14 12:14
13:7,20 14:6,16
15:8,12,13,17
15:21,25 16:4,8
16:11 17:1,5,8
17:15,19,21
18:4,12 19:10
19:20,24 20:4,7
27:25 43:17
45:9 48:10,18
49:3,11,14,23
50:2,6,23 51:7
51:18,22 52:1
52:17,21,24
53:6,11,21 54:5
55:1,9,13 56:5
56:22 57:7,15
57:18 58:12,21
59:2,4,15,23
60:2,7,14,18,23
61:8,16 62:2,18
62:20,25 63:15
64:2 65:8,17
66:8,21 67:6,17
68:5,19 69:5,8
69:15,24 70:4
70:12,20 71:1,8

71:11,15,19,24
72:8,25 73:2,25
74:5,9,12,19
75:2,5,8,12
76:11,21 77:2
77:11,21 78:8
78:18 79:2,9,22
80:1,5,5,11,20
81:1,9 82:4,9
82:20 83:18,23
84:2 85:15,19
86:3 87:2,16
88:5,19 89:12
89:22 90:8,19
91:3,13,22 92:1
92:6,14,25
93:20 94:1,9,21
95:8,16,22 96:4
96:12 97:16
98:4,8,11,19
99:23 100:7,25
101:4,15 102:1
102:5,16,24
103:8 104:3,8
105:8,15,19,24
106:11,16,19
107:4,9,14,21
108:1,10,18
109:5,11 110:2
110:14 112:11
112:22 114:4
114:10 115:3
117:8,24 119:7
119:16,19
120:1,22 125:4
125:8,10 126:7
127:4,12 128:6
130:8,12,14
132:24 133:14
133:14,17
134:10 138:17
141:1 144:1,5,7
147:7,21
148:13,20
149:17 151:16
151:20 160:22
165:2,20,21

167:7 168:18
Fine's 124:14
finish 6:23
finished 4:18
Finishing 36:4
firm 156:14,14
first 6:25 7:10
8:25 11:11 15:2
18:17 20:12,24
25:7 39:20
65:19 120:11
120:12,17
122:2 144:16
154:2 155:19
167:20
fit 20:8 35:10
five 10:6 40:5
45:14 46:17
99:20 106:18
158:21,22
flag 119:13
Flagler 31:10
47:15
flagrantly 157:21
flags 31:15 127:1
flawed 137:14
flaws 146:23
flip 159:10
floor 19:16 42:11
80:22 81:2
128:23 143:11
143:18 168:13
Florida 21:6,9,10
21:11 22:17
23:12 24:10
27:10 31:4 38:6
39:23 42:16
43:1,3 62:5
80:14,16,23
81:13,15,17,20
107:3 130:23
131:2 137:9
152:11,25
153:11 156:2,5
157:13 158:1
158:20,21
159:14 161:9

Florida's 26:16
104:16 158:24
Floridians 25:1
139:8
fluidity 5:16
focus 20:22 93:3
97:6 152:4
155:20
focused 5:7
focusing 10:11
folks 12:22 72:15
103:10 118:21
120:5 141:12
141:20,25
142:6
follow 49:7 53:25
55:13 57:4
59:23 60:6,18
74:23 76:21
77:9 78:8 83:18
85:15 87:2
91:25 114:5
follow-up 14:17
15:22 18:14
69:5 82:10
91:11 99:25
107:7,19 109:6
followed 73:14
following 21:7
32:24 43:14
157:21
follows 35:6,24
38:14 90:1
force 116:18
131:19,20
133:5,9
forcing 83:14
116:25
foregoing 169:2
forever 158:18
form 4:13
formed 104:23
forms 144:15
Fort 37:11
forth 5:15 6:8
89:17 90:14,15
107:17 116:8

141:14 161:24
Forty-eight
124:15
forward 24:7
128:14 139:6
139:21 145:23
146:11 148:9
148:11 162:3
found 26:22 90:5
90:16 142:15
four 16:15 36:12
78:2 83:11
106:18 111:13
111:14 118:17
119:12 121:11
124:12 125:24
128:24
frankly 121:2,14
124:11 129:24
141:9,19
147:15,20
148:5 161:12
free 23:3 52:7
Freeport 28:17
28:18
Friday 12:9
18:15 19:5
131:19 132:9
133:3,5
friend 162:15
front 7:4 15:5
17:24 18:1,9
20:23 22:20
51:12 86:6
124:2 125:14
139:5 163:6,8
163:24 164:19
164:25
full 64:8 147:17
148:3
fullness 116:10
116:19
function 86:23
functional 6:25
7:8,17 21:24
22:22 26:25
30:21 37:25

HT_0005376

JX 0038-0179

2/25/2022                          Common Cause, et al. v. Cord Byrd                    Audio Transcription

Page 11

40:17 41:12
53:17 56:1,4
57:11 58:2,18
58:24 60:10
61:2,2,6 63:13
64:8 67:5,21
68:15 70:9,10
70:18,23 71:7
77:6 100:17,19
**funding** 121:13
**further** 22:12
62:12 128:21
169:5
**future** 162:15

**G**

**Gadsden** 150:14
**game** 105:7
**Garden** 34:2
**Gardens** 41:1,5
42:2
**gather** 116:22
**gavel** 11:4,12
167:9
**Geller** 2:9,10 5:9
6:24 9:4 11:5
12:25 13:3,21
14:2,15,17,18
15:8,11,15,19
15:23 16:2,6,9
16:24 17:2,6,13
17:15,17,20,22
18:4,10,25
19:19,21 20:1,5
59:5,6,24 60:6
60:9,19 61:9
62:3,19 63:16
65:8,10,23 66:9
67:6,8 68:17
69:9,10,24 70:1
70:12,14,25
71:2,10,13,17
71:20,21 72:1
73:1,3,4 74:2,7
74:10,16,21
75:6 89:1,4,22
89:24 90:20

91:11,14,25
92:2,12 93:2
94:3,19 106:17
106:21,23
107:7,10,19,22
108:4,9,11
109:11,13
115:15 133:11
133:12,21
134:19,21
145:16 148:13
148:15 151:25
165:22,23
**Geller's** 151:3
**general** 64:10
146:13
**genuine** 5:25
6:16
**geographical**
21:20 164:16
**geographies**
100:12
**geography** 86:24
**gerrymander**
155:8 159:21
**gerrymandered**
159:14
**gerrymanders**
153:7,22
154:25 155:3
**getting** 61:24
62:19 143:23
161:14
**Gilchrist** 46:15
**give** 4:11 81:11
110:11 111:22
114:22 120:19
141:3 148:9
167:9
**given** 80:15 81:3
92:3 97:13
107:10 109:15
139:2 146:5
163:7 164:24
**gives** 158:3
**giving** 39:18
79:18 118:21

124:2
**Glades** 37:5
**go** 8:14 9:3 14:24
14:25 18:16
20:23 33:16
56:3 61:20
66:13 71:9
72:11 75:20
90:11 95:1
96:10 102:7
104:25 105:2
113:9 116:1
126:22,23
132:6 155:15
**goal** 147:23
148:2
**goes** 34:11 47:23
53:14 60:4
93:25 104:20
109:3 143:11
143:12
**Goff-Marcil** 2:23
2:24 119:8,9
126:15,17
165:24,25
**going** 4:19 6:18
6:19 8:4 9:1
11:3,9,12 13:20
13:21 14:6,11
15:8 16:8,11,12
16:15,16,16,19
18:23 19:17
20:10,11,13,22
20:23 25:2
27:22 32:16
38:17 44:11
48:21 51:15
52:7 57:15 58:2
58:16 61:22,25
63:3,11 64:2
66:2,4 68:5
69:17 71:8
72:11,16 73:9
73:15,17 74:5
75:12 76:16,17
78:15,16 79:17
79:19 80:20

83:10,12,17
84:24 87:17
88:2 96:21 97:3
97:16 102:5
103:11 108:19
110:17,20,21
110:22,25
111:2 118:6,9
118:25 119:12
121:18 125:12
127:1,2 134:11
136:19,21
137:22 141:16
142:3 144:13
147:1 151:24
152:1,4 157:5
161:19 162:19
168:12
**good** 15:14 28:3
64:7 73:8 79:24
82:11 85:3
94:19 97:5
114:22 115:4
119:25 126:18
127:3 132:10
133:1 139:12
139:23 141:9
142:24 143:5
148:5 150:21
155:9 161:16
162:15
**gotten** 63:20
**govern** 116:3
123:5
**governor** 4:24
24:9 103:24
105:3,17 121:7
121:8 131:23
132:3 139:19
159:23 161:4
**governor's**
131:21 142:2
143:20 145:24
161:2,3,13
**Grall** 2:25 3:1
166:1,2
**Grant** 3:2,3

166:3,4
**gray** 48:4
**GrayRobinson**
62:8
**great** 41:4 69:8
86:10 119:15
122:22,23
149:9,15
**greatest** 73:5
**grounded** 159:25
**grounds** 152:1
**groundwork**
139:13
**group** 1:23 10:21
31:2 122:3,25
**group's** 24:21
40:18 41:14
**groups** 117:18
122:17,18,20
123:3
**growing** 21:8
**growth** 33:8
34:19
**guarantee** 141:19
**guaranteed**
141:21
**guard** 145:13
**guardrails** 122:8
**guess** 15:1 56:17
68:10 71:3 81:2
95:20 96:1
**guidance** 132:14
**guys** 75:19

**H**

**H000C8011** 22:7
**H000C8015**
23:17 44:4
**H000C8017**
23:10
**half** 60:5 115:20
**Hallandale** 40:2
**hand** 11:3,12
27:22 45:5
75:17 80:8
**happen** 116:11
117:4

HT_0005377

JX 0038-0180

2/25/2022                    Common Cause, et al. v. Cord Byrd                    Audio Transcription

Page 12

happened 104:1 104:18 108:25 110:5
happens 33:6 50:21 56:16 66:3 67:19 84:10 105:6 110:13
happy 15:19 86:7 86:24 88:21 96:11 103:15
Harbor 35:7
hard 87:20 128:11 132:22
Hardee 37:4
harmful 115:24
harmonize 49:19
Harris 153:4
HB 11:17 22:8,11
head 102:10 128:23
headed 9:5 83:5 150:22
heading 38:23
hear 49:5 66:11 67:10 72:14 138:24
heard 41:4 43:22 109:23 115:18 151:6
hearings 113:11
heavily 85:4
heavy 9:12
held 52:5 152:13
Helen 32:5
help 58:10 68:7 111:16 118:9 121:13,20 150:20
helpful 58:14 140:21
helping 21:5
helps 31:3 47:17
Hendry 41:19
Hernando 35:16
herring 123:18
Hialeah 42:2,2

high 22:5 42:21 146:25
high-level 20:24
highest 31:9
Highland 39:6
Highlands 37:5
highlight 27:13 43:5
highlighted 43:7
highly 111:15
highway 35:18 54:18
Hill 32:18
Hillsboro 36:13
Hillsborough 26:18 34:23 35:23,24 36:8 36:14
hire 69:13
hired 7:25
Hispanic 26:21 33:7,7 41:11 45:4 81:5 100:3 100:21
historical 157:6
historically 61:14 62:11
history 104:1,15 104:17 108:13 138:12
hit 89:15
HJR 92:9
holding 20:15
hole 34:16
Holloway 144:22
home 18:16 56:12 64:8
Homestead 43:4
honest 114:13
Honestly 67:23
hope 58:17 76:13 130:4 151:3
hopefully 11:24 65:6 114:24 162:14,17
hopes 146:25
hoping 12:23

