# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**COMMON CAUSE FLORIDA, et al.,**

    **Plaintiffs,**

**v.**                            **Case No. 4:22-cv-109-AW-MAF**

**CORD BYRD, in his official capacity as**
**Florida Secretary of State,**

    **Defendant.**

_____/

Before JORDAN, Circuit Judge, and RODGERS and WINSOR, District Judges.

PER CURIAM:

This order constitutes the findings of fact and conclusions of law of the three-judge Court following a bench trial held in September and October of 2023.

## I.    PROCEDURAL HISTORY

This case involves constitutional challenges to the congressional districting map proposed by Governor Ron DeSantis and enacted by the Florida Legislature in 2022 (the Enacted Map). The litigation actually began in March of 2022—over a month before the Enacted Map became law—when some plaintiffs (Common Cause Florida, FairDistricts Now, Dorothy Inman-Johnson, Brenda Holt, Leo R. Stoney, Myrna Young, and Nancy Ratzan) sued Florida's Secretary of State, several Florida legislators in charge of reapportionment, and Governor DeSantis for congressional malapportionment. *See* D.E. 1. The case was assigned to Judge Winsor, and after his notification pursuant to 28 U.S.C. § 2284(b)(1), the Chief Judge of the Eleventh Circuit designated Judge Jordan and Judge Rodgers to sit on this three-judge Court. *See* D.E. 3–6. Once the Enacted Map became

law on April 22, 2022, the plaintiffs' malapportionment claims became moot. *See* D.E. 86; D.E. 96.

In May of 2022, with the Enacted Map now in place, the plaintiffs amended their complaint to assert intentional vote dilution claims under the Fourteenth and Fifteenth Amendments to the U.S. Constitution. *See* D.E. 97. The complaint also added the Florida State Conference of the National Association for the Advancement of Colored People Branches as a plaintiff. *See id.* More specifically, the plaintiffs alleged that the Florida Legislature destroyed a Black-performing congressional district in North Florida to intentionally dilute the vote of Black voters. This time, the plaintiffs sued only Florida's Secretary of State, Laurel M. Lee, and Governor DeSantis. Soon thereafter, Secretary Cord Byrd was substituted as a defendant for the now former Secretary Lee. *See* D.E. 103. In November of 2022, we dismissed the plaintiffs' claims against Governor DeSantis, leaving only Secretary Byrd as a defendant. In a 2-1 decision, we denied Secretary Byrd's motion to dismiss the plaintiffs' claims. *See* D.E. 115.

Parallel to this case, on April 22, 2022, another set of plaintiffs sued the Secretary and various legislators in Florida state court for violating the Florida Fair Districts Amendments to the Florida Constitution, *see* Fla. Const. art. III, §§ 20–21 (the FDA), including its non-diminishment provision. *See* Compl., *Black Voter Capacity Bldg. Inst., Inc. v. Sec'y of State Lee*, No. 2022 CA 0666 (Fla. 2d Jud. Cir. Ct.). The parties in that case stipulated to certain material facts—mainly that there is no longer a Black-performing congressional district in North Florida—and asked the trial court to decide various legal questions. *See* Final Order After Hearing and Final Judgment, D.E. 348 at 8–13. Those questions included (1) whether the preconditions in *Thornburg v. Gingles*, 478 U.S. 30 (1986) (the "*Gingles* factors") under § 2 of the Voting Rights Act, 52 U.S.C § 10301, apply to the non-diminishment provision of the FDA, and (2) whether that same provision, either facially or as-applied to the congressional districts in North Florida, violates the U.S. Constitution's Equal Protection Clause. *See id.* at 14. The trial court held that the *Gingles* factors do not apply and that the FDA's non-diminishment provision is consistent with the U.S. Constitution. *See id.* at 24, 31. The trial court then declared that the Enacted Map

constituted an unconstitutional diminishment under the FDA. *See id.* at 54. The defendants appealed to Florida's First District Court of Appeal, which convened en banc and reversed the trial court on December 1, 2023, in an 8-2 decision (with three judges recusing). *See Sec'y of State Byrd v. Black Voters Matter Capacity Bldg. Inst., Inc.*, 375 So. 3d 335 (Fla. 1st DCA 2023) (en banc). The Florida Supreme Court has agreed to hear the case. *See Black Voters Matter Capacity Bldg. Inst., Inc. v. Byrd*, 2024 WL 370045 (Fla. 2024).

Returning to our case, the plaintiffs filed their second amended complaint (the SAC) in February of 2023. *See* D.E. 131. The changes were mainly cosmetic, although the SAC did add five individual plaintiffs (Cassandra Brown, Peter Butzin, Charlie Clark, Veatrice Holifield Farrell, and Rosemary McCoy). *See* D.E. 129. The SAC is the operative pleading.

In August of 2023, we denied as moot Secretary Byrd's partial motion for summary judgment as to various congressional districts because the plaintiffs clarified that their challenge was limited to districts in North Florida. *See* D.E. 178. Before trial, the parties stipulated that Benchmark CD-5 (as re-configured in 2016) is now divided among Enacted CD-2, CD-3, CD-4, and CD-5. *See* Joint Pre-Trial Report, D.E. 187 at 7. Neither side moved for summary judgment on the merits.

The parties agree that the plaintiffs' SAC raises intentional vote dilution claims under the Fourteenth and Fifteenth Amendments to the U.S. Constitution. Their joint pre-trial report and post-trial briefs reflect this understanding. *See* Joint Pre-Trial Report, D.E. 187 at 8 ("The sole issue of fact that remains to be litigated is whether or not . . . intentional discrimination on the basis of race was the reason, *at least in part*, for the elimination of Benchmark CD-5 and the failure to replace it with a Black-performing district in North Florida.") (emphasis added); Plaintiffs' Post-Trial Br., D.E. 218 at 117 ("Intentional vote dilution claims like the one [p]laintiffs bring here are 'analytically distinct' from racial gerrymandering claims and claims brought under Section 2 of the Voting Rights Act."); Secretary's Post-Trial Br., D.E. 217 at 66 ("[W]e again emphasize that this case is solely about whether the Enacted Map was passed with invidious racially discriminatory intent and effect, in violation of the Equal Protection Clause and Fifteenth Amendment.").

The parties also agree that the proper legal framework to evaluate the plaintiffs' claims is set out in "*Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), with the additional factors added by the [Eleventh] Circuit in *Greater Birmingham Ministries v. Secretary of State for State of Alabama*, 992 F.3d 1299 (11th Cir. 2021)." Joint Pre-Trial Report, D.E. 187 at 8. Both sides disavow that this is a constitutional racial gerrymandering case under *Shaw v. Reno*, 509 U.S. 630 (1993). *See* Plaintiffs' Post-Trial Br., D.E. 218 at 117; Secretary's Post-Trial Br., D.E. 217 at 67.[1]

We held a four-day bench trial in Tallahassee during the weeks of September 25 and October 2, 2023, and later received post-trial submissions from the parties.

## II.    BACKGROUND FACTS

### A. Florida History

Florida has a long and turbulent history of denying and suppressing the electoral voice of Black Americans. For over a century, the Legislature passed discriminatory laws and redrew maps to limit ballot access and disenfranchise generations of Black voters. *See* Tr. 335–57, 875–84. These measures not only deprived Black Americans of their constitutional right to vote, but all too often stoked acts of violence that claimed lives and destroyed communities. *See* Tr. 343–45, 876–77.

Lawmakers in Tallahassee today, of course, do not bear responsibility for the injustices committed by their predecessors a century ago. Nor do we conflate the events of this case with the events of the distant past. We do, however, view the history of voter discrimination in Florida as relevant background for contextualizing the claims before us.

The congressional map at issue in this case impacts a region of North Florida known as the "Slave Belt." In the antebellum period, this region was heavily dependent on a plantation economy made possible by coerced labor. *See* Tr. 336, 889. As a result, at the outbreak of the Civil War, the enslaved population of Florida was highly concentrated in this region. *See* Tr. 336; PX 4558. Enslaved laborers in certain counties of the Slave Belt—

---

[1] In a racial gerrymandering case, the plaintiffs need to show that race predominated above all other traditional redistricting criteria. *See Cooper v. Harris*, 581 U.S. 285, 291–92 (2017).

such as Gadsden, Leon, Jefferson, and Madison—constituted more than half of the overall population in those areas at the time.  *See* PX 4558.  The Black population that currently resides in the former Slave Belt shares a lineal connection to those enslaved men and women and comprise a large share of Florida's overall Black population today.  *See* Tr. 889–90.  A map depicting the slave population in Florida in the 1860s, including the former Slave Belt, was introduced at trial and we reproduce it here:



PX 4558.[2]

Despite their outsized presence in the former Slave Belt, Black voters in North Florida struggled to elect their preferred candidates following the Civil War.  The facts are as startling as they are undeniable.  For more than a century, from 1877 to 1993, Florida

---

[2] Secretary Byrd criticized this map because it was drawn by a Democratic map maker and because it did not include total population numbers.  But he did not show that the map was inaccurate with respect to what it sought to show.

failed to elect a single Black candidate to national office. *See* Tr. 356, 880. Florida similarly did not elect a single Black candidate to the Florida House from 1888 to 1969. *See* Tr. 356, 880. The same is true of the Florida Senate, which saw its first Black elected official in 1982. *See* Tr. 356, 880. These prolonged disparities in representation were not coincidental—they were engineered through deliberate legislation and careful map drawing that for decades targeted Black voters both at and beyond the ballot box.

Florida employed a wide array of tactics over this span of time. In 1868, for instance, the Florida Constitution instituted a scheme that awarded white-majority counties disproportionate power in elections and all but codified a malapportioned legislature. *See* Tr. 337, 876. Lawmakers would further silence and suppress Black voters in subsequent decades by, among other things, implementing poll taxes and "Eight Box Laws," which required voters to deposit separate ballots in separate boxes and effectively disenfranchised illiterate persons. *See* Tr. 342–43, 876. Other measures, such as the categorical ban on Black participation in Democratic primaries, were even more conspicuous. *See* Tr. 344, 876.

Black voters often faced outright violence in Florida when they attempted to participate in the electoral process despite such obstacles. As an example, in 1920, a local campaign to register Black voters in a small town outside Orlando known as Ocoee produced one of the bloodiest days in modern U.S. political history. *See* Tr. 344, 876. A similar effort to register Black voters would decades later result in the assassination of Harry T. Moore, the president of the Florida NAACP chapter, in 1951. *See* Tr. 345, 876.

The latter half of the 20th century saw an expansion in ballot access for Black voters amid new forms of voter discrimination in Florida. *See* Tr. 348, 877. Indeed, despite the passage of the Voting Rights Act in 1965, the adoption of subtle countermeasures, such as voter roll purges and at-large elections, would prevent Black voters in Florida from electing their candidate of choice to Congress for several decades. *See* Tr. 353–54, 877–80.

In 1992, a broad national effort to enforce Section 2 of the Voting Rights Act, 52 U.S.C § 10301, prompted Florida to create its first set of Black-performing districts. *See* Tr. 25, 355, 859. The following year, Black voters in these recently formed districts elected

Corrine Brown, Alcee Hastings, and Carrie Meek to the U.S. House of Representatives—the first Black members of Congress to represent Florida since Reconstruction. *See* Tr. 859, 862. These districts would undergo drastic changes in subsequent years. In North Florida, for instance, CD-3, which originally ran North-South from Jacksonville to Orlando, became Benchmark CD-5 in 2012, running East-West from Jacksonville to Tallahassee. *See* Tr. 62−63, 66, 161, 357−59; Plaintiffs' Post-Trial Br., D.E. 218 at 76. Despite the Black Voting-Age Population (the BVAP) not exceeding 50% across such iterations, the district performed consistently for Black voters for three decades until its elimination by the Florida Legislature in 2022. *See* Tr. 357–59, 885.

### B. Florida's Fair Districts Amendments

In Florida, the Legislature bears the responsibility of drawing congressional and state maps. *See* Fla. Const. art. III, §§ 7, 16, 20, 21; Tr. 9. In 2010, 62% of Florida voters—by way of referendum—enacted the FDA to the Florida Constitution. *See* Tr. 360; Fla. Const. art. III, §§ 20–21. The FDA imposes redistricting standards on the Legislature that apply equally to the drawing of congressional and state legislative maps. Its impact on redistricting in Florida cannot be understated.

The FDA contains "Tier 1" and "Tier 2" standards. *See* Fla. Const. art. III, §§ 20(a), 20(b). Tier 2 is subordinate to Tier 1.

Tier 1 provides:

> No apportionment plan or individual district shall be drawn with the intent to favor or disfavor a political party or an incumbent; and **districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process** or *to diminish their ability to elect representatives of their choice*; and districts shall consist of contiguous territory.

§ 20(a) (emphases added). The bolded text is the "non-dilution" clause. *See In re Senate Joint Resol. of Legislative Apportionment 1176*, 83 So. 3d 597, 619 (Fla. 2012) (*Apportionment I*). The italicized text is the "non-diminishment" clause. *See id.* These provisions are modeled after Sections 2 (vote dilution) and 5 (retrogression), respectively,

of the Voting Rights Act, but the Florida Supreme Court does not interpret them exactly as the U.S. Supreme Court interprets the VRA. *See id*. at 620–21.

Tier 2 provides:

> Unless compliance with the standards in this subsection conflicts with the standards in subsection (a) or with federal law, districts shall be as nearly equal in population as is practicable; districts shall be compact; and districts shall, where feasible, utilize existing political and geographical boundaries.

Fla. Const. art. III, § 20(b).

The order of the requirements within each Tier do not establish priority. *See id*. at § 20(c).

### C. The 2012 Redistricting Cycle and Benchmark CD-5

The FDA first applied during the 2012 redistricting cycle. Its misapplication by the Florida Legislature led to no fewer than eight Florida Supreme Court decisions, *see* Tr. 365, culminating in *League of Women Voters of Fla. v. Detzner*, 179 So. 3d 258 (Fla. 2015) (*Apportionment VIII*).

In one such case—*League of Women Voters of Fla. v. Detzner*, 172 So. 3d 363 (Fla. 2015) (*Apportionment VII*)—the Florida Supreme Court ordered the redrawing of CD-5 to cure the Legislature's unconstitutional (under the FDA) partisan gerrymander. The trial court found that political operatives infiltrated the redistricting process and improperly influenced the Legislature to draw Republican-slanted maps. *See id*. at 392. The Florida Supreme Court affirmed these findings. *See id*. at 416 ("[W]e affirm the trial court's factual findings and ultimate determination that the redistricting process and resulting map were 'taint[ed]' by unconstitutional intent to favor the Republican Party and incumbents.").

In *Apportionment VII*, the Legislature drew CD-5 from Jacksonville to Orlando to ostensibly comply with the VRA and with the FDA's non-diminishment provisions. *See id*. at 402. The plaintiffs in that case argued that the Legislature packed "Democratic-leaning black voters into the district" to dilute their vote elsewhere. *See id*. To fix the issue, the plaintiffs proposed a CD-5 configuration that bordered much of Georgia from

Jacksonville to Tallahassee. *See id*. at 404. The Legislature rejected the proposal because that plan would have lowered BVAP percentages from 48.11% to 45.12%—an illegal diminishment (under the FDA and VRA) in the Legislature's view. *See id*. at 405.

The Florida Supreme Court rejected the Legislature's BVAP argument, reasoning instead that "BVAP itself cannot be viewed in a vacuum." *Id*. (citing *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 275–76 (2015)). It is the "ability to elect a preferred candidate of choice" that matters. *Apportionment VII*, 172 So. 3d at 405. To determine whether a district performs for minority voters in that way, mapmakers must perform a "functional analysis." *Apportionment I*, 83 So. 3d at 625. In Florida, a functional analysis requires the consideration of "(1) voting-age populations; (2) voting-registration data; (3) voting registration of actual voters; and (4) election results history." *Id*. at 627.

Given the Legislature's unconstitutional partisan gerrymander in violation of the FDA, the Florida Supreme Court in *Apportionment VII* mandated the plaintiffs' proposed configuration of CD-5 (i.e., Benchmark CD-5) as depicted below in purple:



*Apportionment VII*, 172 So. 3d at 406; PX 7222. Benchmark CD-5's configuration was very similar to one previously drawn by the Legislature's own mapmaker, Alex Kelly, who also drew the Enacted Map at issue here. *See Apportionment VII*, 172 So. 3d at 403–04 ("[L]egislative staffer Alex Kelly initially drew an East-West version of the district, with a

BVAP of 44.96%, and concluded that such a configuration would be constitutionally compliant.").[3]

Though not a "model of compactness," the Florida Supreme Court reasoned that the East-West Benchmark CD-5 was better than the Legislature's alternative and accounted for geography as well as the FDA. *See id.* at 406. As will become relevant later, the Florida Supreme Court did not opine on Benchmark CD-5's compliance with the Fourteenth Amendment to the U.S. Constitution.

The parties disagree on whether Benchmark CD-5 constitutes a "community of interest" and whether that can be considered for purposes of redistricting. *See* Tr. 241–42, 658. Generally speaking, a community of interest refers to a "geographic or socioeconomic or policy-interested group that share a . . . common interest or characteristic." Tr. 793. The Florida Supreme Court has held that, under the FDA, "maintaining communities of interest is not a constitutional requirement, and comporting with such a principle should not come at the expense of complying with constitutional imperatives, such as compactness." *Apportionment I*, 83 So. 3d at 664. The U.S. Supreme Court has, however, recognized it as a traditional redistricting criterion. *See Bush v. Vera*, 517 U.S. 952, 964 (1996) (plurality opinion) (listing "shared broadcast and print media, public transportation infrastructure, and institutions such as schools and churches" as relevant to defining a community of interest); *see also Allen v. Milligan*, 599 U.S. 1, 20–21 (2023) (considering communities of interest under Alabama law). The term nonetheless remains ill-defined. *See* Sandra J. Chen et al., *Turning Communities of Interest into a Rigorous Standard for Fair Districting*, 18 Stan. J.C.R. & C.L. 101, 107 (2022).

Setting that definitional dispute aside for now, the population in Benchmark CD-5 did share various common characteristics. Relative to the enacted districts it was later divided into, Benchmark CD-5 had younger residents, lower household incomes, higher

---

[3] Mr. Kelly testified at trial that the Florida Supreme Court "missed the context" of his map submission because he never opined on its constitutionality. *See* Tr. 67. Moreover, Mr. Kelly testified that he only drew that configuration of CD-5 to memorialize a hand-drawn submission from a member of the public. *See* Tr. 204. We need not address this aspect of Mr. Kelly's testimony.

rates of adults and children living below the poverty line, and lower rates of persons with a high school diploma or college degree.  *See* PX 5042-0018.  The plaintiffs' expert historian, Dr. J. Morgan Kousser, testified that the population in Benchmark CD-5 also shared in a lack of health insurance and a greater dependence on Medicaid.  *See* Tr. 383. And Dr. Mark Edwards Owens, an expert witness for the Secretary, agreed that Benchmark CD-5 overlapped significantly with the former Slave Belt.  *See* Tr. 889–90.

## D.  The 2022 Redistricting Cycle

In Florida, congressional districting maps are drawn by both chambers of the Legislature and enacted as legislation, subject to gubernatorial veto.  *See* Fla. Const. art. III, §§ 7, 8, 20; Joint Pre-Trial Report, D.E. 187 at 4.  The Legislature may override the Governor's veto by a two-thirds vote in each chamber.  *See* Fla. Const. art. III, § 8(c); Joint Pre-Trial Report, D.E. 187 at 4.  State legislative plans, on the other hand, are enacted by joint resolution in the Legislature and are not subject to gubernatorial veto.  *See* Fla. Const. art. III, §§ 16, 21.  State legislative plans must, however, undergo judicial review.  *See* Fla. Const. art. III, § 16(c).  In turn, the Florida Supreme Court must, in accordance with its own rules, "permit adversary interests to present their views" on the joint resolution before entering its judgment on the validity of the legislative apportionment.  *See id.*

In 2020, Florida received an additional seat in Congress after the most recent census—increasing its share of congressional seats from 27 to 28.  *See* Joint Pre-Trial Report, D.E. 187 at 4.  The Legislature began its redistricting process in late 2021 by considering several maps that resembled the East-West Benchmark CD-5 initially drawn by the Florida Supreme Court in the previous redistricting cycle.  *See* Tr. 69−70.

The Legislature was determined to produce a congressional redistricting map that complied with the FDA by maintaining a Black-performing district in North Florida.  *See* Tr. 71, 369−70.   Senator Ray Rodrigues, Chair of the Senate Subcommittee on Congressional Reapportionment, stated that he "intend[ed] for this [redistricting] committee to conduct the process in a manner . . . consistent with case law . . . developed during the last decade . . . and . . . free from any hint of unconstitutional intent."  JX 0001 at 15; Tr. 370.  Representative Tom Leek, Chair of the House Redistricting Committee,

expressed a similar sentiment, stating: "The House will conduct this process in compliance with the Florida Constitution and . . . relevant court preceden[t]." JX 0003 at 7; Tr. 372.

On January 13, 2022, the Senate Subcommittee on Congressional Reapportionment submitted four prospective plans, each of which retained a Black-performing district in North Florida. *See* Tr. 375; Plaintiffs' Post-Trial Br., D.E. 218 at 123. According to Dr. Kousser, one of the plaintiffs' expert witnesses, "[a]ll the plans ha[d] basically the same district in North Florida . . . . It's the district that had been set up in 2016 by the legislature under court orders, cleaned up a little . . . but it's essentially the same district." Tr. 375.

Governor DeSantis opposed the Senate Subcommittee's preliminary plans three days later. *See* Tr. 73−74. As part of the public input process, the Governor proposed an alternative congressional map (Map 79), which divided Benchmark CD-5 into four districts. *See* PX 5053; Tr. 82−83. This map did not preserve a Black-performing district in North Florida. *See* Tr. 83, 432−34. The Governor's production and submission of a congressional redistricting map was unprecedented in Florida history. *See* Tr. 75, 434, 898.[4]

In an accompanying press statement, Governor DeSantis explained his proposed elimination of the only Black-performing district in North Florida. He asserted that the "Northern Florida map [was] an unconstitutional gerrymander that unnaturally connect[ed] communities in Jacksonville with communities hours away in Tallahassee and Gadsden Counties [sic]." Tr. 83.

The plaintiffs claim that the Governor's proposed map deliberately "cracked" Benchmark CD-5 into "four white districts" to eliminate a Black-performing district in the region. *See* Tr. 10, 83. Mr. Kelly, who was called by a witness by both sides, denied that allegation, testifying that Map 79 "split" Benchmark CD-5 because Governor DeSantis

---

[4] The parties agree that during their tenures Florida Governors Thomas LeRoy Collins and Lawton Chiles had lobbied the Legislature for alternative congressional maps. *See* Tr. 434, 439. Similarly, the parties agree that in 1982, "House and Senate leaders, working with [Florida Governor Bob] Graham, had privately worked out a compromise [redistricting] plan." Tr. 438. No Florida governors, however, had previously produced and submitted a map themselves. *See* Tr. 42, 420, 434, 552, 898.

believed it constituted "an unconstitutional gerrymander" under the Equal Protection Clause of the Fourteenth Amendment. *See* Tr. 55, 72, 83, 87, 94.[5]

The Florida Senate rejected the Governor's constitutional argument on January 20, 2022, and passed, by a vote of 31 to 4, a congressional redistricting plan (Map 8060) that retained a Black-performing CD-5 in North Florida. *See* PX 5062; Tr. 10, 74, 86−87, 395−96. According to Senator Rodrigues, the Florida Senate had fulfilled its reapportionment responsibility because Map 8060 complied with the Tier 1 non-diminishment standard of the FDA. *See* Fla. Const. art. III, § 20(a). In his own words, the senators who supported Map 8060 were "a hundred percent confident that there [was] no retrogression with the map" and were "prepared to defend that map in court, if necessary." JX 0027 at 3; Tr. 85.

On February 1, 2022, Governor DeSantis responded to Map 8060 by requesting an advisory opinion from the Florida Supreme Court. *See* Joint Pre-Trial Report, D.E. 187 at 5−6. In "deciding whether to exercise [his] veto power," the Governor asked the Florida Supreme Court to address the Tier 1 non-diminishment standard of the FDA as follows:

> I seek this Court's opinion on whether Article III, Section 20(a) of the Florida Constitution requires the retention of a district in northern Florida that connects the minority population in Jacksonville with distant and distinct minority populations (either in Leon and Gadsden Counties or outside of Orlando) to ensure sufficient voting strength, even if not a majority, to elect a candidate of their choice.

JX 0052 at 2.

