## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

Common Cause Florida, FairDistricts
Now, Florida State Conference of the
National Association for the
Advancement of Colored People
Branches, Cassandra Brown, Peter
Butzin, Charlie Clark, Dorothy Inman-
Johnson, Veatrice Holifield Farrell,
Brenda Holt, Rosemary McCoy, Leo R.
Stoney, Myrna Young, and Nancy
Ratzan,

     *Plaintiffs,*

  v.

Cord Byrd, in his official capacity as
Florida Secretary of State,

     *Defendant.*

Case No. 4:22-cv-109-AW-MAF

## <u>PLAINTIFFS' MOTION FOR RECONSIDERATION</u>

Plaintiffs Common Cause Florida, FairDistricts Now, Florida State

Conference of the National Association for the Advancement of Colored People

Branches, Cassandra Brown, Peter Butzin, Charlie Clark, Dorothy Inman-Johnson,

Veatrice Holifield Farrell, Brenda Holt, Rosemary McCoy,  Leo R. Stoney, Myrna

Young, and Nancy Ratzan, by and through undersigned counsel, file this motion

for reconsideration pursuant to Rule 59(e) of the Federal Rules of Civil Procedure.

Dated: April 24, 2024

Respectfully submitted,

_/s/ Gregory L. Diskant_

Gregory L. Diskant (*pro hac vice*)
H. Gregory Baker (*pro hac vice*)
Jonah M. Knobler (*pro hac vice*)
Catherine J. Djang (*pro hac vice*)
Alvin Li (*pro hac vice*)
Anna Blum (*pro hac vice*)
Newton Portorreal (*pro hac vice*)
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000
gldiskant@pbwt.com
hbaker@pbwt.com
jknobler@pbwt.com
cdjang@pbwt.com
ali@pbwt.com
ablum@pbwt.com
nportorreal@pbwt.com

Christopher Shenton (*pro hac vice*)
SOUTHERN COALITION FOR SOCIAL JUSTICE
1415 West Highway 54, Suite 101
Durham, NC 27707
(919) 323-3380
chrisshenton@scsj.org

Anthony P. Ashton (*pro hac vice*)
Anna Kathryn Barnes (*pro hac vice*)
NAACP OFFICE OF THE GENERAL COUNSEL
4805 Mount Hope Drive
Baltimore, MD 21215
Telephone: (410) 580-5777
aashton@naacpnet.org
abarnes@naacpnet.org

Henry M. Coxe III (FBN 0155193)
Michael E. Lockamy (FBN 69626)
BEDELL, DITTMAR, DeVAULT, PILLANS &
 COXE
The Bedell Building
101 East Adams Street
Jacksonville, Florida 32202
(904) 353-0211
hmc@bedellfirm.com
mel@bedellfirm.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 24, 2024, I electronically filed the

foregoing with the Clerk of Court using CM/ECF, which automatically serves all

counsel of record for the parties who have appeared.

*/s/ Gregory L. Diskant*
Gregory L. Diskant

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................1

LEGAL STANDARD...................................................................................5

I.   BECAUSE THE GOVERNOR IS A STATE ACTOR, THE
     COURT'S *ARLINGTON HEIGHTS* ANALYSIS SHOULD
     HAVE ADDRESSED HIS MOTIVES, RATHER THAN
     TREATING THEM AS IRRELEVANT. ...........................................6

II.  EVEN IF ONLY "LEGISLATIVE" ACTIVITY IS
     RELEVANT, THE GOVERNOR EXERCISED
     LEGISLATIVE AUTHORITY HERE. .............................................10

III. PLAINTIFFS DID NOT NEED TO SHOW THAT THE
     LEGISLATURE AFFIRMATIVELY "RATIFIED"
     GOVERNOR DESANTIS'S DISCRIMINATORY INTENT. ..........15

IV.  THE COURT SHOULD PERFORM A COMPLETE
     *ARLINGTON HEIGHTS* ANALYSIS..................................................17

     A.   This Court Has Already Recognized Many Relevant
          *Arlington Heights* Factors. ........................................................17

     B.   As Judge Jordan Found And As The Court Assumed, The
          Governor Acted With Discriminatory Intent. ...........................21

     C.   A Complete *Arlington Heights* Analysis Reveals that the
          Enacted Map Was Motivated At Least in Part By
          Discriminatory Intent. ...............................................................24

CONCLUSION ...........................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allen v. Milligan*,
  599 U.S. 1 (2023)..........................................................................................18

*Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*,
  576 U.S. 787 (2015)......................................................................................13

*Arthur v. King*,
  500 F.3d 1335 (11th Cir. 2007) .....................................................................5

*Atkins v. Robinson*,
  545 F. Supp. 852 (E.D. Va. 1982), *judgment aff'd*, 733 F.2d 318
  (4th Cir. 1984).................................................................................................8

*Backus v. South Carolina*,
  857 F. Supp. 2d 553 (D.S.C. 2012) ...............................................................5

*CASA de Md., Inc. v. Trump*,
  355 F. Supp. 3d 307 (D. Md. 2018)................................................................8

*City of Mobile v. Bolden*,
  446 U.S. 55 (1980)..........................................................................................6

*Ohio ex rel. Davis v. Hildebrant*,
  241 U.S. 565 (1916)......................................................................................13

*In re Exec. Commc'n Concerning Powers of Legislature*,
  6 So. 925 (Fla. 1887) ..............................................................................11, 12

*Griffin v. Swim-Tech Corp.*,
  722 F.2d 677 (11th Cir. 1984).........................................................................5

*Hallmark Devs., Inc. v. Fulton Cnty.*,
  466 F.3d 1276 (11th Cir. 2006) ......................................................................8

*La Abra Silver Mining Co. v. United States*,
  175 U.S. 423 (1899)......................................................................................14

*Moore v. Harper*,
  600 U.S. 1 (2023).................................................................4, 12, 13, 14