18:22
horizon 142:10 142:12,12
hour 113:14 120:12
hours 113:13 115:20 167:19 167:19,19
House 1:11 7:21 8:1,3,7,12 9:7,9 9:11 10:5 12:6 13:4 14:3 21:14 21:15,22 24:20 46:3 52:13 55:5 55:19 62:5,17 70:6 71:23 72:2 72:4,16,22 73:10,15,18,23 74:11,25 75:1 84:11 92:8,9,16 95:4 96:21,22 103:23 104:21 104:24 119:22 137:7,22 145:19 146:4 147:18 148:3 150:2 151:7 153:8 161:19
House's 21:10
hull 44:22
hurting 121:19
HVAP 55:19 56:2
hypothetical 103:23
hypothetically 121:6

_____ I _____

I-295 30:10
I-4 35:25
I-75 37:15 39:22 41:22 43:13
I-95 32:17 38:5 39:23
idea 73:8 115:19 116:14 141:9

142:24
ideal 26:2,6,8 32:7 34:20 37:8
ideas 9:22
identical 44:8
identified 55:8 57:14 81:4,6
identify 49:1,4,21 50:1 56:11 58:19
if's 142:6
III 152:11
illegal 142:15 155:24
imagine 136:18
immaterial 59:20
immediate 24:13
immediately 5:4 110:6
impact 45:14 47:11 61:21
impacted 23:20 44:7 48:5
imperil 135:8
implemented 27:16
implementing 158:12
important 10:13 64:22,23 68:2 97:10 123:14 153:17 157:2,4 157:11 158:19
importantly 24:25
imposed 108:17
imposes 153:17
imposing 111:10
improper 58:5 136:15 138:25
improve 25:14 25:20 26:9 40:6 40:7 43:8,10 45:20
improvement 25:10 34:16 40:21 44:16,24

improvements 44:18 45:1
improving 34:3
in-process 97:11
inaccurate 53:19 55:22
inappropriate 146:7 161:1
include 34:11 38:24 42:11 47:24
included 10:19 29:13 31:25 35:21 39:11 43:12 46:25 72:6 142:22
includes 23:24 29:18 32:1,10 32:23 38:10,11 40:23 42:1,23 152:8
including 31:12 32:17 40:24 41:18 47:15 109:18
inclusive 26:19
incorporated 85:10
incorporates 36:22 158:1
incorrect 137:21
increase 80:13,15 81:16
incredible 149:3
incumbent 27:19 164:3
independent 96:24
Indian 32:10 36:17
indicate 105:7 118:6
indicated 81:7 117:19 131:10 131:11 132:4 140:6
indicates 99:14

HT_0005378

JX 0038-0181

2/25/2022 Common Cause, et al. v. Cord Byrd Audio Transcription

individual 26:25 100:18,18,19 108:15 144:17 145:11 164:1
individually 41:13
individuals 81:3 81:6
information 54:22,23 58:4 74:4,24 97:24 111:24 130:24 131:4 137:7,25 139:4 142:18 146:17 163:7 164:24
initial 78:21
initially 21:3
initiate 127:20 128:3
initiated 79:1
initiation 83:14
injecting 7:13
inlet 38:18,22
input 53:16 54:3 54:12,14 140:14 149:4 162:25 164:22
instance 78:2 103:4
intend 13:24
intended 93:3,5 93:18 157:14
intensify 100:3,5
intent 27:18 58:5 93:13 154:12 164:2,4
intention 50:3 74:8 75:1 111:25 112:1 124:24,25 137:22
interest 54:13,15 121:1 152:18 152:20 154:23 155:4 159:2,13 160:8 161:7

interest' 154:20
interested 169:8
interesting 131:3 132:9 161:24
interfere 107:24
interference 145:24
interrupt 108:8
introduced 17:24
investigate 116:1
invitation 129:1 129:2
invite 88:2
involved 113:8 149:7 162:9
involvement 161:2
ironic 156:23
Isle 33:25
issue 81:2 141:20 142:23 159:20
issues 116:22 123:19
it'll 66:19 104:21 116:12
items 5:23 8:11 20:24 23:1

**J**

Jacksonville 156:9
Jason 167:21
Jefferson 46:12
Jenne 3:4 166:5
Jerry 144:16
jive 78:14
job 123:25 124:1 153:16 161:16
Johns 29:19,21 29:24 31:12 47:5,8,16
join 151:24 164:25
joined 5:2
judicial 111:19 111:20
Julie 169:13

June 78:24
jurisdictions 158:13
jurisprudence 123:21 136:7
justice 129:8 153:14 156:3 156:10 157:1
justification' 153:24
justifies 159:2
justify 159:4

**K**

Kagan 153:14
Karen 167:22
keep 21:21 25:21 33:24 40:8 41:7 47:6 52:7 86:22 113:21 123:3 143:22 148:24 162:3 168:12
keeping 30:11 31:10,17 32:4 32:19 38:7 39:14 46:20 86:16 168:17
keeps 23:18 29:22 34:15 36:20 38:6 80:6
Kelly 57:16,20 64:3,4 96:12,14 104:12,14
kept 25:24 28:18 33:9,11 35:4 36:25 38:20 39:17
kick 4:19 11:3 94:7 96:6 109:25
kicks 90:17 94:17 109:25
kind 58:9 71:12 75:24 124:22 131:15 139:12 146:3
knew 142:13

knock 6:19
know 8:5,17 9:5 9:6 14:14,14 18:20 24:16 48:21 50:13 52:6,12 54:9,16 54:20 55:4 56:10 57:24 58:9,21 61:22 63:2,6 64:24 65:19 66:1 67:23 69:19,19 75:14 78:6,15 78:16 79:6 80:15 83:5,6,7 83:12 84:11 85:19 87:4,9,24 89:15 90:10,14 91:7 95:23 96:1 97:3,6,9 103:13 103:15 104:11 104:15,19,20 106:19 109:2 110:11,23 114:12,14 117:4 118:10 118:11,13,23 119:3 121:9 122:18,24 123:10 124:21 125:16 128:18 129:4,14 131:13,23 132:2,21,21 133:8 136:20 138:23,25 139:11,16,20 139:22 140:2 140:15 141:16 142:2 145:13 146:1,21 150:13,18 151:2,3,10 159:8,19 160:14 164:13 167:13,25 168:11

knowing 102:10
knowledge 83:1
known 32:25 33:1,2
knows 23:17 136:11
Kyle 167:23

**L**

labeled 44:4
Lafayette 29:4
Lake 31:13,15 32:5 34:12 38:7 46:5 47:16,18 47:24
Lakes 42:3
landing 5:20 24:3 24:24 42:13 71:12 149:13
landscape 152:8
language 93:23 108:24 112:7 145:19 157:16 158:2 164:6
large 30:4 123:11
largest 26:17
Lashonda 144:21
latches 129:16
late 115:19
Latvala 3:5,6 42:4,6 166:6,7
law 22:17 23:18 65:21 77:19,25 79:6,15 102:21 105:5 113:19 114:24 126:24 129:8,13 132:11,16 136:19,20,21 136:23 137:2 155:4 157:12 159:9,11 160:14 162:15 163:15,17
laws 83:20 108:16
lawsuit 78:12,13

HT_0005379

JX 0038-0182

78:21,25 83:14
110:5 111:24
113:6 117:14
119:13 120:11
122:5,10,13
123:2 124:5
126:5 127:25
128:4 129:11
**lawsuits** 117:19
117:22 120:14
123:23 127:6
**lawyers** 8:17
54:20 137:6
**lay** 139:13
**layer** 55:24
**lead** 7:13 58:4,5
**leading** 68:18
**league** 130:23
131:2,5
**learn** 163:10
**leave** 112:7 116:7
132:17
**leaves** 29:14
32:11 37:7 39:9
47:1
**led** 136:13
**Leda** 58:14
167:21
**Lee** 37:9,14
**Leek** 2:2,5,6 4:8
12:9 13:24 14:6
14:8 16:21 17:8
17:10 18:6 20:7
20:13,19,21
28:3 43:17,19
45:12 50:6,8,18
51:7,9,22,24
52:18,24 53:1
53:11,13 54:6,9
55:10,11,21
57:25 58:22,24
59:9,15,17 60:2
60:4,14,16,23
60:25 61:17
62:25 63:2
65:17,19,25
66:21,23 67:18

68:8,21,22 69:7
69:15,17 70:4,6
70:20,22 71:4,5
72:8,10 74:14
75:2,4,9,10
76:2,11,15 77:3
77:22,23 78:18
78:20 79:9,11
82:5,6,20,22
83:23,25 87:17
87:25 88:1
89:12,14 90:8
90:10 91:3,5,22
91:24 92:6,18
92:20 93:20,22
94:14,16 95:8
95:10 96:4,6
101:15,17,22
102:16,18,24
103:7 105:19
105:22 106:11
106:13,18
107:4,6,14,16
108:3,6,19,22
109:5,8 110:2,9
110:10 120:8,9
120:10,24
127:15,17
131:10 134:17
140:6 141:3
143:2,4 163:11
165:6,7 167:10
167:11
**Leek's** 19:12
134:16 163:3
**left** 31:23 32:6
43:14 137:3
**legal** 4:25 8:7
22:15 24:8
76:19 77:4
89:16 90:3,12
90:13 91:17,21
108:7 113:5,16
136:4,20,22
139:19 151:4
152:8 159:24
163:4

**legalities** 8:10
**legally** 23:18
147:17,23,24
148:2 164:19
**legislation** 106:6
**legislative** 62:6
113:9 125:1
145:25 153:22
154:12
**legislative-dra...**
156:11
**legislature** 21:6
23:17 102:20
112:2 142:10
154:7
**legislature's**
154:4
**legitimate** 5:15
142:1
**lend** 86:14
**length** 28:15
**lengthy** 10:17
**Leon** 45:24 46:12
**let's** 10:10,11,12
23:6 25:3,7
27:21 28:4
44:13 45:15
55:2 70:16,19
74:19 78:3
100:2 102:6
107:11 121:6
143:22 160:2
**letter** 5:8,9,20,22
5:24 6:20,24
7:24
**level** 77:20 79:7
**Levy** 46:14
**life** 82:24,24
**light** 160:12
**lighten** 18:18
**limit** 132:4
**limitation** 78:4
118:19
**limitations** 77:16
78:1 79:7,13,16
79:21 82:17,18
83:2,8,22 107:2

108:16 111:11
111:12,14
123:4 126:2
127:21 129:6,6
129:12 150:7
**limited** 63:19
**limits** 153:21
**line** 6:23 8:25
10:1 20:6 30:9
33:3,24 36:18
37:1,12 39:7,14
40:3,21 41:24
41:24 42:17
43:15 47:14
51:14 66:25
67:11 98:12
125:17
**lines** 32:4 35:6
36:19 39:13,25
41:21 43:2,8
46:14 67:12,14
111:1 125:17
152:17 153:19
155:12 160:8
**list** 22:24,25
54:21
**listen** 77:24
83:10 114:21
120:11
**listening** 131:3
138:24
**listens** 162:5
**lists** 54:20
**literally** 155:8
**litigant** 116:14
**litigants** 111:23
117:13 124:3,3
126:4
**litigate** 112:20
141:13
**litigated** 103:1
**litigation** 8:5,6
9:6 10:12 72:21
73:13,19 83:5
101:11 102:14
104:24 109:21
110:13 111:17

111:19 114:20
115:2 116:19
117:3 118:6,12
122:9 129:1
146:11 150:6
151:21 152:22
**litigator** 113:25
**little** 4:20 20:13
57:18 75:25
80:6 108:23
115:22,24,25
140:1 145:13
145:13 155:20
157:5 158:24
**live** 83:7,16
**lived** 81:13
**lives** 82:23
**located** 35:22
**long** 63:10 68:7
113:13 116:14
118:6,9 120:2
133:24 154:21
**longer** 79:12
95:14 109:23
126:2
**look** 14:5 24:17
25:7 49:8 51:11
55:22,25 56:18
56:20,21 57:5
57:24 63:20
64:15 68:2,25
84:9 87:5,12
95:12 99:15
100:1 113:1
120:24 137:20
138:25 147:11
148:4,11 153:2
168:15
**looked** 27:20
55:17 72:2
160:12
**looking** 25:11,23
35:3 48:25 63:5
64:21 68:11
76:3 84:8,14
97:23,25 98:7
98:12,13,14,16