The Florida Supreme Court declined to issue an opinion to inform the Governor's veto decision. *See Advisory Opinion to Governor*, 333 So. 3d 1106 (Fla. 2022). Specifically, it concluded that "the Governor's request might necessitate fact-intensive analysis" and that it could not conduct such an inquiry without "a functional analysis of

---

[5] As a general matter, "cracking means dividing [voters] . . . among multiple districts so that they fall short of a majority in each one." *Gill v. Whitford*, 585 U.S. 48, 55 (2018) (citations omitted). *See Voinovich v. Quilter*, 507 U.S. 146, 153–54 (1993) (explaining that "cracking" can support racial vote dilution claims).

statistical evidence, such as the voting age of minority populations and election results." *Id.* at 1108.[6]

On February 14, 2022, Governor DeSantis produced and submitted a second map (Map 94) for the Legislature's consideration. *See* PX 4527. In keeping with its gubernatorial predecessor, Map 94 divided Benchmark CD-5 into four districts and eliminated the only Black-performing district in North Florida. *See* Tr. 96−97. While the House Subcommittee on Congressional Redistricting deliberated, the Governor's Office took coordinated action.[7]

On February 18, 2022, Governor DeSantis solicited Robert D. Popper, a senior attorney at Judicial Watch, to testify before the House subcommittee as to the Governor's legal objections. *See* JX 0037. Judicial Watch, according to Mr. Popper, is as a "Washington D.C.-based public interest nonprofit dedicated to promoting transparency, accountability, and integrity in government, politics, and the law." JX 2236 at 1. The effort, however, failed to consolidate support for the Governor's views. According to the plaintiffs and Mr. Kelly, the Legislature "was not impressed" with the arguments advanced by Mr. Popper that day. *See* Tr. 105. Instead, both Republicans and Democrats alike were openly hostile toward Mr. Popper after hearing his presentation. *See* Tr. 105−06. Notably, as part of his testimony, Mr. Popper acknowledged that the Tier 1 non-diminishment standard of the FDA could provide a compelling state interest to justify a race-based district under the Equal Protection Clause of the Fourteenth Amendment. *See* JX 0037 at 92, 95, 101; Tr. 104.[8]

---

[6] The Governor's request to the Florida Supreme Court was unusual; the Florida Supreme Court had previously declined a similar request in 1887. *See* JX 0052 at 3; Tr. 422; *In re Exec. Commc'n*, 23 Fla. 297, 298–99 (Fla. 1887). Though rare, the Governor's request was not unprecedented. *See* Tr. 436; *In re Advisory Opinion to Governor*, 81 So. 2d 782, 783–87 (Fla. 1955).

[7] For the discussion by the House Subcommittee on Congressional Redistricting, see, e.g., JX 0037 and JX 0038.

[8] Mr. Popper agreed that complying with the Florida Constitution "absolutely can be a compelling state interest." JX 0037 at 101. Mr. Popper also asserted, however, that Benchmark CD-5 was not narrowly tailored. *See* JX 0037 at 101.

On that same day, the Governor's General Counsel, Ryan Newman, sent a legal memorandum to the House Subcommittee on Congressional Redistricting. *See* JX 0056; Tr. 106. This memorandum, Secretary Byrd conceded, was a direct response to the Legislature's ongoing efforts to preserve a Black-performing district in North Florida. *See* Secretary's Post-Trial Br., D.E. 217 at 46−47.

Mr. Newman argued in his memorandum that the proposed district resembling Benchmark CD-5 was "[f]ar from compact" and did "not respect political subdivisions or communities defined by actual shared interests." JX 0056 at 2. According to Mr. Newman, such legislative proposals existed "specifically to capture minority populations and to combine them into one district." JX 0056 at 3. To that end, Benchmark CD-5, and other Black-performing districts resembling it in North Florida, amounted to racial gerrymanders that were neither required by the FDA nor tolerated by the Equal Protection Clause of the Fourteenth Amendment. *See* JX 0056.

After considering both Mr. Popper's testimony and Mr. Newman's memorandum, an unpersuaded House Subcommittee on Congressional Redistricting passed, by a vote of 14 to 7, a congressional redistricting plan (Map 8011) that rejected the Governor's legal arguments by retaining a Black-performing district in North Florida. *See* DX97; Tr. 13, 113, 557. Like Benchmark CD-5, the proposed CD-3 of Map 8011 spanned East-West from Jacksonville to Tallahassee along the Georgia border. *See* DX97.

The Florida House of Representatives, however, sought to compromise by introducing an unprecedented two-map plan. For the first time in Florida history, the House proposed a congressional redistricting package that featured both a primary map (Map 8019) and an alternative map (Map 8015). *See* Tr. 81, 392, 558.[9]

We reproduce each map below.

---

[9] The two-map plan was first introduced by the House Redistricting Subcommittee on February 25, 2022. *See* Tr. 74. At that time, the Subcommittee introduced Map 8017, a prior version of Map 8019. *See* Tr. 395. The Subcommittee introduced Map 8019, the primary map later adopted by the Legislature, on March 1, 2022. The parties did not raise any relevant distinctions between Maps 8017 and 8019, nor does there appear to be any. *See* https://perma.cc/LJ9C-XWR7.

Map 8019[10]



DX97 at 6 (containing screenshot of same).

Map 8015[11]



DX98 at 3 (containing screenshot of same).

This two-map plan was an attempt by Florida legislators to comply with both the FDA non-diminishment standard and the Governor's stated objections as to the shape of Benchmark CD-5. *See* Tr. 556−57. If the primary map was struck down, or rejected, the

---

x

[10] https://perma.cc/5SN7-BACU.

[11] https://perma.cc/C6NX-USZS.

16

alternative map would "take immediate effect." *See* JX 0038 at 24; Tr. 556−57. Either way, the House reasoned that this proposed compromise would deliver a legally compliant map. *See* Tr. 557.

The primary map, Map 8019, introduced a new, more compact CD-5 configuration and managed to preserve a Black-performing district in North Florida. *See* Tr. 119−22, 132−34. Unlike previous versions of the district, the proposed CD-5 in Map 8019 no longer spanned hundreds of miles along the Georgia border and across eight counties in Florida. *See* Tr. 122. Nor did it attempt to connect allegedly separate and distinct minority population centers across Jacksonville and Tallahassee. *See* Tr. 122. Instead, the proposed CD-5 in Map 8019 was "entirely located in Duval County" and centered around "a compact African American community." *See* Tr. 118, 124.[12]

In the words of Representative Leek, this new "Duval-only" configuration "was put forward as a way to address the novel legal theory raised by the Governor, while still protecting a Black minority seat in North Florida." JX 0038 at 24; Tr. 556−57. Visually, the proposed district was no longer "unusual," "bizarre," or "meandering." JX 0052 at 4. Nor did its shape feature "narrow" or "sprawling" appendages that "compresse[d]" and "stretche[d] . . . solely to connect black voters . . . ." JX 0052 at 4. On the contrary, according to witnesses for Secretary Byrd, the proposed CD-5 was "a highly compact district" with northern, western, and southern lines that coincided exactly with the political boundaries of Duval County. *See* Tr. 118−19, 809. These visual refinements were reflected statistically as well. As compared to Benchmark CD-5, for example, the proposed district scored higher on every stipulated measure of compactness. *See* Joint Pre-Trial Report, D.E. 187 at 3.[13]

---

[12] The proposed Duval-only CD-5 in Map 8019 performed for Black voters in 9 out of 14 test elections as compared to the Benchmark CD-5, which performed in all 14 test elections. *See* Tr. 156, 174, 187−88, 1011. Overall, the Duval-only CD-5 functionally performed for Black voters. *See* Tr. 156, 192, 670−71.

[13] The parties stipulated to the compactness numbers and boundary analyses for all districts used for the 2016-2020 congressional elections (the Benchmark Map) as well as all the districts used in the Legislature's proposed two-map plan and those used for the 2022 congressional election (the Enacted Map) as available on floridaredistricting.gov. *See* Joint Pre-Trial Report, D.E. 187 at 3; *see infra notes* 14−20 and accompanying text.

The proposed Duval-only CD-5 in Map 8019 scored 0.52, 0.9, and 0.45 on the Reock, Convex Hull, and Polsby-Popper measures, respectively.[14] By comparison, Benchmark CD-5 scored 0.12, 0.71, and 0.1.[15] Meanwhile, the Enacted CD-4, which Mr. Kelly identified as the relevant analogue in the Enacted Map, scored 0.38, 0.76, and 0.32, which exceeded Benchmark CD-5, but failed to match or surpass the proposed Duval-only CD-5 on every metric. *See* JX 0046 at 76.[16] Each measure is scored against a minimum compactness score of 0 and a maximum score of 1. *See* Stephen Ansolabehere & Maxwell Palmer, *A Two-Hundred Year Statistical History of the Gerrymander*, 77 Ohio St. L.J. 741, 743−47 (2016).

The proposed Duval-only CD-5 in Map 8019 also scored well on various measures of the stipulated boundary analysis. Mr. Kelly explained that the boundary analysis scores reflect what percent of the district's shape can be explained by political and geographical boundaries. *See* Tr. 218–19; *see also In re Senate Joint Resolution of Legislative Apportionment 100*, 334 So. 3d 1282, 1288 (Fla. 2022) (explaining that an 82.7% boundary analysis score "show[s] that the average district in the new [Florida] House plan follows political and geographical boundaries along 82.7% of its perimeter"). As compared to Benchmark CD-5, the proposed Duval-only CD-5 scored higher on city, county, and water boundaries.[17] Similarly, as compared to the Enacted CD-4, the proposed Duval-only CD-5 scored higher on city, road, and rail boundaries.[18] Enacted CD-4, on the other hand, scored better than the proposed district on county, water, and non-geographic or political boundaries.[19]

---

[14] https://perma.cc/9K5Q-EUU3.

[15] https://perma.cc/E83X-N8SX.

[16] https://perma.cc/SV9Y-XMWK.

[17] *Compare* Benchmark CD-5 (https://perma.cc/X8JF-3V2Y), *with* the proposed Duval-only CD-5 in Map 8019 (https://perma.cc/8YJ9-CMJU).

[18] *Compare* the proposed Duval-only CD-5 in Map 8019 (https://perma.cc/8YJ9-CMJU), *with* the Enacted CD-4 (https://perma.cc/EM6V-K9TV).

[19] *See id.*

Despite these improvements, the proposed CD-5 in Map 8019 potentially introduced a new set of issues. Visually, the neighboring CD-4 enveloped the Duval-only CD-5 on three sides. *See* Tr. 809. According to Dr. Douglas Mark Johnson, an expert witness for the Secretary, the proposed CD-4 created "almost a full Pac Man" shape around the Duval-only CD-5. *See* Tr. 809−10, 832, 1008. Despite performing for Black voters in North Florida, moreover, Map 8019 diminished the BVAP for CD-5 by 10.88%—from 46.20% in the benchmark configuration to 35.32% in the Duval-only configuration. *See* DX98; JX 0070; Tr. 184−86.

As noted, the two-map package proposed by the House included a secondary, alternative plan for the Governor's consideration. This alternative plan, Map 8015, preserved a Black-performing East-West CD-5 in North Florida—it performed for Black voters in 14 out of 14 test elections—and improved the boundary lines of Benchmark CD-5 in Duval County, Leon County, and Columbia County. *See* DX97; Tr. 156, 745. Dr. Matthew Barreto, an expert witness for the plaintiffs, testified that the alternative CD-5 accounted for those "areas where there were jagged edges and kind of smoothed them out to make improvements and follow other political boundaries." Tr. 745. As a result, the alternative CD-5 scored higher on several statistical boundary measures relative to the existing benchmark district.[20]

Overall, Map 8015 retained a CD-5 configuration that resembled the benchmark district in size and shape. *See* Tr. 660, 671. The alternative CD-5, for instance, spanned from Jacksonville to "the south side of Tallahassee" and some believed it "appeared to try

---

[20] As compared to Benchmark CD-5, the alternative CD-5 in Map 8015 scored higher on the Polsby-Popper compactness measure. *Compare* Benchmark CD-5 (https://perma.cc/E83X-N8SX), *with* the alternative CD-5 in Map 8015 (https://perma.cc/J2DE-PJ77). The alternative CD-5 also scored higher on several boundary measures, including city, county, road, and water boundaries. *Compare* Benchmark CD-5 (https://perma.cc/X8JF-3V2Y), *with* the alternative CD-5 in Map 8015 (https://perma.cc/SNF3-FQTM). As compared to the Enacted CD-4, the alternative CD-5 in Map 8015 scored lower on all three compactness measures. *Compare* Enacted CD-4 (https://perma.cc/SV9Y-XMWK), *with* the alternative CD-5 in Map 8015 (https://perma.cc/J2DE-PJ77). The alternative CD-5, however, exceeded the Enacted CD-4 on city and road boundaries, and matched the Enacted CD-4 on rail and non-geographic or political boundaries. *Compare* Enacted CD-4 (https://perma.cc/EM6V-K9TV) *with* the alternative CD-5 in Map 8015 (https://perma.cc/SNF3-FQTM). The Enacted CD-4, on the other hand, scored higher than the alternative CD-5 in Map 8015 on county and water boundaries. *See id.*

and find African American populations to connect together along the corridor." Tr. 692, 745; *see also* Tr. 747−78. To that end, Governor DeSantis objected to the alternative CD-5 on similar racial gerrymandering grounds. *See* Tr. 143.

In late February and early March of 2022, Governor DeSantis publicly declared his opposition to the compromise plan then under consideration in the House. First, on February 28, 2022, the Governor stated at a press conference: "I will veto maps that include some of these unconstitutional districts, and that is a guarantee. They can take that to the bank." Tr. 398. Then, on March 4, 2022, the Governor reiterated his position online: "I will veto the congressional reapportionment plan currently being debated by the House. DOA [Dead on Arrival]." PX 2108 at 2.

The Republican-controlled Senate nonetheless passed the two-map plan proposed by the House on the same day as the Governor's latest opposition statement. The Senate, like the House, reasoned that the compromise package complied with the FDA precisely because both Map 8019 and Map 8015 preserved a Black-performing district in North Florida. *See* JX 0040. Senator Rodrigues described the plan's primary Map 8019 as follows:

> I do believe this is a constitutional map. . . . [W]e laid down the county boundaries as our foundation. . . . [W]e made the decision as a body to prioritize geographic boundaries . . . . The map we're asking you to vote yes on today is . . . [b]etter than the benchmark, better than the map that we passed in January. . . . This is a constitutional map. It is a good map.

JX 0040 at 40−41, 44−45. The compromise plan passed the Senate by a vote of 24 to 15. *See* JX 0040 at 45.

True to his word, Governor DeSantis vetoed the Legislature's two-map redistricting plan on March 29, 2022. *See* Joint Pre-Trial Report, D.E. 187 at 6. In his veto, the Governor summarized his reasoning as follows:

> As presented in both the primary and secondary maps enacted by the Legislature, Congressional District 5 violates the Equal Protection Clause of the Fourteenth Amendment to the U.S.

Constitution for the reasons set forth in the attached memorandum. Although I understand the Legislature's desire to comply with the Florida Constitution, the Legislature is not absolved of its duty to comply with the U.S. Constitution. Where the U.S. and Florida Constitutions conflict, the U.S. Constitution must prevail.

JX 0054.

Mr. Newman provided a fuller legal rationale in a memorandum attached to the veto. *See* JX 0055. In sum, Mr. Newman argued that both maps contained racially gerrymandered districts in North Florida and that Map 8019 also violated the FDA's non-diminishment provision. As to Map 8019, he explained that:

> [The] configuration of the district is more compact [than Benchmark CD-5] but has caused the adjacent district—District 4—to take on a bizarre doughnut shape that almost completely surrounds District 5. The reason for this unusual configuration is the Legislature's desire to maximize the black voting age population in District 5. The Chair of the House Redistricting Committee confirmed this motivation when he explained that the new District 5 was drawn to "protect[] a black minority seat in north Florida." . . . Despite the Legislature's attempt to address the federal constitutional concerns by drawing a more compact district, the constitutional defect nevertheless persists.

JX 0055 at 3 (citation omitted). Similarly, for Map 8015 he stated:

> In the secondary map . . . District 5 is a sprawling district that stretches approximately 200 miles from East to West and cuts across eight counties to connect a minority population in Jacksonville with a separate and distinct minority population in Leon and Gadsden Counties. The district is not compact, does not conform to usual political or geographic boundaries, and is bizarrely shaped to include minority populations in western Leon County and Gadsden County while excluding non-minority populations in eastern Leon County. Because this version of District 5 plainly subordinates traditional districting criteria to avoid diminishment of minority voting age population, there is no question that race was "the predominant factor motivating the legislature's decision" to draw this district.

JX 0055 at 2 (citation omitted).

Regarding Map 8019's compliance with the FDA, Mr. Newman added:

> [T]here is no good reason to believe that District 5, as presented in [Map 8019], complies with the Florida Constitution's non-diminishment requirement. The benchmark district contains a black voting age population of 46.20%, whereas the black voting age population of District 5 in the primary map is only 35.32%. . . . This nearly eleven percentage point drop is more than slight, and while the House Redistricting Chair represented that the black population of the district could still elect a candidate of choice, . . . there appears to be little dispute that the ability of the black population to elect such a candidate had nevertheless been reduced . . . .

JX 0055 at 6 (citations omitted). Mr. Newman argued that though Map 8015 complied with FDA, "[s]uch a district [the alternative CD-5] is not narrowly tailored to achieve the compelling interest of protecting the voting rights of a minority community in a reasonably cohesive geographic area" and thus the FDA's non-diminishment provision is unconstitutional as-applied. *See* JX 0055 at 7.

Following his veto, Governor DeSantis called for a special legislative session scheduled to take place on April 19–22, 2022.[21]

On April 11, the leaders of the Florida Senate and House announced that the "[l]egislative reapportionment staff is not drafting or producing a map for introduction during the special session. We are awaiting a communication from the Governor's Office with a map that he will support." PX 3040. The Governor, in turn, submitted his third, and final, proposed map (Map C0109) on April 13, 2022. Map C0109 would become the Enacted Map as depicted below.

---

[21] The plaintiffs assert that the Governor timed the special legislative session so as to coincide with an April 18 deadline in this case for the plaintiffs to submit interim, proposed maps for the 2022 election cycle. *See* Plaintiffs' Post-Trial Br., D.E. 218 at 106. In the plaintiffs' view, that timing created pressure for the Legislature to acquiesce to the Governor's demands or face a judicially-drawn map. *See* Plaintiffs' Post-Trial Br., D.E. 218 at 106. Secretary Byrd disputes that characterization. *See* Secretary's Post-Trial Br., D.E. 217 at 54 n.7. We need not resolve this dispute.

The Enacted Map



DX93 at 1.

Map C0109 contained 18 districts drawn by the Governor, largely in the North and Northeast, with the rest adopted from the Legislature's previous proposals. *See* JX 0044; PX 3014. Resembling the Governor's previous two proposals, Map C0109 did not contain a Black-performing district in North Florida and diminished the BVAP for the district at issue (Enacted CD-4) by 14.54%—from 46.20% in the benchmark configuration (Benchmark CD-5) to 31.66%. *See* JX 0048 at 34 (Representative Leek responding "no" to a question as to whether CD-4 or CD-5 as proposed by the Governor, would perform for Black candidates of choice).[22]

Following the Governor's proposal, the Senate's General Counsel, Daniel Nordby, opined that the Governor cited to "valid legal precedents" in his veto memo and that "[i]n the absence of controlling judicial precedent contrary to the Governor's position on the precise question presented . . . [M]ap [C0109] [was] worthy of careful consideration . . . . " PX 3014 at 3.

---

[22] According to Mr. Kelly, CD-4 is the relevant analogue in Map C0109. *See* JX 0046 at 76.

On April 19, 2022, Mr. Kelly testified before the House Redistricting Subcommittee and Senate Committee on Reapportionment in support of Map C0109. *See* JX 0044; JX 0046. Mr. Kelly stated that he was the sole map maker for the 18 Governor-drawn districts in Map C0109 and that in performing the task he did not consider party identification. *See* JX 0044 at 16. The only time Mr. Kelly considered party identification "was early in the process" in an attempt to "draw a compact African American performing district in . . . Northeast Florida to both try to comply with the U.S. Constitution and the State Constitution . . . . " JX 0044 at 18. Under the Governor's reasoning (as explained in the veto memo), he was not able to do so.[23]

Mr. Newman also provided legislative testimony, which largely reiterated the Governor's legal position as outlined in the veto memo. Of note, however, Mr. Newman clarified that certain applications of the FDA could withstand strict scrutiny under the Equal Protection Clause of the Fourteenth Amendment. *See* JX 0044 at 69.

The chairs of the Senate and House committees came around to the Governor's position. Senator Rodrigues considered Map C0109 a "compromise map" because it included districts previously drawn by both legislative chambers and the Governor. *See* JX 0045 at 83. He also considered Map C0109 to have a "constitutional basis." *See* JX 0045 at 99. Similarly, Representative Leek said that the Legislature had "not ceded any responsibility" to the Governor and acknowledged that Map C0109 is one of "innumerable number of maps that can be [legally] compliant." JX 0044 at 8; JX 0048 at 27.[24]

Map C0109, however, was not without its detractors. Democratic legislators derided the Governor's actions as a hijacking of the redistricting process. *See, e.g.,* JX 0047 at 13 (statement of Senator Shevrin Jones: "[W]hat I did not think was going to happen was that we were going to acquiesce to the Governor and allow him to hijack this process."). Senator Randolph Bracy called the Governor a "bully" and found it "ridiculous" that the Senate could switch its position on the constitutionality of its two-

---

[23] We will return to Mr. Kelly's map drawing in more detail in summarizing his trial testimony.

[24] The transcript reads "illegally," but it is clear from context that the text should read "legally."

map plan in a matter of three weeks. *See* JX 0047 at 6. Representative Kamia Brown argued that the Governor's "intent [was] to disenfranchise the same people that [the Equal Protection Clause] was designed to protect." JX 0050 at 21.

On April 21, 2022, the day the Legislature enacted Map C0109, Democratic members of the House staged a peaceful protest on the House floor in response to the Governor's elimination of a Black-performing district in North Florida. *See* Tr. 570–71. Some Republican legislators, however, maintained that the Legislature had done its job properly. *See, e.g.,* JX 0047 at 33 (statement of Senator Kelli Stargel: "I believe these maps are constitutional . . . . I don't think any of us who vote for them today are racist or following the direct will of the Governor."); JX 0050 at 70 (statement of Representative Randy Fine: "We don't do this because we are bullied. We do this because we think it is right.").

The Governor signed the Enacted Map into law on April 22, 2022. In the most recent election cycle, none of the newly formed districts in North Florida elected Black voters' candidates of choice. *See* Tr. 423.

## III. THE WITNESSES AT TRIAL

### A. The Plaintiffs' Witnesses

#### 1. James Kelly (called by both sides)

Mr. Kelly drew CD-3, CD-4, and CD-5 in the Enacted Map, while the Legislature drew CD-2. *See* Tr. 930. He was called as a witness by both sides. *See* Tr. 930. We summarize the entirety of his testimony here.

During the 2021-22 redistricting cycle, Mr. Kelly was the Governor's Deputy Chief of Staff. *See* Tr. 39. By the time this trial began, Mr. Kelly was the Governor's acting Chief of Staff. *See* Tr. 38. Mr. Kelly is highly experienced in Florida's redistricting process, having first participated in that process as a legislative aide in 2001. *See* Tr. 40. During the 2012 cycle, Mr. Kelly served as the staff director for the House Redistricting Committee, where he gained substantial experience in drawing maps for both chambers.

*See* Tr. 41.   Mr. Kelly displayed thorough knowledge of geographic and political boundaries in Florida.  *See, e.g.,* Tr. 223.[25]

Though not a lawyer, Mr. Kelly articulated the same legal arguments that Mr. Newman made in the Governor's veto memo.  *See* Tr. 41, 131.  In Mr. Kelly's own words, "[t]he Florida Supreme Court got it wrong" when it determined in *Apportionment VII* that Benchmark CD-5 was required under the FDA because it did not consider the Fourteenth Amendment's Equal Protection Clause.  *See* Tr. 76–77; *Apportionment VII*, 172 So. 3d at 403–04.  At the time of the Governor's veto in 2022, however, no federal or state court had taken or accepted the Governor's view of the law.  *See* Tr. 80.

Mr. Kelly disagreed that Florida voters are still affected by their historically unequal access to the political process.  *See* Tr. 112.  And he also disagreed that communities of interest are valid redistricting criteria under Florida law.  *See* Tr. 242–43.

Mr. Kelly acknowledged that the Enacted Map—in contrast to the Legislature's two-map proposal—eliminated a Black-performing district in North Florida.  *See* Tr. 57, 71, 74, 83, 97.  As to the Governor's non-diminishment criticism of Map 8019—as set out in Mr. Newman's veto memo—Mr. Kelly agreed that the Enacted Map only worsened the non-diminishment problem under the FDA.  *See* Tr. 148.