*Ownbey v. Morgan*,
  256 U.S. 94 (1921)........................................................................6

*Smiley v. Holm*,
  285 U.S. 355 (1932)................................................................12, 13, 14

*Taylor Woodrow Constr. Corp. v. Sarasota/Manatee Airport Auth.*,
  814 F. Supp. 1072 (M.D. Fla. 1993)....................................................5

*United States v. Rios-Montano*,
  2020 U.S. Dist. LEXIS 230122 (S.D. Cal. Dec. 7, 2020) .................................8

*United States v. Yonkers Bd. of Educ.*,
  837 F.2d 1181 (2d Cir. 1987) ...........................................................7

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977)................................................................*passim*

*Washington v. Davis*,
  426 U.S. 229 (1976)....................................................................9, 15

*Wilkins v. United States*,
  376 F.2d 552 (5th Cir. 1967) ............................................................6

*Wisconsin Legis. v. Wisconsin Elections Comm'n*,
  142 S. Ct. 1245 (2022)....................................................................8

**Other Authorities**

Fed. R. Civ. P. 59(e)........................................................................5

Fla. Const. Art. III...........................................................................11

Fla. Const. Art. III, § 8....................................................................11

Fla. Const. Art. III, § 16...................................................................25

Fla. Const. Art. III, § 21...................................................................25

Fla. Const. Art. IV.........................................................................11

FLA. CONST. ART. IV, § 1............................................................................................6

FLA. CONST. ART. IV, §1(c) ....................................................................................11

U.S. CONST. ART. I, § 4...........................................................................................12

**INTRODUCTION**

Last September and October, this Court held a trial on Florida's 2021–22 congressional redistricting. In that highly unusual redistricting process, Governor DeSantis and the Legislature acted together to perform the State's law-making function, resulting in the State's current congressional plan (the "Enacted Map"). As the Court's opinion describes, the process can fairly be divided into two distinct periods: pre-DeSantis and post-DeSantis. As the record demonstrates, once he entered the fray, Governor DeSantis's intent and actions dictated the subsequent legislative process and the end result.

However, when this Court issued its Findings of Fact and Conclusions of Law, it found that the Governor's intent was all but irrelevant. The Court reasoned that "even assuming that *Governor DeSantis* acted with some unlawful discriminatory motive in creating and proposing the redistricting map that was ultimately enacted into law, the plaintiffs have not proven that *the Florida Legislature* had a similar motive in adopting and passing that map." Op. at 50 (emphasis added).[1] The Court held that this was "fatal" to Plaintiffs' claims. *Id.*

We respectfully submit that this holding was incorrect as a matter of law and should be reconsidered. As the Supreme Court has explained, the

---

[1] The Court's *per curiam* opinion is cited herein as "Op." and Judge Jordan's concurrence is cited as "Conc."

fundamental question in an intentional discrimination case is whether the relevant state action was motivated at least in part by racial discrimination.  As the trial evidence showed, that condition was met here.  The Governor attacked the legitimacy of Benchmark CD-5 and vetoed the Legislature's preferred "Duval-only" map.  In its place, the Governor crafted, and exerted immense pressure on the Legislature to pass, the Enacted Map.  Absent Governor DeSantis's actions, the Enacted Map would not be in place today.  The Court recognized as much in its opinion.  Nonetheless, the Court did not conduct a holistic analysis of the actions of the State—the entire lawmaking process, encompassing both the Governor and the Legislature—leading up to the Enacted Map, as required by *Vill. of Arlington Heights v. Metro. House Dev. Corp*.  429 U.S. 252 (1977).  Instead, it disregarded the Governor's outcome-determinative motive and conduct because no individual member of the Florida Legislature was shown to have personally shared his views. We believe that analysis was incorrect as a matter of law for two reasons.

First, the Court erred by treating the Governor as an outsider to the legislative process.  Unlike private citizens advocating for legislative action, the Governor is *himself* a state actor directly subject to the Fourteenth and Fifteenth Amendments.  He may not discriminate on the basis of race when using state authority, any more than the Legislature can.  No case law supports the notion that, where multiple state actors act jointly to bring about the challenged conduct, *all of*

2

*them* must be driven by illegal consideration of race.  Indeed, *Arlington Heights* holds the opposite: it requires courts to consider the totality of the circumstances behind the challenged state action and deems it sufficient if racially discriminatory intent is just one contributing cause.  As discussed in more detail below and at trial, the Governor played an outsized role in enacting the 2021–22 congressional redistricting map.  The Court's assumption about the Governor's outcome-determinative motive and actions was enough—without more—to require a ruling in favor of Plaintiffs.  Thus, if the Court were to find that Governor DeSantis's actions, which dominated the process through which the Enacted Map became law, were in fact motivated by racial discrimination, that would be enough to satisfy Plaintiffs' *Arlington Heights* burden.

Second, even if the *Arlington Heights* analysis were properly cabined to "legislative" state action, the Governor's actions here were "legislative."  This is because the Florida Constitution establishes that the governor's veto and approval of legislation are both *legislative* functions, and their exercise is an exercise of *legislative* power—not executive power.  This understanding is confirmed by the text and structure of the Florida Constitution and more than a century of Florida Supreme Court precedent.  Similarly, as a matter of federal constitutional law, a governor exercises *legislative* power—not executive power—when he vetoes or signs congressional redistricting legislation.  The Elections Clause of the U.S.

Constitution assigns the task of redistricting to "the Legislature" of each state. For more than a century, the U.S. Supreme Court has held that, when authorized by state law, state governors may veto redistricting legislation notwithstanding this textual grant of authority to "the Legislature," because such a veto is considered part of the "legislative function." *Moore v. Harper*, 600 U.S. 1, 25-26 (2023) (internal quotation omitted).