HT_0005380

JX 0038-0183

2/25/2022                    Common Cause, et al. v. Cord Byrd                    Audio Transcription

Page 15

98:24 99:1,5,6
99:11 100:16
100:19,20,21
**looks** 8:3 99:8
104:6 129:19
**lose** 83:13
**losing** 106:20
150:15
**lost** 77:14
**lot** 5:5 12:18
24:16 48:17,22
53:13,16 56:13
85:8 113:3,4,15
113:16,17,18
113:21,21,24
114:1 122:16
123:3 127:1
131:4,4 132:10
132:19 140:13
142:4 146:5
147:12 150:5
163:10
**Loxahatchee**
39:2
**Lucie** 38:11

**M**

**M** 1:24
**maintain** 27:11
125:23
**maintained** 82:6
82:8
**maintains** 45:2
95:4
**Maitland** 34:1
**major** 30:11 38:4
39:21 41:2
43:13 145:14
**majority** 28:15
34:12 37:6
42:17 47:24
137:11 138:8
153:14 156:13
156:20
**majority-mino...**
27:12 33:6
37:21 41:11

153:8 158:16
**making** 58:6
117:13 139:3
**Manatee** 36:22
**maneuver** 146:8
**manifest** 109:22
**manner** 27:10
**map** 7:9,18,21
8:3 9:10,11
10:18 12:7,12
12:21,23 13:1,5
13:10,22 14:5
14:11 17:14
18:1,6,9,14,21
18:24 19:8 21:6
22:7,13,20,21
23:10,17 24:7
24:11,12 25:3,4
25:5,6,7,8,9,16
25:24 26:10,10
26:15,19,23
27:4,13 30:1
31:4,10 33:11
33:15,21 34:16
34:17 40:10,12
40:22 41:17
42:10 43:8,22
43:24,25 44:2,4
44:5,6,9,12,14
44:15,18,24,24
45:2,7,8,10,17
47:12,21 49:1
51:6,21 52:3
56:9 57:2,12,14
58:8,15,17
59:11,18,25
61:5 62:1 65:1
66:7 67:19,20
76:3,7 84:12,14
84:24 85:1 86:5
89:7,10,20 90:4
90:6,14,16,16
90:17 91:2
92:10,10 93:7
93:16,18,25
94:6,10,12
96:22,22 97:7

98:23 99:4,13
100:9 101:13
101:13,19,19
101:22,23,24
102:2,13,22
103:1 104:20
104:22 105:16
106:6,9 112:3
116:8 122:12
127:8 129:21
131:7,18,20,24
132:1 133:18
134:2 135:4,18
135:20,24,25
136:1,8 137:14
137:18,25
138:3,6,9,10
140:13 141:8
141:11,12,14
141:21,23
142:1 145:18
145:21,23
146:18 147:17
147:24 149:16
150:10 155:21
155:21,25,25
156:6,7,11,12
156:12 157:22
157:25 159:17
161:2,3,4,9
162:7
**map's** 17:11
102:2
**mapping** 156:15
**maps** 4:25 5:12
7:12 8:2,11 9:1
9:15,20 10:8,24
13:5,8,10 15:4
17:23 21:11
22:11 23:21
24:1,6,17,18
28:11 48:4,8
51:11,20 52:13
52:15 53:2,3,10
54:24 55:5,6,12
55:19,24 61:12
64:24 65:2

77:17 82:19
83:2 87:5,21
88:17 91:18
92:9,15,22 97:4
101:11 103:23
104:25 105:18
114:21 115:1
116:2 119:21
120:12,16
121:2 122:4
123:8 124:6
127:4,8,9
128:13,14,15
131:15 140:22
146:2 147:14
160:8,18
**March** 121:9
**Margate** 38:7
**margin** 62:23
**margins** 62:15
**Mariano** 3:7,8
112:15,17
114:5,6 115:4
166:8,9
**Marion** 29:5,6
31:13 34:13
46:1,18 47:16
47:25
**mark** 16:5,14
**Martin** 38:11
**material** 113:16
**materially** 80:23
81:24
**materials** 10:20
**math** 15:14
124:13,14
126:8
**mathematical**
34:4 43:11
44:19,20 81:11
**matter** 94:13
127:5 169:4
**matters** 139:18
**McClain** 3:9,10
166:10,11
**mean** 59:12,14
65:12 66:2,13

66:14,15 77:6
91:5 94:10 96:2
100:9 102:11
104:10 107:11
113:2 122:22
128:2 141:19
158:14 160:11
167:18
**meaningful**
149:11
**means** 10:1 55:17
61:23 76:18
116:2
**measure** 66:24
67:3 122:2,5
**measures** 34:4
**Medley** 42:3
**meet** 6:14 18:17
18:19 19:3
38:22 112:20
150:19 152:23
155:13
**meeting** 4:20 7:3
7:10 10:19,20
19:6 55:16 77:5
113:13 115:21
140:8 145:10
168:8
**meetings** 113:12
140:18 145:11
167:14
**member** 2:9 5:8
5:23 9:4 11:5
12:25 13:21
14:17,21 17:15
53:16 54:3,12
54:14 59:4 65:8
67:6 69:9,24
70:12 71:2,19
72:3,4 73:2,23
74:25 88:23
89:1,22 106:17
106:21 109:11
115:14 122:3
127:25 133:7
133:11 134:19
140:2,14 145:8

HT_0005381

JX 0038-0184

2/25/2022                    Common Cause, et al. v. Cord Byrd                    Audio Transcription

Page 16

145:16 148:13
162:17,25
168:2
**members** 4:9,15
4:19 5:10,13
9:19,20 10:7
11:16 12:17
20:21 22:19
28:4,11 33:16
40:15 41:4
43:20 48:12
112:13 115:5
115:12,18
117:16,24
120:6 121:24
123:6 125:5
126:9,13
127:12,17
134:15 137:3
137:10,11
138:8,17 140:5
140:9,10,19,23
141:1 144:9
145:2,3 148:24
149:4,9,10
151:6 160:22
162:22 164:18
164:22 165:3
167:9,13,15
**members'** 97:13
**mention** 118:25
123:16 162:25
**mentioned** 22:2
22:13 43:25
73:11 147:21
**met** 5:13 54:16
147:11
**methodology**
21:10 45:1
48:22 49:7
51:20
**metric** 55:18
**metrics** 25:14
45:21
**Miami** 40:25,25
41:1,5 42:3
**Miami-Dade**

26:17 40:24
41:20,21 42:21
42:25 43:2
85:18,25 86:1,8
86:9
**Miami-Dade/B...**
40:20
**microphone** 4:17
**microphones**
165:4
**million** 81:3
**mind** 90:3 148:25
**mine** 146:14
**minimis** 131:11
**minorities** 63:25
80:16 157:16
164:6
**minorities'** 38:1
135:1 158:7
**minority** 21:23
21:25 22:23
23:13 24:10,21
26:24 27:5 31:2
40:18 41:14
60:11 80:13,17
82:3 85:8 86:12
95:3 134:3,23
137:3,10
**minus** 28:13
**minute** 11:6
87:17 102:6
103:9 108:21
**minutes** 22:12
95:24 110:8
113:15 120:4
**Miramar** 40:1
**mirror** 42:9
**missing** 18:17
167:22
**misspeak** 104:17
**misstated** 73:7
**mistaken** 59:8
**mix** 154:13
**moment** 116:9
118:18 163:20
**Monday** 5:22
**monitors** 88:20

**Monroe** 42:24
**month** 124:16
**months** 10:6 22:3
78:3,4 83:11,14
121:10,11
124:13,16
126:22 127:2,2
127:25 142:7
142:25 164:21
**mood** 18:18
**moot** 17:10 19:22
20:3 127:5
**morning** 114:15
124:23
**motioned** 118:24
**motivating** 154:3
**mount** 123:11
**move** 5:11 10:1
14:12 16:8,12
16:16 19:18
20:10 27:12
43:21 63:9
66:25 67:11,11
68:7 75:13 77:5
78:5 88:25
105:11 110:15
110:17 125:12
128:14 132:8
132:23 134:11
143:17 144:14
147:4 148:8
161:15
**moved** 64:17
**moves** 72:22
93:17 162:10
168:18
**moving** 10:11,13
31:7 35:2 36:10
37:19 41:9
62:22 67:14
80:6 111:13
128:24 139:6
139:21 143:22
143:24 162:3
168:17
**multiple** 10:2
117:18 125:7,9

130:11,13
144:4,6,18
**municipal** 32:4
35:6 37:1,12
39:7,13,25
42:19
**municipalities**
28:17 29:24
33:25 40:8 41:7
42:2 43:3 47:8
85:4,13,18 86:8
86:10,17,23,25
**municipality**
31:17 32:18
**Myers** 37:12
**myfloridahous...**
23:5

─────── **N** ───────

**name** 164:20
**narrative** 146:8
**narrow** 116:7
155:13
**narrowly** 152:19
154:20
**Nassau** 29:11
46:24
**National** 39:2
156:21
**naturally** 99:22
100:14
**nature** 7:14 91:5
**nauseam** 5:24
**nay** 125:8,9
130:12,13
144:5,6
**nays** 167:5
**nearly** 21:18
164:12
**necessarily** 66:2
66:4 78:13
82:24 87:5
161:21
**necessary** 9:7
29:2 34:23 39:4
117:15 152:7
**need** 11:7 29:2

88:19 110:6
111:23 116:15
116:25 118:10
118:11 119:11
120:12 124:4
129:18 135:25
137:20 143:6
143:23 148:24
161:25
**needed** 23:3
29:16 32:12
34:24 47:3 64:9
108:22 110:7
155:10
**neighborhood**
67:1
**neighborhoods**
140:11
**neither** 161:2
169:5
**never** 7:20 73:9
73:14 152:22
158:20
**new** 23:8 25:9,9
25:15 30:1,7
33:6 40:12
62:10 63:23
131:15 136:20
136:21
**night** 7:5 21:1
115:20
**nine** 44:16 78:4
83:13 167:5
**Nolan** 144:16,19
**non-black** 56:16
**non-dilution**
61:11
**Nope** 16:4
**normally** 58:7
114:9 132:20
**north** 23:12
24:10 32:16
38:22 40:25
153:9
**northern** 35:5,20
35:25 38:15
42:18

HT_0005382

JX 0038-0185

2/25/2022                  Common Cause, et al. v. Cord Byrd                  Audio Transcription

Page 17

note 13:8 18:15 87:18 92:7 132:25 133:2 141:10 142:5 157:4 158:19
noted 37:24 40:16 91:15
notice 126:24
noticed 10:17
noticing 84:14
notion 135:18 141:8,13,21 142:2,6 161:6
novel 24:8 89:16 91:6,9 93:5 106:4 136:4 139:19 159:24 159:25
number 9:17 25:23 26:9,22 56:3 86:6,7,10 86:25 112:25 118:7 142:7 154:5 158:16
numbers 8:24 10:22
numerical 135:12
numerous 156:15
NW 1:24