In terms of shape, Mr. Kelly explained that any congressional district centered in Duval County would have to split the county because its population is larger than what would be allowed under the Equal Protection Clause's one-person, one-vote principle.  *See* Tr. 119–20.  Mr. Kelly chose the St. John's River as the dividing line between CD-4 and CD-5 in Duval.  This had the effect of splitting the Black community.  *See* Tr. 178.  Mr. Kelly said that the river was a logical place to make that split.  *See* Tr. 232.  Mr. Kelly agreed that Map 8019's CD-5 would perform for Black voters 9 out of 14 times in test elections.  *See* Tr. 156.

---

[25] Mr. Kelly confirmed that Florida Governors Bush and Scott did not propose their own maps during their respective congressional redistricting cycles, 2002 and 2012.  *See* Tr. 42.  Mr. Kelly did point out, however, that in 1955 Governor Collins vetoed a legislative map.  *See* Tr. 250.

Mr. Kelly testified that there are two ways to measure "compactness": visually and mathematically. Visually, a map drawer asks whether an ordinary person would reasonably conclude that the district is "easy on the eyes—squares, rectangles—circular; do they represent sort of clear and obvious appeasing shapes?" *See* Tr. 210. Keeping counties whole may serve as a proxy for compactness. *See* Tr. 211. Accounting for city lines, major roadways, railways, and waterways is also relevant to compactness. *See* Tr. 213. Mathematically, one common method is to draw a "circle or convex shape around a district, and then . . . [to] measure compactness as a ratio of the percentage of the actual filled-in boundaries . . . ." Tr. 211. The Enacted Map split fewer counties than the Legislature's two-map proposal. *See* Tr. 214–15.[26]

According to Mr. Kelly, the Enacted Map's CD-24, depicted below, complied with the U.S. Constitution even though it was drawn to avoid diminishment under the FDA. *See* Tr. 168. In other words, the Legislature had a compelling state interest to comply with the FDA in that instance. *See* Tr. 168. On this point, he distinguished the Duval-only district in Map 8019 by arguing that CD-24 did not distort surrounding districts. *See* Tr. 168–69. Mr. Kelly, moreover, testified that CD-24, unlike the proposed Duval-only CD-5 in Map 8019, followed city and county lines, did not diminish, and was not drawn for race-based reasons. *See* Tr. 168−69.

---

[26] Mr. Kelly did not testify about how compactness scores are measured.

Enacted Map CD-24



DX93 at 12. Similarly, Mr. Kelly took no issue with the length of Enacted CD-2 (as he did with CD-5 in the Benchmark map and in Map 8015) because it adhered to rural county lines. *See* Tr. 221.

In drawing the Enacted Map, Mr. Kelly only considered race initially in an attempt to draw a compact district in North Florida with at least a 40% BVAP, using Benchmark CD-5's 46% BVAP as the reference point. *See* Tr. 161, 934. He chose 40% not because it was a "sacrosanct line in the sand," but because it was a "reasonable number" to merit a true functional analysis. *See* Tr. 935. In accordance with Mr. Newman's analysis, Mr. Kelly thought that a "more than slight" reduction in BVAP would constitute diminishment under the FDA. *See* Tr. 149. Mr. Kelly agreed, however, that BVAP alone is not a substitute for a functional analysis. *See* Tr. 149. In the end, Mr. Kelly determined that "there was no

way to come close to the benchmark," so he saw no need to perform a functional analysis, and did not perform such an analysis. *See* Tr. 161, 918.

Once Mr. Kelly realized that he could not draw a district in North Florida that "checked all the boxes," he attempted to draw those districts without considering race at all. *See* Tr. 171, 920. He said that he did not have the racial demographic data turned on in his districting software when drawing those districts because he "couldn't figure out how to turn it on." Tr. 233. It was only after he had drawn the North Florida districts that he realized he had drawn four majority white districts. *See* Tr. 171. Mr. Kelly, however, "was aware of the demographics." Tr. 170. He simply "didn't pay attention to what [he] was creating for those districts when [he] was drawing the map." Tr. 170.

## 2. House Leader Fentrice Driskell

House Leader Fentrice Driskell represents North Tampa and North Hillsborough County in the Florida House of Representatives and currently serves that chamber as Minority Leader for the Democratic Party. *See* Tr. 509. Representative Driskell was selected to serve on the House Redistricting Committee in the most recent cycle and testified at trial on the redistricting process at issue in this case. *See* Tr. 509, 512−13.[27]

Representative Driskell's testimony began with a description of the early stages of that process in September of 2021 and the Governor's subsequent involvement in January of 2022. Representative Driskell stated that at the outset the committee placed "great emphasis" on the legal standards that the legislators would need to understand in order to fulfill their duties. *See* Tr. 515. "The goal," according to Representative Driskell, "was to . . . draw maps that satisfied both the federal . . . standards and the legal precedent following that, and . . . the Fair Districts Amendments and any legal precedent following that . . ." Tr. 522. She understood that it was "possible to have multiple maps . . . [as] the result of the different policy choices . . . [but] the one thing that would never be in question

---

[27] On cross-examination, Representative Driskell conceded that she was "generally" a political opponent of Governor DeSantis and that she had previously stated that the Governor had sown "hate and division" during his time in office. *See* Tr. 604−05. Representative Driskell had personally spoken with the Democratic National Redistricting Committee about redistricting during the latest cycle. *See* Tr. 596−97.

was whether or not [they] adhered to the federal and State standards . . . . " Tr. 526. According to Representative Driskell, the Governor's initial involvement starting in January of 2022 was something she had "never even contemplated, particularly because the Florida Constitution says that it's up to the [L]egislature to draw the maps." Tr. 552.

Representative Driskell explained that the House Redistricting Committee "kept moving in [its] process" at first, but that "the conversation then started to change and evolve" after the Florida Supreme Court rejected the Governor's request for an advisory opinion. *See* Tr. 554. At that point, the committee began to consider whether to "thread the needle to keep the Governor happy" by drawing "a map that was . . . a nod to the Governor's map" with respect to CD-5 in North Florida. *See* Tr. 554. In her own words, Representative Driskell observed that "the [L]egislature itself, legislative leadership, was starting to yield to the Governor somewhat" at this point. Tr. 555.

Representative Driskell testified on the impact of the Governor's decision to veto the Legislature's two-map compromise and call for a special session on March 29, 2022. She noted that when the Governor followed through on his veto threat, the Legislature entered "a period of uncertainty" in which "there weren't any committee meetings. . . . no opportunity for public feedback. . . . [or] calls from the committee chair or speaker . . . " Tr. 563. Representative Driskell stated that "[i]t was effectively total silence" and that "[t]he mood had certainly shifted because it felt like . . . the Governor was in the driver['s] seat and like we were going to do whatever it is that he wanted us to do." Tr. 563−64.

In this context, the outcome of the special session became immediately obvious to Representative Driskell. "Once we got back for special session, it was the Governor's show. It was his people, his experts, his map drawers. There was really nothing for the legislative committee staff to do. . . . they were trying to set up a legal challenge to effectively undo the Fair Districts Amendments." Tr. 567. Representative Driskell concluded by stating that the Governor had "effectively use[d] this process to make new law" and "got exactly what he wanted." Tr. 568, 573. In her own words, the congressional redistricting cycle had "started out as a legitimate process," but ended as "a farce . . . designed to give the Governor what he wanted." Tr. 573−74.

### 3. Dr. Matthew Barreto

Dr. Barreto provided expert testimony for the plaintiffs as to mapping and redistricting methods. *See* Tr. 636. He holds a Ph.D. from the University of California, Irvine, and is a Professor of Political Science and Chicano Studies at UCLA. *See* Tr. 627. He also served as the faculty director for the UCLA Latino Politics and Policy Institute and The Voting Rights Project. *See* Tr. 631. Dr. Kassra Oskoii, a Professor of Political Science and International Relations at the University of Delaware, helped Dr. Barreto prepare his report in this case. *See* Tr. 636.

Dr. Barreto testified that BVAP alone is insufficient to determine whether a district performs. *See* Tr. 650. He explained that "you also have to look at the rest of the voters in that district, and you take the totality of all of the election results to determine whether or not a district performs." Tr. 649. Dr. Barreto compared, through a functional analysis, the Enacted Map to the preexisting benchmark map (including Benchmark CD-5) and the Legislature's two-map proposal. Tr. 647. He concluded that the Benchmark Map and the Legislature's two-map proposal performed for Black voters in North Florida, while the Enacted Map did not. *See* Tr. 647–53. Part of the reason the Enacted Map did not perform, according to Dr. Barreto, was because it split the Black community in Jacksonville into two different districts. *See* Tr. 704. Dr. Barreto found that Black voters in North Florida voted as a cohesive voting bloc, and that white voters bloc-vote against the Black-preferred candidate. *See* Tr. 650, 655. Dr. Barreto also testified that Black voters constitute a community of interest in North Florida due to lower household incomes, higher poverty rates, and lower educational attainment. *See* Tr. 656−57. Dr. Barreto explained that communities of interest are commonly considered in redistricting. *See* Tr. 658.

According to Dr. Barreto, the Governor's objections to Map 8019 were contradicted by his lack of objection to state-level maps. For instance, as to the Governor's contention that Map 8019 no longer performed for Black voters, Dr. Barreto pointed out that four state districts fell below 35% BVAP and were nonetheless listed as "FDA-compliant by the State of Florida." Tr. 679. In response to the Governor's objection that CD-5 in Map 8019 distorted CD-4 and was enveloped by CD-4 on three sides, Dr. Barreto pointed to a nearly

identical situation in the state-level maps—Senate Districts 4 and 5, *see* Tr. 689, which are depicted below.  Dr. Barreto testified that the Governor could have objected to the state-level maps but chose not to.  *See* Tr. 686.

Senate Map 8058[28]



### 4.  Dr. J. Morgan Kousser

Dr. J. Morgan Kousser is a Ph.D. historian and political scientist whose research focuses on election law, Southern history, political science, race relations, social scientific history, and legal history.  *See* Tr. 328.  Dr. Kousser has testified before the House Judiciary Committee twice on voting rights legislation and testified or consulted in over sixty voting rights cases, including several in Florida.  *See* Tr. 329−30.  He provided expert testimony with respect to Florida's history of voting rights and racial discrimination.  *See* Tr. 330.

To prepare for this case, Dr. Kousser consulted numerous categories of evidence, including legislative hearings and floor debates, court cases, press conferences, newspaper articles, demographic reports, and scholarly materials on redistricting in Florida and the history of discrimination in Florida.  *See* Tr. 332−33.  He did not conduct independent research at the Florida Archives or the Bob Graham Center.  *See* Tr. 437.  He also examined the testimony of the opposing expert witness in the case, Dr. Mark Edwards Owens.  *See*

---

[28] https://perma.cc/ZU9Z-899M.

Tr. 333.  Finally, Dr. Kousser also prepared and submitted a report for this case, which, among other things, applied the *Arlington Heights* factors to the case at hand.  *See* Tr. 333.[29]

Dr. Kousser began his testimony by discussing the historical background factor of the *Arlington Heights* analysis.  According to Dr. Kousser, "Florida has used election law from the beginning of the time that Black people could vote . . . to heighten the discrimination against Blacks."  Tr. 335.  He asserted that Florida has used redistricting, in particular, "as a disenfranchising device or a device to diminish Black political influence from the very beginning."  Tr. 335.  Dr. Kousser also identified the counties of Benchmark CD-5 as comprising "the Slave Belt" or "Plantation Belt" of antebellum Florida, where there is "a long tradition of Black people . . . being discriminated against."  Tr. 336; *see* PX 4558.  The 1868 Florida Constitution, for example, contained a provision that awarded white-majority counties disproportionate legislative power.  *See* Tr. 337.  As a result, "Black males could vote, but . . . even if they voted, they didn't have the opportunity to elect candidates of their choice in nearly the proportions of the[ir] population . . . . "  Tr. 337.

Dr. Kousser discussed other discriminatory measures aimed at Black voters in Florida throughout the 19th and 20th centuries as well, including annual registration

[29] Dr. Owens, Secretary Byrd's opposing expert witness, did not challenge any facts cited in Dr. Kousser's report.  *See* Tr. 334, 874.

certificates,[30] Eight Box Laws,[31] poll taxes,[32] secret ballots,[33] all-white primaries,[34] at-large elections,[35] and voter roll purges.[36] This racial animus was not limited to legislative action either. All too often, opposition to Black voters in Florida also manifested itself through brutal acts of violence that targeted those who dared vote or register others in the community. *See* Tr. 341, 343−45.[37] Together, these "overwhelmingly discriminatory actions" worked in unison to disenfranchise Black voters, according to Dr. Kousser. *See*

---

[30] Annual registration certificates operated as voter ID laws in the late 19th century and narrowed ballot access for the Black population by forcing "small farmers, farm workers, [and] sharecroppers . . . to come into town [to] get registered annually" and requiring them to store the issued certificates until it was time to vote in an election. *See* Tr. 341.

[31] Prior to 1889, Florida voters could endorse their candidate of choice "for Governor, Secretary of State, State Senator—whoever happened to be on the ballot"— by depositing a single ballot. *See* Tr. 341. The Eight Box Law changed that by requiring that a different "ballot for [each] office had to be put in that particular election box, and [since] . . . election officials were not required by the law to tell any voter which box to put the ballot in. . . . [i]t worked as a literacy test." Tr. 342.

[32] In 1889, Florida began utilizing the poll tax as a suffrage requirement. *See* Tr. 342. Together, the Eight Box Law and the poll tax "greatly reduced the [Black] turnout in the 1892 elections and thereafter." Tr. 342.

[33] The secret ballot law required voters to mark a printed ballot inside a voting booth without outside help. *See* Tr. 343. This law targeted those who "were barred from learning to read and write during slavery" and "acted as a literacy test" on election day. *See* Tr. 342.

[34] Dr. Kousser testified "[t]he Democratic party after 1892 was completely dominant in Florida, so if you wanted to have real power, the real power was all in the Democratic primary. That was where your vote counted. And there was [an] absolute bar on Blacks voting in the Democratic primary until after *Smith v. Allwright*" was decided in 1944. *See* Tr. 344; *See Smith v. Allwright*, 321 U.S. 649 (1944).

[35] Almost immediately after all-white primaries were repealed, the Florida Legislature implemented at-large elections statewide for school boards. *See* Tr. 346. "An at-large election is discriminatory against minority voters if there is racially polarized voting, because if there is a majority of the controlling population . . . then no Blacks or other members of minority groups . . . can be elected. They can't get enough crossover votes to be elected." Tr. 346.

[36] According to Dr. Kousser, there "were repeated purging of the rolls. . . . often stopped by legal action, either in the courts or by the Department of Justice" at the turn of the 21st century. *See* Tr. 354. For example, there were "major purges" in 2000, 2004, and 2012, "which disproportionately affected minorities—sometimes Blacks, always minorities." Tr. 354.

[37] Black and white Republicans were murdered in North Florida throughout the late 19th century and Black voters residing in Florida during the Jim Crow era would experience election violence well into the mid-20th century. *See* Tr. 343. Dr. Kousser offered two distinct examples: the 1920 Ocoee riots in which white residents attacked the local Black population in response to a voter registration drive, and the 1951 assassination of Harry T. Moore, president of the Florida chapter of the NAACP, for his efforts to register Black residents in the state. *See* Tr. 344−45.

Tr. 356.  As a result of these tactics, Florida did not elect a single Black congressional candidate from 1877 to 1993.  *See* Tr. 356.  Florida similarly failed to elect a single Black candidate to the State Legislature for nearly a century.  *See* Tr. 356.

These unconstitutional tactics were confronted by Congress and the U.S. Supreme Court, respectively, in the Voting Rights Act of 1965 and *Thornburg v. Gingles*, 478 U.S. 30 (1986).  "The legal environment," Dr. Kousser testified, "changed such that it made it possible for Blacks to have a stronger bargaining position" and, in 1992, Black interest groups finally managed "to bargain with the Democratic party and the Republican party to try to get seats particularly in Congress, but also in the State [L]egislature."  Tr. 354−55.  As it relates to North Florida, this negotiation led to the formation of a Congressional District 3 the following year, "which had enough Black voters in it so that . . . with . . . some crossover voting . . . they had . . . enough . . . to elect candidates of their choice."  Tr. 357.

In 1993, the North-South CD-3, which spanned from Jacksonville to Orlando, enabled a Black candidate to win a congressional district in Florida for the first time in more than a century. *See* Tr. 358.  This district would change in shape and composition with every redistricting cycle from 1993 to 2016.  *See* Tr. 357−58.[38]

But despite these changes, CD-3 would remain an "effective minority district[ ]" through the years—allowing Black voters to elect a candidate of their choice despite never exceeding a BVAP of 50%.  *See* Tr. 358.  The most significant change came in 2016 when the Florida Supreme Court "ruled that the North-South orientation of the Congressional District 3 . . . had allowed for the packing of Blacks into that district and . . . diminish[ed] . . . Black influence in the surrounding areas."  Tr. 357.  To address this issue, the Florida Supreme Court redrew CD-3 itself that year—replacing the existing North-South district with the East-West Benchmark CD-5.  *See* Tr. 357.

---

[38] For map evolution, see PX 4557 (CD-3 from 1992 to 1996); PX 7230 (CD-3 from 1996 to 2002); PX 5043 (CD-3 from 2002 to 2012); PX 5044 (CD-5 from 2012 to 2016); PX 7199 (CD-5 from 2016 to 2022).

As part of his testimony on Florida's electoral history, Dr. Kousser also discussed the enactment of the FDA, which among other things was designed to prevent the dilution of minority voting power in Black-performing districts. *See* Tr. 359. According to Dr. Kousser, the FDA was passed in 2010 by voter referendum despite opposition from then-Governor Rick Scott: "[T]he Republican leadership opposed the FDA in its initial attempts to qualify in its passage and post-passage, but the voters, regardless of political party, overwhelmingly backed it" with "more than 62 percent of the vote." Tr. 360. The FDA, Dr. Kousser explained, was "an additional guarantee for Black representation in addition to what was offered by the [VRA's] Section 2 and Section 5." Tr. 361. The effort to undermine the FDA and "to diminish the overall influence of Black voters," in Dr. Kousser's words, was "a continuation of the discrimination that had occurred in the past" and informed his perspective on the challenged action in this case. *See* Tr. 365−66.

Turning to the other *Arlington Heights* factors, and the most recent redistricting cycle, Dr. Kousser testified that, by late 2021, legislators "had learned their lessons" and were seeking to comply with the law. *See* Tr. 369. "They wanted to abide by what the Florida Supreme Court had said," and follow, among other things, the "particular formula or methodology for determining whether a minority [was] effective or preserved . . . . " Tr. 369−70. This formula required legislators to account for any potential diminishment by examining factors that went beyond the BVAP within a given district. *See* Tr. 371, 374. This process, according to Dr. Kousser, "was moving quite quickly" but "was brought to a halt, or at least . . . slowed down, by the Governor's action of submitting a plan in mid-January. . . . indicat[ing] he was going to veto . . . and eventually propos[ing] a third iteration of his plan for a special session" in late March of 2022. *See* Tr. 375−76.

Based on his analysis of Florida history, Dr. Kousser concluded that the events of the 2021-22 redistricting cycle, including the extent of the Governor's intervention, were

"extraordinary" compared to prior cycles, and its impact on Black voters were both "foreseen" and "foreseeable." *See* Tr. 420−21, 423−24.[39]

### 5. Charlie Clark

Charlie Clark, a Black man and one of the plaintiffs, testified that he resides in Enacted CD-2, and provided his home address. *See* Tr. 258. Before that, he lived in Benchmark CD-5. *See* Tr. 258. Mr. Clark is a registered Democrat and regularly votes in Florida elections. He spoke fondly of his former representative, Democratic Congressman Al Lawson of Benchmark CD-5. *See* Tr. 265. Mr. Clark greatly appreciated how responsive Congressman Lawson was to the needs of the community, giving as an example his helping rural residents of Tallahassee regain power after a hurricane. *See* Tr. 265–66. Mr. Clark and Congressman Lawson also attend the same church. *See* Tr. 265.

Under the Enacted Map, Mr. Clark's representative is now Republican Congressman Neal Dunn. Congressman Dunn was not Mr. Clark's candidate of choice—Congressman Lawson was. *See* Tr. 265. In his view, Congressman Dunn is not focused on issues that impact the Black community. *See* Tr. 268.

Mr. Clark has resided in Tallahassee since 1982. *See* Tr. 257. He worked for 32 years in the Florida Department of Agriculture and Consumer Services, where he was the first Black person to head the Department's Pesticide Registration Program. Born in Louisiana in 1951, Mr. Clark grew up in the "Jim Crow South." *See* Tr. 257–58. He described his lived experience, from the age of three until leaving to college, as taking place in a "totally Black society . . . segregated by race and by geograph[y]." *See* Tr. 257. He can trace his familial roots to Haitian slaves sold in Statesboro, Georgia, to a plantation owner by the name of Clarke in Alexandria, Louisiana. *See* Tr. 268. His family members call themselves "the I-10 people" because they all live along I-10 between Texas and Florida. *See* Tr. 257.

---

[39] On cross-examination, Dr. Kousser testified that he knew Governor Collins had "lobbied to get maps that were more fairly apportioned" and that he vetoed apportionment maps. *See* Tr. 434. Dr. Kousser also said that he was aware of previous special sessions calling for reapportionment throughout the mid-20th century in Florida. *See* Tr. 436.

Mr. Clark is a member of various civic organizations, including the NAACP in Tallahassee, and is heavily involved in the St. Michael and All Angels Episcopal Church—also in Tallahassee. *See* Tr. 259. Mr. Clark explained that the Episcopal Church is divided into districts within each state and that he is in the Diocese of North Florida. *See* Tr. 259. This diocese extends from Jacksonville to Quincy (just northwest of Tallahassee) and south to Gainesville, with its headquarters in Jacksonville. *See* Tr. 259. Mr. Clark travels to Jacksonville about seven times a year for church-related matters. *See* Tr. 261−62. In his 40 years living in North Florida, Mr. Clark has seen large pockets of poverty among Black constituents. *See* Tr. 262–63.

Mr. Clark said he voted for the FDA because he wanted to give Black voters a fair shot at electing a candidate of their liking. *See* Tr. 261. During the 2012 redistricting cycle, he found it "refreshing" that he could provide public input on the process. *See* Tr. 264. In contrast, under the 2022 redistricting cycle, Mr. Clark expressed his frustration at how the "Governor of Florida hijacked the whole process and kind of bent the legislators to their knees until they basically capitulated and did what he wanted them to do in terms of redrawing the map of this district." *See* Tr. 264. He was unaware of any public meetings held for the 2022 redistricting cycle. *See* Tr. 279.

Secretary Byrd sought to discredit Mr. Clark by pointing out that his voter identification card was not in evidence and that he could not remember the name of his state representatives. *See* Secretary's Post-Trial Br., D.E. 217 at 8–9; Tr. 272–73. The Secretary also argued that Mr. Clark's close ties to former Congressman Lawson cut against his credibility because he has a special interest in seeing him win a future election. *See* Secretary's Post-Trial Br., D.E. 217 at 8. We do not find the Secretary's arguments persuasive. We instead credit Mr. Clark's testimony and conclude—as explained later—that he has Article III standing.

### 6. Dorothy Inman-Johnson

Dorothy Inman-Johnson, a Black woman and one of the plaintiffs, testified that she resides in the part of Tallahassee that falls into enacted CD-2 and the old benchmark version of that same district. *See* Tr. 302. She has been a member of the Florida NAACP for four

decades and joined Common Cause several years ago. *See* Tr. 302. Much like Mr. Clark, Ms. Inman-Johnson is a registered Democrat whose candidate of choice in the 2022 election cycle was Congressman Lawson. *See* Tr. 309–10, 318. And, like Mr. Clark, she has found Congressman Dunn unresponsive to her calls. *See* Tr. 314. Ms. Inman-Johnson does not believe Congressman Dunn is a "good representative." Tr. 314. She was not aware of any opportunity to provide public feedback during the 2022 redistricting cycle. *See* Tr. 307.

Ms. Inman-Johnson moved to Tallahassee in 1971 and has been at her particular address since 1990. *See* Tr. 302, 325. Born into a racially segregated Birmingham in Alabama, she described her upbringing as filled with "racial overtones with fire hoses [and] dogs" because she "was one of the teenage protesters in the civil rights movement." Tr. 301. In fact, her mother would organize carpools in Birmingham. *See* Tr. 302. Ms. Inman-Johnson was a public-school teacher in Leon and Gadsden counties for over 25 years. *See* Tr. 303. In the 1980s, she was the first ever Black woman elected to the Tallahassee City Commission, a position she is running for again. *See* Tr. 303–04.