In their Pre-Trial and Post-Trial Briefs, Plaintiffs argued that the Governor's actions should be considered legislative in nature, but the Court did not address this argument. Dkt. No 194 at 27 (Plaintiff's Pre-Trial Brief); Dkt No. 218 at 108-09 (Plaintiff's Post-Trial Brief). It should do so now. The Court's opinion already makes many of the findings required for a proper *Arlington Heights* analysis of the Enacted Map. It need only make findings, as opposed to assumptions, about the intent of Governor DeSantis in order to complete the analysis. When the Court correctly performs an *Arlington Heights* analysis that includes findings about Governor DeSantis' intent and recognizes his pivotal role in the legislative process, it should conclude that the Enacted Map violates the Fourteenth and Fifteenth Amendments.

In short, this Court's holding that Governor DeSantis's motives and actions were irrelevant to the *Arlington Heights* analysis was doubly incorrect as a matter of law: not only was he a state actor fully bound by the Fourteenth and

4

Fifteenth Amendments, but his participation in the redistricting process was also every bit as "legislative" as that of the Florida Senate or House.   Reconsideration is respectfully requested.

## LEGAL STANDARD

Fed. R. Civ. P. 59(e) permits motions to alter or amend a judgment, which may include a motion for reconsideration.  Reconsideration of a prior order is an "extraordinary remedy" that should be used "sparingly." *Taylor Woodrow Constr. Corp. v. Sarasota/Manatee Airport Auth.*, 814 F. Supp. 1072, 1072-73 (M.D. Fla. 1993); *accord Griffin v. Swim-Tech Corp.*, 722 F.2d 677, 680 (11th Cir. 1984).  To prevail on a motion to reconsider, the movant must identify "manifest errors of law or fact" or extraordinary circumstances. *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007) (quotation omitted).

To succeed on an intentional vote dilution claim under the Fourteenth and Fifteenth Amendments, Plaintiffs must demonstrate that the voting scheme had a discriminatory purpose and effect. *Backus v. South Carolina*, 857 F. Supp. 2d 553, 568 (D.S.C. 2012), *aff'd* 568 U.S. 801 (2012).  In showing discriminatory intent, "a plaintiff [need not] prove that the challenged action rested solely on racially discriminatory purposes, . . . or even that [discrimination] was the 'dominant' or 'primary' [purpose]." *Arlington Heights*, 429 U.S. at 265-68.  It is

enough to "pro[ve] that a discriminatory purpose has been a motivating factor." *Id.* at 265-66.

## ARGUMENT

**I.   BECAUSE THE GOVERNOR IS A STATE ACTOR, THE COURT'S *ARLINGTON HEIGHTS* ANALYSIS SHOULD HAVE ADDRESSED HIS MOTIVES, RATHER THAN TREATING THEM AS IRRELEVANT.**

Governor DeSantis is a state actor.  FLA. CONST. art. IV, § 1.  This obvious legal truth leads to another: as a state actor, he is bound by the Fourteenth and Fifteenth Amendments of the U.S. Constitution and their prohibitions on racial discrimination.  *Cf. Wilkins v. United States*, 376 F.2d 552, 556 (5th Cir. 1967) (stating that lawsuit against Governor George Wallace of Alabama "was a typical Fourteenth Amendment proceeding" that "sought to enjoin State action").  After all, "[t]he Equal Protection Clause proscribes purposeful discrimination because of race by *any* unit of state government, whatever the method of its election." *City of Mobile v. Bolden*, 446 U.S. 55, 73-74 (1980) (emphasis added) (*superseded by statute on other grounds*, Voting Rts. Act of 1965, Pub. L. No. 97-205, § 3, 96 Stat. 131); *see also Ownbey v. Morgan*, 256 U.S. 94, 111 (1921) (Fourteenth Amendment "restrains state action, whether legislative, executive, or judicial").

The Court recognized that Governor DeSantis is a state actor in its opinion.  "There are two relevant state actors in this case—the Florida Legislature, which passed the Enacted Map, and the Governor, who proposed, pushed for, and

signed the Enacted Map into law." Op. at 50. As this statement implies, the Governor is not a mere third-party outsider to the state action that Plaintiffs challenge here, such as a private interest group or lobbyist. *Cf. United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1225 (2d Cir. 1987) (discussing standard that applies when a state actor takes action to "effectuat[e] the [invidious] desires of private citizens") (internal quotation omitted). Rather, he is himself a state actor who played a central—indeed, outcome-determinative—role in the challenged state action. Thus, the Court should have treated the Governor's motives as central to the *Arlington Heights* analysis. Instead, the Court deemed those motives irrelevant unless the Legislature shared them. That was an error of law. *See* Op. at 50-51 ("It is not enough for the plaintiffs to show that the Governor was motivated in part by racial animus . . . [T]hey also must prove that the Florida Legislature *itself* acted with some discriminatory purpose when adopting and passing the Enacted Map." (emphasis in original)).

While the *Arlington Heights* framework is most frequently applied to legislative enactments, *Arlington Heights* itself makes clear that its framework is not restricted to the actions of legislatures. Instead, *Arlington Heights* repeatedly uses broader language to refer to the proscribed conduct, such as "state action," "official action," or "governmental act." 429 U.S. at 264-68; 266 n.14. This language is capacious enough to include action by a governor. The decision also

7

makes express reference to "legislators *and administrators*" as possible sources of improper racial motivation. *Id.* at 265 (emphasis added); *see also id.* at 267 (referring to "the [relevant] *decisionmaker*'s purposes" (emphasis added)).