**O**

Oak 32:18
Oakland 34:2
object 68:17
obligation 89:6 121:13 162:3
obviously 134:12 139:17
Ocala 29:6 46:20
occur 109:19 116:20
occurred 18:2 48:7
occurs 57:12
Ocoee 34:1
oddly 31:15

offered 12:9 13:5
office 8:18 131:21 143:20 161:13
Officio 4:4 167:3
oh 19:4 49:11 54:7 55:19 73:1 99:4 118:10 127:15 134:18
Okaloosa 28:8
okay 12:14 15:15 15:25 16:11 17:8 19:10,25 20:10 48:20 49:12 50:23 51:17,25 52:20 53:20 54:25 57:17 59:1,3 60:19 65:19 68:6 69:8,17 72:1 73:2 74:12 74:21 75:12,18 77:9 80:1 82:11 84:2 88:23 89:1 89:2 97:22 98:11,19 99:13 101:4,5 102:4 103:6 104:8 105:10 106:15 108:9 110:14 110:17 112:11 115:8,11 125:12 126:7 127:14 130:16 134:10,17,18 144:24 149:17 160:24
Okeechobee 37:5 38:16
old 56:8 63:22
Omphroy 3:11 3:12,13 82:13 84:4,6 85:17,21 87:3 88:6,7 94:23 97:17,19 97:20 98:4,6,10 98:14 99:2,12

99:24 101:1 103:18,21 104:5 166:12 166:13
once 5:3 10:19 101:18 153:10 158:17
one-third 63:23 76:5
ones 93:12 116:3
Opa-locka 41:1,5
open 139:20 140:8
operative 154:23
operatives 156:18
opine 5:3 70:17
opined 91:17
opining 96:25
opinion 4:24 5:1 15:7 79:18 108:7 135:13 138:13 153:13 153:14 156:4 156:20 157:7 157:10,22,23 160:16 161:15 161:23
opinions 72:5 137:8 161:7 162:10
opportunity 27:7 82:2 110:12 131:1 134:9 149:10 151:13 157:15 163:22 163:23 164:6
oppose 138:6
opposed 50:3 104:24 125:8 130:12 144:5
opposing 151:25
opposite 95:15 96:2,7
opposition 159:16
optimistic 5:17

150:24 162:12
options 105:3
oral 156:19
Orange 26:18 31:19 32:4,8,23 33:2,3,10,24 34:10 47:22
order 2:3 11:6 17:18,20 22:4 27:17 32:13 38:13 155:12
ordered 109:24
organization 133:25
original 130:18
originally 58:1
Osceola 32:21 36:17
ought 135:9
outcome 156:22 163:6
outperformed 68:13
outside 7:25 23:20 69:12,20 69:21 70:9 72:4 91:17 117:18 135:16 152:21
overall 26:4 44:13,19 61:18
overlay 35:13
overnight 114:14 145:12
overperforman... 68:16
overturn 127:7
overturned 102:23
overview 25:6 27:21
owe 121:15

**P**

packet 7:3 22:20 23:3,4 98:25 113:2,2
packing 155:15

155:18
page 98:7 99:1,3 99:5,5
pages 11:1 119:3
paid 137:9
Pairing 34:21
Palm 26:17 37:23 38:12,15,18,21 38:22 39:5,10 40:11 85:7
Panhandle 28:6 29:9
paper 125:14
papers 77:14 110:18
paraphrase 90:22,24
Park 34:1 38:7 40:25
Parkway 35:19
part 29:12,18,21 31:12 32:23 34:13,22 35:17 36:6,12 37:2,3 41:17 43:24 46:24 47:16,25 65:21 78:24 79:5 84:13 91:21 96:6 129:9 133:18 163:13
participant 140:17
participate 27:7 149:10 157:16 164:7 168:7
particular 14:5 59:25 78:1 87:1 87:6 99:18 154:5
particularly 81:10
parties 169:7
partisan 7:11,14 8:9 154:9
partner 24:2
partners 5:18

HT_0005383

JX 0038-0186

33:22 41:6
45:20 146:19
147:1
parts 31:13 46:12
47:18 64:15
party 27:19
138:8 164:3
Pasco 35:17 36:6
pass 104:21
105:5 133:10
138:10 143:10
143:11 161:11
passed 12:7 22:7
26:12 44:15,25
45:17 92:8
102:25 103:23
103:24 128:14
128:16 142:11
143:14 157:9
path 58:4 72:11
patterns 65:5
pause 4:22 43:20
paused 4:23
Payne 3:15,16
166:14,15
PCB 26:11
Pembroke 40:1
people 26:4
29:15 31:24
32:12,19 34:11
34:20 35:10
36:14,15,23
38:12 39:9 47:2
47:23 52:3
75:18 78:6
81:13,15 83:6
83:10,12
103:13 104:11
113:8 114:23
115:24 116:17
116:21 119:13
121:14,19
129:2,11,17
138:4
people's 129:9
perceived 30:25
percent 60:5 76:7

81:16,19 98:2
98:18 99:9,10
99:21,22 126:1
percent's 69:6
percentage 81:23
98:9
Perez 153:5
perfect 122:5
perform 19:7,9
56:1 60:21
63:24 64:13,18
65:12,16 66:7
66:12,18 67:13
67:14,15,22,24
68:1 69:4 86:22
performance
55:4 61:13,18
61:20,21 65:20
66:24 67:2 68:3
68:9,12,14,24
70:18 76:4
95:12 96:9
performed 13:4
14:4 17:7 58:18
58:25 69:21
156:14
performing 27:1
27:3 30:23
37:21 40:16
41:11 53:17
58:8 59:22
61:14 62:11
63:21 95:3 97:5
performs 60:17
61:4,5 62:1
63:6,10,14
64:16 66:1 67:4
67:5,22 68:4
69:1,3 70:9,10
70:22 76:20,25
77:5
period 8:11 83:1
101:10
permitted 54:10
person 26:8
28:13 79:13
164:14

personally 73:6
116:13 137:21
151:5
perspective
164:22
perspectives
140:9
phrase 59:9
Pick 138:9
picked 118:7
piece 104:23
125:14 167:20
pieces 10:11
50:14,15
piggyback 57:22
57:25 96:14,17
Pinellas 35:5,8,9
35:20
Pines 40:1
place 59:19 66:17
93:13,25
101:25 102:14
102:23 103:2
116:8 124:9
128:13 142:20
154:4 155:19
placed 26:16
places 82:8
150:14
plaintiff 154:2,10
Plaintiffs 156:19
plan 21:14 102:2
103:4 109:16
109:17,18
116:13,23
142:23 156:17
156:21
planned 4:20
8:22 164:1
planning 13:2
plans 80:19
153:23
play 60:20 102:9
121:6
please 2:3 4:10
4:12,16 13:19
23:2 88:18

107:8,20
112:19 117:22
125:2 127:10
165:3,5
pleased 148:10
plus 28:12
point 6:24,25 7:9
7:24 17:18,20
17:21 38:25
64:7 68:23
71:14,18 98:5
116:16 119:20
119:24 127:5
130:19 150:8
168:5
pointed 150:3
points 25:10
68:13 99:11,16
122:2 160:25
policy 51:4
109:20 120:25
political 10:10
21:19 27:7,19
54:3 154:8
157:17 164:3,7
164:16
Polk 25:21 34:15
34:17,22 36:17
Polsby-Popper
25:18 30:16
34:7 44:22
Polson 156:10
Polston 157:1
Polston's 156:4
Popper 131:22
132:11,15
159:6
population 21:9
21:19 22:24
26:2,7,8 28:10
28:12 29:2,3,16
29:19 30:21
31:21,25 32:7,9
32:12,13,15
34:10,14,18,21
34:24,24 36:7,9
36:16,24 37:8

37:10,18,23,24
38:13 39:4,12
41:19 42:25
45:24 46:2,19
47:3,5,22 48:1
60:12 80:14
81:16,18,21
97:25 99:21
100:4,6,11,13
100:16 131:9,9
164:12
populations
86:12
Poreda 84:25
85:1 86:5 98:21
98:23 99:4,13
100:8,9
Port 31:19
portion 35:13,20
46:10 64:16
111:8,9
portions 64:13
64:17
position 62:16
128:23 129:23
130:2,5 132:17
139:24
possibility 80:16
possible 21:19,22
34:19 39:22
41:3 42:14
47:12 56:21
65:14 117:13
117:14 123:19
possibly 73:10
132:6
posted 7:4
postponed 19:3
posture 12:21
113:6 143:17
149:5
postured 24:13
potential 111:22
112:19 124:3
potentially 58:5
79:11,13
143:19,20

HT_0005384

JX 0038-0187

power 155:5
powers 156:25
practical 164:12
pre-clear 158:11
pre-clearance
  157:7 158:20
  158:22
pre-suit 113:7
precedent 22:18
  27:11 77:17
  136:8,17,18
  138:13
precinct 93:12
precisely 88:1
preclude 106:7
predicate 62:20
Predicting 73:18
predominant
  152:16 153:19
  154:3
predominated
  154:16
predominating
  159:15
prefer 12:18,19
  129:3
preference 158:4
prepare 101:14
  117:14
prepared 117:19
  120:14
preparing 53:9
present 4:6 12:3
  74:4 75:1
  131:15
presentation
  20:16 23:2
  44:10 48:11
  159:18
presented 131:8
  131:23 133:5
presenting
  131:18
presently 57:2
  111:11
president 131:1
presuming 51:3

pretty 73:8
  115:19 124:23
prevail 79:17
prevent 160:4
prevents 45:25
  153:23
previous 34:6
  40:10 44:17
  108:14 109:15
  114:7
previously 23:19
  65:2 72:21
primarily 28:14
  32:3 35:18
  37:10,15 52:13
  52:18
primary 23:9
  24:7,11 25:4,6
  32:24 35:24
  43:2,24 44:2,6
  44:9,12 45:7
  47:12,21 48:25
  51:6,21 53:9
  55:18 59:11,18
  61:5 62:1 64:10
  64:24 66:7 76:3
  80:18 89:10
  90:4,14,16,16
  91:2 92:23 93:7
  93:16 94:10
  97:6 101:12,18
  101:22 102:2
  102:15 105:16
  106:5 121:10
  131:7 134:2
  136:15 137:13
  138:2 141:12
  145:17 148:1
  150:10 155:21
  157:25 159:17
  160:18
primary/secon...
  93:4 138:11
principles 30:7
printed 10:24,25
printout 22:21
  88:15

prior 14:9,20
  24:3,5 62:9
  78:23 83:2
  131:18 157:9
prioritize 49:20
priority 50:16
privilege 9:8
  72:24 75:11
  149:1
probably 49:17
  53:7 72:13
  101:9 124:14
  129:24 141:9
  168:13
problem 93:8,9
  94:17 127:10
  147:23
problematic
  111:15
procedural
  124:11
procedurally
  143:9
procedure 112:3
  114:19 122:8
  124:17,18
  128:12 129:20
proceed 139:24
process 4:23,23
  5:4,12,17,19
  6:6 7:14,19,22
  8:1,8 10:5,9
  21:10 22:4 24:2
  24:23 27:8
  42:13 48:22
  50:12 53:1,3
  55:6,12,23
  57:11 73:13
  78:5,23 96:20
  104:3,11,13
  106:4 118:22
  123:7 124:8
  126:24 128:12
  128:16,18,18
  128:19 130:19
  136:15 137:3,5
  141:7 145:25

149:11 150:21
150:23 151:14
157:17 161:14
161:15 162:5
162:11 163:9
163:14,17
164:7 167:12
167:18 168:3,7
168:10,17
processes 96:24
produce 9:20
  89:6 137:7
  147:16 148:2
produced 10:4
product 9:8
  72:23 75:10
  125:2 129:5
  140:16,24
  146:12 147:24
  148:3,4,12
  149:13 162:3
  163:24 164:18
  164:23 167:20
  168:1,14,15
productive
  140:20
professor 162:16
prohibited
  152:16
prohibitions
  158:6
promise 16:24
prompts 158:25
pronounce 42:4
proper 12:21
  117:14 157:3
properly 21:24
  57:13
proponent
  144:20,24
proponents 90:4
  136:1 158:17
proportion 80:22
  81:18
proportional
  80:15
proposal 33:21