Secretary Byrd attempted to discredit Ms. Inman-Johnson by introducing previous statements she had made on social media criticizing Governor DeSantis. She called the Governor "a mix of Hitler and Putin" and that he is "a straight-up dictator" for "dismantling our constitutional rights to suit his political agenda." Tr. 323–25. Though reflecting Ms. Inman-Johnson's dislike for the Governor, those statements do not lead us to disbelieve her testimony, which was essentially limited to establishing standing. We find Ms. Inman-Johnson's testimony credible and conclude—as explained later—that she has Article III standing.

### 7. Amy Keith (Common Cause)

Amy Keith is the Program Director for Common Cause Florida and appeared on behalf on the organization at trial. *See* Tr. 490. Ms. Keith testified that "Common Cause is a nonprofit, nonpartisan organization dedicated to upholding the core values of American democracy" and "work[ing] to create open, accountable government . . . and . . . to make sure that every eligible voter is able to have . . . their vote counted . . . . " Tr. 491.

According to Ms. Keith, Common Cause Florida has around 93,000 members throughout Florida with at least one member in the enacted CDs 2, 3, 4, and 5. *See* Tr. 492−93. Ms. Keith personally oversaw the organization's effort to contact these members, testifying that she and others "took a list of [the] most committed and engaged members. . . . looked at the ZIP codes. . . . that were wholly contained within the different congressional districts, and . . . contacted them to confirm their residence" and voter registration. *See* Tr. 493. This process occurred in July of 2023 and was completed over several weeks. *See* Tr. 497.

Secretary Byrd attempted to discredit Common Cause Florida at trial by arguing that Ms. Keith had not produced the compiled membership list and could not confirm how long each undisclosed member had lived in CD-2, CD-3, CD-4, and CD-5, or whether they intended to vote in the 2024 election. *See* Tr. 498−99; *see also* Secretary's Post-Trial Br., D.E. 217 at 9−10. We find the Secretary's arguments unpersuasive.

Before trial, Ms. Keith declared under penalty of perjury that due to "privacy concerns, and the risk of retaliation," Common Cause "keeps its membership list and membership information confidential." D.E. 166-8 at 2–3; Tr. 496. She further declared that if this Court was "unsatisfied with this affirmation," Common Cause would "endeavor to obtain the permission of those members" and would reveal their names and addresses "subject to a protective order limiting that information to attorney's eyes only." D.E. 166-8 at 3.

At trial, Ms. Keith testified that she had personally re-confirmed the residence and voter registration status of each member in the aforementioned congressional districts in the week prior to trial. *See* Tr. 499. She further testified that while she could not "speak for any single individual's . . . ability or willingness to vote," she had "checked the public voter rolls" to confirm their status and believed these individuals were "committed to the democratic process and participation." Tr. 499. We find Ms. Keith's testimony credible with respect to standing.

### 8. Cynthia Slater (Florida NAACP)

Cynthia Slater is a longtime member of the Florida State Conference of the NAACP and currently serves as the organization's lead for Civic Engagement and as the president of the organization's Daytona Beach branch. *See* Tr. 615–16. She appeared on behalf of the Florida NAACP at trial. Tr. 615. Ms. Slater testified that "[t]he mission of the NAACP is to protect the rights of African Americans and minorities through the democratic process." Tr. 616.

According to Ms. Slater, the Florida NAACP has about 12,000 members across the state, including North Florida. *See* Tr. 617. In July of 2023, Ms. Slater personally reviewed "a list compiled by the NAACP of four members who live in Congressional Districts 2, 3, 4, and 5." Tr. 618. She testified that the compiled list contained the names and addresses of the members and that she personally knew three out of the four individuals as residents of North Florida and members of the NAACP. *See* Tr. 618−619. Ms. Slater further testified that she had taken additional steps to confirm the accuracy of the list and could personally confirm that each individual had been a resident of their respective congressional district as well as a member of the NAACP for at least ten years. *See* Tr. 620, 623−24.

Secretary Byrd attempted to discredit the Florida NAACP at trial by indicating that Ms. Slater had not created or produced the compiled membership list and could not credibly represent that each undisclosed member would vote in the 2024 election. *See* Tr. 623−24; *see also* Secretary's Post-Trial Br., D.E. 217 at 10−11. We find the Secretary's arguments unpersuasive.

At trial, Ms. Slater testified that the NAACP did not disclose its membership lists publicly due to a "history of violence and threats." Tr. 621. Ms. Slater stated that she had personally confirmed the compiled list by cross-referencing the provided ZIP code of each member with their respective congressional district as well as with the Florida Supervisor of Election voter rolls. *See* Tr. 626. In her own words, Ms. Slater "confirmed their address, their congressional district and . . . if they were active voter[s]" based on their participation "in the last couple of elections." Tr. 626. In addition, although Ms. Slater is not a resident of North Florida, she testified that she personally knew three of the four individuals

residing in the aforementioned congressional districts "because of the leadership role that they serve . . . within the Florida State Conference." Tr. 619, 624. We find Ms. Slater's testimony credible as to standing.

## B. The Secretary's Witnesses

### 1. Dr. Douglas Mark Johnson

Dr. Douglas Mark Johnson is the president of the National Demographics Corporation, which offers various demographic services to local governments, ranging from building databases and drafting maps to planning hearings and leading discussions in community outreach meetings. *See* Tr. 785−86. Dr. Johnson has a bachelor's degree in government from Claremont McKenna College, an MBA from UCLA, and a Ph.D. in political science from Claremont Graduate University. *See* Tr. 784−85. Dr. Johnson provided expert testimony with respect to mapmaking and demographics, and the redistricting process in general. *See* Tr. 795.[40]

At trial, Dr. Johnson disagreed with two aspects of Dr. Barreto's testimony. First, Dr. Johnson disagreed with Dr. Barreto's conclusion that the Enacted Map "cracked" the Black voting population in Jacksonville. *See* Tr. 796. Second, Dr. Johnson rejected Dr. Barreto's observation that the Legislature's proposed CD-5 in Map 8019 "closely resembled" the enacted State Senate District 5 from the same redistricting cycle. *See* Tr. 796.[41]

Dr. Johnson took issue with Dr. Barreto's "description of Jacksonville demographics and his allegations that the enacted map cracked the Black voting strength in Jacksonville." Tr. 796. In particular, Dr. Johnson focused on the areas of Black population in Jacksonville along the St. Johns River. *See* Tr. 821−23. He testified that "the Black voting strength on the East side [of the river] . . . is significantly less Black than 50%" and thus concluded that Dr. Barreto's statement that the Enacted Map's "district line split[ ] the Black

---

[40] On cross-examination, Dr. Johnson admitted that other courts had excluded his testimony, in whole or in part, all five times he had testified as an expert. *See* Tr. 813−15.

[41] Dr. Johnson also criticized Dr. Barreto's use of dot maps, but we do not find that discussion relevant for purposes of our evaluation of the plaintiffs' claims.

population in half" was "clearly wrong." Tr. 822−23.  Dr. Johnson, however, did not address the concession by Mr. Kelly that he had knowingly split the Black community by drawing the district line down the St. Johns River.  *See* Tr. 177−78.  Dr. Johnson, moreover, conceded that he had not conducted a functional analysis to determine the impact of that split on the Black population and did not dispute Dr. Barreto's conclusion that Map 8019 performed for Black voters in Jacksonville, while the Enacted Map did not.  *See* Tr. 824−25, 827.

Dr. Johnson also disagreed with Dr. Barreto's "description of the Senate district in Jacksonville, Senate District 5 with the [Map 8019] proposed congressional district in the same area . . . as closely resembling each other." Tr. 796.  In Dr. Johnson's opinion the two districts did not "resemble each other at all." Tr. 796.  Yet when asked to compare the two shapes by the Court, Dr. Johnson conceded that the two districts were "very similar" and that any differences between them were "just a matter of degrees." Tr. 832.

### 2. Dr. Mark Edwards Owens

Dr. Mark Edwards Owens is a professor of political science at the Citadel.  *See* Tr. 851.  He holds a bachelor's degree in political science from the University of Florida and a Ph.D. from the University of Georgia.  *See* Tr. 854−55.  He is also the co-director of the Symposium on Southern Politics—a conference which brings political scientists and historians together every two years to study elections and state politics in the South.  *See* Tr. 852.  He has testified and provided expert reports in several federal court cases and currently teaches courses on campaigns, elections, and Southern politics.  *See* Tr. 855−56.  Dr. Owens provided expert testimony with respect to political history, racially polarized voting, and the redistricting process generally.  *See* Tr. 856.

Dr. Owens disagreed with several aspects of Dr. Kousser's testimony.  Namely, he concluded that Dr. Kousser had overlooked "critical junctures" of reapportionment history in Florida and omitted facts surrounding recent political developments and the latest redistricting cycle.  *See* Tr. 856−57.  With respect to critical junctures, which he defined as "major shifts in how we might define an institution or how an institution has governed

itself," Dr. Owens provided testimony on three dates referenced by Dr. Kousser. *See* Tr. 857.

First, Dr. Owens identified the Voting Rights Act of 1964 as a critical juncture in the state's history and focused on the fact that Florida, in contrast to the rest of the southern states, was not covered by Section 5 of the VRA. *See* Tr. 858. Contrary to Dr. Kousser's testimony, then, Dr. Owens concluded that this difference in VRA coverage indicated "an absence of large-scale . . . discrimination" in Florida's reapportionment history. *See* Tr. 858.

Second, Dr. Owens identified 1992 as a critical juncture for two reasons. Similar to Dr. Kousser, he highlighted the creation of three Black-performing districts that year. *See* Tr. 859. But he also pointed to the constitutional amendment passed that year, which imposed eight-year term limits on Florida legislators and, as it relates to the case at hand, prevents representatives from having "experience within redistricting from decade to decade." Tr. 859.

Third, Dr. Owens focused on 2011 to underscore that, after the passage of the FDA, legislators could no longer utilize partisanship or communities of interest to draw maps. *See* Tr. 860. In his words, under the FDA, legislators are "actually directed not to consider those issues." Tr. 860.

Dr. Owens also testified that Dr. Kousser had omitted certain facts surrounding recent political developments and the latest redistricting cycle. In his opinion, Dr. Kousser had selectively quoted members of the minority party "to frame and provide a narrative to the redistricting process." Tr. 860. Instead, Dr. Owens pointed to statements made by Representative Randy Fine, which he believed established that legislators "knew what was happening . . . and participated in that process" to "vote [for] the plan that [was] ultimately enacted." Tr. 861. Dr. Owens also opposed Dr. Kousser's characterization of the Governor's veto decision as "extraordinary." *See* Tr. 864. In response, he testified that governors in five other states had vetoed congressional maps in this redistricting cycle and that "the Governor did so in Florida in this case in the only opportunity that he had to participate" in the process. *See* Tr. 863−65.

On cross-examination, Dr. Owens qualified several aspects of his testimony on direct. Among other points, he admitted that he had never testified as an expert witness before 2022; did not consider himself a historian; and did not "object to Dr. Kousser's account of the history and the events in Florida." Tr. 873−74. When asked specifically, Dr. Owens agreed that there was "a long-standing general history of racial discrimination against minorities that [had] influenced Florida's electoral process" and, in particular, that "the Black population in Congressional District 5 has a lineal connection to the many enslaved people brought there to work in the antebellum period." Tr. 875, 889−90.

Regarding Dr. Kousser's framing of the Legislature's intent, Dr. Owens further conceded that Representative Fine was the sole legislator from his research who had "stated publicly that [he] agreed with the Governor's novel legal theory." Tr. 902. Similarly, as to Dr. Kousser's characterization of the vetoed compromise, Dr. Owens admitted that, even as compared to other states, "Governor DeSantis' veto was unique this cycle because it was a veto based on the racial composition of voters in the proposed district." Tr. 907−08.

## IV. STANDING

We first address Article III standing. Where at least one plaintiff has standing to maintain the action, and to seek each form of relief, it is unnecessary to address the standing of the other plaintiffs. *See, e.g., Horne v. Flores*, 557 U.S. 433, 446−47 (2009); *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017).

"[A] plaintiff may not invoke federal-court jurisdiction unless he can show a personal stake in the outcome of the controversy." *Gill v. Whitford*, 585 U.S. 48, 65 (2018) (citation and internal quotation marks omitted). That is to say, the plaintiff must have Article III standing. For this, the plaintiff must show he (1) suffered an "injury in fact" (2) that is "fairly traceable to the challenged action of the defendant" and (3) is likely to be "redressed by a favorable decision." *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560−61 (1992) (citations and internal quotation marks omitted). Each element must be supported "with the manner and degree of evidence required at the successive stages of the litigation," so at this stage the elements must be "supported adequately by the evidence adduced at trial." *See id.* at 561 (citation and internal quotation marks omitted).

The plaintiffs assert standing for two individuals, Mr. Clark and Ms. Inman-Johnson, as well as for two organizations, Common Cause Florida and the Florida NAACP. The Secretary disputes standing as to all of the plaintiffs. We conclude that Mr. Clark and Common Cause have standing. Accordingly, we need not decide whether any of the other plaintiffs do. *See Town of Chester,* 581 U.S. at 439 ("At least one plaintiff must have standing to seek each form of relief requested in the complaint.").

The plaintiffs have brought vote dilution claims under the Fourteenth and Fifteenth Amendments. The "'dilution of racial minority group voting strength may be caused' either 'by the dispersal of [minorities] into districts in which they constitute an ineffective minority of voters or from the concentration of [minorities] into districts where they constitute an excessive majority.'" *Voinovich,* 507 U.S. at 154 (citation omitted). In the world of electoral law, the former is known as "cracking," while the latter is known as "packing." *See Gill*, 585 U.S. at 55; *Vieth v. Jubelirer*, 541 U.S. 267, 286 n.7 (2004) (plurality opinion).

Because the "plaintiffs' alleged harm is the dilution of their votes, th[eir] injury is district specific. . . . The boundaries of the district, and the composition of its voters, determine whether and to what extent a particular voter is packed or cracked." *Gill*, 585 U.S. at 49. A plaintiff is injured if the legislative district was "deliberately designed to waste [his] vote[ ] in elections where [his] chosen candidates will win in landslides (packing) or are destined to lose by closer margins (cracking)." *Id.* (citations and internal quotation marks omitted); *see also Baker v. Carr*, 369 U.S. 186, 206 (1962) ("[V]oters who allege facts showing disadvantage to themselves as individuals have standing to sue.").

Mr. Clark credibly testified that he has lived in Tallahassee since 1982, that he is a registered and active voter, that he intended to vote in future elections, that he was in the former Benchmark CD-5, and that he is now in the Enacted CD-2. That is enough to demonstrate his standing. And if the plaintiffs need to establish the standing of voters in every possibly affected North Florida congressional district in the Enacted Map, Ms. Keith credibly testified that Common Cause has members who are registered voters in Enacted CD-2, CD-3, CD-4, and CD-5. That too is sufficient. *See Friends of the Earth, Inc. v.*

*Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 181 (2000) ("An [organization] has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit").[42]

## V.  LEGAL STANDARD FOR VOTE DILUTION CLAIMS

As a general matter, "a vote dilution claim alleges that the State has enacted a particular voting scheme as a purposeful device 'to minimize or cancel out the voting potential of racial or ethnic minorities[.]'" *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (citation omitted). *See also, e.g., Rogers v. Lodge*, 458 U.S. 613, 617 (1982) ("The Court has recognized . . . that multimember districts violate the Fourteenth Amendment if 'conceived or operated as purposeful devices to further racial discrimination' by minimizing, cancelling out or diluting the voting strength of racial elements in the voting population.") (citation omitted); *White v. Regester*, 412 U.S. 755, 765 (1973) ("[W]e have entertained claims that multimember districts are being used invidiously to cancel out or minimize the voting strength of racial groups.") (citation omitted).

### A.  Fourteenth and Fifteenth Amendments

The Supreme Court has held that vote dilution claims are cognizable under the Fourteenth Amendment, but has left open whether they can also be brought under the Fifteenth Amendment. *Compare, e.g., Shaw*, 509 U.S. at 641 (explaining that certain "schemes violate the Fourteenth Amendment when they are adopted with a discriminatory purpose and have the effect of diluting minority voting strength" in situations where "members of a racial minority group vote as a cohesive unit"), *with, e.g., Voinovich*, 507 U.S. at 159 ("This Court has not decided whether the Fifteenth Amendment applies to vote-dilution claims[.]"). The "design of the [Fifteenth] Amendment is to reaffirm the equality of races at the most basic level of the democratic process," and it "prohibits all provisions denying or abridging the voting franchise of any citizen or class of citizens on the basis of

---

[42] If necessary, we also conclude that Ms. Inman-Johnson and the Florida NAACP have Article III standing.

race." *Rice v. Cayetano*, 528 U.S. 495, 512 (2000). The majority of circuits that have addressed the issue have concluded that vote dilution claims can be asserted under the Fifteenth Amendment. *See Lodge v. Buxton*, 639 F.2d 1358, 1373 (5th Cir. 1981), *aff'd sub nom, Rogers v. Lodge*, 458 U.S. 613 (1982); *Washington v. Finlay*, 664 F.2d 913, 919 (4th Cir. 1981); *Perkins v. City of West Helena*, 675 F.2d 201, 205−06 (8th Cir. 1982); *Lucas v. Townsend*, 967 F.2d 549, 551 (11th Cir. 1992). *See also Page v. Bartels*, 248 F.3d 175, 192−94 (3d Cir. 2001) (concluding that Fifteenth Amendment vote dilution claims were not frivolous or insubstantial). Some district courts, however, have disagreed. *See, e.g., Tigrett v. Cooper*, 855 F. Supp. 2d 733, 748 (W.D. Tenn. 2012); *Perez v. Texas*, 2014 WL 12853571, at *2 (W.D. Tex. June 23, 2014) (three-judge court); *Alabama State Conference of the NAACP v. City of Pleasant Grove*, 372 F. Supp. 3d. 1333, 1341−42 (N.D. Ala. 2019).

We assume, without deciding, that vote dilution claims can also be brought under the Fifteenth Amendment as the plaintiffs allege. In the plaintiffs' own framing, a vote dilution claim under the Fifteenth Amendment mirrors, and is congruent with, a vote dilution claim under the Fourteenth Amendment. And in their view, both claims require proof of discriminatory purpose and dilutive effect. *See* Plaintiffs' Post-Trial Br., D.E. 218 at 101–02. So if the plaintiffs' Fourteenth Amendment vote dilution claim fails, so too does their Fifteenth Amendment vote dilution claim.

## B. Discriminatory Purpose

As to discriminatory purpose, we must presume the good faith of the legislature. *See Abbott v. Perez*, 585 U.S. 579, 603 (2018). Taking this presumption into account,

> [a]n election practice violates . . . the Fourteenth and Fifteenth Amendments if it is undertaken and maintained for a discriminatory purpose. Under this intent-based approach, "[r]acial discrimination need only be one purpose, and not even a primary purpose, of an official act" for a violation to occur. But discriminatory intent "implies more than intent as volition or intent as awareness of consequences . . . . It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group."

48

*Fusilier v. Landry*, 963 F.3d 447, 463 (5th Cir. 2020) (some internal quotation marks and citations omitted). Stated differently, "[d]iscriminatory purpose may be established by proof that the [government] used race as a substantial or motivating factor in its . . . practices. . . . [O]nce a discriminatory purpose is established, the burden shifts to [the government] to prove that, at the time of the discriminatory act, the same decision would have been made for a legitimate reason." *Burton v. City of Belle Glade*, 178 F.3d 1175, 1189 (11th Cir. 1999).

In assessing the matter of discriminatory intent, "'direct or indirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of [the government's] actions' may be considered." *Fusilier*, 963 F.3d at 463 (citation omitted). "We evaluate all available direct and circumstantial evidence of intent in determining whether a discriminatory purpose was a motivating factor in a particular decision." *Burton*, 178 F.3d at 1189. The Eleventh Circuit, for example, has explained that under the Supreme Court's decision in *Arlington Heights*

> relevant evidentiary factors include substantial disparate impact, a history of discriminatory official actions, procedural and substantive departures from the norms generally followed by the decision-maker, and the legislative and administrative history of the decision. . . . [E]vidence of the historical background of the decision is relevant to the issue of discriminatory intent. . . . Indeed, all actions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose.

*Id.* (citations and internal quotation marks omitted); *see also Greater Birmingham Ministries*, 992 F.3d at 1332. Nevertheless, the presumption of good faith accorded to the legislature is not changed by a finding of past discrimination. *See Abbott*, 585 U.S. at 603.

## C. Dilutive Effect

Since 1982, vote dilution claims under Section 2 of the Voting Rights Act, 52 U.S.C. 10301, do not require a showing of discriminatory intent. *See Gingles*, 478 U.S. at 35−36. Understandably, then, most plaintiffs asserting vote dilution claims in the last 40 years have proceeded under Section 2 and have not invoked the Fourteenth or Fifteenth Amendments.

*See generally* Travis Crum, *Reconstructing Racially Polarized Voting*, 70 Duke L. J. 261, 282 (2020) ("Indeed, after *Gingles*, constitutional vote dilution claims are rare."); Luke P. McLoughlin, *Section 2 of the Voting Rights Act and City of Boerne: The Continuity, Proximity, and Trajectory of Vote-Dilution Standards*, 31 Vermont L. Rev. 39, 42 (2006) ("Doctrinally, statutory vote dilution has eclipsed the constitutional species."). That means that there is a dearth of Supreme Court authority on what is required to prove dilutive effect with respect to congressional districts under the Fourteenth or Fifteenth Amendments. *See Cano v. Davis*, 211 F. Supp. 2d 1208, 1248−49 (C.D. Cal. 2002) (three-judge court), *summ. aff'd*, 537 U.S. 1100 (2003); *Perez v. Abbott*, 253 F. Supp. 3d 864, 942−44 (W.D. Tex. 2017) (three-judge court); *Ga. State Conf. of the NAACP v. Georgia*, 269 F. Supp. 3d 1266, 1277−81, 1278 n.7 (N.D. Ga. 2017) (three-judge court).

As we explain below, even assuming that Governor DeSantis acted with some unlawful discriminatory motive in creating and proposing the redistricting map that was ultimately enacted into law, the plaintiffs have not proven that the Florida Legislature had a similar motive in adopting and passing that map. Because that failure to prove the requisite intent is fatal to the plaintiffs' vote dilution claims under the Fourteenth and Fifteenth Amendments, we need not and do not address how dilutive effect can (or must) be proven for constitutional vote dilution claims in this context.

## VI.    LACK OF RATIFICATION BY THE LEGISLATURE

To prevail on their vote dilution claims, the plaintiffs must prove that race was a motivating factor in the adoption and passage of the Enacted Map by the Florida Legislature. *See Arlington Heights*, 429 U.S. at 265; *Greater Birmingham Ministries*, 992 F.3d at 1321. That is because it is the Legislature's responsibility to draw maps for congressional redistricting in Florida. *See* Fla. Const. art. III, §§ 7, 20.

We pause here to emphasize a critical detail that was sometimes confused or glossed over in the plaintiffs' case. There are two relevant state actors in this case—the Florida Legislature, which passed the Enacted Map, and the Governor, who proposed, pushed for, and signed the Enacted Map into law. It is not enough for the plaintiffs to show that the Governor was motivated in part by racial animus, which we will assume without deciding

for purposes of our decision. Rather, they also must prove that the Florida Legislature *itself* acted with some discriminatory purpose when adopting and passing the Enacted Map. *See Abbott*, 585 U.S. at 608–09; *Matthews v. Columbia County*, 294 F.3d 1294, 1297 (11th Cir. 2002). This they have not done.

Any racially discriminatory purpose on the Governor's part—which, again, we assume without deciding—cannot simply by virtue of his role in the legislative process be imputed to the Florida Legislature. *See Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021) ("The 'cat's paw' theory has no application to legislative bodies. The theory rests on the agency relationship that exists between an employer and a supervisor, but the legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents."); *cf. United States v. O'Brien*, 391 U.S. 367, 384 (1968) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it . . . . ").

Our analysis begins, as it must, with a presumption that the Florida Legislature acted properly and in good faith when passing the Enacted Map. *See Abbott*, 585 U.S. at 603 ("[I]n assessing the sufficiency of a challenge to a districting plan, . . . [the] good faith of [the] state legislature must be presumed.") (citation omitted); *League of Women Voters of Fla., Inc. v. Florida Sec'y of State*, 32 F.4th 1363, 1373 (11th Cir. 2022) ("[W]hile we do not require courts to incant magic words, it does not appear to us that the district court here meaningfully accounted for the presumption at all."). Courts must "exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." *Miller*, 515 U.S. at 916. Such restraint is warranted for two reasons. First, reapportionment is primarily a duty and responsibility constitutionally vested in the state government. *See Growe v. Emison*, 507 U.S. 25, 34 (1993) (citing U.S. Const. art. I, § 2). Second, "[f]ederal-court review of districting legislation represents a serious intrusion on th[at] most vital of local functions." *Miller*, 515 U.S. at 915. A "complex interplay of forces" impacts the redistricting calculus and legislatures "must have discretion to exercise the political judgment necessary to balance competing interests." *Id*. at 915–16. *Cf. Cooper*, 581 U.S.

at 319 (stating, in a racial gerrymandering case, that the plaintiff's burden to overcome the good-faith presumption is a "demanding" one).