Recognizing that *Arlington Heights* covers all governmental activity, courts have applied its framework to the actions of all manner of state actors—not merely legislators. *See, e.g.*, *Hallmark Devs., Inc. v. Fulton Cnty.* 466 F.3d 1276, 1283-84 (11th Cir. 2006) (applying *Arlington Heights* to review of county zoning decision); *CASA de Md., Inc. v. Trump*, 355 F. Supp. 3d 307, 325 (D. Md. 2018) (applying *Arlington Heights* to review of executive immigration action); *accord. United States v. Rios-Montano*, No. 19-CR-2123-GPC, 2020 U.S. Dist. LEXIS 230122, at *6-7 (S.D. Cal. Dec. 7, 2020) ("The Government has provided no convincing justification for why [one state actor] . . . would be subject to Constitutional equal protection constraints that [a second state actor] is free to ignore."). Redistricting cases are no exception. *See, e.g., Wis. Legislature v. Wis. Elections Comm'n*, 595 U.S. 398 (2022) (invalidating, under the Equal Protection Clause, a redistricting plan drawn by the Governor of Wisconsin and selected by the Wisconsin Supreme Court over the objections of the Wisconsin Legislature). And *Arlington Heights* has been applied where a state actor *blocks* a desired action for racial reasons, as Governor DeSantis did here. *See, e.g.*, *Atkins v. Robinson*, 545 F. Supp. 852 (E.D. Va. 1982), *judgment aff'd*, 733 F.2d 318 (4th Cir. 1984).

The Court's opinion assumed that Governor DeSantis acted with racially discriminatory intent in the process by which the Enacted Map became law.  Op. at 50-52.  Judge Jordan's separate opinion actually so found.  Conc. at 1.  Under the Court's assumption and Judge Jordan's findings, the Governor violated the Fourteenth and Fifteenth Amendments when he engaged in racially motivated state action—namely, vetoing the Legislature's initial "Duval-only" map, which would have retained a Black-performing district in Northern Florida; crafting and advocating the Enacted Map, which eliminated a Black-performing district in Northern Florida; and ultimately signing that map into law.  These racially motivated state actions not only contributed to Plaintiffs' vote-dilution injury, they were its but-for and proximate cause.  This exceeds what is required under *Arlington Heights* and should have shifted the burden to the Secretary to prove that "the same decision would have resulted even [without the Governor's] impermissible [racial] purpose."  429 U.S. at 270 n.21.

The Court's opinion seems to suggest that, when multiple state actors jointly bring about the challenged state action, *all* of them must share an illicit racial motive for the Fourteenth and Fifteenth Amendments to be triggered.  That is not correct.  *Arlington Heights* explains that a plaintiff need only show "that a discriminatory purpose has been *a motivating factor*" behind the challenged state action—not "that the challenged action rested *solely* on racially discriminatory

purposes." *Id*. at 265-66 (emphasis added); *see also Washington v. Davis*, 426 U.S. 229, 240 (1976) (holding the "basic" question in an intentional discrimination case is whether "the invidious quality" of the challenged state action can "*ultimately be traced* to a racially discriminatory purpose") (emphasis added). Here, the evidence showed that the Governor's racially motivated actions were instrumental in bringing the Enacted Map into existence; without those actions, the Enacted Map would never have been proposed—let alone become law. *See infra* at IV.B, IV.C. Discriminatory purpose was therefore "a motivating factor" behind the Enacted Map. That is more than enough to carry Plaintiffs' burden.

Plaintiffs request that the Court reconsider its opinion with respect to the intent of Governor DeSantis and the relevance of that intent. On reconsideration, the Court should make findings about the Governor's motives, not just an assumption. If those findings bear out the Court's assumption, then the Governor's illicit use of race was plainly—at the least—a contributing cause of Plaintiff's injury. The Court erred by excluding Governor DeSantis from the *Arlington Heights* analysis and treating the Legislature as the only state actor whose intent mattered.

## II.  EVEN IF ONLY "LEGISLATIVE" ACTIVITY IS RELEVANT, THE GOVERNOR EXERCISED LEGISLATIVE AUTHORITY HERE.

Even if the *Arlington Heights* analysis were properly restricted to purely *legislative* intent, the Court erred by overlooking a crucial fact: as Plaintiffs

noted in their Pre-Trial and Post-Trial briefs, Dkt. No. 194 at 27; Dkt. No. 218 at

108-10, Governor DeSantis exercised legislative authority in connection with the

redistricting process, just like the Florida Senate and House of Representatives.

Under the Florida Constitution, both the Governor's veto of a bill and

his signing of a bill into law are exercises of legislative authority, not executive

authority.  The Florida Constitution, as the source of all lawmaking authority in

Florida, defines both powers.  It does so in Article III, which concerns the

Legislature and its powers, rather than Article IV, which concerns the Executive

and its powers.  *See* FLA. CONST. art. III, § 8 (defining the veto and approval

powers); *compare* FLA. CONST. art. III (Legislature), *with* FLA. CONST. art. IV

(Executive).  Thus, for purposes of Florida law, the power to veto or approve

legislative enactments are legislative powers, not executive ones, and when the

Governor vetoes or approves a bill, he is acting legislatively—just as the Senate

and House of Representatives are when they vote on legislation.

The Florida Supreme Court has long placed great import on this

structural choice.  Almost 140 years ago, the Florida Supreme Court declined to

issue an advisory opinion concerning the Governor's use of the veto, noting that

the Florida Constitution permitted the Governor (then and now) to seek an

advisory opinion only concerning "*executive* powers and duties."  FLA. CONST. art.