97:8
proposals 96:23
proposed 22:21
  23:19 25:9,16
  26:10,15,19
  59:11 90:7
  97:25 98:3,16
  101:12 130:1
  134:2,23 135:4
  135:10,22
  138:14 139:19
proposes 22:8
proposing 91:18
  105:16,18
  106:5 141:11
proposition
  159:9
propositions
  91:21 92:4
protect 24:20
protected 7:12
  22:23 26:20,21
  26:22,24 30:19
  45:3,3,22 55:8
  56:11 57:2,13
  58:3,19,25
  69:22 84:8,9,17
  86:18 87:6,13
  88:16 95:3,14
  135:9 150:1
protecting 24:9
protection 21:23
  152:14 153:21
protects 31:2
proud 140:14,23
  147:14 162:25
  164:20,20
proudly 26:9
prove 154:2,18
  155:7
provide 5:11
  15:7 27:4 88:22
  122:8 151:11
provided 6:1
  9:17 169:4
provides 65:6
providing 129:10

HT_0005385

JX 0038-0188

provision 21:24
provisions
   154:23 160:19
prudent 139:1
public 4:11 8:12
   115:9,11
   120:25 122:3
   122:17 123:6
   126:12 130:20
   130:21 144:14
   145:1 149:4
   167:13
pull 67:25
punch 20:5
purported 134:3
purpose 28:13
   29:4 118:14
   120:20
purposes 52:14
   55:19
pursue 152:20
pushing 132:3
put 24:7 65:2
   66:25 89:17
   90:13,15 97:4
   109:4 116:8
   137:15 141:14
   141:23 142:14
   157:2 161:24
   167:25
Putnam 31:11
   46:18
puts 139:23
putting 143:16

**Q**

qualify 83:11
qualifying 78:2
   121:10 139:11
question 7:9 9:16
   13:1,13,17,19
   14:2,7,9,13,24
   14:25 15:4,9,18
   15:23 16:1,3,5
   16:13,13,18,21
   16:22 17:3,9,10
   18:5,6,8,11,23

19:7,10,13,14
19:16,22 20:2,8
20:9 48:15 49:5
50:7 51:11,16
52:9 56:7,17,23
57:5 58:23
60:25 62:18
63:3 64:3,7
68:6,18,20
69:19 71:3,12
74:1,6,9,14,15
74:17,18,19,23
75:21 76:1,16
77:25 79:23
80:8,13,21 82:4
82:16 84:5,22
84:25 85:3,22
88:24 89:16,17
89:18,20 90:3
90:13,15 91:1,4
91:6,9,12 92:19
94:15 95:23
96:1 97:22
100:1 101:9,18
104:4,9,10
105:9,20 108:2
108:25 109:2
112:16 115:6
133:12 139:20
158:23,25
159:8
questionable
   62:23
questions 5:11,15
   6:2 10:9 11:8
   11:21 12:16,17
   12:18,22 13:7
   16:20 17:3
   18:16,21 20:15
   48:12,13,17
   52:4,7 75:16
   77:15 87:15
   90:11,12 93:3
   103:12,16,17
   105:11,25
   110:15 112:13
   126:9,11

132:10 137:1
144:10 150:20
167:16
quibbling 54:12
quick 68:6
quickly 74:20
   114:9 116:1
   121:1 122:5
   123:19 146:10
quite 128:24
quo 112:8 125:24
Quorum 4:6
quote 21:12
   65:20,24
quotes 65:24
quoting 62:16

**R**

race 152:16
   153:18 154:1,3
   155:11 159:15
   160:4
race-based
   154:19
racial 153:7,22
   154:9,15,25
   155:3,8 157:15
   158:7 159:2,4
   159:22 160:8
   164:6
racially 159:14
   159:21
railway 38:15
   43:15 51:12
raise 68:23 81:1
raised 7:10 24:8
   135:6 149:23
Ranches 40:1
Randy's 124:13
range 26:5
Ranking 2:9 5:8
   5:23 9:4 11:5
   12:25 13:21
   14:17 17:15
   59:4 65:8 67:6
   69:8,24 70:12
   71:2,19 73:2

89:1,22 106:17
106:21 109:11
115:14 133:11
134:19 140:2
145:15 148:13
162:17
rationale 151:6
Raton 39:6
reach 130:2
reached 97:1
   137:17
read 21:12
   113:17 123:21
   153:9 156:3
   158:14 163:20
readily 131:12
reading 110:22
ready 103:18
   108:19
real 8:6 68:6
   96:20 131:19
   150:9 151:1
realities 163:8
reality 8:5
   164:24
really 14:24 15:2
   19:5 58:14 64:7
   78:14 85:6
   118:5,7,14
   122:12,12
   123:16 126:18
   132:10 145:24
   146:5 157:23
reapportion
   108:15
reapportionme...
   62:7 109:1,16
reason 73:21
   85:21 100:4
   102:3 103:3
   109:6,20 142:4
   146:16 152:19
   153:20 157:11
   160:17
reasonable
   122:10 126:3
   129:10 139:1

reasoned 21:16
reasoning 109:9
reasons 73:10
   112:25 150:17
   151:14 152:2
   155:9
receive 19:22
   55:3
received 5:8,22
receiving 9:12
   33:12,18
   164:22
receptive 140:8
recognizable
   37:16 41:2
recognize 12:22
   14:7 16:14
   18:13,23 57:15
   64:2 84:24
   120:22 129:7
   139:13 145:20
   162:1
recognized 12:2
   13:1 14:1 15:22
   16:22 17:9
   20:19 28:1
   43:18 45:10
   48:15 50:7,24
   51:8,18,23 52:9
   52:17,21,25
   53:6,12,22 54:5
   55:1,9 56:5,23
   57:8 58:12,22
   59:5,16 60:3,8
   60:15,24 61:8
   61:16 62:2 63:1
   63:15 65:9,18
   66:8,22 67:7,17
   69:16,25 70:5
   70:13,21 71:2,4
   71:20 72:9 75:3
   75:8,21 76:12
   77:2,12,21
   78:19 79:2,10
   80:11 82:21
   83:24 84:4
   85:16 88:5 89:2

89:13,23 90:9
90:19 91:13,23
92:1,19 93:1,21
94:2,14,22 95:9
95:17 96:5,13
97:19 98:21
99:23 100:7,25
101:5,16
102:17 103:20
105:13 106:2
106:12,22
107:5,9,15,21
108:3,10,20
109:12 110:9
111:5 112:16
112:23 115:14
118:2 119:8,17
120:8 121:22
125:20 126:16
127:16 128:8
134:20 138:20
143:3 145:5
147:8 148:14
148:21 149:18
151:17
**recognizes** 150:1
**recognizing**
    74:14
**recommend**
    14:12
**recommended**
    72:6 156:12
**reconcile** 49:19
**record** 5:24
    21:15 72:15
    114:1 148:17
**recording** 168:20
    169:3
**records** 8:12
    113:10
**recreate** 25:13
**recreated** 37:22
**red** 119:13
    123:17 127:1
**redistrict** 21:7
**redistricting** 1:11
    2:2 4:23 8:23

11:24 12:8 22:4
22:7 39:20 52:3
58:16 66:3
82:23 92:22
104:16 108:15
109:1,15
123:22 145:9
148:25 151:22
151:23 152:22
153:1,12,22
156:2 160:5
163:14
**redraw** 66:1
**reduce** 158:15
**reducing** 62:13
**reduction** 30:20
    59:18,19,25
    60:10,22
**refer** 23:3
**referenced** 23:1
**referencing**
    64:12
**referring** 85:9
    133:17
**reflect** 145:20
**reflective** 33:7
**reflects** 10:21
**refocus** 43:21
**refresher** 108:23
**Refuge** 39:3
**regard** 47:12
    116:6
**regarding** 5:1
    41:5 80:13
**regardless**
    137:24
**regards** 97:23
    131:7 133:18
**region** 20:18
    27:21,24 29:21
    33:8
**regions** 29:10
**registered** 98:8
    99:9,10,17
    100:21
**registration**
    64:21

**regret** 124:21
**regretfully**
    160:20
**regular** 5:6 24:4
    24:5,24 149:13
**reiterate** 119:11
**reiterated** 6:2
**reject** 141:4
    145:24
**related** 163:17
**relates** 9:14
    81:10,20
**relating** 13:8
    104:9,10
    105:20 141:6
**relative** 68:23
    69:2 169:6
**relatively** 15:14
**released** 63:19
    74:24
**reliable** 30:22
**reliance** 135:14
**relied** 52:13,18
**rely** 114:2
**remain** 29:25
    35:9 47:8
    150:24
**remainder** 35:16
    46:2
**remaining** 29:12
    32:9,15 34:10
    35:12 36:6,16
    37:3,10 42:25
    46:10,19,24
    47:22 48:2
**remains** 45:22
    81:19 139:20
**remedial** 156:17
    156:20
**remember** 19:15
    61:17 70:8
    82:22 86:16
    92:8 160:2,5
    165:3
**remind** 11:19
    142:6
**reminded** 119:2

**reminder** 4:15
    20:15
**reminders** 4:9
**remove** 110:25
    111:22 112:6
**removes** 111:8,9
**removing** 124:12
**Reock** 25:17
    30:14 31:9 34:5
    42:21 44:21
**reorganize** 80:4
**Rep** 12:23 15:8
    18:4 45:9 53:21
    57:22 75:20
    79:22 82:13
    84:4 89:3 94:22
    94:23 95:16
    97:17,18,19
    98:4 101:5
    102:6 103:18
    110:24 117:12
    118:23 150:3
    151:2,2 162:16
    162:20
**repeat** 7:23 13:19
**repeatedly** 119:2
**repetition** 148:16
**rephase** 15:20
**replace** 21:2
**replaced** 102:23
**report** 23:1
**reported** 167:7
**reporter** 8:18,20
**represent** 56:8
    137:11
**representative**
    2:10,11,12,14
    2:16,18,20,22
    2:24 3:1,3,6,8
    3:10,13,16,18
    3:20,22,24 4:1
    4:3,5 6:11,12
    12:2,4,15 13:3
    13:11,16,18,24
    14:2,15,18
    15:11,15,19,23
    16:2,6,9,24

17:2,6,13,17,20
17:22 18:10,25
19:19,21 20:1,5
21:4 27:23,25
28:2 42:4,6,8
43:23 45:6,11
48:14,16,20
49:6,13,16,24
50:4,10,17,25
51:17,19,25
52:10,20,22
53:4,7,20,24
54:7,25 55:2,14
56:6,22,24 57:4
57:7,9,17 58:13
59:1,3,6,24
60:6,9,19 61:9
62:3,19 63:16
64:6 65:10,23
66:9 67:8 68:17
69:10 70:1,14
70:25 71:10,13
71:17,21 72:1
73:1,4 74:2,7
74:10,16,21
75:6,14,22
76:13,22 77:9
77:13 78:9 79:3
79:24 80:3,7,9
80:12,25 81:1
81:25 82:12,15
83:19 84:6
85:17,21 86:6
87:3 88:6,7
89:4,24 90:20
91:11,14,25
92:2,12 93:2
94:3,19,24
95:20,25 97:20
98:6,10,14 99:2
99:12,24 101:1
101:7,20 102:4
102:8 103:21
104:5 105:12
105:14,15,23
106:1,3,15,23
107:7,10,19,22

HT_0005387

JX 0038-0190

108:4,9,11
109:13 111:4,6
112:12,15,17
112:18,22,24
114:4,6,10,12
115:3,15 117:8
117:10 118:1,3
119:7,9,16,18
119:19,25
120:8,23
121:21,23
125:19,21
126:15,17
127:3,15 128:7
128:9 130:8
131:21 133:12
133:17,21
134:21 138:19
138:21 143:2
145:4,6 147:7,9
148:15,20,22
149:17,19,20
151:17,19,25
158:8 162:21
164:8 165:8,9
165:11,13,15
165:17,19,23
165:25 166:2,4
166:7,9,11,13
166:15,17,19
166:21,23,25
167:2,4
**representatives**
60:12 134:4
135:2 157:18
**representing**
144:17,22
**represents** 48:4
134:25
**request** 5:4 9:14
12:10 111:2
125:15
**requested** 4:25
**requesting** 5:23
**requests** 6:15
**require** 107:17
116:17 126:4