Discriminatory purpose may be proved through direct evidence of legislative purpose, such as "[o]utright admissions of impermissible racial motivation." *See Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). Or it may be inferred from the totality of the circumstances surrounding a plan's enactment, guided by the well-established *Arlington Heights* factors. *See Arlington Heights*, 429 U.S. at 266–68. In the redistricting context, the *Arlington Heights* factors include (1) the existence of a disproportionate racial impact, including evidence of a consistent pattern of actions by the legislature disparately impacting a particular group; (2) the historical background and context for the redistricting plan and the "specific sequence of events" leading up to its adoption; (3) procedural and substantive departures in the normal decision-making process; and (4) the legislative and administrative history behind the plan, including contemporary views expressed by lawmakers. *See id*. Other relevant considerations include (5) the foreseeability of any disparate impact; (6) the knowledge of that impact; and (7) the availability of less discriminatory alternatives. *See Greater Birmingham Ministries*, 992 F.3d at 1322.

Discriminatory purpose also may be established on the basis of ratification. *See Matthews*, 294 F.3d at 1297. In the legislative context, proving a ratification theory of discriminatory purpose generally requires evidence that (1) a legislature enacted a law with the "purpose of effectuating the desires" of another person or group; (2) racially discriminatory considerations were a motivating factor behind those desires; and (3) the legislature was aware of the discriminatory motives and adopted those motives as its own. *See United States v. Yonkers Bd. of Ed.*, 837 F.2d 1181, 1225 (2d Cir. 1987) (citation omitted); *Matthews*, 294 F.3d at 1297–98. Stated differently, the legislature "must ratify not only the [desired legislative measure] itself, but also the unconstitutional basis for it." *Matthews*, 294 F.3d at 1297.

Here the plaintiffs freely concede there is no direct or circumstantial evidence of racially discriminatory purpose on the part of any member of the Florida Legislature. *See* Tr. 982 (counsel agreeing that the plaintiffs are "not accusing any legislator of racial

animus"). And they also concede that with respect to the alternative maps it initially passed (Maps 8019 and 8015) that the Legislature did not act with discriminatory motives. *See* Tr. 980. Rather, their position is that the Florida Legislature knowingly ratified the Governor's discriminatory purpose not by affirmatively "endorsing it," *see* Tr. 981, but by "capitulat[ing] to the Governor's racially motivated demands" and "reluctant[ly] acquiesc[ing]" in the Enacted Map. *See* Plaintiffs' Post-Trial Br., D.E. 218 at 111. But capitulation and acquiescence to a desired end, without more, do not constitute ratification of a racially discriminatory motive under settled precedent.[43]

Ratification of another's racially discriminatory motives requires a conscious, deliberate choice by the decision-making body. *See Gattis v. Brice*, 136 F.3d 724, 727 (11th Cir. 1998) ("A policymaker's approval of an unconstitutional action can constitute unconstitutional [government] policy only when the policymaker . . . . [is shown to have] not only accepted [a] recommendation . . . but knew of and ratified the improper motives behind [that] recommendation.") (citation omitted). This may be shown with evidence that the decision-makers themselves "agreed with" the discriminatory motives. *See Thomas ex rel. Thomas v. Roberts*, 261 F.3d 1160, 1174 n.12 (11th Cir. 2001), *judgment vacated sub nom. Thomas v. Roberts*, 536 U.S. 953 (2002), *opinion reinstated*, 323 F.3d 950 (11th Cir. 2003). Or it may be demonstrated with evidence that the decision-makers knowingly chose a particular course of action for the purpose of giving effect to the discriminatory motives. *See Hallmark Dev., Inc. v. Fulton County*, 466 F.3d 1276, 1284 (11th Cir. 2006) (quoting *Yonkers*, 837 F.3d at 1225).[44]

---

[43] Of course, municipal liability under 42 U.S.C. § 1983 may attach where "final policymakers have acquiesced in a longstanding practice that constitutes the [municipality's] standard operating procedure." *Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016). But this is not a municipal policy case, and in any event that theory of municipal liability is separate and distinct from ratification, and was not argued by the plaintiffs here.

[44] *See also Thomas*, 261 F.3d at 1174 n.12 ("[W]hen plaintiffs are relying not on a pattern of unconstitutional conduct, but on a single incident, they must demonstrate that [final decisionmakers] had an opportunity to review [a] subordinate's decision and agreed with both the decision and the decision's basis before a court can hold the government liable on a ratification theory."); *Salvato v. Miley*, 790 F.3d 1286, 1296 (11th Cir. 2015) ("Only when the authorized policymakers approve a subordinate's [unconstitutionally motivated]

So, for example, in *Yonkers*—a case the plaintiffs rely on—the Second Circuit concluded that elected city officials purposefully funneled subsidized housing projects to existing minority areas for decades in order to "achiev[e] or preserv[e]" the racial housing segregation demanded by constituents. *See* 837 F.2d at 1223–24. The Second Circuit also separately found direct evidence of discriminatory purpose but held that, even assuming there was no such evidence, the city's knowing responsiveness to constituents' racially segregationist desires gave rise to an equal protection violation. *See id.* at 1224−26. Similarly, in *Smith v. Town of Clarkton*, 682 F.2d 1055, 1066 (4th Cir. 1982), the Fourth Circuit ruled that city officials withdrew from a multi-municipality housing authority and blocked the construction of public housing in "direct response" to "racially inspired" public opposition to the project. In both *Yonkers* and *Clarkton*, the elected officials' deliberate responsiveness to the racial biases of the community gave effect to those biases and, in and of itself, established discriminatory purpose. *See Yonkers*, 837 F.2d at 1223−26; *Clarkton*, 682 F.2d at 1066−67.[45]

Other cases similarly illustrate the types of official action that fall short of the evidentiary standard for ratification. In *Matthews*, the Eleventh Circuit held that a county was not liable on a ratification theory when only one of a three-member majority of county commissioners who voted to eliminate a public employee's job had an unconstitutional motive. *See* 294 F.3d at 1296–98. The fact that the other two members may have been influenced by the improperly motivated member or might have been aware of his improper

_____

decision and the basis for it have they ratified that decision.") (citation and internal quotation marks omitted).

[45] The doctrinal basis for decisions like *Yonkers* and *Clarkton* is rooted in longstanding Supreme Court precedent holding that "a governmental body may not escape liability under the Equal Protection Clause merely because its discriminatory action was undertaken in response to the desires of a majority of its citizens." *Yonkers*, 837 F.2d at 1224; *see also City of Cleburne, Tex. v. Cleburne Living Center, Inc.*, 473 U.S. 432, 448 (1985) ("[T]he electorate as a whole, whether by referendum or otherwise, could not order city action violative of the Equal Protection Clause, . . . and [public officials] may not avoid the strictures of that Clause by deferring to the wishes or objections of some fraction of the body politic.") (citations omitted); *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect."); *Lucas v. Forty-Fourth Gen. Assembly of Colo.*, 377 U.S. 713, 736–37 (1964) ("A citizen's constitutional rights can hardly be infringed simply because a majority of the people choose that it be.").

motives did not establish that the others actually ratified or endorsed those motives. *See id.* at 1297–98; *see also Campbell v. Rainbow City*, 434 F.3d 1306, 1313 (11th Cir. 2006) (no ratification by nine-member city planning commission in denying a real estate developer's variance request where only one member had an unconstitutional motive and two other members may have been "influenced" by the improperly motivated member but "not a scintilla of evidence" showed a majority of the members "knew of and ratified" the unconstitutional motive). More recently, in *Saunders v. Town of Hull*, 874 F.3d 324 (1st Cir. 2017), a police officer sued a town and former police chief, alleging that he was passed over for promotion in retaliation for protected speech disparaging the former chief, in violation of the First Amendment. The decision-maker in *Saunders* was the town's Board of Selectmen, but it adopted the former chief's recommendation, which the plaintiff alleged was retaliatorily motivated, as evidenced by the former chief's later statement to him that "Town Hall has my back." *Id.* at 328–29. The First Circuit held that the plaintiff's own suspicions and the former chief's single, unsubstantiated statement did not establish that the Board was "aware of—let alone expressly approved of—[the former chief's purported retaliatory] motive" when it declined to promote the plaintiff. *See id.* at 331.

The legal principles at work in these authorities are uncomplicated. A public and collective decision-making body, like the Florida Legislature, is answerable only for its *own* unconstitutional actions and motivations. The unlawful motivations of others— whether constituents, the Governor, or even a single member of the body itself—do not become those of the decision-making body as a whole unless it is shown that a majority of the body's members shared and purposefully adopted (i.e., ratified) the motivations. *See Campbell*, 434 F.3d at 1313. A contrary rule would put public officials in an untenable position:

> Lawmakers' support for legislation can come from a variety of sources; one [official] may support a particular piece of legislation for a blatantly unconstitutional reason, while another may support the same legislation for perfectly legitimate reasons. A well-intentioned lawmaker who votes for the legislation—even when he votes in the knowledge that others are voting for it for an unconstitutional reason and even

when his unconstitutionally motivated colleague influences his vote—does not automatically ratify or endorse the unconstitutional motive. If [a contrary rule applied], the well-intentioned lawmaker in this hypothetical would be forced either to vote against his own view of what is best . . . or subject [the government entity on whose behalf he is acting] to Section 1983 liability. We think the law compels no such outcome.

*Matthews*, 294 F.3d at 1298; *see also Veasey v. Abbott*, 830 F.3d 216, 234 n.17 (5th Cir. 2016) ("[S]peculation and conclusory accusations by opposing legislators are not an appropriate foundation for a finding of purposeful discrimination."). So it is here. The conceded absence of *any* evidence that *any* member of the Florida Legislature, much less a majority of its members, was actually motivated by racial discrimination in passing the Enacted Map dooms the plaintiffs' case for ratification. Indeed, even without the good faith presumption, the evidentiary record establishes that the Florida Legislature acted with the purpose of ensuring the 2022 redistricting cycle yielded congressional district plans that complied with the United States and Florida Constitutions.

Examples abound. At the start of the redistricting process, the Chairs of the Senate and House redistricting committees explicitly pledged their commitment to producing constitutionally compliant congressional districts, including the preservation of a Black-performing district in North Florida consistent with the FDA's non-diminishment provision. In the months that followed, the committees produced at least six different maps purposefully tailored to that end. Each time, Governor DeSantis publicly excoriated the committees' plans as unconstitutional racial gerrymanders, dispatched his surrogates to argue the purported legal case against them, and even, in an unprecedented move, submitted two congressional redistricting maps of his own eliminating the only Black-performing district in North Florida. And each time, the Legislature roundly rejected the Governor's objections and instead—three times over—one or both chambers passed redistricting plans that did, in fact, preserve a Black-performing district in North Florida. The Legislature's final redistricting plan was an extraordinary two-map compromise intended to reconcile the FDA's non-diminishment standard with the Governor's stated constitutional objections to the prior proposed plans, and it passed in the face of immense

opposition and public veto threats from the Governor. These are not the actions of a legislative body infected with racial animus. To the contrary, the Florida Legislature clearly fought hard and enacted congressional districting maps that it believed were compliant with the United States and Florida Constitutions, including the FDA's non-diminishment provision.

That said, there did come a time when the Legislature seemed to run out of steam. The Governor vetoed its two-map redistricting plan and called for a special legislative session. At that point, rather than produce yet another new map of its own, the Legislature decided to just await a map from the Governor. The Governor's third and final map included some districts previously endorsed by the Legislature and others proposed only by the Governor, and it again eliminated the only Black-performing district in North Florida. This time the Legislature changed course and enacted the Governor's map. Some legislators viewed the Enacted Map as a compromise map that represented but one of "innumerable" ways to achieve constitutionally compliant congressional districts. *See* JX 0048 at 27. Others condemned the Enacted Map and even peacefully protested against it on the House floor. Significantly, though, not one legislator said or did anything to suggest, much less support an inference, that *any* legislator voted for the Enacted Map *because* they shared or intended to effectuate any racially discriminatory motive on the Governor's part. Consequently, whatever might be said about the Legislature's decision to give up the fight for preserving a Black-performing district in North Florida, it did not amount to ratification of racial animus in violation of the Fourteenth and Fifteenth Amendments. There being no evidence of discriminatory purpose on the part of the Florida Legislature, the plaintiffs' vote dilution claims fail.

## VII.  CONCLUSION

The plaintiffs have not proven that the Legislature acted with race as a motivating factor in passing the Enacted Map.  Accordingly, the plaintiffs' intentional vote dilution claims fail under the Fourteenth and Fifteenth Amendments.

Final judgment will be entered by separate order.[46]

**SO ORDERED** on March 27, 2024.

---

[46] We thank counsel for their thorough presentations and the professional manner in which they litigated and tried this case.

JORDAN, Circuit Judge, Concurring.

The Court's opinion assumes without deciding that Governor Ron DeSantis acted with race as a motivating factor but concludes that the plaintiffs' claims fail because the record does not show that the Florida Legislature ratified the motivation attributed to the Governor. I join the opinion in full but write separately to explain why the evidence presented at trial convinces me that the Governor did, in fact, act with race as a motivating factor.

# I

As a general matter, "in the absence of clear evidence to the contrary, courts presume that [public officials] have properly discharged their official duties." *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926). I begin, therefore, with a presumption that Governor DeSantis acted properly in drawing and submitting the Enacted Map and eliminating a Black-performing congressional district in North Florida.

This presumption of good faith, however, is not boundless. "When there is a proof that a discriminatory purpose has been a motivating factor in the decision, . . . judicial deference is no longer justified." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).

Determining the motivation of a large collective body is a difficult undertaking. *See Hunter v. Underwood*, 471 U.S. 222, 228 (1985) ("When we move from an examination of a board of county commissioners such as was involved in [*Rogers v. Lodge*, 458 U.S. 613 (1982)] to a body the size of the Alabama Constitutional Convention of 1901, the difficulties in determining the actual motivations of the various legislators that produced a given decision increase."); *United States v. O'Brien*, 391 U.S. 367, 384 (1968) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it . . . ."). But the Governor is a single person, so the inquiry as to him is more straightforward.

The parties agree that, with respect to intent, the plaintiffs need only show that race was "a motivating factor." *See* Joint Pre-Trial Report, D.E. 187 at 8. Their understanding of the law is correct. To satisfy the intent prong of an intentional vote dilution claim, a

plaintiff need not "prove that the challenged action rested solely on racially discriminatory purposes. Rarely can it be said that a legislature or administrative body," or even an executive official, "made a decision motivated solely by a single concern, or even that a particular purpose was the dominant or primary one." *Arlington Heights*, 429 U.S. at 265 (citation and internal quotation marks omitted). In other words, "discrimination need not be the sole goal in order to be unlawful." *Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 771 (9th Cir. 1990). *See also Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979) (a discriminatory purpose "implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group") (internal quotation marks omitted).

The Supreme Court has directed lower courts to "look to [its] decision in *Arlington Heights* for guidance" in "assessing a jurisdiction's motivation in enacting voting changes." *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 488 (1997) (citing *Lodge*, 458 U.S. at 618, as an example in the vote dilution context under the Equal Protection Clause). Though constitutional/intentional vote dilution claims are seldom raised in a post-*Gingles* world, *see* Majority Op. at 49–50, the courts that have adjudicated such claims continue to apply traditional equal protection principles to determine intent. *See Garza*, 918 F.2d at 771 (citing *Arlington Heights* for intent finding in intentional vote dilution case); *League of United Latin Am. Citizens v. Abbott*, 601 F. Supp. 3d 147, 160 (W.D. Tex. 2022) (three-judge court) ("[C]ourts evaluating intentional-discrimination claims in the voting-rights context fall back on doctrines established in Equal Protection cases."); *Georgia State Conf. of NAACP v. State*, 269 F. Supp. 3d 1266, 1279 (N.D. Ga. 2017) (three-judge court) (using *Arlington Heights* to assess intent in an intentional vote dilution case governed by the Fourteenth Amendment). That makes sense to me, and both sides agree that we should apply the *Arlington Heights* factors, as supplemented by the Eleventh Circuit in *Greater Birmingham Ministries v. Sec'y of State for the State of Alabama*, 992 F.3d 1299 (11th Cir. 2021), in analyzing the circumstantial evidence to determine whether there is discriminatory intent. *See* Joint Pre-Trial Report, D.E. 187 at 8.

Importantly, neither *Arlington Heights* nor *Greater Birmingham Ministries* purport to set out an exhaustive list of relevant factors. *See Arlington Heights*, 429 U.S. at 268; *Greater Birmingham Ministries*, 992 F.3d at 1322. As summarized in *Greater Birmingham Ministries*, the factors to consider are "(1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; . . . (5) the contemporary statements and actions of key legislators[;] . . . . (6) the foreseeability of the disparate impact; (7) knowledge of that impact[;] and (8) the availability of less discriminatory alternatives." *Greater Birmingham Ministries*, 992 F.3d at 1322.

That these eight factors are merely instructive is confirmed by *Hall v. Holder*, 117 F.3d 1222 (11th Cir. 1997), a Voting Rights Act/Fourteenth Amendment vote dilution case which predated *Greater Birmingham Ministries*. In *Hall*, the Eleventh Circuit explained:

> *Lodge*'s endorsement of both *Zimmer* [*v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973) (en banc), *aff'd on other grounds sub nom.*, *East Carroll Parish Sch. Bd. v. Marshall*, 424 U.S. 636 (1976) (per curiam)] and *Arlington Heights* provides a list of factors which, although not exclusive, are instructive in any equal protection voting rights challenge. The *Lodge* Court viewed the following *Zimmer* factors as relevant to discriminatory intent: (1) minority access to any candidate selection ("slating") process; (2) the degree to which government officials are responsive to minority needs; (3) the justification for the electoral system; (4) past discrimination and its effect on present-day political participation; (5) the size of electoral districts; (6) the existence of a majority-vote requirement; (7) in elections for multi-member offices, whether single-shot voting is permitted; and (8) the existence of geographic subdistricts. . . . The *Lodge* Court also found that three other facts "bear heavily on the issue of purposeful discrimination," including: (9) the percentage of minority citizens and voters in the jurisdiction; (10) racial polarization in voting; and (11) the degree of minority electoral success. . . . Additionally, after *Lodge*, courts must heed *Arlington Heights*'s attention to legislative and administrative history when evaluating a challenged electoral system, and pay particular attention to the circumstances surrounding a

particular decision and deviations from the normal decision-making process.

*Id.* at 1225 (citations omitted).  This long list of factors demonstrates just how contextual the analysis can (and must) be.

Determining intent is a fact intensive inquiry that does not lend itself to neat categorizations.  Many of the relevant facts can fairly fall under several of the relevant factors.  *See Greater Birmingham Ministries*, 992 F.3d at 1322 n.33 (acknowledging same).  And no single factor is dispositive—"[t]he inquiry is practical."  *Feeney*, 442 U.S. at 279 n.24.  *See also N. Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 221 (4th Cir. 2016) (characterizing *Arlington Heights* as a "holistic" approach); Jessica A. Clarke, *Explicit Bias*, 113 Nw. U. L. Rev. 505, 584 (2018) ("*Arlington Heights* calls for a holistic review of evidence of discriminatory intent, considering history, context, effects on minority groups, and statements by decisionmakers.").

## II

Having sat through trial, and having evaluated the evidence presented, I find that Governor DeSantis acted with race as a motivating factor (among others) in drawing and pushing through the Enacted Map.  Here's why.

## A

"The important starting point for assessing discriminatory intent under *Arlington Heights* is the impact of the official action [and] whether it bears more heavily on one race than another."  *Reno*, 520 U.S. at 489 (quoting *Arlington Heights*, 429 U.S. at 266) (internal quotation marks omitted).  The "impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions."  *Id.* at 487 (citing *Arlington Heights*, 429 U.S. at 265−66).  To that end, an official like Governor DeSantis who personally submits a redistricting plan "having a dilutive impact is more likely to have acted with a discriminatory intent . . . than [one] whose plan has no such impact."  *Id.*

The Enacted Map challenged by the plaintiffs here undeniably impacts one race more heavily than another and supports an inference that Governor DeSantis acted with

race as a motivating factor. "In the context of single-member districts, the usual device for diluting minority voting power is the manipulation of district lines." *Voinovich v. Quilter*, 507 U.S. 146, 153 (1993). Of course, congressional districts, including the former Benchmark CD-5, necessarily undergo changes after each decennial census and their shapes and dimensions cannot be seen or treated as eternally sacrosanct. In this case, the 2020 Census reported that Florida's population had grown by nearly 15% in a decade—gaining Florida an additional congressional seat and requiring the creation of a new congressional map. *See* Joint Pre-Trial Report, D.E. 187 at 4.

Proposed by Governor DeSantis and later approved by the Florida Legislature, the Enacted Map splintered the Black voters of Benchmark CD-5 into Enacted CD-2, Enacted CD-3, Enacted CD-4, and Enacted CD-5. *See* Joint Pre-Trial Report, D.E. 187 at 7. The mere reallocation of voters across districts, without more, does not prove (or even sometimes suggest) discriminatory intent. But "[s]ometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." *Arlington Heights*, 429 U.S. at 266. That, for me, is the situation here.

The disparate impact of the Enacted Map is beyond dispute. And it is significant, particularly when considered in light of Florida's persistent efforts to bar Black voters in this region from exercising their constitutional right to vote. *See* Majority Op. at 4−7, 33−35. It bears repeating that between 1992 and 2022 Benchmark CD-5 and its predecessor—the former CD-3—enabled Black voters in North Florida to begin the difficult work of undoing more than a century of voter discrimination. For three short decades, they experienced the promise of representative democracy. Indeed, despite never constituting a majority of the voting-age population, Black residents in Benchmark CD-5—which had racially-polarized voting, *see* Tr. 651−52—organized to elect candidates who reflected their needs and values. They secured representation and effected change in their communities. According to Charlie Clark, one of the plaintiffs, "if Blacks got together, they were given a fair chance to choose somebody of their liking to represent them." Tr. 261.

The Enacted Map drawn by Governor DeSantis eradicated any such chance by drastically weakening minority voting strength through "cracking," the dispersal of Black voters "into districts in which they constitute an ineffective minority of voters" and lack the power to elect candidates of their choice. *See Voinovich*, 507 U.S. at 153−54 (describing "cracking"); *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986) (same). The Enacted Map fragmented Black voters to such an extent that, for the first time in thirty years, they could no longer elect a congressional candidate of their choice anywhere in North Florida.

Sometimes numbers help tell a story, and here's what some of the relevant numbers show. The Black Voting Age Population ("BVAP") in Benchmark CD-5 was 46.20%, and it was 35.32% in the Duval-only CD-5 in Map 8019 proposed by the Legislature. *See* DX98; JX 0070; Tr. 184−86. Both of those versions of CD-5 performed for Black voters in North Florida. *See* Tr. 156, 174, 187−88, 192, 670−71, 1011. But in the Enacted Map, the BVAP for Enacted CD-4, which Alex Kelly identified as the relevant analogue, fell to 31.66%. *See* JX 0046 at 76. This decrease in the BVAP percentage, though seemingly slight at first glance, proved determinative. Again, unlike the CD-5 configuration in the Benchmark Map and in Map 8019, the configuration (and location) of CD-4 in the Enacted Map did not perform for Black voters in North Florida. *See* JX 0048 at 34; PX 5042-032; Tr. 740. And, as the legislative record shows, everyone knew at the time of enactment that the Governor's proposal did not have any congressional district that would perform for Black voters in North Florida. *See, e.g.,* JX 0048 at 34−35; JX 0047 at 14, 26, 42; JX 0050 at 8, 9, 26, 28, 45, 51, 58.

To put this in visual perspective, here are the Duval-only CD-5 in Map 8019 and CD-4 in the Enacted Map.

| Map 8019[1] | Enacted Map[2] |
|---|---|
|  |  |

The numerical differences may appear innocuous at first. Map 8019 produced a BVAP of 35.32% in CD-5 and 8.91% in CD-4, while the Enacted Map produced a BVAP of 31.66% in CD-4 and 12.80% in CD-5. *Compare* BVAP figures for CD-4 and CD-5 in Map 8019 (https://perma.cc/4RBR-D79P), *with* BVAP figures for CD-4 and CD-5 in the Enacted Map (https://perma.cc/2YS4-ATBD). Combined, the two districts contain exactly the same number of Black voting age individuals across the two maps—264,792—yet Governor DeSantis managed to eliminate any Black-performing district in North Florida through the Enacted Map.[3]

---

[1] https://perma.cc/5SN7-BACU.