IV, §1(c) (emphasis added); *see In re Exec. Commc'n Concerning Powers of*

*Legislature*, 6 So. 925 (Fla. 1887).  The Florida Supreme Court reasoned from this distinction: "Any duty imposed by the constitution on the governor with reference to a bill, before it becomes law, is not an executive duty."  *In re Exec. Commc'n*, 6 So. at 925.  Instead, the Court held, "any act which is an essential prerequisite" to the enactment of a law "is legislative" and is performed by the Governor "as a part of the lawmaking power, and not as the law-executing power."  *Id.*

Federal law also confirms that, in the context of congressional redistricting, the gubernatorial veto of, or signature on, a redistricting bill are part of the legislative process.  The power to draw congressional districts is delegated to the states by the Elections Clause of the U.S. Constitution.  U.S. CONST. art. I, § 4, cl. 1.  By its terms, the Elections Clause grants this power specifically to the "Legislature" of each State, but the term "Legislature" has consistently been construed to include all parts of a state's lawmaking process.  The U.S. Supreme Court has affirmed and reaffirmed this understanding in a long line of cases, most recently *Moore v. Harper*, 600 U.S. 1 (2023).

Importantly, *Moore* reaffirmed that when state legislatures exercise their Elections Clause power, they "may not create congressional districts independently of requirements imposed by the state constitution *with respect to the enactment of laws*."  *Id.* at 26 (quoting *Smiley v. Holm*, 285 U.S. 355, 373 (1932)) (emphasis added) (internal quotations omitted).  In reaching this result, the *Moore*

Court examined historical practice, constitutional structure, and its own precedents, and found that these sources all supported the application of state constitutions to legislatures engaged in congressional redistricting. *See id.* at 21-27 (collecting and discussing cases). The Court relied on various precedents, all of which indicate that the authority to district for congressional elections under the Elections Clause could be conditioned in various ways by state law. *See Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787 (2015) (Elections Clause allows state to vest congressional redistricting authority in an independent redistricting commission); *Smiley*, 285 U.S. 355 (1932) (Elections Clause power includes gubernatorial veto); *Ohio ex rel. Davis v. Hildebrant*, 241 U.S. 565 (1916) (congressional redistricting properly subjected to voter referendum authorized by state constitution). In its examination of these precedents, the *Moore* Court found that the Elections Clause does not "carve[] out an exception to th[e] basic principle" that state legislative authority is exercised pursuant to its definition in state law. 600 U.S. at 22.

Of these authorities, *Smiley v. Holm* is particularly important here. In *Smiley*, the U.S. Supreme Court reviewed a decision from the Minnesota Supreme Court holding that, because the Elections Clause assigns federal redistricting authority to the "Legislature" of each state, Minnesota's governor had no power to veto congressional maps. 285 U.S. 355. The Minnesota Supreme Court had

13

reasoned that the term "Legislature" refers solely to the state's Senate and House of Representatives as such, and does not encompass "the [entire] lawmaking power of the state." *Id.* at 365 (internal quotation omitted). The U.S. Supreme Court unanimously reversed. It held that when a state's constitution provides that congressional maps are "subject . . . to the veto of the Governor," that veto is "part of the legislative process" and, for that reason, is consistent with the Elections Clause. *Id.* at 369-70.

As the Court recently explained in *Moore*, *Smiley* stands for the proposition that "the Governor's veto" is part of a state's "legislative function" when it comes to congressional redistricting, and "[t]he reasoning . . . unanimously embraced in *Smiley* commands our continued respect." 600 U.S. at 25-26 (quoting *Ariz. State Leg.*, 576 U.S. at 808). Even the dissent in *Moore* conceded that "when [the veto] power is conferred on the Governor of a State, it 'makes him in effect a third branch *of the legislature*,'" 600 U.S. at 61 (Thomas, J., dissenting) (quoting Thomas M. Cooley, *Gen. Principles of Const. L.* 50 (1880)) (emphasis in *Moore*), and that gubernatorial "approval" of a redistricting bill is also "legislative in its nature," and not executive. *See id.* (quoting *La Abra Silver Mining Co. v. United States*, 175 U.S. 423, 453 (1899)).

Thus, even assuming the *Arlington Heights* analysis is properly cabined to the legislative process itself, the Court's exclusion of Governor

DeSantis's motives and actions was error. As a matter of both state and federal law, Governor DeSantis's veto of the two-map solution, which included the "Duval-only" plan, and his later signature approving the Enacted Map, are legislative in nature and part and parcel of the legislative process that resulted in the challenged law. The motives underlying the Governor's actions throughout this process are therefore relevant to the Fourteenth and Fifteenth Amendment analysis, just like the motives underlying the actions of members of the House or Senate. *See Davis*, 426 U.S. at 242 (court must consider "the totality of the relevant facts" bearing on intent).

## III.   PLAINTIFFS DID NOT NEED TO SHOW THAT THE LEGISLATURE AFFIRMATIVELY "RATIFIED" GOVERNOR DESANTIS'S DISCRIMINATORY INTENT.

Instead of considering the Governor's illegal motivation as sufficient in and of itself, or considering it together with the motives of the Florida House and Senate, the Court required Plaintiffs to show that the Florida House and Senate had independently "ratified" Governor DeSantis's discriminatory motives by affirmatively adopting those motives as their own. *See* Op. at 52-53.

Plaintiffs agree that ratification of Governor DeSantis's discriminatory intent is one method by which they could have shown that the Enacted Map violated the Fourteenth and Fifteenth Amendments. *See* Dkt. 218 at 110-15. But ratification is not the only way to find discriminatory intent. Nor is a

ratification analysis necessary in a case like this one, where the individual who acted with impermissible racial motives is *himself* a state actor and was *himself* an integral part of the legislative process that resulted in the Enacted Map. As the Court's opinion expressly acknowledges, an alternative, equally acceptable mode of analysis is consideration of the *Arlington Heights* factors. Op. 52. Properly conducted, that analysis should recognize the Governor's own direct role in the law-making function, as the Plaintiffs urged before and after trial. Dkt. 194 at 27-28; Dkt. 218 at 108-110. That analysis should consider the circumstances involving all the state actors involved in the law-making function, without artificially separating one from the others.