127:22,23
**required** 32:14
69:22 154:11
154:22 155:8
158:10
**requirement**
86:21 155:14
**requirements**
112:21 157:8
157:20
**requires** 128:3
155:2 167:19
**research** 113:17
**resemble** 143:13
**resolution** 110:12
**resolve** 51:3,5
109:23 123:18
**resources** 123:1
123:9,10
151:11
**respect** 27:10
73:5 140:2
154:8 161:22
161:23
**respectful** 133:8
**respectfully** 74:3
138:7
**respectively**
26:19
**respects** 38:4
**respond** 11:8
14:18
**responded** 81:4
**response** 3:14
42:7 82:1
**rest** 23:22 37:14
76:25 142:16
**restate** 33:17
**restrict** 106:14
129:9
**restricting** 118:8
**result** 66:15
97:12 117:3
157:14 164:5
**resulted** 140:21
**results** 64:20
73:14

**resumed** 5:4
**retain** 9:8 15:6
16:9 17:6 19:8
123:10
**retained** 8:12
13:4 14:3,4
69:12,20 70:17
71:6 72:6
**retaining** 72:23
**retrogressive**
158:14
**return** 130:18
**reveals** 21:15
**review** 21:14
27:21 70:17
105:1 111:23
113:15 114:1
138:10
**reviewed** 116:9
**reviewing** 93:6
**revisit** 163:17
**revisiting** 162:23
**revolves** 85:3
**right** 6:19 11:1
12:19 17:1 18:8
20:11 43:16
44:13 50:17
52:7 61:18 63:8
63:9 64:9 67:16
68:24,25 69:6
69:18 74:12
75:5,18 76:14
83:3,11 84:2
85:5,14 89:16
90:15 94:21
97:16 98:25
99:11 103:7,8
103:20 104:11
106:14,16,21
107:25 109:8
113:14 114:23
115:5 121:12
122:15 124:13
126:11 127:19
129:22 136:25
144:9,13,25
145:2 150:22

161:11,17
**Rights** 136:7
152:10 154:24
155:2 157:8
158:3
**ripple** 10:1
**rise** 58:20 168:19
**risk** 142:13
**River** 32:11
36:18 37:11
**road** 7:13 28:15
32:25 35:19
36:1,2,2,2
37:11 51:13
54:17
**roadblocks** 43:10
**roads** 35:24
**roadway** 43:13
**roadways** 30:11
32:24 37:12
38:5 39:22 41:2
**robin** 52:6 71:9
**Robinson** 3:17,18
147:8,9 166:16
166:17
**robust** 121:24
**roll** 2:4 165:5
**Rommel** 3:19,20
117:8,10
166:18,19
**room** 19:17
**Rosa** 28:8
**roughly** 95:11
**round** 52:5 71:9
88:25 101:6
102:6 103:18
106:17,22,24
106:24 153:12
**rounded** 38:25
**Route** 33:1
**Royal** 40:11
**rule** 91:19 92:5
136:16 145:22
146:9 157:13
158:1,14
**rules** 122:7
152:10 158:3

158:11
**ruling** 21:13
**run** 7:7,17 78:15
78:17 83:8,17
96:24 117:1
**running** 78:6
118:12 120:18
161:13
**runs** 156:9
**rush** 109:21
127:22
**rushed** 20:18

**S**

**safe** 62:13
**safeguards** 27:17
**safety** 35:7
141:15
**Sam** 167:21
**sanity** 44:10
**Santa** 28:7
**Sarasota** 36:23
36:25 37:3
**sat** 88:9
**satisfactory** 18:7
116:24
**satisfied** 135:13
151:5
**save** 112:6
**saw** 80:7
**Sawgrass** 39:22
**saying** 14:22 63:8
66:20 72:15
73:19 96:18
106:7 113:21
113:23 123:22
136:10
**says** 93:8,12
103:24 110:25
124:15 125:15
153:15
**scale** 68:4
**scenario** 102:9
**scholar** 163:4
**school** 141:15,18
**Scoon** 130:22,25
131:1 133:13

2/25/2022                  Common Cause, et al. v. Cord Byrd                  Audio Transcription

133:16,23
**score** 25:17,18,18
  30:14,15,16
  31:9 34:5,7
  42:22 44:19
**scores** 25:12,17
  30:13 40:8
  44:21 55:17
**scrutiny** 152:21
  154:17 155:1
**seat** 24:10 84:13
  102:12
**second** 7:24 8:13
  11:4 13:10
  43:20 71:15
  79:5 80:2 101:6
  108:18 122:16
  125:13 141:14
  144:21 154:15
**secondary** 23:16
  24:12 25:5
  43:21,25 44:4
  44:23 45:7,10
  51:21 52:23
  53:9 65:1 76:7
  80:18 89:20
  90:6,17 92:23
  93:17,18,24
  94:7,11,16 97:7
  101:13 102:1
  102:15 106:5
  135:20,24,25
  136:15 137:13
  137:14,25
  138:5 141:8,11
  145:21,23
  155:21 156:7
  157:22 160:18
**SECRETARY**
  2:5,7,9,11,13
  2:15,17,19,21
  2:23,25 3:2,4,7
  3:9,11,15,17,19
  3:21,23,25 4:2
  4:4,6 165:8,10
  165:12,14,16
  165:18,20,22

165:24 166:1,3
166:5,8,10,12
166:14,16,18
166:20,22,24
167:1,3,5
**section** 88:13
  152:11 158:9,9
  158:25 159:1,3
**Sections** 158:2
**see** 8:8,14 51:12
  51:13 72:4
  73:23 82:12
  87:5,20,21
  88:11 89:1 91:7
  98:20 100:2
  102:18 117:4
  123:20 128:21
  130:5 135:15
  146:16 149:3,5
  149:8 162:5,18
  168:12,13
**seeing** 110:17
  115:8,11
  126:11 128:6
  134:11,17
  144:13 145:2
  160:24
**seeking** 8:11
**seen** 75:17 80:19
  136:7 137:6,19
  162:4
**sees** 20:8
**segment** 100:16
**segue** 23:7 44:1
**Segueing** 46:7
**selected** 55:7
**selfish** 8:9
**Seminole** 32:2
  142:11
**Senate** 24:2
  33:22 41:6
  42:11 45:19
  46:3 84:11
  92:10,17 95:2,6
  95:14 96:22,25
  97:10 103:24
  104:22,24

119:21,22
137:17 139:16
146:25 148:4
149:25 161:19
**Senate's** 96:19
**senator** 84:12
**sense** 91:17
  103:14 128:3
  129:7 135:3
**sentence** 76:25
**separate** 108:14
  161:4
**separating**
  153:24
**separation**
  156:25
**sergeant** 4:13
**serious** 90:3,12
  90:12,25
  120:16 137:1
**seriously** 137:4
**serves** 154:19
**session** 5:6 24:4,5
  24:24 114:16
  117:17 139:15
  147:12 149:14
  162:2
**set** 22:5 51:6
  54:20,21 83:2
  93:2 107:17
  136:8,17
**sets** 7:19
**setup** 24:18
**seven** 147:11
**severability**
  142:15,22
  147:22
**shakes** 5:20
**shape** 23:11
  29:20 31:8,23
  41:17 43:9
  154:13
**shaped** 31:15
  35:1 46:21
  47:18
**share** 99:17
  142:18

**shared** 137:8
**shares** 22:24
  41:23
**Shelby** 157:6,10
**shift** 62:14
**shifting** 21:9
**shifts** 154:18
**Shores** 41:1
**short** 29:15 32:7
  32:12 37:8 47:2
  72:13 123:13
  129:24
**shortening** 150:7
**shorter** 143:23
**shortly** 29:14
**shot** 52:8 86:4
**show** 20:6 125:10
  130:14 144:7
  152:18 155:14
  158:13 167:7
**showed** 167:14
**showing** 154:11
**shown** 40:10
**shows** 48:2 97:11
**shy** 34:20
**side** 36:1,3 38:25
  40:4 41:25
  73:16 159:10
**sides** 5:14 42:18
**sign** 105:4 121:7
  161:20
**signed** 102:20,21
**significant** 6:20
  119:5 142:9
  154:4 162:25
**signs** 121:9
**silence** 4:10
**similar** 13:11
  24:14 25:24
  33:10 37:22
  41:5,16 45:17
  46:22 47:9,21
  85:25 86:1
  158:2
**similarly** 45:2
**simply** 85:12
  109:24 116:21

136:5
**simultaneously**
  17:25
**sincerely** 112:1
**single** 7:8,18 9:25
  10:3 25:22 26:7
  30:5 35:10
  54:20,21 91:21
  92:4,10,21,24
  133:6
**single-subject**
  91:19 92:5
  136:16
**singular** 23:15
  59:9,13,14,20
**sir** 16:3 17:13,18
  18:3,10 19:19
  108:5 133:20
**Sirois** 3:21,22
  5:13 12:2,4,15
  12:23 13:16,18
  13:24 21:4
  27:23,25 28:2
  42:8 43:23 45:6
  45:9,11 56:22
  56:24 57:7,9,23
  76:2 138:19,21
  145:11 162:20
  162:21 166:20
  166:21
**Sirois's** 13:11
**sit** 79:19 88:3,21
  149:2
**sitting** 119:1
  138:23 168:2
**situation** 24:19
  54:11 77:19
  81:20 114:18
  151:9
**six** 22:23 26:17
  26:24 37:4 44:6
  48:5 55:3,7
  84:10 147:11
  164:21
**six-year** 79:7
**Skidmore** 4:4,5
  75:14,20,22

HT_0005389

JX 0038-0192

76:13,22 77:9
77:13 78:9 79:3
79:22,24 80:3
97:18 101:5,7
101:20 102:4,6
102:8 118:1,3
145:4,6 150:3
151:2 167:3,4
**SKOON** 134:8
**slap** 122:13
**sleep** 115:22
**slide** 48:2
**slight** 45:18
**slightly** 64:25
**Slosber-King**
3:23,24 82:12
82:15 83:19
166:22,23
**small** 34:22
43:10
**smoothly** 80:6
**snapshot** 22:22
**so-called** 89:10
90:4 91:2 93:7
135:20 138:2
**software** 7:6
87:18,22
**solely** 79:14
**solidly** 27:3
**soliloquy** 16:20
16:25
**solution** 23:14
**somebody** 82:18
96:10
**somewhat** 139:20
**son** 18:19,20
**son's** 18:17
**soon** 42:13 121:5
**sooner** 123:24
146:10
**sorry** 17:13 49:3
49:16 55:20
71:1 77:4,14
99:2,5 101:20
108:22
**sort** 71:8 102:9
**sorting** 154:19

**sorts** 129:16
**sounds** 58:15
88:19 95:1
110:7 113:24
122:19,22
**south** 31:7 32:8
36:17 39:3 47:4
**southeast** 39:10
88:13
**southern** 31:12
36:3 37:2 38:19
40:3 42:19,25
**Southwest** 40:1
**speak** 96:19
120:6 130:24
138:18 141:2
160:23
**speaker** 70:7
72:22 88:20
144:21
**speakers** 4:16
125:7,9 130:11
130:13 144:4,6
**speaking** 4:17
**specific** 23:7 40:9
108:25
**specifically** 6:10
160:3
**spend** 6:22 8:4
162:22
**spent** 10:8
163:12 164:21
**split** 25:25 26:1
26:10,11,12,14
28:9 29:4 30:6
31:19 38:9
40:11 46:1
84:23
**splits** 22:25 25:24
44:14,16 46:18
84:16,18,20
86:2
**splitting** 39:5
46:5 86:15,20
**spoke** 80:21
131:22
**spoken** 69:21