[2] https://perma.cc/TW6E-28X7.

[3] In Map 8019, CD-4 and CD-5 contain a nominal BVAP of 53,374 and 211,418 individuals, respectively (https://perma.cc/4RBR-D79P). In the Enacted Map, CD-4 and CD-5 contain a nominal BVAP of 187,108 and 77,684 (https://perma.cc/2YS4-ATBD). When added, the two figures in each map yield an identical figure of 264,792 individuals.

Secretary Cord Byrd, in defending the Governor and the Enacted Map, argues that non-performance for Black voters in North Florida was simply the consequence of Mr. Kelly applying neutral districting principles (e.g., compactness) rather than pursuing an engineered outcome. That contention, however, defies the reality on the ground and flies in the face of the evidence presented at trial.

First, there is the reality on the ground. It has been known for decades that cartographers can, with the advent of geographic information systems and computer programs, create redistricting maps that achieve desired political and other outcomes while providing purportedly neutral reasons (i.e., cover) for their map-making decisions. *See, e.g.,* Mark Monmonier, Bushmanders and Bullwinkles: How Politicians Manipulate Electronic Maps and Census Data to Win Elections 155 (2001) (noting, almost a quarter century ago, the "ease with which political cartographers can exploit block data and geographic information systems"). The task has only become easier over time as computers have become faster and more powerful, and redistricting software programs have become more sophisticated. To experience this technological advance firsthand, one need only visit the Five-Thirty-Eight website, choose a state, input the desired outcomes or preferences, and—presto!—you have a redistricting map that achieves your goals. Or you can use a website like DistrictR to play around with the many map possibilities for each state by using a number of variables. Whatever the choice of platform, everyone and anyone can play the role of sophisticated cartographer today.[4]

Second, there is the evidence presented at trial. Mr. Kelly acknowledged the vast discretion he had to choose among a number of alternatives in drawing district lines: "[I]n redistricting . . . . if you're complying with the law this way or that way, ultimately, you can make a decision . . . . in some parts of the state, there's thousands of ways you could go, even if you're complying with the law [and] if you're drawing compact districts that follow city and county lines." Tr. 164. In other words, there were choices to be made, and

---

[4] Five-Thirty-Eight, projects.fivethirtyeight.com/redistricting-2022-maps (https://perma.cc/K37W-54RK); DistrictR, districtr.org (https://perma.cc/LJ5H-TQ9Y).

the Florida Legislature presented Governor DeSantis with the opportunity to adhere to compactness measures and at the same time maintain a Black-performing district (with a lower BVAP) in North Florida through Map 8019. Tellingly, the Secretary did not present at trial the various configurations that Mr. Kelly had come up with and rejected, and we are asked to take him at his word that he was not able to turn on the demographic data in the redistricting software that he used to draw the Enacted Map.[5]

Out of the "thousands of ways" to comply with the law, Map 8019 offered the Governor a compact Duval-only CD-5 that abided by city and county lines, and which also performed for Black voters. *See* JX 0038 at 24; JX 0040 at 40−41, 44−45. Yet rather than accept the Legislature's proposal, or tweak it a bit, Governor DeSantis chose to say no and submit a competing map that managed to introduce just enough changes to eliminate and prevent performance by Black voters. Mr. Clark contemplated this stark reality in his testimony: "[W]e really did not feel that the actions of the Governor [were] . . . positive . . . for us as a Black people . . . . [I]t was a vicious assault on what I have come to expect as just a regular voter . . . ." Tr. 271.[6]

The real-life impact of the challenged action is significant. Prior to the Enacted Map, Mr. Clark resided in Benchmark CD-5 and was represented by former Congressman Alfred Lawson Jr. According to Mr. Clark, Congressman Lawson was a community figure who attended church every Sunday with local Black constituents, *see* Tr. 270, and would "give his personal cellphone to somebody who [caught] him on the street." Tr. 266. Mr. Clark testified that he could provide "hundreds of examples" demonstrating the Congressman's responsiveness to his constituents. *See* Tr. 265. In the aftermath of a hurricane, for instance, Congressman Lawson "did not wait for any government assistance," but instead identified the rural homes that needed new electrical poles and fundraised to purchase and install them. *See* Tr. 266. Mr. Clark also testified that

---

[5] More on that later.

[6] At trial, the Secretary presented a number of race-neutral reasons offered by Governor DeSantis and his subordinates for the district configurations in the Enacted Map. As I explain later, I find those reasons to be pretextual and—on this record—probative of discriminatory intent.

Congressman Lawson sought regular feedback from his constituents. "We always could call his office . . . and he would always have . . . meetings of some sort that you could . . . talk to him about things that had happened in Washington . . . ." Tr. 269.

Another plaintiff, Dorothy Inman-Johnson, provided a similar account. For example, she testified that Congressman Lawson "understood the issues impacting [them], and . . . [that] he was a representative that [they] trusted to know what those issues were and how [they] were impacted" by them. Tr. 308−09. Ms. Inman-Johnson added that Congressman Lawson "was very accessible" and maintained a local office "that had staffers who . . . worked in the community, knew the people in . . . [the] community, and worked for [the community]." Tr. 309. As a whole, Ms. Inman-Johnson believed that Black residents had "access to reach [Congressman Lawson] and tell him what [their] needs were, and [that] he would express that on the floor of Congress and [bring] a lot of benefits back to . . . the district." Tr. 309.

The Enacted Map replaced Benchmark CD-5 with four new districts, each of which elected four white Republicans in 2022. Mr. Clark now resides in Enacted CD-2, where former Congressman Lawson was defeated by current Congressman Neal Dunn. Mr. Clark's recent experiences with Congressman Dunn exemplify the practical impact of the Enacted Map. In sharp contrast to his previous experiences with Congressman Lawson, Mr. Clark testified that Congressman Dunn has ignored his requests for information and has yet to hold a public meeting for local constituents. *See* Tr. 269−70. "Both times I called . . . I left my name, my number, my email address. I just wanted . . . for somebody to call me and tell me where I could mail a letter . . . but I did not get callbacks from either one of [the calls]." Tr. 270.

Similarly, Ms. Inman-Johnson testified that Congressman Dunn was "not as accessible" and that although she had managed to speak with his staff by phone, "nothing was done on the issue that [she] had contacted them about." Tr. 311. Ms. Inman-Johnson said that Congressman Dunn was based in Panama City, rather than Tallahassee, and "was not familiar at all with the long-time work of" local Black activists, such as Edwina Douglas Stevens whom residents "considered the mother of the South Side of Tallahassee."

Tr. 312−13.  Ms. Inman-Johnson concluded her testimony by asserting that Congressman Dunn and his staffers were less visible, less accessible, and less attentive to issues she cared about, such as poverty, housing, and criminal justice.  *See* Tr. 312−14.

"Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another."  *Washington v. Davis*, 426 U.S. 229, 242 (1976).  The undeniable disparate impact of the Enacted Map weighs heavily in favor of a finding that race was a motivating factor for Governor DeSantis.

## B

Also probative is the sequence of events leading up to the passage of the Enacted Map—mainly the Governor's stated objections and reasoning for opposing the Legislature's proposed maps.  The Governor first stepped into the picture in mid-January of 2022 when he proposed Map 79 in place of the Florida Senate's four prospective maps.  *See* Majority Op. at 12.  Unlike the Senate's maps, Map 79 did not maintain a Black-performing district in North Florida.  The Governor's justification for not having such a district was that the "Northern Florida map" was an "unconstitutional gerrymander" because it "unnaturally connect[ed]" Tallahassee and Jacksonville.  Tr. 83; Plaintiffs' Pre-Trial Br., D.E. 194 at 12.  Up until this point in the timeline, I take the Governor at his word that he held a good-faith constitutional concern about a district spanning from Tallahassee to Jacksonville.  *Cf. Voinovich*, 507 U.S. at 159 ("[The map drawer's] preference for federal over state law when he believed the two in conflict does not raise an inference of intentional discrimination; it demonstrates obedience to the Supremacy Clause of the United States Constitution.").

It was not until February 18, 2022, when the Governor sent his proxies—Robert Popper and General Counsel Ryan Newman—out in support of his second proposal, Map 94, that signs of discriminatory intent (and pretext) began to arise.  Messrs. Popper and Newman generally argued that proposed CD-3 (the then-House-proposed reconfiguration of Benchmark CD-5 in Map 8011) was racially gerrymandered.  Yet under established Supreme Court precedent, states can take race into account in drawing congressional

district lines. *See Wyche v. Madison Par. Police Jury*, 635 F.2d 1151, 1160 (5th Cir. 1981) ("In drawing district lines, a legislative body is forbidden to discriminate invidiously, but it is not required to be color blind."). Although "the federal courts may not order the creation of majority-minority districts unless necessary to remedy a violation of federal law[,] . . . that does not mean that the State's powers are similarly limited. Quite the opposite is true . . . ." *Voinovich*, 507 U.S. at 156 (citation omitted). Awareness of race in drawing district lines, therefore, "does not lead inevitably to impermissible racial discrimination." *Shaw v. Reno*, 509 U.S. 630, 646 (1993). *Accord Bush v. Vera*, 517 U.S. 952, 958 (1996) (plurality opinion) ("Strict scrutiny does not apply merely because redistricting is performed with consciousness of race. Nor does it apply to all cases of intentional creation of majority-minority districts."); *United Jewish Organizations of Williamsburgh, Inc. v. Carey*, 430 U.S. 144, 161 (1977) (plurality opinion) ("[N]either the Fourteenth nor the Fifteenth Amendment mandates any per se rule against using racial factors in districting and apportionment . . . . The permissible use of racial criteria is not confined to eliminating the effects of past discriminatory districting or apportionment."). As a result, a racial gerrymander results only when race is "the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Alabama Legis. Black Caucus v. Alabama*, 575 U.S. 254, 272 (2015) (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). Neither Mr. Popper nor Mr. Newman ever convincingly explained why, under established Supreme Court precedent, the proposed CD-3 constituted a racial gerrymander.[7]

In fact, Mr. Popper's testimony before the Florida House was so weak that representatives from both sides of the aisle resoundingly rejected it. *See, e.g.,* Tr. 105–06 (Mr. Kelly agreeing that the House Subcommittee was "very hostile" to and "slanderous"

---

[7] The factual issue I address is whether, under the first prong of a constitutional/intentional vote dilution claim, the Governor acted with race as a motivating factor in proposing and pushing through the Enacted Map. That inquiry may at first glance appear to be in tension with the accepted principle that a legislature has discretion to consider race in drawing districts as long as race does not predominate. But the key distinction is that race constitutes an impermissible factor when it is used in an invidious manner to dilute minority voting rights. *See Wyche*, 635 F.2d at 1160.

of Mr. Popper). The negative reaction was not surprising. Mr. Popper admitted to not having performed a "functional analysis to determine whether a more compact district could have been drawn without diminishing the minority's voting ability." JX 0037 at 85. Yet he still hypothesized that CD-3 was not narrowly tailored because of its alleged noncompactness. *See* JX 0037 at 90, 101; PX 2236 at 5–6. The problem with this assertion was (and is) that Mr. Popper put the cart before the horse—the requirement of narrow tailoring only comes into play when race is a predominant factor such that a racial gerrymander exists and requires a compelling state interest. *See, e.g., Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 193 (2017) ("Where a challenger succeeds in establishing racial predominance, the burden shifts to the State to demonstrate that its districting legislation is narrowly tailored to achieve a compelling interest.") (internal quotation marks and citation omitted).

Moreover, applying the Secretary's eye-ball test (i.e., "you know it when you see it," Tr. 810), it is not at all obvious that proposed CD-3 had a fatal compactness problem. The Legislature's proposed CD-3 was long (~200 miles), but so was CD-2 (~180 miles) in the Enacted Map, which the Governor drew and submitted. Though the lack of compactness alone is not enough to establish racial gerrymandering, at this point in the timeline it was the Governor's primary objection. *See* JX 0056; Tr. 665.

In addition to proposed CD-3's alleged noncompactness, Mr. Newman asserted that the FDA's non-diminishment provision should apply only to majority-minority districts. *See* JX 0056. At the time, however, no Florida court had ever said as much. In fact, the Florida Supreme Court said exactly the opposite in *In re Senate Joint Resol. of Legislative Apportionment 1176*, 83 So. 3d 597, 625 (Fla. 2012) (*Apportionment I*) ("[T]he Legislature cannot eliminate majority-minority districts or weaken other historically performing minority districts where doing so would actually diminish a minority group's ability to elect its preferred candidates."). Mr. Newman understandably chose not to contend with that part of *Apportionment I*, and he instead selectively cited the decision for other favorable propositions. *See* JX 0056. Tellingly, Mr. Newman would later drop the non-diminishment argument in his second memorandum. *Compare* JX 0056 at 5, *with* JX 0055

at 5. Unsurprisingly, the Legislature rejected the Governor's legal arguments—as presented by Messrs. Popper and Newman—and moved forward with other proposed maps that maintained a Black-performing district in North Florida.

The Governor's opposition to the Legislature's two-map plan, in particular Map 8019, betrays any semblance of good faith. The Duval-only configuration of CD-5, one would think, resolved the Governor's already dubious racial gerrymandering concerns. Gone was the supposed "sprawling" or "bizarre" district created to connect "separate" and "distinct" communities in Tallahassee and Jacksonville. *See* Majority Op. at 17. And it should have been uncontroversial that the proposed CD-5 in Map 8019 continued to perform for Black voters. Putting aside the other problems with his legislative testimony— set out above—Mr. Popper conceded that complying with the FDA's non-diminishment provision "absolutely can be a compelling state interest." JX 0037 at 101. So the Legislature was well within its discretion to choose a map that continued to perform for Black voters among the myriad of acceptable configurations. Significantly, Republican leaders in the Florida House and Senate—who are also entitled to a presumption of good faith, *see Abbott v. Perez*, 585 U.S. 579, 603 (2018)—were confident that the Legislature's two proposed maps complied with both the Florida and U.S. Constitutions. *See* JX 0038 at 24; JX 0040 at 40−41, 44−45.

I find it probative that the Governor's immediate objections to the Duval-only configuration of CD-5 in Map 8019 came without a reasoned explanation. On February 28, 2022, only a few days after the House Subcommittee proposed Map 8017 (the nearly identical predecessor to Map 8019), the Governor publicly denounced it as containing "unconstitutional districts" and promised to veto it. *See* Majority Op. at 20; Tr. 395. The Governor was unequivocal, stating that "[t]hey can take that [his veto threat] to the bank." Majority Op. at 20. Then again on March 4, 2022, three days after the House Subcommittee proposed Map 8019, the Governor reiterated his intentions of vetoing and called the House's two-map compromise, including Map 8019, dead on arrival. *See id.* No explanations came with the Governor's opposition at that time.

Not until he vetoed the Legislature's two-map plan weeks later, on March 29, 2022, did the Governor finally provide reasons for his objections in Mr. Newman's veto memo. *See id.* Under scrutiny, however, the reasons offered by Mr. Newman do not hold up.

Let's start with the flimsiest objection—that the Duval-only CD-5 in Map 8019 violated the FDA's non-diminishment provision because it reduced the BVAP in Benchmark CD-5 by 10.88% (from 46.20% to 35.32%). *See id.* at 21–22. Curiously, up until that point the Governor had argued that the FDA *did not* apply to Benchmark CD-5. *See id.* at 15. So it is difficult to understand how the FDA somehow now mattered as to the Duval-only CD-5. But even setting that difficulty aside, if the Governor's real concern was the reduction of the BVAP in the Duval-only CD-5 by about 11%, how could the Governor propose the Enacted Map that only exacerbated the problem by reducing the BVAP by over 14% (from 46.20% to 31.66%)? In other words, if the problem in the Duval-only CD-5 was a low BVAP percentage, how could the remedy for that problem be a district that took the BVAP percentage even lower?

Mr. Kelly, the Governor's map drawer, had no answer for this at trial:

> JUDGE JORDAN: So why is it valid to complain about these maps on that ground when the Governor's maps have the same problem?
>
> [MR. KELLY]: Your Honor, the -- Mr. Newman's commentary was getting at the dual -- the dual problem that the legislature's final map passed because the legislature's explanation was that it was drawing a race-based district and at the same time, the legislature argued that it met its nondiminishment standard. Mr. Newman was pointing out that either way, the legislature wanted to look at it, either side of the argument failed. So the legislature's argument, it was contradicting itself.
>
> JUDGE JORDAN: Even though the Governor's map had the same problem? The Governor's map doesn't solve that problem, right?
>
> [MR. KELLY]: Correct, Your Honor.

Tr. 147. Counsel for the Secretary similarly argued at closing that the Governor's non-diminishment objection was essentially an alternative argument, and that in reality the

Governor would pursue a "race-neutral map" because Benchmark CD-5 "is no benchmark at all." Tr. 1003–06. In counsel's own words, that is "one of the other arguments that's playing out in the state court." Tr. 1005. That makes no sense whatsoever.

If Benchmark CD-5 was not (or no longer) a benchmark, why did Mr. Newman use it as a benchmark in criticizing the lower BVAP percentage in the Duval-only CD-5? If the Governor believed that the application of the FDA's non-diminishment requirement here would violate the U.S. Constitution, that should have been his stated objection. But it was not. Instead, the Governor purported to defend the FDA's non-diminishment requirement and then turned around and gutted that requirement even more with the Enacted Map that he drew. I find the Governor's FDA objection, as set out in Mr. Newman's veto memo, disingenuous.

Moreover, the Governor's diminishment objection to the Duval-only CD-5 does not fare any better on the merits. In *League of Women Voters of Fla. v. Detzner*, 172 So. 3d 363, 405 (Fla. 2015) ("*Apportionment VII*"), the Florida Supreme Court expressly rejected the Florida Legislature's argument that a decrease in the BVAP alone is sufficient to constitute diminishment under the FDA. The focus, said the Florida Supreme Court, should instead be on the "ability to elect a preferred candidate of choice," which one determines by way of a functional analysis. *See id. See also Apportionment I*, 83 So. 3d at 625.[8]

As Mr. Kelly testified at trial, "more often than not" the Duval-only CD-5 "would perform for the Black community's candidate of choice." Tr. 156. On the other hand, no district in North Florida performs for Black voters in the Enacted Map. *See* Majority Op. at 23, 26. If the Governor was really concerned with diminishment, he (through Mr. Kelly) would have performed a functional analysis to see whether his proposal contained a North Florida district that continued to perform for Black voters. But Mr. Kelly, an experienced map drawer, testified that he did not perform any functional analysis *whatsoever*. *See* Tr.

---

[8] It is generally accepted that functionality, and not just BVAP numbers, is the methodology for determining whether a district performs. *See, e.g., Bethune-Hill*, 580 U.S. at 194–96.

918. If Mr. Kelly was telling the truth, then the Governor's diminishment objection was (and is) groundless. And if Mr. Kelly was not telling the truth—and he did in fact perform a functional analysis—then the Governor's objection—stated solely in terms of the BVAP percentage decrease—was pretextual.

Let's move on to the Governor's objection to the Duval-only CD-5 on racial gerrymandering grounds. That objection also quickly collapses in on itself. Again, recall that a state can take race into account in drawing district lines as long as that factor does not predominate. *See Voinovich*, 507 U.S. at 156; *Wyche*, 635 F.2d at 1160. *Accord Bush*, 517 U.S. at 958 (plurality opinion). A racial gerrymander results only when race is "the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Alabama Legis. Black Caucus*, 575 U.S. at 272.

The Governor argued that CD-4 in Map 8019 resembled a "bizarre doughnut shape that almost completely surround[ed] [the Duval-only] District 5," which could only be explained by the Legislature's desire to maintain a Black-performing district. *See* JX 0055 at 3. The Secretary's expert witness, Dr. Douglas Mark Johnson, characterized CD-4 in the Duval-only Map 8019 as "almost a full Pac Man." Tr. 809–10. But that purported desire on the part of the Legislature, even if true, does not establish a racial gerrymander because strict scrutiny does not apply to all cases of race-conscious redistricting. *See Bush*, 517 U.S. at 958 (plurality opinion).

On its own terms, the Governor's objection to the shape of CD-4 in the Duval-only Map 8019 does not withstand scrutiny. If the Governor took that objection seriously, one would think that he would have also objected to a nearly identical pair of Florida Senate districts, Senate Districts 4 and 5. But he did not. *See* Majority Op. at 31–32.[9]

---

[9] Other Florida officials in the Executive Branch, such as the Secretary of State, have in the past filed comments in connection with the Florida Supreme Court's review of the Legislature's proposed state legislative maps. *See In re Sen. Jt. ADR of Legis. Apportionment 2-B*, 89 So. 3d 872, 893–94, 893 n.13 (Fla. 2012). Governor DeSantis could have done the same here if he thought Pac-Man shapes were indicative of non-compact redistricting. Although the Governor does not have veto power over the Legislature's state legislative maps, he could have objected to them like any other member of the public in

So that readers can see for themselves, both pairs—the enacted SD-4 and SD-5 of Senate Map 8058, and the vetoed CD-4 and CD-5 of Congressional Map 8019—are reproduced below.

Enacted Senate Map 8058[10]          Vetoed Congressional Map 8019[11]



At trial, Dr. Johnson testified on direct examination that the "ultimate rule of compactness is . . . you know it when you see it." Tr. 810. He stressed that SD-5 was enveloped by only a two-thirds Pac-Man in Map 8058 versus CD-5's almost full Pac-Man in Map 8019. *See* Tr. 810. But that claim is visually wrong and, in any event, cannot possibly be a distinction that makes or breaks a district under the U.S. Constitution's racial gerrymandering standards. Indeed, when pressed, Dr. Johnson later conceded that the two districts were "very similar," and that any difference between them was only "a matter of

---

the same way that he proposed congressional maps without having any express constitutional authority to do so. *See* Fla. Const. art. III, §§ 7, 8, 16, 20–21.

[10] https://perma.cc/ZU9Z-899M.

[11] https://perma.cc/5SN7-BACU.

degrees." Tr. 832. So much for the alleged constitutional Pac-Man problem in the Duval-only Map 8019.

The problems with Governor DeSantis' racial gerrymandering objection do not end there. Mr. Kelly conceded that CD-24 in the Enacted Map complied with the U.S. Constitution even though the Legislature had specifically drawn the district to avoid diminishment under the FDA. *See* Majority Op. at 27−28 (discussing this point and reproducing CD-24). The Governor apparently did not find CD-24 objectionable because it did not create the same Pac-Man-like distortion that the Duval-only CD-5 supposedly did. *See id.* As explained above, however, that objection lacks merit even according to the Secretary's own expert witness. It appears to me that the Governor's theory of racial gerrymandering is one of selective applicability. To the extent that the Governor argued that CD-24 was different because it followed city and county lines, and did not diminish under the FDA, the Republican leaders in both the Florida House and Senate debunked that argument, explaining that the Duval-only CD-5 in Map 8019 complied with traditional redistricting criteria and was constitutional under both the Florida and U.S. Constitutions. *See* JX 0038 at 24; JX 0040 at 40−41, 44−45.

## C

Because of the one-person, one-vote principle of the Equal Protection Clause, both sides agreed that Duval County had to be split somewhere after the 2020 Census. *See* Tr. 228, 829. The Duval-only CD-5 had a lesser disparate impact on Black voters in North Florida and was therefore a viable and less discriminatory alternative to what Governor DeSantis drew in the Enacted Map.

As explained in *Greater Birmingham Ministries*, 992 F.3d at 1322, the existence of such an alternative is relevant in assessing whether the circumstantial evidence points to discrimination as a motivating factor. *Cf. Cooper v. Harris*, 581 U.S. 285, 317 (2017) ("One, often highly persuasive way to disprove a State's contention that politics drove a district's lines is to show that the legislature had the capacity to accomplish all its partisan goals without moving so many members of a minority group into the district."). This case

is somewhat unusual in that the Legislature itself, rather than the plaintiffs, had already provided a less discriminatory alternative: Map 8019.

Enacted CD-4 is the analogue to Map 8019's Duval-only CD-5. *See* JX 0046 at 76. For Enacted CD-4, the legislative record demonstrates that the House performed a functional analysis and determined that it did not perform for Black voters. *See* JX 0048 at 34. Dr. Matthew Barreto, one of the plaintiffs' expert witnesses, confirmed that assessment. He testified that Enacted CD-4 performed in only 1 out of 14 test elections: the 2012 U.S. Senate race. *See* PX 5042-032; Tr. 740.

Map 8019's Duval-only CD-5 competes with—and for the most part beats—Enacted CD-4 on compactness and boundary grounds. Figure A below compares the stipulated-to compactness and boundary analysis scores for Benchmark CD-5 and the two analogous districts in Map 8019 and the Enacted Map. The "Test Elections" column displays the respective performance scores for Black voters in each district.