The Governor's actions here were not an outside influence that must be ratified, like the lobbying of a bigoted faction of private citizens, but an important exercise of unambiguously legislative power itself. Where a legislative actor—the Governor—vetoes a bill, drafts its replacement, and then signs the replacement into law, all with racially discriminatory intent, as the Court assumed took place here, ratification of that intent by other legislators is not necessary so long as the *Arlington Heights* factors support the conclusion of state responsibility. Indeed, none of the ratification cases this Court cited applied the doctrine to assess

the outsize influence of a state governor on a state legislature engaged in enacting congressional redistricting legislation.

## IV.   THE COURT SHOULD PERFORM A COMPLETE *ARLINGTON HEIGHTS* ANALYSIS.

For the reasons above, the Court erred by simply assuming that the Governor acted with discriminatory intent and then setting that intent aside as irrelevant.  Because the Governor is himself a state actor bound by the Fourteenth and Fifteenth Amendments, as well as a crucial part of the legislative process in the redistricting context, actual fact findings about the Governor's intent are necessary for a complete analysis of Plaintiffs' claims.

### A.   This Court Has Already Recognized Many Relevant *Arlington Heights* Factors.

The Court has already recognized many of the *Arlington Heights* factors present in this case.  There is no need to recite here all the many deviations from substantive and procedural norms that occurred during the 2021–22 redistricting cycle.  They are found throughout the court's thoughtful analysis of the facts leading up to the Enacted Map.  Instead, we include a brief summary.

First, of course, is Florida's "long and turbulent history of denying and suppressing the electoral voice of Black Americans" and the fact that the Black population of Benchmark CD-5, when it was created in 2016, "shares a lineal connection to those enslaved men and women [of the antebellum period] and

comprise[s] a large share of Florida's overall Black population today."  Op. at 4-5;
*cf. Allen v. Milligan*, 599 U.S. 1, 21 (2023).

The Legislature began the 2022 redistricting process "determined to
produce a congressional redistricting map that complied with the [Fair Districts
Amendment] by maintaining a Black-performing district in North Florida."  Op. at
11.  But once the process was underway, the Governor intervened by producing his
own map—one that eliminated a Black opportunity district in North Florida.  "The
Governor's production and submission of a congressional redistricting map was
unprecedented in Florida history."  *Id*. at 12.  "No Florida governors . . . had
previously produced and submitted a map themselves."  *Id*. at 12 n.4.

Then, the Governor sent a representative, Robert Popper, to the
Legislature to argue that Benchmark CD-5 was unconstitutional because it lacked a
compelling state interest.  "[B]oth Republicans and Democrats alike were openly
hostile toward Mr. Popper after hearing his presentation."  *Id*. at 14.  In fact,
Popper undermined his own position, "acknowledg[ing] that the . . . FDA could
provide a compelling state interest to justify a race-based district under the Equal
Protection Clause of the Fourteenth Amendment."  *Id*.

The Governor then sought an "unusual" advisory opinion from the
Florida Supreme Court, which "had previously declined a similar request in 1887."
*Id*. at 14, n.6.  The Governor also sent a memo from his counsel, Mr. Newman, to

the Legislature, arguing that the Benchmark CD-5 was unconstitutional under the federal constitution for the same reasons expressed by Mr. Popper.  *Id*. at 15.

After considering both Mr. Popper's testimony and Mr. Newman's memorandum, "an unpersuaded House Subcommittee on Congressional Redistricting passed, by a vote of 14 to 7, a congressional redistricting plan (Map 8011) that rejected the Governor's legal arguments by retaining a Black-performing district in North Florida." *Id*.  Then the Legislature tried to compromise with the Governor, "[f]or the first time in Florida history, . . . propos[ing] a congressional redistricting package that featured both a primary map (Map 8019) and an alternative map (Map 8015)." *Id*.

"The primary map, Map 8019, introduced a new, more compact CD-5 configuration and managed to preserve a Black-performing district in North Florida." *Id*. at 17.  "[T]he proposed CD-5 in Map 8019 was 'entirely located in Duval County' and centered around 'a compact African American community.'" *Id*.  "In late February and early March of 2022, Governor DeSantis publicly declared his opposition to the compromise plan then under consideration in the House." *Id*. at 20.  The Legislature nonetheless enacted the two-map compromise, concluding "that the compromise package complied with the FDA precisely because both Map 8019 and Map 8015 preserved a Black-performing district in North Florida." *Id*.

Following the Governor's veto of the compromise plan and the announcement of a special session, the Legislative leaders announced that "reapportionment staff [would] not [be] drafting or producing a map for introduction during the special session." *Id*. at 22.  And upon receipt of the Governor's Map, the Legislature did not obtain an opinion of counsel that it complied with federal and state law.  Rather, the Senate's General Counsel, Daniel Nordby, recognized that there was an "absence of controlling judicial precedent" in support of the Governor's plan. *Id*. at 23.   He said only that the governor's argument was "worthy of careful consideration."   *Id*.  "At the time of the Governor's veto in 2022, . . .  no federal or state court had taken or accepted the Governor's view of the law." *Id*. at 26.  That is, the Legislature accepted the Governor's arguments and voted for the Governor's plan *without* an opinion of counsel that it was lawful and *without* the opinion of any Court that it was lawful.

Moreover, despite the Governor's stated objections to the compact Duval-only district, his counsel, Mr. Newman, agreed in testimony before the Legislature "that certain applications of the FDA [to a compact district] could withstand strict scrutiny under the Equal Protection Clause of the Fourteenth Amendment." *Id*. at 24.  Finally, although Duval County had to be cut in some fashion to create a congressional district (because its population was otherwise too large), the Governor's map drawer conceded that in drawing new CD-5 he "had

knowingly split the Black community by drawing the district line down the St.

Johns River." *Id*. at 43.

In the end, "Governor DeSantis' veto was unique to this cycle because

it was a veto *based on the racial composition of voters* in the proposed district."

*Id*. at 45 (emphasis added).