**sponsor** 18:22
161:17
**Springs** 28:17,19
39:15
**St** 29:19,21,22,23
29:24 31:12
38:11 47:5,7,8
47:16
**staff** 4:14 5:13
9:21 22:14 38:1
40:18 41:13
43:7 51:2,3
56:18 57:16,20
64:3,4 70:8,10
70:22,24,24
71:7 76:2 88:4
88:10,21 89:10
91:15 96:7,12
96:14 97:15
104:12,14
130:1 149:6
150:19 167:17
167:21
**stage** 105:6 162:7
**stakeholders**
162:9
**stand** 124:9,10
125:1
**standard** 23:15
135:7
**standards** 4:25
21:17 25:11
54:16 61:11
77:4 135:7,8
163:21,25
164:11
**standing** 8:17
123:12
**stands** 25:3
**start** 28:4 45:15
120:18 140:7
**started** 117:17
120:15
**starting** 22:10
28:6 126:23
**state** 11:18,24
20:18 22:17

23:23 27:22
28:15 32:22,25
33:1 35:18,25
37:11 48:3 52:2
52:12 53:3,18
55:12 62:6
64:16 79:20
80:14 81:20
96:21,22
108:13 116:11
119:21 138:12
152:17,18,20
153:4,18,23
154:18 155:7,9
155:13 158:8
158:19 159:1,3
159:11,13,13
160:6,7 161:8
**stated** 156:19
**statement** 62:21
**statements** 15:1
122:17
**states** 152:15,22
153:3,16 155:3
155:17 157:10
158:10,15
160:1,4,19
**statewide** 22:22
25:11,16 27:20
30:14 64:11
**statistically**
66:18
**statistics** 22:22
**status** 112:8
125:24
**statute** 77:16
78:1,4 79:7,12
79:16,20 82:16
82:17 83:2,8,21
107:2,24
108:16 111:11
111:11,13,14
123:4 126:2
127:21 129:5,6
150:7
**statutes** 118:19
125:25 129:12

**stave** 112:4
114:19 115:1
124:19
**stay** 63:7
**steady** 99:16
**step** 8:13 78:21
139:12 143:17
143:18 162:5
**stepping** 168:10
**stick** 102:13
**stop** 6:5 7:13
10:10,11 14:10
15:11 57:23
**straight** 105:2
**strange** 151:23
**Street** 1:24
**strength** 21:25
131:24
**stretch** 141:17
**strict** 152:21
154:17 155:1
**strictly** 63:7
**strike** 93:7
**strike-all** 12:20
12:24 21:2
**strikes** 93:24
**striking** 29:25
**strong** 131:20
132:9 133:4,9
155:10
**stronger** 69:1,1
**strongly** 117:5
**struck** 24:12 44:2
93:19 109:18
153:7 157:7
**structure** 20:25
23:6,21 44:5
**studied** 72:6
**study** 116:22
**stuff** 65:24
147:22
**subcommittee**
12:8 14:21 22:7
44:15,25 45:18
97:3 145:9
163:19
**subcommittees**

23:4
subdivisions 154:8
subject 85:20 92:21,21,24
subjects 162:23
submit 123:8 159:5
submitted 161:9
subordinated 154:7
subsequent 160:13
substance 146:5
substantial 131:12 134:25 135:12
substantive 20:22 112:4 124:19 129:21 143:6 168:3
successful 8:2 127:7
sue 9:1 72:16 73:10,15,17 121:3,3 122:21 129:2 137:22
sufficient 123:23 150:5 153:24
suggest 102:11
suggested 159:23
suggestions 6:8
suggests 140:3
suing 72:17 74:10 75:1
suit 8:23 129:14
Suite 1:24
sum 113:20
summer 163:10
Sumter 34:12 47:25
Suncoast 35:19
Sunrise 39:24
supersede 77:19
support 115:17 115:18 117:5,7 119:24 132:11

132:16 142:4 147:6 159:9
supportive 163:3
suppose 122:1
supposed 135:8
suppositions 65:13 66:5
Supreme 5:1 21:12 27:11 62:6 90:11 104:25 116:7 152:13,25 153:3,11 155:1 156:1,5 157:10 160:15
sure 5:7 11:9 12:17 22:19 24:23 25:1 27:15 48:23 49:6,21 54:1 57:12 66:14 86:21 91:8 94:12 98:6,24 111:22 113:5 114:17 117:13 118:14 122:9 122:15 129:3 129:17 131:13 149:9,22,23 152:3 161:14 168:4
surprise 152:3
surprised 128:21
survive 138:9 154:25
suspicion 122:25
Sweetwater 43:3
swum 88:17

T
table 140:12
tailored 152:19 154:20
tailoring 155:14
take 4:12 12:10 12:20 20:11,13 23:8 24:13,16

44:1 45:6 52:4 53:23 55:23 56:18,21 57:5 57:24 67:25 72:16 81:9 86:3 95:24 110:20 111:2 113:4,7,9 113:16,17,18 113:20,23 115:25 116:12 118:6,9,12 122:14 139:12 139:17 141:20 163:20
takes 109:22 113:3,15 139:22
talk 23:6 29:14 48:22 55:3,6 68:9 74:13 95:5 97:14 104:13 113:8 124:22 128:22 140:1 151:13 161:12
talked 14:23 144:12 157:5 162:24
talking 61:18 76:4 85:22 123:3 124:2 125:16
Tallahassee 150:14 156:9
Tamarac 38:8
Tamiami 41:22
Tampa 35:4 36:4 56:7
taxpayers 137:9
technical 10:21 43:6,7 106:24 167:12
tedious 167:12 167:18
tell 7:11 63:5 67:21 93:14 113:25 129:19 143:8

telling 127:24
ten 21:7 80:24 81:12,13,14
tension 49:2,9,11 49:18,25 50:2,4 50:15,19,20,21 51:4,5
terms 68:14 101:13 105:18 111:19 118:10 118:18 139:8 139:11 140:14 150:22
terrible 136:17
terribly 147:21
territory 27:15 157:19 158:18 164:10
test 25:21 63:21 63:24 152:21
testified 159:6
testifying 8:16 72:12
testimony 4:12 115:9,11 130:20,21 132:25 144:14 145:2 146:4
text 9:25 10:18 10:20,25
thank 4:8 6:5,10 6:11,13 9:22 11:14 12:4 18:25 20:21 28:2,3 43:19 45:11,12 48:10 48:16,20 50:8 50:11,25 51:9 52:10 55:21 56:24 57:9,20 58:10,13 59:6 59:17 60:19 61:9 62:3 63:16 64:4,6 65:7,10 65:11 66:9,23 67:8,18 68:22 69:10 70:1,14

71:5 72:10 74:21 75:22 76:22 77:13,23 78:9,11 79:3,25 80:9,25 81:25 82:15 83:19 84:6 85:1 87:14 88:7,18 89:4,14 89:24 90:20 94:3,24 95:25 96:15,16 97:15 97:20 98:19,23 99:24 101:1,3,4 101:7 105:14 105:23 106:3 106:23 108:11 109:13 110:10 111:6 112:11 112:17,18 114:6 115:15 117:10 118:3 119:9,18 120:10 121:23 121:24 125:21 126:7,17,18 127:17 128:9 130:25 132:23 132:24 133:19 133:21 134:10 134:21 138:16 138:21 143:4 145:6 147:6,9 148:12,19,22 149:16,20 151:14,19 160:21 165:2 167:11,13,17 167:21,24 168:1,9,16
Thanks 130:7
That'd 82:4
theater 10:10
theories 113:5
theory 24:8 136:5 139:19 159:24
thick 113:1,2

2/25/2022                          Common Cause, et al. v. Cord Byrd                          Audio Transcription

Page 26

68:11 97:5
103:1 115:19
123:15 139:25
142:5 143:24
144:12 150:21
168:4
**things** 6:22 9:3
11:3 54:13 56:3
66:16 112:8
116:1 118:24
129:17 142:9
145:15,16
146:20 147:13
149:22 158:5
158:15
**think** 5:9 8:19
11:23 13:23
18:7 20:4 50:13
51:10 53:19
54:3 59:10,11
61:24 62:9
63:11 64:7,23
66:11,16,19
73:8,16 75:24
77:24 78:3 79:6
80:6,7 90:10
97:5,10 101:17
104:10 106:24
107:22 108:1,7
115:9,23
117:15,20
118:16,20
119:4,14
121:14 122:7
123:5,8 124:6
126:3,19
127:18 128:25
129:22 132:7,9
134:25 136:14
136:16,17,25
138:1,9,15
139:3,7,10,11
139:21 140:2,6
140:12,19
141:6,15,18,24
142:1,4,25
143:5 144:22

145:25 146:7
146:23 147:2
147:20 148:24
149:8,25
150:13,21,22
152:7 155:22
157:2,24
159:18,24,25
161:20,24
162:4,6,15
163:22 164:23
**third** 95:22 102:6
103:9 123:15
150:8
**Thirty** 113:24
**Thompson** 3:25
4:1 80:7,9,12
80:25 81:25
105:12,14,23
119:17,18
166:24,25
169:13
**thorough** 167:15
**thought** 56:11
138:5 142:24
161:1
**thoughtful**
167:16
**thoughts** 71:16
**thread** 53:25
**threatened**
117:22
**three** 15:13 16:15
26:20,20 28:21
34:3,18 40:12
45:2,3 100:22
100:23 103:19
105:3 106:17
118:13 125:17
127:25 153:2
**three-minute**
16:20,25
**three-word** 19:15
**threshold** 28:10
58:20 146:20
**thrown** 102:3
**tied** 31:8

**tier** 25:10 30:7
33:5 48:24,24
49:8,8 50:13,14
50:14,15,18,19
50:19,21 54:16
86:17,18 135:7
135:8 163:25
164:11
**Tier-two** 135:7
**time** 4:12 6:14,22
7:2 10:1,8,16
11:7,20,21,23
14:11 15:9
20:14,17 23:8
34:3 39:20
48:19 66:25
67:10 69:18
72:2 76:5,7
78:13 97:22
101:11 102:22
109:4 111:23
113:4,4,7,9,16
113:17,18,21
113:21 114:1
115:25 116:10
116:12,19,21
117:14,21
120:2 122:14
123:13,23
124:3,3,21
128:11 129:11
131:5,20
132:19 137:23
139:13 142:10
142:12,12
147:22 148:16
150:5,6,19
162:22,23
163:11,18,18
**timeframe**
111:18
**timeline** 143:23
**timeliness** 109:7
**times** 6:3 9:17
51:4 84:23
147:12
**timetable** 139:6

**timing** 103:14
**tiny** 88:12
**titles** 144:18
**today** 4:11 5:5
6:21 10:2,14
11:10,16 22:10
23:2 74:4 79:19
115:21 122:20
130:4 140:22
143:15,21
147:5,19 149:6
151:6,15
160:11,21
161:3 163:6,22
164:19 165:1
168:16
**today's** 4:19
10:20 26:13
**told** 17:22,25
19:21
**tonight** 124:15
**top** 26:16 55:24
98:9
**tort** 129:15
**tossed** 103:3
**tossing** 106:9
**total** 86:7,25 98:8
99:9,17,18
100:21
**totally** 73:6
**touched** 163:18
**touching** 75:24
**track** 10:22
18:17,19
106:20 122:11
123:7 150:22
**traditionally**
156:17
**Trail** 33:2 41:22
**trained** 87:23
**transcript** 169:3
**TRANSCRIPT...**
1:10
**TRANSCRIPT...**
169:1
**trend** 68:10
**trends** 64:15