Figure A[12]

| | PERFORMANCE | | COMPACTNESS | | | BOUNDARIES | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | BVAP (%) | TEST ELECTIONS | REOCK | CONVEX HULL | POLSBY POPPER | CITY (%) | COUNTY (%) | ROAD (%) | WATER (%) | RAIL (%) | NON-GEO/ POLITICAL (%) |
| Benchmark Map CD-5 | 46.20 | 14/14 | 0.12 | 0.71 | 0.1 | 7 | 59 | 17 | 10 | 2 | 16 |
| Map 8019 CD-5 | 35.32 | 9/14 | 0.52 | 0.9 | 0.45 | 65 | 65 | 10 | 29 | 1 | 21 |
| Enacted Map CD-4 | 31.66 | 1/14 | 0.38 | 0.76 | 0.32 | 8 | 86 | 2 | 55 | 0 | 2 |

---

[12] The compactness and boundary analysis scores can be found on floridaredistricting.gov. *See* Compactness Report for Benchmark Map (https://perma.cc/E83X-N8SX); Boundary Analysis Report for Benchmark Map (https://perma.cc/X8JF-3V2Y); Compactness Report for Map 8019 (https://perma.cc/9K5Q-EUU3); Boundary Analysis Report for Map 8019 (https://perma.cc/8YJ9-CMJU); Compactness Report for Enacted Map (https://perma.cc/SV9Y-XMWK); Boundary Analysis Report for Enacted Map (https://perma.cc/EM6V-K9TV).

The key difference between Map 8019 and the Enacted Map drawn by the Governor is that the former maintained a Black-performing district in North Florida and the latter did not. Map 8019's Duval-only CD-5 had higher compactness scores than Benchmark CD-5 and Enacted CD-4. And it scored higher than Enacted CD-4 on city, road, and rail boundaries. Enacted CD-4, meanwhile, scored higher on county and water boundaries, and lower on non-geographic/political boundaries.[13]

As previously mentioned, Mr. Kelly explained at trial that, when faced with equally compact options for a district, it is appropriate to choose the configuration that contains a district that performs for Black voters over one that does not. *See* Tr. 163–64. Indeed, under the FDA, compactness is subordinate to non-diminishment. *See* Fla. Const. art. III, §§ 20(a)–(b). It is difficult to understand, therefore, why the Governor was so adamant in proposing and pushing congressional districts that prioritized marginal improvements in compactness over performance when he rejected Map 8019.

## D

In modern politics, "we rarely have legislators announcing an intent to discriminate based upon race, whether in public speeches or private correspondence." *Veasey v. Abbott*, 830 F.3d 216, 235 (5th Cir. 2016) (en banc). Instead, "people hide discriminatory intent behind seemingly legitimate reasons" and these reasons "can and do mask racial intent." *Id.* at 236.

The aim of the *Arlington Heights* analysis is to help a trier of fact decide, in a case involving circumstantial evidence, whether a discriminatory purpose is "cleverly cloaked in the guise of propriety." *Lodge v. Buxton*, 639 F.2d 1358, 1363 (5th Cir. 1981), *aff'd sub nom. Rogers v. Lodge*, 458 U.S. 613 (1982). Governor DeSantis made clear that there was never a path forward for a Black-performing district in North Florida. To every proposal by the Legislature, he voiced objections which turned out to lack legal or factual

---

[13] The percentages listed in the boundaries columns of Figure A reflect how much of the district's shape can be accounted for by that factor. *See* Tr. 218–19. *See also In re S. Joint Resol. of Legis. Apportionment 100*, 334 So. 3d 1282, 1288 (Fla. 2022) (explaining that an 82.7% boundary analysis score "show[s] that the average district in the new [Florida] House plan follows political and geographical boundaries along 82.7% of its perimeter").

foundation. Of all the maps in play, it was only the Governor's proposal—which became the Enacted Map—that splintered Black voters and eliminated North Florida's only Black-performing congressional district. Applying the *Arlington Heights* and *Greater Birmingham Ministries* factors holistically, the way for me to make sense of all of this is to infer—and therefore find—that the Governor was motivated, at least in part, by race in drawing and submitting the Enacted Map.

## III

In certain cases, a plaintiff may also establish discriminatory intent by demonstrating that a decisionmaker's seemingly race-neutral reasons are pretextual. *See, e.g., Gray v. Bd. of Higher Educ., City of New York*, 692 F.2d 901, 905 (2d Cir. 1982) (a plaintiff "must show that the discrimination he suffered was intentional . . . [under] *Arlington Heights* . . . . [o]r, he could establish that the reasons given by [the defendant] were pretexts"). The Secretary acknowledged this alternative basis in his post-trial brief. *See* Secretary's Post-Trial Br., D.E. 217 at 91 ("Pretext isn't an express *Arlington Heights* factor, though *Arlington Heights* cases have touched on the asserted justifications for governmental actions.").

"When the Constitution forbids the political branches to do something directly . . . it becomes necessary to curtail the use of proxies—seemingly neutral criteria adopted only because they approximate a more desired (but strictly forbidden) scheme of classification." *La Porte Cnty. Republican Cent. Comm. v. Bd. of Comm'rs of La Porte*, 43 F.3d 1126, 1130 (7th Cir. 1994). The plaintiffs have made a showing of pretext as to Governor DeSantis and that showing confirms my finding that for him race was a motivating factor in drawing and submitting the Enacted Map.

## A

A "factfinder's rejection of the [defendant's] legitimate, nondiscriminatory reason for its action does not *compel* judgment for the plaintiff." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 146 (2000) (citation and internal quotation marks omitted). After all, the "ultimate question is whether the [defendant] intentionally discriminated, and proof that the [defendant's] proffered reason is unpersuasive, or even obviously contrived, does

not necessarily establish that the plaintiff's proffered reason . . . is correct." *Id.* at 146−47. An official can justify a challenged action any number of ways—all pretextual—but nonetheless harbor no underlying discriminatory purpose. "In other words, it is not enough to *dis* believe the [defendant]; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Id.* at 147 (citation and internal quotation marks omitted).

Nevertheless, "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the [defendant's] explanation." *Id.* As an example, in this context that inference could rest not only on "a blend of history and an intensely local appraisal of the design and impact of the [challenged action]," but also on the credibility of the official's justifications themselves. *See White v. Regester*, 412 U.S. 755, 769−70 (1973). *See also Lodge*, 458 U.S. at 622 (same). As the Supreme Court has put it:

> The factfinder's disbelief of the reasons put forward by the defendant . . . may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination. Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the [defendant] is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt.

*Reeves*, 530 U.S. at 147 (citation and internal quotation marks omitted). As relevant here, "once the [defendant's] justification[s] ha[ve] been eliminated, discrimination may well be the most likely alternative explanation, especially since the [defendant] [was] in the best position to put forth the actual reason for [his] decision." *Id.* at 134.

The record in this case supports a finding that Governor DeSantis proffered objections to the Duval-only CD-5 that were pretextual throughout a redistricting process that ultimately eliminated the sole Black-performing district in North Florida. The

Secretary's assertion that the elimination of a Black-performing district in North Florida was the natural byproduct of a map drawn solely for reasons of compactness—and compactness alone—contradicts the evidentiary record and is not credible for the reasons set out earlier and summarized again below.

In January and February of 2022, Governor DeSantis objected to the Legislature's preliminary maps (which retained a Black-performing district resembling Benchmark CD-5) twice on grounds of compactness. This position was reiterated at trial by Mr. Kelly, the Governor's map drawer, who confirmed that "the Governor's objection was essentially that Benchmark CD-5 was unconstitutional because it was elongated and not compact and crossed many political lines." Tr. 114. The following month, the Legislature addressed these concerns directly by offering Governor DeSantis a two-map plan. As previously discussed, the primary Map 8019 preserved a Black-performing Duval-only CD-5 in North Florida, while also retaining a compact shape and respecting political subdivisions. Mr. Kelly himself admitted as much at trial. *See* Tr. 116, 122.

At this point Governor DeSantis' objections changed. As articulated in Mr. Newman's memo, *see* JX 0055, the complaint was now that the Duval-only CD-5 in Map 8019 resulted in impermissible diminishment under the FDA. Specifically, Governor DeSantis argued that "there was no good reason to believe that District 5 [in Map 8019] . . . complie[d] with the Florida Constitution's non-diminishment requirement. . . . [because] its nearly eleven percentage point drop [was] more than slight." JX 0055 at 6. Mr. Kelly reiterated this position at trial—claiming that Map 8019 resulted in impermissible diminishment because the Duval-only CD-5 "had a double-digit drop in its Black voting age population" relative to Benchmark CD-5. *See* Tr. 144.

If diminishment in violation of the FDA was the problem, one would expect that the Governor's proposed map would remedy this concern. But then Governor DeSantis submitted his third and final map, which diminished the BVAP in the relevant analogue district *even more*. *See* JX 0046 at 76. As a reminder, Map 8019, which Governor DeSantis had vetoed just two weeks earlier, diminished the BVAP for CD-5 by 10.88%—from 46.20% in the Benchmark CD-5 configuration to 35.32% in the Duval-only CD-5

configuration (which, despite the drop, maintained a Black-performing district). *See* DX98; JX 0070; Tr. 184−86. The Enacted Map, which was drawn and proposed by the Governor, diminished the BVAP for the relevant comparison district (the Enacted CD-4) by 14.54%—from 46.20% in Benchmark CD-5 to 31.66% in the Enacted CD-4, and made the district non-performing for Black voters. *See* Figure A (set out earlier).

In sum, Governor DeSantis objected to a Black-performing, compact district on FDA diminishment grounds and then proposed a map that resulted in even more diminishment and eliminated the sole Black-performing district in North Florida. These "[s]everal points, considered together, reveal a significant mismatch between the decision the [Governor] made and the rationale he provided." *Dep't of Com. v. New York*, 139 S.Ct. 2551, 2575 (2019) (finding bad faith or improper behavior where the asserted rationale for a challenged action appeared contrived). Notably, Mr. Kelly and counsel for the Secretary could not explain this state of affairs at trial.

Perhaps the Governor's actions could be partially explained on the basis of partisanship (i.e., that the North Florida districts in the Enacted Map were drawn for partisan gain). But the FDA prohibits partisan advantage as a criterion for redistricting, *see* Fla. Const. art. III, § 20(a), and for obvious political and other reasons the Governor cannot publicly admit (through the Secretary) to doing something that the Florida Constitution flatly forbids. Indeed, Mr. Kelly testified on numerous occasions that he did not take partisanship or incumbency into account. *See* Tr. 20, 82, 97, 220−21, 239, 444. If the Governor is not willing to fall on the partisanship sword, and the Secretary has chosen not to defend on it, it is not my obligation to construct that theory for them. *See United States v. Sineneng-Smith*, 140 S.Ct. 1575, 1579 (2020) ("In our adversarial system of adjudication, we follow the principle of party presentation."); *Greenlaw v. United States*, 554 U.S. 237, 243 (2008) ("In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation. That is, we

rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.").[14]

## B

Mr. Kelly's testimony at trial regarding his initial consideration and later non-consideration of race in drawing the Enacted Map also weighs against the Governor with regard to pretext. In many critical respects, I did not find Mr. Kelly to be a credible witness.

When asked whether he had "racial demographic data turned on" as he was drawing four majority-white districts in North Florida, he responded this way: "It's going to sound funny, but I couldn't figure out how to turn it on. I couldn't figure out how to show that layer of information." Tr. 233. According to Mr. Kelly, it was not until after he had drawn the districts in North Florida that he realized what he had done. *See* Tr. 171. That testimony, to me, is not worthy of credence. Mr. Kelly is perhaps one of the most experienced map drawers in Florida. At the time he was drawing the Enacted Map, he was working in the Governor's Office, and both chambers of the Legislature were run by members of the Governor's party. In other words, Mr. Kelly had all of the State's resources at his fingertips. I cannot believe that in drawing the map that the Governor submitted to the Legislature that Mr. Kelly somehow failed to pick up the phone or send an e-mail to sort out the software problem. Mr. Kelly testified that he unsuccessfully tried to create a Black-performing district in North Florida with a BVAP of 40%. *See* Tr. 161, 934−35. If he tried to do as he said, Mr. Kelly obviously had the racial demographic data working at some point. In my calculation as a factfinder, Mr. Kelly's testimony on this point was damning evidence against the Governor.[15]

---

[14] In any event, even if partisan gain in violation of the FDA was one of the Governor's reasons for drawing the Enacted Map, I still find that race was also another motivating factor. In the redistricting arena, "[m]ixed motives are inevitable." *La Porte Cnty. Republican Cent. Comm.*, 43 F.3d at 1130.

[15] Mr. Kelly tried to explain that, in lieu of having the racial demographic data turned on, he engaged in a "painstaking process" of "frequently" running reports for the BVAP numbers. *See* Tr. 912−13. I do not buy that explanation given Mr. Kelly's (1) vast experience as a map drawer and (2) access to resources at the Legislature that would have allowed him to turn on the racial demographic data.

My evaluation of Mr. Kelly's testimony on this point is not unique. In April of 2022, Mr. Kelly appeared before the Senate Committee on Reapportionment during the special session convened by Governor DeSantis to discuss what would ultimately become the Enacted Map. He stated that "he had not done a functional analysis on any of the districts" and that "[r]ace and political partisan data in no way related at all to . . . any of the districts on the map" because he had not examined that data. *See* JX 0046 at 62−66. This testimony was met with suspicion by some in the Legislature. The day after Mr. Kelly testified, Senate Minority Leader Audrey Gibson reacted to the presentation on the Senate floor: "It's clear as mud . . . in terms of the data because I thought I heard in the committee that Mr. Kelly didn't use any data." JX 0045 at 78. Senator Gibson later added that the FDA was meant to "afford protection of racial and language minorities" and that "the information . . . received and heard yesterday in the committee . . . . [was] diminishment by any means." JX 0047 at 9−10. Senator Randolph Bracy reacted similarly to Mr. Kelly's statements: "[H]is presentation was comical . . . . He was just drawing, had no idea, didn't look at any data. . . . I find it comical that he would even say that." JX 0047 at 5−6.

## C

As previously explained, Map 8019 offered both a more compact and less discriminatory alternative for a Black-performing district in North Florida: the Duval-only CD-5. It was rejected by Governor DeSantis.

To the extent that the Governor's objection to the Duval-only CD-5 was lack of compactness, the State Senate map for SD-4 and SD-5 had a similar Pac-Man look, and the Governor did not voice any complaint about them to the Florida Supreme Court. Moreover, Dr. Johnson, one of the Secretary's expert witnesses, ultimately conceded that the situations were "very similar" and that any differences were "a matter of degree." Tr. 832. The proffered compactness objection therefore rings hollow to me, and I find it to be pretextual as well.[16]

---

[16] Even if compactness was one of the factors considered by the Governor, I still find that race was also another motivating factor.

# IV

Viewed through the lens of the *Arlington Heights/Greater Birmingham Ministries* factors, the evidence presented at trial convinces me that Governor DeSantis drew, proposed, and submitted the Enacted Map with race as a motivating factor.  That conviction is reaffirmed by my further finding that the Governor's main reasons for objecting to the Duval-only CD-5 in Map 8019 were pretextual.

I do not think that Governor DeSantis harbors personal racial animus toward Black voters.  But I do believe that he used race impermissibly as a means to achieve ends (including partisan advantage) that he cannot admit to.  As others have explained, a finding of discriminatory purpose in these circumstances is "not tantamount to a finding" that the Governor "had a racist motivation," but is instead "the product of . . . [him] engag[ing] in the single-minded pursuit of incumbency" by disregarding and targeting the ability of Black voters in North Florida to elect their candidate of choice.  *See Veasey*, 830 F.3d at 336 (Costa, J., concurring in part and dissenting in part) (citation and internal quotation marks omitted).  *See also Garza*, 918 F.2d at 778 (Kozinski, J., concurring in part and dissenting in part) (explaining that a finding of intentional discrimination does not mean that officials "harbored any ethnic or racial animus towards" a minority community, but rather that they "engaged in the single-minded pursuit of incumbency and ran roughshod over the rights of protected minorities").  I join the Court's opinion because I agree that the plaintiffs have failed to prove that the Legislature ratified or adopted the Governor's use of race as a motivating factor.  *See generally Brnovich v. Democratic Nat'l Committee*, 141 S.Ct. 2321, 2350 (2021) ("The cat's paw theory has no application to legislative bodies.") (internal quotation marks omitted); *O'Brien*, 391 U.S. at 383 ("Inquiries into [legislative] motives or purposes are a hazardous matter.").

WINSOR, J., Concurring in Part and Concurring in the Judgment.

Plaintiffs claim Florida's Enacted Map violates the Constitution by discriminating based on race. But after a full trial on the merits, they have not proven their case. To succeed, they needed to prove both a discriminatory purpose and a discriminatory effect. *See Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021). And as the court's opinion cogently explains, Plaintiffs did not show that the Legislature acted with a discriminatory purpose. That ends the case.

I join the court's opinion in substantial part, and I concur in the judgment.[1] I write separately for two reasons. First, I explain why Plaintiffs did not prove discriminatory purpose as to the Legislature *or* the Governor. Second, I explain that Plaintiffs' failure to prove discriminatory effect provides an independent reason to deny relief.

## I.

The court's opinion does not address whether the Governor acted with a discriminatory purpose because it would not change the outcome. Even assuming for argument's sake that he did act with racial animus, the Legislature did not. That alone dooms Plaintiffs' case. Judge Jordan, though, writes separately to express his view that the Governor acted with a discriminatory purpose, at least in part. I respectfully disagree with that conclusion and write to explain why.

Because Plaintiffs have no direct evidence of racial animus, they rely on circumstantial evidence. *Cf. Rogers v. Lodge*, 458 U.S. 613, 618 (1982) ("Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts . . . ." (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)); *Vill. of Arlington*

---

[1] I join Sections I, IV, V.A, V.B, VI, and VII. As to Section IV, I agree that Mr. Clark testified credibly and has standing. A single Plaintiff with standing suffices, *see Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 53 n.2 (2006), and I would stop with Mr. Clark. Ms. Keith's testimony was insufficient to show associational standing for Common Cause because merely having members in an affected district does not establish standing. There had to be proof that those members intended to vote, and Ms. Keith could not say that they did. *See* Tr. 498-99; *cf. Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 489 (1982) ("The law of averages is not a substitute for standing.").

*Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). But the circumstantial evidence Plaintiffs cite does not prove racial animus.

## A.

First, Plaintiffs argue that the Governor went to great lengths to dismantle the former Congressional District 5 ("Benchmark CD5" or the "Benchmark"), which was a black-performing district. The evidence at trial indeed proved the Governor opposed Benchmark CD5 and any district that resembled it. He publicly stated he opposed race-based districting, and as all sides agree, Benchmark CD5 was a race-based district: it was drawn specifically to ensure it would elect black-preferred candidates.[2]

To me, opposing race-based redistricting cannot be proof of discrimination or racial animus. As Plaintiffs' counsel acknowledged, "it's not racist to disagree" with race-based redistricting policies. Tr. 942. In fact, there are ample good-faith reasons some might oppose race-based districting. For one, "[w]hen the State assigns voters on the basis of race, it engages in the offensive and demeaning assumption that voters of a particular race, because of their race, 'think alike, share the same political interests, and will prefer the same candidates at the polls.'" *Miller v. Johnson*, 515 U.S. 900, 911-12 (1995) (quoting *Shaw v. Reno*, 509 U.S. 630, 647 (1993)). Moreover, "[r]ace-based assignments 'embody stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts—their very worth as citizens—according to a criterion barred to the Government

---

[2] No one disputes this. *See* Tr. 944 ("Judge Winsor: But you don't dispute [Benchmark CD5] was drawn for race-based purposes, right? [Plaintiffs' counsel]: All of these were. Yes, Your Honor. I don't want to get into arguing about predominance or consideration. That's an issue, but—yes, it was drawn for race-based reasons, just like all five of these [former] districts were . . . ."). In their operative complaint, Plaintiffs described Benchmark CD5 as "connect[ing] the Black populations of Tallahassee and Jacksonville," and they included an image of the Benchmark "with Black VAP Overlay," showing just how carefully the district was drawn to capture black voters. ECF No. 131 ¶ 81; *see also* DX85, DX89, DX90. Their expert testified that certain areas of Duval were "included in [the Benchmark] because they wanted to allow Blacks to elect candidates of their choice. I agree with that." Tr. 445; *see also id.* at 800 ("And so what you can see on his map on the left is that that benchmark district was drawn with these fingers to get every possible Black resident into that district. Anywhere there was a collection of a few dots, they drew a finger to grab those residents."); ECF No. 218 ¶ 405 (Plaintiffs' proposed finding: "[T]he Florida Supreme Court created Benchmark CD-5 specifically to comply with the FDA's non-diminishment provision, and preserve a 'historically performing minority district[]' in North Florida—even though Benchmark CD-5 did not then have a population that was majority-Black.").

by history and the Constitution.'" *Id.* (quoting *Metro Broad., Inc. v. F.C.C.*, 497 U.S. 547, 604 (1990) (O'Connor, J., dissenting)). In short, "[r]acial classifications are antithetical to the Fourteenth Amendment, whose central purpose was to eliminate racial discrimination emanating from official sources in the States." *Shaw v. Hunt*, 517 U.S. 899, 907 (1996) (cleaned up); *see also League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 511 (2006) (Roberts, C.J., concurring in part and dissenting in part) ("It is a sordid business, this divvying us up by race."). So the fact that the Governor sought to dismantle race-based Benchmark CD5 does not help Plaintiffs' claim.

Yet that is much of Plaintiffs' case. Plaintiffs emphasize not only that the Governor wanted to eliminate Benchmark CD5 but also just how *much* he wanted to do so. They note that he went so far as to veto a plan that was inconsistent with his views. Plaintiffs explain it this way:

> In an unprecedented manner, he hijacked the redistricting process and, with much bluster, demanded the elimination of that district. He insisted that he would veto any map that preserved Benchmark CD-5, and he insisted that the Legislature pass his own favored map—drawn by one of his staffers—that eliminated a Black opportunity district in North Florida.

ECF No. 218 ¶ 2.

To be sure, the Governor's opposition was strong. But a strong opposition to race-based districting is no better evidence of racial animus than a moderate opposition to it. Florida governors, like United States Presidents, routinely use their legislative authority to advance their policy goals, just as legislators do.[3] Plaintiffs call the Governor's insistence here "bull[ying] the legislature." ECF No. 218 ¶ 310. Others might call it exercising political will. But one shouldn't call it racist. In my view, the fact that the Governor went to great lengths to oppose race-based redistricting provides zero evidence of racial animus.

---

[3] In Florida, Congressional redistricting is done through the ordinary legislative process, a process in which the Governor has legislative authority. *See* Fla. Const. art 3, § 8; *see also Smiley v. Holm*, 285 U.S. 355, 369 (1932) (describing gubernatorial veto "as a part of the legislative process").

**B.**

Plaintiffs also argue that Florida's history sheds light on the Governor's motivation. It is true that a body's history of discrimination can sometimes be a relevant consideration, *see Arlington Heights*, 429 U.S. at 267, but it is entirely unhelpful here. The fact that Florida segregated its public facilities decades ago does not make it more likely that Florida's current Governor (born in 1978) acted with racial animus in 2022.[4] And nothing about a law adopted in the 1880s helps us understand the Governor's recent legislative purpose. *Cf.* Tr. 340-41 (Plaintiffs' expert testimony about 1887 legislative action). As the Supreme Court has explained, "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value." *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987); *accord League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 923 (11th Cir. 2023) ("A federal court must remain mindful of the danger of allowing the old, outdated intentions of previous generations to taint Florida's legislative action forevermore on certain topics." (cleaned up) (quoting *Greater Birmingham Ministries*, 992 F.3d at 1325)). "Although the history of racial discrimination in this country is undeniable, we cannot accept official actions taken long ago as evidence of current intent." *McCleskey*, 481 U.S. at 298 n.20. Florida's history does not help Plaintiffs here.

**C.**

Plaintiffs next argue pretext. They contend the Governor's proffered objections to the Legislature's proposed maps cannot be his real reasons. But Plaintiffs' pretext arguments cannot withstand scrutiny.

---

[4] Largely for this reason, I do not join Sections II or III of the court's opinion. The court sets out a summary of the trial evidence and makes many findings not pertinent to our conclusion that Plaintiffs have not proven legislative ratification of any impermissible intent. Plaintiffs themselves conceded they had no evidence that any legislator acted with a racially discriminatory purpose. Their entire theory was that the Governor acted with such a purpose and that by adopting the Governor's preferred map, the Legislature ratified his impermissible purpose. *See* Tr. 982 (Plaintiffs' counsel: "I'm contending that the legislature, by passing this, bears responsibility for the racial animus that motivated, in part, the Governor. I'm not accusing any legislator of racial animus."). We can and do reject that theory without regard to the history the court describes. Section VI lays out all facts necessary to our conclusion.