**B.    As Judge Jordan Found And As The Court Assumed, The Governor Acted With Discriminatory Intent**.

When the *Arlington Heights* factors already discussed by the Court are

considered without artificially excluding the Governor from the analysis—

including his veto of the Legislature's preferred map and his signing of the Enacted

Map into law—it is entirely clear that "a discriminatory purpose [was] a

motivating factor" behind the Enacted Map.  *Arlington Heights*, 429 U.S. at 265-

66.   Judge Jordan has already made detailed factual findings as to the issue of the

Governor's intent, which provide a helpful framework for this Court's analysis.

We recite here elements from Judge Jordan's findings that the Court may wish to

consider.

In the Court's analysis—which assumed that the Governor acted at

least in part in bad faith—the pivotal moment in the story is the point when the

Legislature ran out of steam.  Op. at 57.  That is a good moment for the Court to

focus upon now because the Legislature ran out of steam precisely when—indeed,

precisely because—the Governor vetoed the compact Duval-only map, which the Court found met all the Governor's previously stated objections. *Id*. at 17.

The Duval plan had been designed to address the Governor's "novel" legal theory while protecting a Black minority seat in North Florida. *Id*. In Judge Jordan's view, it was telling that Governor DeSantis objected to the map even before having seen it and "without a reasoned explanation." Conc. at 14. He found that the Governor's subsequent veto of that plan "betray[ed] any semblance of good faith." *Id*. at 14.

An accompanying veto memorandum issued by Mr. Newman set forth the Governor's purported objections to the Duval-only CD-5. *Id*. at 15-19. As Judge Jordan saw it, "the reasons offered by Mr. Newman do not hold up." *Id*. at 15. They were "disingenuous" and transparently pretextual. *Id*. at 16. Judge Jordan noted that the existence and rejection of "such an alternative [as the Duval-only map] is relevant in assessing whether the circumstantial evidence points to discrimination as a motivating factor." *Id*. at 19.

Rather than finding the compromise map acceptable, Mr. Newman fashioned a brand-new theory to address the compact Duval-only CD-5, making what Judge Jordan called "the flimsiest objection." *Id*. at 15. Mr. Newman now argued that the district violated the FDA, not the federal constitution, because it diminished the Black Voting Age Population ("BVAP") from Benchmark CD-5.

But the Governor's subsequently Enacted Map, far from resolving this supposed conflict with the state constitution, diminished the district's BVAP *even further*, effectively leaving Black voters with no means of electing their preferred candidates. *Id*. at 6, 24-25.   As Judge Jordan put it, the Governor therefore "purported to defend the FDA's non-diminishment requirement" but simultaneously "turned around and gutted that requirement even more with the Enacted Map that he drew." *Id*. at 16.

Judge Jordan found that the Governor's veto made clear that there was not and never had been "a path forward for a Black-performing district," in *any* configuration, in Northern Florida. *Id*. at 21.   So the Legislature bowed out and abandoned its Duval-only CD-5, even though that map surpassed both the Benchmark and the Enacted Map on traditional compactness measures. *Id*. Indeed, "[t]he key difference between Map 8019 and the Enacted Map drawn by the Governor" was solely that "the former maintained a Black-performing district in Northern Florida and the latter did not." *Id*.

Finally, as Judge Jordan recognized, the discriminatory impact of the Enacted Map is "beyond dispute." *Id*. at 5.   The number of Black performing districts in Northern Florida went from one to zero.   For the first time in over three decades, Black Floridians in the region were not able to elect their candidate of choice. *Id*. at 5-6.   This impact was also entirely foreseeable.   Indeed, the

"legislative record demonstrates that the House performed a functional analysis and determined that [the Enacted Map] did not perform for Black voters" in Northern Florida.  *Id*. at 20.

Taken together, the totality of the circumstances led Judge Jordan to the conclusion that Governor DeSantis "drew, proposed, and submitted the Enacted Map with race as a motivating factor."  *Id*. at 27.  We respectfully submit that the Court should make fact findings about the Governor's intent consistent with those of Judge Jordan.

### C.   A Complete *Arlington Heights* Analysis Reveals that the Enacted Map Was Motivated At Least in Part By Discriminatory Intent.

Judge Jordan joined the Court's opinion, notwithstanding his conclusions about the Governor's intent, citing *Brnovich v. Democratic National Committee* for the proposition that "[t]he cat's paw theory has no application to legislative bodies."  *Id*. at 28 (citing *Brnovich*, 141 S. Ct. 2321, 2350 (2021)).  But Plaintiffs do not rely on anything resembling a cat's paw theory.

As described by the Supreme Court, "[a] cat's paw is a dupe who is used by another to accomplish his purposes."  *Brnovich*, 141 S. Ct. at 2350 (internal quotation omitted).  The doctrine, which originates in the employment law context, permits imputation of a subordinate's bad intent onto an innocent and unknowing decisionmaker through principles of agency law alone.  *Id.*  The Supreme Court rejected this mode of analysis for the actions of "legislative

bodies," since legislators are not the agents of outside lobbyists or interest groups, and "[i]t is insulting to suggest that they are mere dupes or tools." *Id*.

Plaintiffs here have never argued that the Florida Legislature adopted the Enacted Map because outside private actors "duped" them into providing support for an illegal plan. Rather, the evidence shows the Legislature was fully informed about the law regarding redistricting at the outset of the process. Op. at 11-12. Before the Enacted Map, it passed *lawful* maps and repeatedly rejected the Governor's demand to ignore the Florida Constitution and enact a racially discriminatory map. *Id*. at 12-13, 15-16, 20. It recognized the legal arguments that his proponents advanced were unpersuasive and said so. *Id*. at 14. It created a map that thoughtfully addressed the Governor's stated concerns, while preserving a Black opportunity district in North Florida. And it passed that map in the face of the Governor's immense pressure. *Id*. at 16-18. As Plaintiffs agreed at trial, there was no reason to accuse any legislator of racial animus. Tr. 982.