65:14 66:5,5,16
68:24,25 95:13
96:8,11 135:14
**trial** 156:12
**tricks** 60:20
**tricky** 158:5
**tried** 100:3 109:4
109:24
**trouble** 53:14
54:19 167:23
**true** 159:10
169:2
**truly** 117:15
146:15
**trusts** 153:15
**try** 13:20 42:12
109:21 114:17
115:21 121:16
129:23 130:2
150:20
**trying** 15:2 49:20
77:4 86:22 98:1
98:17 102:9
110:11 111:21
112:6 129:25
**Tuck** 4:2,3
148:20,22
167:1,2
**turn** 4:13,16
116:2 165:4
**turnout** 64:21
**Turnpike** 38:6
39:23 42:16
43:1
**turns** 136:22
**TV** 20:6
**tweaks** 137:15
**two** 13:10 22:11
24:6,18 28:21
29:8 40:22 41:7
43:12 45:25
48:4 50:2 81:14
84:19 88:25
91:18,20 92:4,9
92:15,15,22
103:11 118:13
121:10 131:15

HT_0005392

JX 0038-0195

131:25 144:15 162:18
two-tier 21:17
type 77:18
types 54:13 100:10 118:19

**U**

U.S 33:2 35:18 37:15 38:5 41:22 43:1
ultimate 63:3 66:24 67:3
ultimately 61:22 61:24 63:11 70:6 76:17 77:15 79:17 116:24
unable 108:12
unanimously 133:10
unanswered 91:7
unchallenged 9:12
unchanged 48:3 130:19
unconstitutional 90:17 136:6,12 138:13 156:24
underlying 95:10
understand 10:8 18:18 19:12 22:4 49:15,23 50:3 66:12 67:24 76:10 81:3 82:1 94:7 95:6 117:12 118:14,17,22 120:5 123:16 133:23 135:5 146:18,19 152:8 155:24
understanding 13:9 17:14 71:22 110:4 120:4 133:6 163:13 168:6

undertaken 22:3
undertaking 21:24
undoubtedly 73:12
unfortunately 84:12 142:17
unintended 116:16
Union 46:17
unique 24:18,19 147:20,21 149:1
uniquely 47:17
United 153:3 157:10 160:1 160:19
unknown 91:6
unnecessary 117:3
unprecedented 138:11
upcoming 25:2
updated 12:12
updates 12:13
upfront 93:23
upheld 8:3
uphold 22:5
urge 115:17 117:6,16 120:21 127:18 128:4 143:21
use 52:15 53:1 54:10,17,18 55:12,18 91:16 113:22 114:19 115:21 123:7 124:11 153:18 159:15
uses 28:14 32:3 39:2,6,25 41:2 42:15 47:13
utilize 164:16
utilizes 30:9 39:21
utilizing 21:19 37:1 39:13

**V**

v 1:4 153:3,4,5
valid 160:12
variation 61:19
vast 42:17
Venice 37:1
verifies 74:25
version 14:5 34:6 40:10 44:17 159:3
versus 72:12
veto 105:4 146:1 161:11
vetoed 102:21
vetoes 103:25
Vice 2:7 11:4,13 17:11 168:18
**VICE-CHAIR** 2:8 11:14 12:14 13:7,20 14:6,16 15:8,13,17,21 15:25 16:4,8,11 17:1,5,8,15,19 17:21 18:4,12 19:10,20,24 20:4,7 27:25 43:17 45:9 48:10,18 49:3 49:11,14,23 50:2,6,23 51:7 51:18,22 52:1 52:17,21,24 53:6,11,21 54:5 55:1,9,13 56:5 56:22 57:7,15 57:18 58:12,21 59:2,4,15,23 60:2,7,14,18,23 61:8,16 62:2,18 62:25 63:15 64:2 65:8,17 66:8,21 67:6,17 68:5,19 69:5,8 69:15,24 70:4 70:12,20 71:1,8 71:11,15,19,24 72:8,25 73:2,25

74:5,9,12,19 75:2,5,8,12 76:11,21 77:2 77:11,21 78:8 78:18 79:2,9,22 80:1,5,11,20 81:9 82:4,9,20 83:18,23 84:2 85:15,19 86:3 87:2,16 88:5,19 89:12,22 90:8 90:19 91:3,13 91:22 92:1,6,14 92:25 93:20 94:1,9,21 95:8 95:16,22 96:4 96:12 97:16 98:4,8,11,19 99:23 100:7,25 101:4,15 102:1 102:5,16,24 103:8 104:3,8 105:8,19,24 106:11,16,19 107:4,9,14,21 108:1,10,18 109:5,11 110:2 110:14 112:11 112:22 114:4 114:10 115:3 117:8,24 119:7 119:16 120:1 120:22 125:4,8 125:10 126:7 127:12 128:6 130:8,12,14 132:24 133:14 134:10 138:17 141:1 144:1,5,7 147:7 148:13 148:20 149:17 151:16 160:22 165:2,21 167:7
**VIDEO** 1:10 168:20
view 161:22
viewing 11:1

views 95:2 139:18
violate 92:20,23 160:18
violated 157:22
violates 91:19 92:5 136:16 159:22
violating 126:24
violation 136:6 156:24
Virginia 153:4
visual 25:20 29:25 40:6 43:9
visually 24:17 30:18
voiced 4:24
Volusia 31:13,16 31:19,24 32:2 32:17 47:14,18
vote 91:20 92:8 112:2 116:2,7 117:6,16,22 119:6,15 120:21 121:14 125:2,5 127:10 127:18 128:5 130:6 138:14 140:24 143:21 146:24 147:17 149:15 163:23 165:4
voted 109:17 130:3 133:7 142:21,21
voter 60:11 64:21 144:18
voters 23:13 27:5 56:13 80:22 81:10 98:9 99:9 99:10,17 100:21 120:20 121:12,13,16 130:23 131:2 148:6 150:13 154:5,19 155:16

2/25/2022                    Common Cause, et al. v. Cord Byrd                    Audio Transcription

Page 28

| | | | | |
|---|---|---|---|---|
| **votes** 136:19 | 114:2,19 | **we're** 6:18 9:5 | 157:24 162:13 | 115:5,12 117:9 |
| **voting** 21:23,25 | 118:21 119:20 | 11:9 12:11,23 | **weaken** 62:10 | 120:6 126:14 |
| 31:2 65:5 92:3 | 121:20 122:12 | 13:2 14:10 | **weakening** 61:13 | 127:13 134:15 |
| 131:24 136:7 | 122:14,23 | 16:12,15,16,19 | 61:21 62:24 | 138:18 141:2 |
| 138:4 148:11 | 141:4 143:8 | 18:16 19:17 | 65:15 | 145:3 160:23 |
| 152:9 153:25 | 147:2 149:6 | 20:10,22 54:12 | **weapon** 112:4 | **withheld** 146:17 |
| 154:24 155:2 | 153:2,9 155:20 | 58:6,16 61:17 | 124:17,18 | **withstand** 154:17 |
| 157:8 158:3,11 | 156:3 160:25 | 64:14 67:14 | **weaponizing** | **Women** 130:23 |
| 160:4 161:3 | 161:6 162:24 | 72:11 75:12 | 129:20 | 131:2 |
| 165:1 | 163:20 167:12 | 78:15 85:22 | **webpage** 23:5 | **wondering** 99:7 |
| **voting-age** 30:21 | 167:17,21,24 | 91:8,19 96:7,25 | **website** 7:4 123:8 | 104:6 |
| 97:24 100:3,5 | 168:1,9,10 | 97:11 103:11 | **week** 4:21,22 | **Woodson** 6:12 |
| 131:8 | **wanted** 5:18 | 106:4 110:11 | 22:6 26:12 | **word** 66:12 91:16 |
| **VRA** 79:6 155:9 | 119:23 123:2 | 110:17,22,25 | 44:15 145:10 | **worded** 93:14 |
| 155:12 158:9 | 123:12 128:19 | 111:2,21 112:3 | 159:6 | **words** 50:2 |
| 158:17,18 | 149:23 150:8 | 113:3,13 | **weeks** 55:16 | 113:20 |
| 159:1 | **wanting** 122:21 | 114:17 118:10 | 121:8 147:15 | **work** 5:5,18 6:21 |
| | 123:18 | 118:25 124:1 | 162:18 | 7:15 9:8 10:13 |
| **W** | **wants** 18:19 89:8 | 124:17,18 | **weighed** 162:10 | 11:10 20:22 |
| **wading** 114:18 | 96:10 | 125:12,16 | **welcome** 48:18 | 50:11 72:23 |
| **wait** 95:17 | **Washington** 1:24 | 126:23 129:2 | 105:21 133:1 | 75:10 93:5 |
| **waiting** 75:15 | **wasn't** 19:25 | 129:20,25 | 133:15 | 103:25 124:7 |
| **walk** 22:10 25:4 | 68:13 | 130:19 133:1 | **Wellington** 38:24 | 124:10,11 |
| 27:23 44:11 | **waste** 148:15 | 133:24 134:11 | **weren't** 120:14 | 125:2 129:5,25 |
| 88:4 | **wasting** 14:10 | 136:10,19,21 | **west** 34:11 38:23 | 132:21 135:15 |
| **walked** 168:5 | **watch** 90:1,23 | 141:11 143:16 | 47:23 156:9 | 139:17 140:24 |
| **walking** 168:3 | **watched** 159:7 | 143:16,21 | **western** 33:23 | 142:9 146:12 |
| **Walton** 28:8 | **water** 35:14 | 144:13 147:1 | 38:25 42:18 | 148:8 150:25 |
| 46:10 | **waterway** 51:14 | 147:19,25 | **Weston** 39:25 | 151:1 163:24 |
| **want** 5:6 6:5,5,22 | **way** 9:11 11:8 | 149:25 150:22 | **whatsoever** 93:6 | 164:18 167:19 |
| 8:1,2,4,8,13 9:3 | 24:8 33:23 38:4 | 152:5 162:1 | 93:15 | 167:20,25 |
| 10:7 13:12 | 42:12 51:10 | 168:16 | **wholistically** | 168:1,14,14 |
| 15:10 18:16,20 | 52:1,2 56:9 | **we've** 25:24 | 64:20 139:23 | **worked** 25:19 |
| 19:17 22:19 | 67:12,14 73:15 | 26:13 27:20 | **wholly** 25:22 | 84:12 |
| 23:8 24:4,25 | 76:14 87:4,7 | 28:23 30:25 | 26:16 30:2 | **working** 24:23 |
| 33:16 43:20 | 88:13 92:15 | 43:6 48:21,23 | 31:11 33:9,11 | 97:11 132:22 |
| 49:21 50:10 | 93:14 110:5 | 49:7 55:4 63:20 | 35:5,23 38:8,20 | 137:6 164:21 |
| 52:3,5 53:22,23 | 114:19 115:1 | 65:2 80:19 82:6 | 39:17,19 40:13 | **works** 83:9 |
| 53:24,25 54:11 | 129:1 131:16 | 82:8 87:22 | 42:20 46:20 | **workshop** 147:14 |
| 67:24 70:7 | 132:14 145:22 | 90:13 95:13 | 134:23 150:12 | **world** 127:24 |
| 71:11 72:14 | 149:11 161:9 | 96:24 97:1,8 | **Wildlife** 39:3 | **wouldn't** 102:12 |
| 83:6,8 86:3 | 168:3 | 113:11,14 | **win** 83:13 | 102:25 141:23 |
| 87:12,25 95:1 | **we'll** 11:5 15:11 | 115:18 119:2 | **Winter** 34:1,1 | **written** 158:9 |
| 95:17 96:20,24 | 20:24 25:4 69:9 | 127:25 128:19 | **wish** 117:25 | 160:3 |
| 101:3 103:10 | 104:20 114:25 | 135:14 136:12 | **wishes** 121:3 | **wrong** 93:12 |
| 103:13,14 | 132:17 136:22 | 147:12,14 | 130:23 | 121:15 124:18 |
| 104:16 113:6 | 168:12 | 148:10 157:4 | **wishing** 105:10 | 124:20 145:25 |

HT_0005394

JX 0038-0197