Plaintiffs contend that after the Governor criticized Benchmark CD5 and the Legislature's similar proposal as noncompact racial gerrymanders, the Legislature offered him a black-performing district that did not resemble those at all. And indeed, the Legislature approved a map that included what the parties called the "Duval-only" option (CD5 in Map 8019). That district was reasonably compact, and with 35% black voting-age population, it would typically perform for black-preferred candidates. In Plaintiffs' telling, this proposed district addressed all the Governor's proffered concerns, yet "the Governor wouldn't take 'yes' for an answer." ECF No. 218 ¶ 3. This, they say, shows the Governor's objections were all pretext. There are several problems with this argument.

For starters, the Duval-only option was not in a standalone bill; it was part of a two-map package. The primary map included the Duval-only option, but the bill also had a secondary map that would automatically become effective if a court invalidated the primary map. And the secondary map included a long, meandering, race-based district like Benchmark CD5. So even assuming the Duval-only map satisfied the Governor's proffered objections (more on that below), the Governor could not accept it without simultaneously blessing the Jacksonville-to-Tallahassee race-based district he opposed. He would have to say "yes" not only to the Duval-only option but also to race-based redistricting.[5]

Saying yes to the secondary map would be no small thing. In this litigation, Plaintiffs assure us the primary map was legally valid. If that were true, that would make the secondary map a nonissue. But in the legislative process, many were not so convinced. Representative Geller, for one, opposed the bill precisely because he found the Duval-only option unconstitutional. JX38 at 134-35 ("I don't believe that the change in the proposed minority district contained wholly within Duval County is constitutionally compliant in

_____

[5] The two-map package was unusual. At earlier stages of the litigation, Plaintiffs described it as "extraordinary." ECF No. 131 ¶ 114. At the time, they contended this supported their *Arlington Heights* analysis. *Cf.* 429 U.S. at 267 ("Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role."). But now having acknowledged they have no evidence of the *Legislature's* animus, relying instead wholly on the *Governor's* alleged animus, Plaintiffs focus on other purported departures. At any rate, there was no evidence that the Governor supported a two-map plan. He vetoed the only one presented to him.

that I think that it represents a substantial dilution or diminishment of the minorities' ability to elect representatives of that community's own choice. In that sense, I believe that proposed map is constitutionally deficient."). He was not alone. *See, e.g., id.* at 145 (Rep. Skidmore: "I am very concerned about the primary map District 5 because it does seem to me, based on language that the House actually used, that it does reflect diminishment. And I recognize that the secondary map is there in case the Court does rule that way."); *see also* JX40 at 28 (Sen. Ausley: "I'm very concerned about this map. I believe that it violates the Florida Constitution."); *id.* at 35 (Sen. Cruz: "I truly do not believe this one is constitutional.").[6]

Others apparently had concerns too, as the only logical reason to include a secondary map is to account for the possibility that a court would invalidate the primary one. Representative Geller put it this way:

> The notion that that map is constitutionally compliant is belied by the very fact that there is a so-called secondary map in an effort to assure constitutional compliance. If there was confidence that the proposed district in Duval County was constitutionally compliant, we would not have a secondary map or a need for a secondary map. And it is therefore apparent that even the proponents of that map have no confidence in it as being constitutionally compliant.

JX38 at 135-36; *see also* ECF No. 131 ¶ 114 ("[T]he Legislature approved two maps, recognizing that the map it created in an effort to placate the Governor *could easily be found illegal*." (emphasis added)).

Aside from the two-map aspect, there were other nonpretextual reasons to reject the Duval-only option. For one, there were indications that it too was drawn for race-based purposes, even though it was compact. J. Alex Kelly, who drew portions of the enacted map and who was heavily involved in the redistricting effort, credibly testified that "the House admitted publicly they drew CD-5 and [Map 8019] with race-based intentions. They subordinated other standards to try to accomplish a racial purpose." Tr. 124; *see also* JX38

---

[6] The evidence at trial was that the Duval-only CD-5 performed for black voters in 9 of 14 test elections (or approximately 64% of them), while Benchmark CD-5 performed in all 14 of them.

at 24 (Representative Leek: "[Map 8019] was put forward as a way to address the novel legal theory raised by the governor while still protecting a black minority seat in North Florida."); JX55 at 3 (Memorandum from Governor's general counsel: "[T]he House Redistricting Committee drew a new version of District 5 [the Duval-only option] . . . . The reason for this unusual configuration is the Legislature's desire to maximize the black voting population in District 5.").

In addition, although the Duval-only district itself is relatively compact, it creates a decidedly noncompact surrounding district. Compare CD-5 (purple) to the surrounding CD-4 (yellow):

Vetoed Congressional Map 8019



*See* DX97 at 6. Plaintiffs reject this complaint too. They say the Governor cannot have a good-faith opposition to donut-shaped districts because he did nothing to stop Senate District 5, which they say is similarly shaped. But even assuming Senate District 5 resembled CD4 (above), the Governor has no role in redistricting state legislative seats.

*See* Fla. Const. art. III, § 16. It is true, as Plaintiffs note, he could have lodged an objection as an ordinary citizen. But his not engaging as a private citizen in a process lacking any gubernatorial role cannot support a conclusion that he acted with animus in a separate process in which he has a substantial constitutional role.

Plaintiffs further argue that the Governor's complaint about the length of Benchmark CD5 and its counterpart in the two-map package must be pretext. ECF No. 218 ¶¶ 175-76. Why, Plaintiffs wonder, would the Governor complain about the length of those districts while registering no objection to the enacted District 2, "that also runs about 200 miles in length"? *Id.* ¶ 175; *see also id.* ("Plainly, then, the Governor had no objection to elongated congressional districts as such.").

But Plaintiffs have not shown the Governor complained about length for length's sake. Instead, the Governor raised length in the broader context of his objection to the race-based district. The Governor's general counsel submitted this explanation to the Legislature:

> The proposed district, which largely tracks current Congressional District 5, *spans approximately 200 miles from East to West and cuts across eight counties* to join a minority population in Jacksonville with a separate and distinct minority population in Leon and Gadsden Counties. The district is not compact and does not otherwise conform to usual political or geographic boundaries. Instead, it appears to be drawn solely to combine separate minority populations from different regions of northern Florida in a less than majority-minority district so that together they may have an opportunity to elect a candidate of their choice.
>
> Where race is "the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district," the legislature must prove that such "race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." Because the Legislature cannot show that the proposed Congressional District 3 would satisfy strict scrutiny, the proposed district violates the Fourteenth Amendment to the U.S. Constitution and should not be included in any map enacted by the Florida House of Representatives.

JX56 at 1 (citation omitted). Plaintiffs excerpt from this only the italicized portion as they argue the Governor's "objection to elongated congressional districts" is pretextual. ECF No. 218 ¶ 175.

At any rate, both districts (Benchmark CD5 and Enacted CD2) may be similar lengths, but a quick look at both shows they are not similar. Below is the district the Governor criticized for (among other things) "span[ning] approximately 200 miles from East to West" and having been "drawn solely to combine separate minority populations from different regions," JX56 at 1. Note especially the areas around the district's biggest population centers, Jacksonville and Tallahassee:

Benchmark CD5 (from DX91)



Below, by contrast, is enacted CD2, which the Plaintiffs argue shows pretext:

Enacted CD2 (from DX93)



Note the absence of fingers poking into or out of urban areas. There are no jagged edges or curious appendages. It is really quite boring. In short, the two districts are both long, but they are nothing alike. The Governor's objecting to the former and approving the latter does not show pretext.

Finally, Plaintiffs argue that the Governor's Fourteenth Amendment concerns are pretextual. It is settled that the Equal Protection Clause "limits racial gerrymanders in legislative districting plans." *Cooper v. Harris*, 581 U.S. 285, 291 (2017). "[I]f racial considerations predominated over others, the design of the district must withstand strict scrutiny." *Id.* at 292. The Governor repeatedly expressed concerns that Benchmark CD5 and the vetoed bill were racial gerrymanders that violated the Equal Protection Clause. *See, e.g.*, JX55; JX56. But in Plaintiffs' view, this must be pretextual because no court ever held the Benchmark CD5 violated equal protection.

It is true that no court ever found the Benchmark violated equal protection, but neither has a court found the district did *not* violate equal protection. As noted above, Plaintiffs do not dispute that CD5 was drawn predominantly for race. *Cf. Cooper*, 581 U.S. at 291 (noting that proving race was the predominant factor behind a map "entails demonstrating that the legislature 'subordinated' other factors—compactness, respect for political subdivisions, partisan advantage, what have you—to 'racial considerations.'" (quoting *Miller*, 515 U.S. at 916)). And although they argue tepidly that the Benchmark satisfied strict scrutiny—including citing witness testimony for the legal conclusion that the Florida Constitution's "non-diminishment mandate could provide a compelling state interest sufficient to justify a race-based district under federal Equal Protection," ECF No. 218 ¶ 191—they provided no evidence that Benchmark CD5 was narrowly tailored or necessary to remediate previous discrimination. *Cf. Shaw*, 517 U.S. at 909. Nor have they shown that a State can use compliance with its own laws (here the Fair Districts Amendment) as a compelling state interest. *Cf. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 207 (2023) ("Outside the circumstances of these cases [race-based college admissions], our precedents have identified only two compelling interests that permit resort to race-based government action. One is remediating specific, identified instances of past discrimination that violated the Constitution or a statute. The second is avoiding imminent and serious risks to human safety in prisons, such as a race riot." (citations omitted)).

Regardless, the court need not determine whether the Governor's equal protection arguments are correct. Even if some court later determined that Benchmark CD5 complied with equal protection, that would not mean a contrary view evidenced pretext. It would not mean a contrary view was not a reasonable one offered in good faith. Here, Plaintiffs have not shown the Governor's expressed equal protection concerns were pretextual.[7]

In short, Plaintiffs have not shown the Governor's proffered objections to Benchmark CD5 or the two-map package he vetoed were pretextual. But even if they had, that would not be enough. "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis omitted). Here, Plaintiffs have not shown that discrimination was the real reason.

## D.

Underlying Plaintiffs' claim is the idea that the Governor had an obligation to approve any legally compliant or "reasonable" map the Legislature might offer. But this misunderstands how the legislative process works. A governor can veto any legislation he opposes. Redistricting is an "inherently political process," *Bush v. Vera*, 517 U.S. 952, 1014 n.9 (1996), and there are limitless ways districts can be configured. Different actors in the legislative process will have different views about which map is best. Here, the Governor opposed the Legislature's proposed two-map plan. So did Plaintiffs' witness Representative Driskell, who voted against it. So did nearly all Democrats in the Florida Legislature, with all but one voting no. *See* CS/SB 102, 2022 Sess. (Fla. 2022). In all, 62

---

[7] Plaintiffs offer another pretext argument related to the equal protection issue. Plaintiffs contend the Governor complained that the Duval-only option had too few black voters to comply with state law but then supported the enacted plan, which had even fewer. ECF No. 218 ¶ 364 ("In other words: The Legislature's Duval-only plan supposedly violated the FDA by diminishing the strength of Black voters as compared to Benchmark CD-5. Therefore, the Governor's 'solution' to this problem was to diminish it even further . . . ."). This mischaracterizes the Governor's objection. He was not objecting to noncompliance with state law in the abstract. He instead argued that (a) "[b]ecause racial considerations predominated even in drawing the new [Duval-only] District 5, the Legislature must satisfy strict scrutiny," and (b) to the extent one might argue compliance with the state constitution could satisfy strict scrutiny, "there is no good reason to believe" the proposed map complied with state law because it diminished black voting age population from 46% to 35%. JX55 at 4-6.

legislators voted no on the same bill Plaintiffs say the Governor vetoed based on racial animus. Surely all 62 had their reasons, but there is no evidence that a desire to harm black citizens was among those reasons. There is likewise no evidence that the Governor's veto was motivated—even in part—by a desire to harm black citizens.

\*       \*       \*

"Federal-court review of districting legislation represents a serious intrusion on the most vital of local functions." *Abbott v. Perez*, 585 U.S. 579, 603 (2018) (cleaned up) (quoting *Miller*, 515 U.S. at 915). In considering a challenge like this one, the court must presume legislative good faith. *Id.* And "only the clearest proof could suffice to establish the unconstitutionality of a statute" based on its alleged purpose. *Flemming v. Nestor*, 363 U.S. 603, 617 (1960). Here, Plaintiffs offer no proof—much less "the clearest proof"—that anyone in the legislative process acted with any illicit purpose. And that includes the Governor. We are correct, then, to enter judgment in the Secretary's favor.

## II.

Next, as both sides agree, Plaintiffs cannot succeed without showing both a discriminatory purpose and a discriminatory *effect. See Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 204 F.3d 1335, 1345 (11th Cir. 2000); *see also* ECF No. 194 at 25-26. Much of the trial focused on the Legislature's purpose (or, as noted in Section VI of the court's opinion, the Governor's purpose), and we agree Plaintiffs have not met their burden as to purpose. But as an independent basis for rejecting Plaintiffs' claims, I conclude they have not met their burden on the effects prong either.

In recent years, there have been relatively few decisions addressing Fourteenth Amendment vote dilution in the context presented here: redistricting of single-member districts. In fact, Plaintiffs have pointed to no case in which a court did what Plaintiffs ask us to do here: conclude in a non-gerrymandering case that a single-member district violated the Fourteenth Amendment by diluting minority voting strength. Typically, Plaintiffs bring vote dilution claims under § 2 of the Voting Rights Act. This is because after the 1982

VRA amendments, a successful plaintiff need not show discriminatory purpose—it is enough to show discriminatory effect. *See Thornburg v. Gingles*, 478 U.S. 30, 35 (1986).[8]

Plaintiffs advance no § 2 claim here, presumably because they cannot meet the effects test the Supreme Court laid out in *Thornburg v. Gingles*. So Plaintiffs argue—as they must—that a § 2 vote dilution claim requires a greater showing as to effect than a Fourteenth Amendment claim does. In other words, they argue, they can show discriminatory effects under the Fourteenth Amendment even in circumstances where Supreme Court precedent establishes there are no discriminatory effects for § 2 purposes. ECF No. 218 ¶¶ 232-39, 397-405. I am unconvinced.

A § 2 claim requires "proof that 'the political processes leading to nomination or election . . . are not *equally open* to participation' by members of a protected class '*in that its members have less opportunity* than other members of the electorate to participate in the political process and to elect representatives of their choice.'" *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2332 (2021) (emphasis in *Brnovich*) (quoting § 2 (codified at 52 U.S.C. § 10301(b))). Similarly, a Fourteenth Amendment vote dilution claim requires a showing "that 'the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice.'" *Id.* at 2331-32 (emphasis omitted) (quoting *White v. Regester*, 412 U.S. 755, 766 (1973)). That means Plaintiffs have the same burden of showing discriminatory effects whether they bring their claim under § 2 or the Fourteenth Amendment. *Cf. Abbott*, 585 U.S. at 626 n.1 (Sotomayor, J., dissenting) ("The Fourteenth Amendment and § 2 of the [VRA] prohibit intentional 'vote dilution,' *i.e.*, purposefully enacting 'a particular voting scheme . . . "to minimize or cancel out the voting potential of

---

[8] In *Mobile v. Bolden*, 446 U.S. 55 (1980), the plurality "declared that, in order to establish a violation either of § 2 or of the Fourteenth or Fifteenth Amendments, minority voters must prove that a contested electoral mechanism was intentionally adopted or maintained by state officials for a discriminatory purpose." *Gingles*, 478 U.S. at 35. In response, Congress "revised § 2 to make clear that a violation could be proved by showing discriminatory effect alone." *Id.*

racial or ethnic minorities,'" an action disadvantaging voters of a particular race.'" (quoting *Miller*, 515 U.S. at 911)).

In amending § 2, Congress took language "almost verbatim from *White*," a Fourteenth Amendment vote dilution case that "came to have outsized importance in the development of [the] VRA case law." *Brnovich*, 141 S. Ct. at 2331-33; *accord Chisom v. Roemer*, 501 U.S. 380, 397 (1991) ("The statutory language [in § 2] is patterned after the language used by Justice White in his opinions for the Court in *White v. Regester* and *Whitcomb v. Chavis*." (citations omitted)). Even before *Brnovich* highlighted the clear connection, the Eleventh Circuit recognized that "the Supreme Court, historically, has articulated the same general standard, governing the proof of injury, in both section 2 and constitutional vote dilution cases." *Johnson*, 204 F.3d at 1344. In short, Congress did not amend § 2 to create a new and different effects standard; it "revised § 2 to make clear that a violation could be proved by showing discriminatory effect alone and to establish as the relevant legal standard the 'results test,' applied by [the Supreme] Court in *White v. Regester*." *Gingles*, 478 U.S. at 35; *accord Chisom*, 501 U.S. at 395 n.22 (1991) ("Congress explained that its purpose in adding section 2(b) was to 'embod[y] the test laid down by the Supreme Court in *White*.'" (alteration in *Chisom*) (quoting Senate Report)); *see also Brnovich*, 141 S. Ct. at 2331 (noting that "the words the Court chose [in *White*] would later assume great importance in VRA § 2 matters").[9]

As noted above, after Congress made § 2 cases easier to prove by removing the intent requirement, most vote dilution plaintiffs pursued their claims under § 2, not the

---

[9] In *Gingles*, the Court surveyed the amendment's legislative history, which included a frequently cited Senate Report. 478 U.S. at 43-44. The Court noted that "[f]irst and foremost, the Report dispositively rejects the position of the plurality in *Mobile v. Bolden*, which required proof that the contested electoral practice or mechanism was adopted or maintained with the intent to discriminate." *Id.*

> The intent test was repudiated for three principal reasons—it is "unnecessarily divisive because it involves charges of racism on the part of individual officials or entire communities," it places an "inordinately difficult" burden of proof on plaintiffs, and it "asks the wrong question." The "right" question, as the Report emphasizes repeatedly, is whether "as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice."

*Id.* (citations omitted).

Fourteenth Amendment. So it was in the context of § 2 that the Supreme Court developed a framework for evaluating discriminatory effect. That framework requires a showing, among other things, that the minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. This is because "[u]nless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice." *Id.* at 50 n.17; *accord Growe v. Emison*, 507 U.S. 25, 40 (1993). Plaintiffs here have not proven this. In fact, to have the black-performing district Plaintiffs sought, the Legislature would have to join black voters from urban areas in Tallahassee and Jacksonville—cities 160 miles apart—along with a long, narrow stretch of sparsely populated land between.[10]

It is thus clear that Plaintiffs cannot meet the § 2 vote dilution standard, and—like the Eleventh Circuit—I "doubt that any plaintiff . . . can establish a constitutional vote dilution claim where his section 2 claim has failed." *Johnson*, 204 F.3d at 1344; *accord id.* at 1344-45 ("The parties have cited (and we have found) no case in which a circuit court has concluded that an at-large or multi-member-district electoral system, although not in violation of section 2, unconstitutionally dilutes minority voting strength. In the absence of Supreme Court direction, therefore, we question, as a legal proposition, whether vote dilution can be established under the Constitution when the pertinent record has not proved vote dilution under the more permissive section 2." (note omitted)); *Lee Cnty. Branch of NAACP v. City of Opelika*, 748 F.2d 1473, 1478 n.7 (11th Cir. 1984) ("[I]f the plaintiffs cannot prevail under the generally more easily proved 'results' standard of section 2, it is unlikely that they could prevail on their constitutional claims in any event."); *Lucas v.*

---

[10] In their proposed findings, Plaintiffs assert that "[f]or North Florida's Black voters to have a meaningful chance of electing their preferred candidates, they required a 'Black-performing' district—*i.e.*, one in which Black voters comprised a large enough proportion of the population to exert a significant influence on elections." ECF No. 218 ¶ 136. They further assert that "from 1992 until 2022, there was a Black-performing district in Northern Florida, anchored in Jacksonville." *Id.* ¶ 138. They acknowledge that none of those comprised a majority of minority voters, and the exhibit they rely on, *see id.*, shows that none of the referenced districts was "geographically compact."

*Townsend*, 967 F.2d 549, 556 (11th Cir. 1992) ("[T]he district court's factual findings regarding plaintiffs' failure to show either discriminatory effect or discriminatory intent [as to constitutional claim] are equally fatal to plaintiffs' Section 2 claim.").[11]

Regardless, even if a Fourteenth Amendment vote dilution claim requires a lesser showing of discriminatory effect than does a § 2 vote dilution claim, Plaintiffs still must show *some* discriminatory effect. *See Johnson*, 204 F.3d at 1345 ("Even if we assume that it is possible, as a matter of law, to prevail on a constitutional claim where no section 2 violation can be in fact established, Plaintiffs here have not proved their constitutional claim."). They must show, at the least, "that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice." *White*, 412 U.S. at 765-66. Plaintiffs have not done that.

At best, Plaintiffs have shown that a different arrangement might lead to better outcomes for candidates black voters generally prefer. But they have not shown that black voters had less opportunity than other voters. They have not shown that there was less opportunity for black voters to participate in the political process. *Cf. Bolden*, 446 U.S. at

---

[11] Plaintiffs' suggestion that the Supreme Court provided a "clear holding in *Strickland* that the *Gingles* preconditions 'do[] not apply [where] there is intentional discrimination against a racial minority,'" is beyond misleading. ECF No. 218 ¶ 239 n.6 (alterations in Plaintiffs' brief) (quoting *Bartlett v. Strickland*, 556 U.S. 1, 20 (2009)). *Strickland* provided no such "clear holding." For one, the purported "clear holding" is in Justice Kennedy's plurality opinion, joined by just two other Justices. Second, that opinion avoided the issue altogether. That case—a § 2 case—did not "involve allegations of intentional and wrongful conduct," and the Court made clear that it "therefore need not consider whether intentional discrimination affects the *Gingles* analysis." *Strickland*, 556 U.S. at 20. The plurality did say that its "holding does not apply to cases in which there is intentional discrimination against a racial minority," *id.*, but it certainly did not conclude that a constitutional vote dilution claim can survive without meeting the *Gingles* prerequisites. In fact, in another case that Plaintiffs misleadingly cite—*Georgia State Conference of NAACP v. State*, 269 F. Supp. 3d 1266, 1278 (N.D. Ga. 2017)—a three-judge panel cited *Strickland* and noted that the Supreme Court left open the issue of how *Gingles* applied to intentional discrimination claims. Plaintiffs cited this case to suggest that *Gingles* "should be relaxed" in intentional dilution claims, ECF No. 218 ¶ 239 n.6, but that court *dismissed* an intentional dilution claim because Plaintiffs did not sufficiently allege facts to support all *Gingles* prerequisites. *NAACP*, 269 F. Supp. 3d at 1281-85; *see also Thompson v. Kemp*, 309 F. Supp. 3d 1360, 1362, 1365-66 (N.D. Ga. 2018) (Martin, J.) (three-judge court also dismissing Fourteenth Amendment vote dilution claim for failure to allege facts supporting *Gingles* prerequisites).

73 (plurality) (noting that black voters "register and vote in Mobile 'without hindrance,'" and that electoral defeats of black-preferred candidates "alone does not work a constitutional deprivation"); *see also Osburn v. Cox*, 369 F.3d 1283, 1288 (11th Cir. 2004) (rejecting Fourteenth Amendment claim and noting plaintiffs had not alleged "that they were prevented from registering to vote or from voting at all," but instead alleged "they were outvoted in relation to selecting the candidate of their preference").

Plaintiffs do not argue that the Legislature had an obligation to *maximize* the number of black-performing districts. And although Plaintiffs halfheartedly suggest the Legislature could not constitutionally reduce the preexisting number of black-performing districts— *see* ECF No. 218 ¶ 232 ("[A]ctionable vote dilution includes both claims that votes were canceled out entirely or—as is the case here—that a particular districting plan was purposefully conceived to minimize or dilute the strength of a minority voting bloc *vis-à-vis the preexisting baseline*." (emphasis added) (cleaned up))—they cite no authority supporting this. Of course, there is no need to consider a "preexisting baseline" if the question is equality of opportunity. The Fourteenth Amendment ensures that minorities have no "less opportunity than [do] other residents in the district to participate in the political processes and to elect legislators of their choice." *White*, 412 U.S. at 766. It does not ensure that they have no less opportunity to elect preferred candidates than they did under an earlier map the Florida Supreme Court enacted.

Plaintiffs had to prove both discriminatory effects and a discriminatory purpose. They proved neither. Thus, I concur in the decision to grant judgment in the Secretary's favor.[12]

---

[12] As noted above, I also concur in Sections I, IV (in part), V.A, V.B, VI, and VII.