Indeed, the same Legislature passed *state* redistricting maps in full compliance with Florida law that, for the first time, produced no objections and were approved in the Florida Supreme Court's facial review. Op. at 31-32. But, unlike the legislative maps, the Governor has veto power over the *congressional* maps produced by the Legislature, and therein lies the difference. Op. at 11 (citing FLA. CONST. art. III, §§ 16, 21). Governor DeSantis used his veto—his legislative

25

authority with respect to congressional redistricting—in bad faith to achieve his racially motivated ends.

The gubernatorial veto is a unique, and powerful, legislative function. Unlike the rest of the legislative process, which requires legislators from diffuse locales and representing diverse interests to find common ground to pass legislation, the veto is the only legislative power that can be exercised unilaterally by a single state official. The uniqueness of that legislative authority greatly simplifies the *Arlington Heights* analysis. Here, given the extraordinary power that Governor DeSantis wielded in shaping and creating the Enacted Map, most notably through his use of the veto, the challenged legislation can "be traced to a racially discriminatory purpose," *Davis*, 442 U.S. at 282, without the factfinder having to wade into the murky waters of attempting to ascertain whether other legislative actors also shared that motive.

That finding is compelled by the record here. By using his veto, Governor DeSantis permanently, and singlehandedly, changed the course of the legislative process and tainted its result. Op. at 20-25; *see id.* at 22 (legislative leadership were "not drafting or producing a map for introduction during the special session" and instead were "awaiting a communication from the Governor's Office with a map that he will support."). If Governor DeSantis had not vetoed the Legislature's 2021 congressional redistricting map, the Legislature's proposed map

would have been law, not the Enacted Map—and a Black opportunity district would exist in North Florida today.  If that veto was exercised with racially discriminatory intent, as the Court's opinion assumes, then the Enacted Map is the direct result of that racially discriminatory veto.  Under a proper *Arlington Heights* analysis, no amount of good faith from individual Senators and Representatives can overcome that problem.  *See Abbott v. Perez*, 138 S.Ct. 2305, 2327 (2018) (totality of the circumstances surrounding a challenged legislative enactment "must be weighed together").  Indeed, the Governor's veto is the but-for cause of the Enacted Map.  Governor DeSantis's actions here are more than sufficient to meet Plaintiffs' burden under *Arlington Heights*.

Indeed, the Supreme Court has held that plaintiffs need only show that discriminatory purpose was  a "motivating" factor behind a challenged legislative action—not the "'dominant' or 'primary' one"—in order to establish a constitutional violation.  *Arlington Heights*, 429 U.S. at 265.  *See also Velasquez v. Abilene*, 725 F.2d 1017, 1022 (5th Cir. 1984) ("Racial discrimination need only be one purpose, and not even a primary purpose, of an official act in order for a violation of the Fourteenth and Fifteenth Amendments to occur.") (citing *Arlington Heights*, 429 U.S. at 265).  It follows therefore that if a but-for cause of "a given legislative enactment" was taken with racially discriminatory intent—as it plainly was here— Plaintiffs' burden under *Arlington Heights* has been satisfied.  *Id.*

27

## CONCLUSION

For the reasons above, Plaintiffs respectfully request that their Motion for Reconsideration be granted, and that the Court make factual findings that Governor DeSantis acted with racially discriminatory intent, in violation of the Fourteenth and Fifteenth Amendments of the U.S. Constitution. If the Court so finds, then under the *Arlington Heights* analysis, it should enjoin operation of the Enacted Map and give the Legislature the first opportunity to draw a new map in time for the 2026 congressional election.

## **LOCAL RULE 7.1(B) CERTIFICATION**

Counsel for Plaintiffs has conferred with counsel for Defendant on Defendant's position on this motion.  Defendant opposes this request.

## **LOCAL RULE 7.1(F) CERTIFICATION**

Undersigned counsel certifies that this memorandum contains 7,367 words, excluding the case style, table of contents and table of authorities, and certifications.

Dated: April 24, 2024

Respectfully submitted,

*/s/ Gregory L. Diskant*

Gregory L. Diskant *(pro hac vice)*
H. Gregory Baker *(pro hac vice)*
Jonah M. Knobler (*pro hac vice*)
Catherine J. Djang *(pro hac vice)*
Alvin Li (*pro hac vice*)
Anna Blum (*pro hac vice*)
Newton Portorreal (*pro hac vice*)
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000
gldiskant@pbwt.com
hbaker@pbwt.com
jknobler@pbwt.com
cdjang@pbwt.com
ali@pbwt.com
ablum@pbwt.com
nportorreal@pbwt.com

29

Christopher Shenton (*pro hac vice*)
SOUTHERN COALITION FOR SOCIAL JUSTICE
1415 West Highway 54, Suite 101
Durham, NC 27707
(919) 323-3380
chrisshenton@scsj.org

Anthony P. Ashton (*pro hac vice*)
Anna Kathryn Barnes (*pro hac vice*)
NAACP OFFICE OF THE GENERAL COUNSEL
4805 Mount Hope Drive
Baltimore, MD 21215
Telephone: (410) 580-5777
aashton@naacpnet.org
abarnes@naacpnet.org

Henry M. Coxe III (FBN 0155193)
Michael E. Lockamy (FBN 69626)
BEDELL, DITTMAR, DeVAULT, PILLANS &
 COXE
The Bedell Building
101 East Adams Street
Jacksonville, Florida 32202
(904) 353-0211
hmc@bedellfirm.com
mel@bedellfirm.com

*Attorneys for Plaintiffs*

## __CERTIFICATE OF SERVICE__

I certify that on April 24, 2024, I electronically filed the foregoing with the Clerk of Court using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

*/s/ Gregory L. Diskant*
Gregory L. Diskant